## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT CLEVELAND

| | | |
|---|---|---|
| Kevin Keith, | : | Case No. |
| Petitioner, | : | *(This case is related to 1:18-cv-00047)* |
| -vs- | : | |
| Warden, | : | |
| Marion Correctional Institution, | | |
| | : | |
| Respondent. | | |
| | : | |

---

### Petition for Writ of Habeas Corpus under § 2254

---

Petitioner, Kevin Keith, pursuant to Article I, § 9 and Article III of the United States Constitution, as well as the Sixth and Fourteenth Amendments, 28 U.S.C. § 2241 *et seq.* (including 28 U.S.C. § 2254), 18 U.S.C. § 3006A, and all other applicable law, respectfully moves this Court for a Writ of Habeas Corpus declaring unconstitutional and invalid his convictions for Aggravated Murder, imposed by the Court of Common Pleas, Crawford County, Ohio, on May, 26, 1994, and ordering a new trial.

Respectfully Submitted,

/s/ James R. Wooley
James R. Wooley (003850)
Calland M. Ferraro (0093439)
Jones Day – Cleveland
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-7345
jrwooley@JonesDay.com
cferraro@JonesDay.com
Trial Attorney

And


/s/ Zachary M. Swisher
Zachary M. Swisher (0076288)
Sybert, Rhoad, Lackey Swisher, LLC
153 South Liberty Street
Powell, Ohio 43065
(614) 785-1811
zach@law153group.com

And

/s/ Rachel Troutman
Rachel Troutman (0076741)
Supervising Attorney, Death Penalty Dept
Office of the Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215
Rachel.Troutman@OPD.ohio.gov

And

/s/ James M. Petro
James M. Petro (0022096)
Attorney-at-Law
6573 Marissa Loop #405
Naples, FL 34108
Jimpetro73@gmail.com

Counsel for Petitioner



**Memorandum in Support**

## I.        Introduction

Kevin Keith is entitled to a writ of habeas corpus because his conviction is the result of the State's repeated suppression of material evidence. Keith was wrongly convicted for the aggravated murders of Marichell Chatman, Linda Chatman, and Marchae Chatman, and the attempted aggravated murders of Quanita Reeves, Quentin Reeves, and Richard Warren. At

trial, the State relied heavily upon the testimony of G. Michele Yezzo, forensic analyst with Ohio's Bureau of Criminal Investigation (hereinafter "BCI"), to provide the crucial link between Keith and the crime scene. BCI was identified by the prosecution as one of the three agencies involved in the investigation of Kevin Keith.

BCI had documented that it was a "consensus" among BCI analysts that analyst Yezzo's "findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." It was noted in Yezzo's personnel file that she had the "reputation of giving dept. answer [it] wants if [they] stroke her." This information, as well as evidence of Yezzo's racial bias, was documented before Yezzo testified against Keith. Keith did not learn of it until 22 years after he'd been convicted and sentenced to death, when a news article highlighted some of the details in Yezzo's personnel file.

The state courts denied Keith even the ability to file a motion on the merits about this violation of *Brady v. Maryland*, 373 U.S. 83 (1963). They faulted Keith for failing to uncover earlier the evidence that the State should have willingly provided him at the time of his trial in 1994. Moreover, despite denying Keith the ability to fully brief this *Brady* issue on the merits, the state court of appeals determined that the Yezzo evidence was immaterial. In making its determination, it failed to consider all of the suppressed evidence Keith had gathered and presented to the courts via *Brady* claims over the years—in 2004, 2007, 2010, and 2016—collectively.

Keith is entitled to the writ of habeas corpus.

## II.      Statement of Facts

At some time shortly after 8:45 p.m.[1] on February 13, 1994, a gunman entered a Bucyrus Estates' apartment and shot all six people inside. Three were killed: Marichell Chatrnan; her five-year-old daughter, Marchae; and Marichell's aunt, Linda Chatman. The other three victims survived: Marichell's boyfriend Richard Warren, and Marichell's young cousins, Quanita and Quinton Reeves.

### A.  Police believed Keith was the perpetrator and built a case around him.

The surviving adult, Richard Warren, escaped from the crime scene to a nearby restaurant where he told no less than four different witnesses—including a police officer—that he did not know who shot him. *See* Tr. 240, 305, 620, 623. The hospital security guard report, created the next day at 1:00 p.m., reflected Warren's description of the shooter: "The perpetrator whos [sic] name is still unknown is still at large. The only description of the perpetrator is that it is a black male approximately 6' 3" in hiegth [sic] and about 260 lbs." Ex. 1.

After Warren came out of surgery, the police called him and gave him four or five "Kevins" from which to choose. Tr. 353. Despite having initially told four witnesses that he did not know who shot him, Warren ultimately recalled that his shooter's name was "Kevin." It is unclear as to when or how he recalled the name, however. His nurse, John Foor, testified that Warren wrote the name down immediately upon coming out of surgery, at five a.m. the day after he was shot and that he called the police immediately to tell them. Warren denied that he wrote the name down; his hands were strapped down. Warren admitted on cross-examination that he did not know whether he or the police first mentioned the name "Kevin" as the person

---

[1] Richard Warren testified that Linda Chatman arrived at the apartment at "about 8:45," and the shooter arrived after that. Tr. 337-38.

4

who was the shooter. *See* Tr. 372 (Defense Counsel: "So you don't recall whether you mentioned the name to them or they mentioned it to you; do you?" Warren: "No, sir, I do not.").

But the police had immediately committed themselves to the fact that Keith was the shooter. One of the officers even testified that he brought up Keith's name at the crime scene that night. Tr. 790. At first, the suspicion seemed logical. The victims' family member, Rudel Chatman, was the informant for a cocaine drug raid that had occurred a couple weeks before, and Keith had been one of the eight people arrested in that raid.[2] Also, five witnesses told the police that they had seen a "large black man"—described as about 6' 1", 350 lbs. in the area. Keith was 6', 300 lbs. and one of the few black men in the small city of Bucyrus.

The police acted quickly: on February 15, less than two days after the shootings, Kevin Keith was arrested at his home in Crestline, Ohio. Bucyrus Chief of Police conducted a press conference after Keith's arrest, and he referenced carpet fibers, shoe prints, and shoes that had been collected as evidence and submitted to BCI. The Chief continued, "I don't want to say that we've made an arrest and now we're going to make the case, but we're still very interested in putting a lot of this evidence together." Ex. 2, Clip 1. Chief Beran explained, "What we have is some evidence that we have collected that we hope we will be able to link him to the crimes." Ex. 2, Clip 2.

**B. Evidence contradicted police theory, but Keith was already arrested.**

Weeks after Keith's arrest, however, the police discovered that the "large black man" described by those five witnesses was not Kevin Keith. See Tr. 752-53 (Captain Corwin acknowledged that they "determined it was Karie Walker," not Keith). And none of the witnesses had actually seen that man do anything criminal; they had all been describing a man

---

[2] Keith was charged with selling what equaled to less than 3 grams of crack cocaine.

who was simply a bystander at the scene. That bystander was Karie Walker, who had just moved in to the apartment complex a few days earlier.

      This was not the only reason that should have given the police pause about their quick decision to arrest Keith. Two days after Keith's arrest, seven-year-old surviving victim Quanita Reeves told her nurse that the person who shot them was "Bruce," who was "Daddy's friend." Tr. p. 735. Quanita then reiterated to detectives that "Daddy's friend Bruce" was the man who shot them. Tr. 715. The detectives showed her the photo lineup containing Keith's picture, and she was clear that "none" of the pictures were of the man who shot them. She was also clear that Keith was not the man she knew as "Bruce." *Id*. at 721.

      Then in March, BCI completed its analysis of the evidence collected by the Bucyrus Police. Despite Chief Beran's "hope" that the police collected carpet fibers, shoe prints, and shoes would "link [Keith] to the crimes," none of that evidence implicated Keith. Tr. 481, 48990; Yezzo deposition, p. 19-21, 26.

      Keith had an alibi that was supported by several people, including an uninterested party. Judith Rogers, the neighbor of Keith's girlfriend Melanie Davison, happened to notice Keith and Davison leaving Davison's apartment in Mansfield at about 8:45 p.m. that evening. Tr. 691. In other words, Rogers saw Keith at a location over a half an hour away from the crime scene at the same time the shootings occurred. Rogers was clear about the timing, because she recalled the television show she was watching and knew it came on at 8:30 p.m. *Id*.

      Around 9:00 p.m., Keith and Davison arrived in Crestline at the home of Keith's aunt, Grace Keith. Grace Keith testified to seeing Keith at her house around 9:00. Tr. 685. Yolanda Price, who was also at Grace's house at that time (*see* tr. 684), confirmed Keith was there. Ex. 3. Price also saw Davison waiting outside in the car. *Id*.

6

Davison recalled that she and Keith were at Gracie Keith's house in Crestline for about ten minutes and arrived back at Davison's Mansfield apartment at 9:25 p.m. Ex. 4. The sheer distance involved makes it impossible for Keith to have been the shooter. Keith was accounted for before, during, and after the shootings that took place at 8:45 p.m.

### C. Ohio BCI forensic analyst G. Michele Yezzo provided the crucial forensic evidence that implicated Keith.

The night of the shooting, Nancy Smathers told police she saw the person who was probably the shooter get into a car. She reported that the shooter got his car stuck in a snow bank and had to push the car out to escape. Tr. 381-85. She described the color of the car as "a white, cream, light yellow." Tr. 389. Based on her report, the police took impressions from the snow of the tire treads and a partial license plate print in the snow. Tr. 474-77.

The Bucyrus Police Department determined that the partial license plate impression in the snow was a "043." Approximately three weeks after the shootings, Keith's girlfriend Melanie Davison drove her grandfather's Oldsmobile Omega to visit Keith in jail. Because the police saw that the license plate on Davison's Omega was "MVR043," the police impounded the Omega as the car used in the crime.  But Davison's Omega was **not the** "white, cream, light yellow" of the getaway car as described by Smathers. Tr. 389.  It was green. Tr. 448, 449.  *See also* Ex. 5 (Color photo of Alton Davison's car)).

Smathers never identified Davison's car as the car she saw that night. *See* tr. pp. 379-402. Keith denied ever even having been in Davison's car.  The forensic testing on the inside of Davison's car supported Keith's claims—there was not a scrap of evidence inside the Omega linking it to Keith, to the crime, or to the scene. Yezzo Deposition, pp. 18-19, 27. Still, the prosecution maintained that Keith's association to Davison's granddaughter meant Keith had access to Davison's car. It did not matter that Davison's Omega was the wrong color.

The State submitted to BCI analyst Michele Yezzo pictures of Davison's Omega, tire track and license plate impressions from the scene, and photographs from the scene.  Yezzo concluded and ultimately testified that the snow impression "bears the numbers '043' and is set toward the driver's side of the car with spacing and orientation similar to the license plate 'MVR043' on [Davison's car]." State's Trial Ex. 1, attached here for convenience as Ex. 6.

The tire-track impressions from the scene did not match the tires on Davison's car, but because Alton Davison recalled putting different tires on the car in August, the State's theory became that Keith changed the tires (but not the license plate) on the Omega to avoid being linked to the scene.  Yezzo compared the snow tire track impressions to the Omega's previous brand of tires. Yezzo did not actually physically examine a tire to make this comparison but instead relied on the brochure picture of what the previous tire looked like. Dep. Tr. 22; Ex. 7. Yezzo testified that the tread designs from the tires that were previously on the Omega were similar in tread design to the tire imprints left at the crime scene. Dep. Tr. 23.  She explained her conclusion of "similar in tread design" in a way that implied the tire track impression she examined was indeed a *match* with the tire tread from the brochure.  Dep. Tr. 14, 24-25; *see also id*. at 25 ("[I]t's similarity is it would have originated from the Triumph 2000.").

Yezzo's testimony connecting the Omega's license plate and former tires to the crime scene was the forensic evidence that linked Keith to this crime.

The State also argued that a spent bullet casing, found outside the home of Fernelle Graham, pointed to Keith as the shooter. Graham lived in the house across from the General Electric plant, and because this is where Keith picked up his other girlfriend Zina Scott on the night of the murders, the State used it to link Keith to the crime. But the record refutes the purported link to Keith.

8

Ms. Graham testified that it was "a quarter to ten" when she looked out of her window and saw the trash on her sidewalk. Tr. 430. According to her testimony, the bullet casing was found with that trash. But Zina Scott testified that Keith picked her up at the GE plant 11 p.m. that night. If the trash and casing were outside Graham's house at 9:45, and Keith picked up Zina at 11 p.m., then the trash and bullet casing were there before Keith was in the area.

From crime to sentencing, only three-and-a-half months passed. Ultimately, Keith's death sentence was never carried out. On September 2, 2010, Governor Ted Strickland commuted Kevin Keith's death sentence to a life sentence, citing doubts about Keith's guilt as his reasoning for the commutation.

**D. Since his conviction, Keith has repeatedly discovered exculpatory or impeachment evidence that was suppressed by the State.**

**i. 2004: discovery of evidence that cast doubt on how the name "Kevin" came into the case**

In April 2004, a public records request led Keith to the handwritten notes that, according to the sworn testimony of John Foor, had supposedly been destroyed years ago. The notes were from Warren's hospital stay, and the name "Kevin" was written in handwriting different from the other handwritten notes that are clearly attributable to Warren. Warren's handwriting was nearly illegible, included misspelled words, and the words he wrote were haphazardly strewn across the pages. In contrast, the name "Kevin" was written neatly and clearly, and in handwriting that was the same as the words "Captain Stanley" and "Bucyrus Police."

**ii. 2007: discovery of evidence that strongly points to Rodney Melton as the shooter.**

In 2007, Keith uncovered compelling exculpatory information in a public records request to the Ohio Pharmacy Board. From late 1993 to mid-1994, Rodney and Bruce Melton had been leading a pharmacy burglary ring, in which they and their associates stole controlled substances

from pharmacies around Ohio.  The Ohio Pharmacy Board spearheaded and documented that criminal investigation, and the Galion Police Department participated in the investigation. Although the pharmacy burglary ring was unrelated to the Bucyrus Estates shootings, the investigatory materials provided detailed information about the Meltons' activities leading up to the Bucyrus Estates shootings.

In these documents, Keith learned that Rodney Melton not only had motive to injure the victims of the Bucyrus Estates shootings, but Melton also told a confidential informant two weeks before the Bucyrus Estates shootings that he had been paid to "cripple" Rudel Chatman, whose actions as a police informant were the motive behind the shootings.  *See* Tr. 830.  The suppressed documents also revealed the police reported that the Melton brothers had "spread the word that anybody that snitches on them would be killed."  Ex. 8, p. 8 (pharmacy board report).

The suppressed documents indicate that Melton and his associates knew about Rudel Chatman's status as an informant around the time of the Bucyrus Estates shootings. In an interview with the police, Melton's associate, Milton James Parker, told the police "we know about Rudell [sic], you know? You might as well just keep him under wraps or whatever you're gonna do with him, Jerry[3], you know? 'Cause he's done around here."  Ex. 9, p. 16 (Parker interview with police).

Moreover, Melton was seen around the area shortly after the shootings (Tr. 670); he had the same color of car the shooter drove (Tr. 675), and he insisted on using that car in his criminal activities.  Ex. 8, p. 11.  The license plate of his car matched the partial number the police lifted from the snow.  Tr. 679.  He knew the type of ammunition used.  Tr. 670.  He told police his car (which fits the physical description of the car seen at the crime scene) was broken down.  Tr. 671.  He gave the police two conflicting alibis for the time of the crime.  Tr. 673, Ex. 10 (Police

---

[3] "Jerry" is Detective Jerry Hickman.

Index Report p. 30).   He had motive to seek revenge on Rudel Chatman because Chatman was an informant regarding Melton's heroin sales. Ex. 11.  He was overheard at the hospital after the shootings stating that this happened because of Rudel's "snitching."  Tr. 758.  He had previously told a confidential informant that he would kill anyone who "snitched" on him.  Ex. 8, p. 8.  He told a confidential informant, two weeks before the shootings, that he had been paid $15,000 to "cripple" the person responsible (Rudel Chatman) for recent drug raids.  Ex. 8, p. 11.  Melton's brother told another confidential informant that Melton was paid to kill Rudel.  Ex. 9, p. 16.  Melton was known to wear the particular type of mouth-covering mask that the killer wore.  Ex. 12, p. 8 (Confidential Informant Voluntary Statement January 14, 1994).

These files support what Quanita Reeves, the 7-year-old survivor, initially told police: that the shooter was her "daddy's friend, Bruce."  Quanita likely got the right family, but the wrong brother.  Rodney and Bruce were inseparable and both were often with Quanita's father, as part of this pharmacy burglary ring.  It is more than plausible that Quanita had just gotten the Melton brothers' names mixed up.

These Pharmacy Board files further revealed that it was Melton's habit to wear a mask that covers his mouth because he has a noticeable gap between his front teeth. Ex. 12., p. 7, 8. Significantly, Quanita Reeves and Richard Warren both recalled that the man who shot them wore a mask or turtleneck that covered his mouth. Tr. 348, 716. Also, after Keith was arrested for the murders, Melton's accomplice in the pharmacy burglary ring told the police that Melton was paid to kill Chatman. Ex. 8, p. 11.

Significantly, these records reflect what Melton's own family members believed: that he was responsible for the crimes in this case.  Tr. pp.  695-702. They contacted Keith's trial attorney during the trial and told him that Melton is a "psychopathic killer."  Tr. p. 700.  Keith's

11

trial counsel presented this information to the attention of the judge and the prosecutor, but the jury never heard it.

Out of the presence of the jury, defense counsel and the prosecution discussed Melton's responsibility for other murders for which he had not been charged.  They argued over whether the State would charge Melton:

> Defense counsel:  Mr. Wiseman, are you charging [Melton] for the other two murders from years ago that I told you about yesterday?
>
> Prosecutor:  I don't know.  If there is evidence, sure, then I am going to charge him with them.
>
> Defense counsel:  I know this woman is telling the truth and he has murdered and killed those two men and I believe what she told me yesterday.
>
> The Court:  But she didn't witness them.
>
> Prosecutor:  And we can't prove it because he bragged to the family years ago.  You can't convict him of this.
>
> Defense counsel:  Even based on the fact the same gun was used to kill the guy in 1971.  So the murders go on.
>
> The Court:  I understand that, but we are dealing with this case now.

Tr. pp. 760-61.

> ### iii. 2010: discovery of evidence that the bullet casing was reportedly discovered elsewhere; evidence that undercuts the State's claim that Warren's nurse introduced the name "Kevin" into the case.

In 2010, Keith discovered the Bucyrus Police Department's logs that documented the station's incoming calls. Specifically, the logs show that no 5:00 a.m. phone call from Nurse Foor came into the station, despite the State's assertion that "John Foor called the Bucyrus Police Department. That is how the name Kevin found its way into the case." Tr. 835. The logs also showed that the bullet casing purportedly linking Keith to the crime scene may have

12

actually been found at McDonald's rather than where Keith picked up his girlfriend, as the State claimed.

Since before trial, Keith has challenged the Bucyrus Police Department's claim that the name "Kevin" first found its way into this case when surviving adult Richard Warren told his nurse, John Foor, that "Kevin" shot him. The State claimed that Foor called the police and relayed this information immediately, and that this led directly to Keith's arrest.

Keith submitted public records requests in 2007 to obtain evidence of phone calls between the police and Foor, but the Bucyrus Police Department told him that the call logs did not exist and that any recordings were destroyed. An unrelated lawsuit produced radio dispatch logs that included all entries from the day of the Bucyrus Estates shootings. In 2010, Keith received these logs and discovered that they showed no call from Warren's nurses to the police. He attempted to challenge his conviction based in part on *Arizona v. Youngblood* as the calls were destroyed. The Crawford County prosecutor opposed this motion, arguing again that Keith was at fault for not discovering this evidence sooner and alleging that he'd failed to establish bad faith on the part of the police department.

### iv. 2016: discovery of evidence of Yezzo's bias, mental imbalance, reputation among her peers as an expert who will "stretch the truth to satisfy a department."

In January 2016, counsel for Keith saw an article in the Cleveland Plain Dealer that referenced BCI analyst Yezzo, the expert who had linked Davison's car to the crime scene. Ex. 13. The article quoted from a memo written by a state supervisor about Yezzo: "Yezzo's findings and conclusions regarding the truth maybe [sic] suspect. She will stretch the truth to satisfy a department." *Id*. This triggered Keith's counsel to obtain Yezzo's personnel file from .

13

Yezzo's time at BCI. Keith had no knowledge of this information in Yezzo's personnel file until he read about it in the newspaper in 2016.

That file revealed a long history of mental instability and untrustworthy forensic analysis. In January 2009, Yezzo received the last of many verbal reprimands of her career as a forensic scientist with Ohio's Bureau of Criminal Investigation. It referred to her "interpretational and observational errors" as "failures that could lead to a substantial miscarriage of justice." Ex. 14. Yezzo tendered her resignation the following month. Ex. 15.

This was not the first time Yezzo's forensic conclusions were questioned by her superiors and peers. One example was in May 1989: a memorandum from the Assistant Superintendent to the Superintendent documented that the "consensus" was that Ms. Yezzo's "findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." Ex. 14, p. 2.

Yet another example occurred in summer of 1993. In the notes detailing the investigation of Yezzo for "threatening co-workers and failure of good behavior" (Ex. 17, p. 2), it was noted that Yezzo had a "reputation of giving dept. answer wants if [they] stroke her." Ex. 18, p. 12. In the same notes, it was recorded that the analysts reworking Yezzo's cases, due to her suspensions, questioned with Ms. Yezzo's conclusions on a blood analysis and a partial footprint analysis. *Id.*

Other documents indicate that Yezzo did not respond well to "peer review." Ex. 19. Yezzo had demonstrated hostile behavior on more than one occasion with more than one coworker, and at least one of those occasions came about during discussions of a peer review. Ex. 20. She was abusive verbally and physically to her co-workers, actually having attempted to physically assault at least two of her colleagues. *Id.* at 2, 3. She used racial slurs ("nigger bitch,"

"nigger in a woodpile") when addressing an African-American co-worker. *Id*. at 5, 7. By 1989, it was the "consensus of opinion" in her section at BCI that she "suffers a severe mental imbalance and needs immediate assistance." *Id*. at 8.

Then in 1993, less than a year before Yezzo testified against Keith, she was placed on Administrative Leave for "threatening co-workers and failure of good behavior." Ex. 17, p. 2. Yezzo had threatened that she was going to "kill some co-workers" on multiple occasions, which led to her suspension. *Id*. A hearing to determine the extent of Yezzo's suspension was stayed until May 26, 1994. Ex. 21. Less than two weeks before this hearing, on May 12, 1994, Yezzo testified against Keith via deposition, which was only allowed for material witnesses.

After learning about this in 2016, Keith's current counsel brought this information to the attention of the current Crawford County Prosecutor and met with him in April 2016. Prosecutor Crall indicated he wished to look into the information he was provided, and Keith's counsel agreed not to file a new trial motion until Crall had some time to look into it.

In June 2016, Keith's counsel met with former Ohio Attorney General (and former Lieutenant Governor) Lee Fisher. Fisher was the Attorney General during the time period that Keith was indicted, tried, and convicted. In his role as Attorney General, he was the "chief legal officer and chief law enforcement officer for the state of Ohio." Ex. 22, p. 1 He was, effectively, the person in charge of Yezzo, as BCI is a section under the Office of the Attorney General. *Id*. Fisher "also hired and supervised the Superintendent of BCI." *Id*. at 2.

Keith's counsel provided Fisher with documents from Yezzo's personnel file. Before that, Fisher had not known about this troubling information regarding Yezzo, because he had "relied upon the chain of command" and those in supervisory positions to appropriately handle personnel issues. *Id*. at 2. On July 1, Fisher provided an affidavit with his conclusions from

15

reading about Yezzo and from reviewing information about Keith's case. *See* Ex. 22 (incorporated herein in its entirety as if rewritten.)

Fisher found the information about Yezzo "very troubling," and "concerning due to the fact that the opinions of BCI's forensic analysts are relied upon by law enforcement, judges, and juries. The character of the analyst is important." *Id*. He expressed his belief that "Ms. Yezzo's opinions were very likely wrong and that the prejudice in [Keith's] case is very significant." *Id*. at 3. Fisher is "deeply concerned that Ms. Yezzo's conclusions and testimony led to a miscarriage of justice in Mr. Keith's case." *Id*.

Fisher would not only have prevented Yezzo from testifying against Keith, but he would have ordered another analyst to re-examine the evidence submitted to Yezzo. *Id*. Fisher recognized that the State had a duty to disclose to Keith this information about Yezzo: "Because Ms. Yezzo did testify as a witness for the State against Mr. Keith, the defense should have been notified about the information in her personnel file. It is my opinion that the State had a duty to disclose this information because it severely impacts Ms. Yezzo's credibility." *Id*.

Keith provided Prosecutor Crall with a copy of Fisher's affidavit on July 21, 2016. Counsel for Keith has left messages with and sent emails to Prosecutor Crall regularly since that time, but the only response he received from then on out was the State's court filings opposing Keith's attempt for a new trial.

On August 19, 2016, counsel for Keith met with Attorney General Mike DeWine and several members of his staff in order to discuss what was discovered in Yezzo's personnel file and how it impacted Keith. In advance of that meeting, Keith provided a copy of his prepared but unfiled new trial motion to Stephen Schumaker, Deputy Attorney General for Law Enforcement, for distribution to the meeting's attendees. The meeting concluded with the

Attorney General's indication that he wished to look into it, and Keith's counsel agreed not to file a new trial motion until the Attorney General had some time to do so. The day following the meeting, counsel exchanged emails with members of the Attorney General's Office, indicating that they would be in touch. Since that time, Counsel for Keith has not heard from the Attorney General's Office on this matter, and emails sent by Keith's counsel went unanswered.

<strong>v.    2017:  discovery of evidence of "bad faith"</strong>

On December 28, 2016, the Supreme Court of Ohio changed Ohio's public records law to provide defendants with a "clear legal right" to obtain the public records in their own cases. *State ex rel. Caster v. City of Columbus,* 89 N.E.3d 598, 610 (2016).  Accordingly, that same day, Keith made a public records request to obtain the Bucyrus Police Department's file in its entirety. On February 2, 2017, Keith received the response to his public records request.  Those records revealed a subpoena dated May 12, 1994, for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time."  Written on this subpoena were the words "Ignore For Now." Ex. 29.

At the time of trial, the Bucyrus Police Department deliberately ignored a defense subpoena for the department's phone records.  When Keith attempted to obtain them over a decade later, he was informed that the department had destroyed the records.  Then the State sat on this evidence that the police ignored the subpoena.

### E.  Keith's litigation of suppressed evidence

In addition to presenting the State an opportunity to correct this miscarriage of justice, Keith has, over the years, filed three New Trial Motions based on the newly discovered evidence from 2007, 2010, and 2016. The State has argued in response to the Keith's *Brady*

claims that he should have discovered the evidence sooner, and that it was not material to his case.

Despite abundant evidence that the wrong man was convicted for these shootings, no court has ever substantively reviewed this case. When Ohio Governor Ted Strickland commuted Keith's death sentence to life, he issued a statement lamenting that "the pending legal proceedings may never result in a full reexamination of his case, including an investigation of alternate suspects, by law enforcement authorities and/or the courts.  That would be unfortunate – this case is clearly one in which a full, fair analysis of all of the unanswered questions should be considered by a court."  (Governor's Statement Regarding Clemency Application of Kevin Keith, 9/2/10.)

Keith has been waiting for 24 years for that to happen.

### III.    Grounds for Relief

**First Ground for Relief**

**The State violated Kevin Keith's rights to due process when it failed to disclose critical impeachment evidence of a key witness.**

1.  A defendant's constitutional rights are violated when the State suppresses favorable evidence that is material to his case. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). When determining prejudice, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995).

2.  The "*Brady* duty extends to impeachment evidence as well as exculpatory evidence." *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *Kyles,* 514 U.S. at 433. "Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood*, 547 U.S. at 869-70 (internal citations omitted).

3.  *Brady* is implicated even in cases where the individual prosecutor does not have personal knowledge of favorable evidence in the State's possession and thus fails to disclose it to the

defendant. This is because the State has a duty to learn of evidence "known to others acting on the government's behalf in a case." *Kyles*, 514 U.S. at 437–38.

4.  The State identified BCI as one of the government agencies involved in the investigation of Keith.

5.  BCI had documentation that would have been significant impeachment evidence of Yezzo.

6.  BCI's files contained a memorandum drafted by the Assistant Superintendent stating that "Yezzo's 'findings and conclusions regarding the truth maybe [sic] suspect. She will stretch the truth to satisfy a department.'" Ex. 16, p. 2.

7.  In August 1993, less than a year before Yezzo testified against Keith, she was placed on Administrative Leave for "threatening co-workers and failure of good behavior."  Ex.  17, p. 2. A hearing to determine the extent of Yezzo's suspension was stayed until May 26, 1994— a couple of weeks after her testimony at Keith's trial.  Ex. 21.  In the investigation of the complaints against Yezzo, it was noted that Yezzo had a "reputation of giving dept. answer wants if [they] stroke her."  Ex. 18, p. 12.  The same notes recorded that the analysts reworking Yezzo's cases, due to Yezzo's suspension, questioned with Yezzo's conclusions on a blood analysis and a partial footprint analysis. *Id.*

8.  The State knew that the "consensus of opinion" in her section at BCI was that she "suffers a severe mental imbalance and needs immediate assistance." Ex. 16, p. 1.  It knew she had been abusive verbally and physically to her co-workers, actually having attempted to physically assault at least two of her colleagues.  Ex. 20, p. 2, 3.  And it had documented her use of racial slurs ("nigger bitch," "nigger in a woodpile") when addressing an African-American co-worker.  *Id.* at. 5, 7.

9.  Keith was never given the opportunity to confront Yezzo about her biases, because he was never informed about the information in Yezzo's personnel file.  BCI supervisors and Yezzo's colleagues knew that Yezzo's findings were "suspect" and that she could be influenced by law enforcement in her conclusions. Ex. 16, p. 2; Ex. 18, p. 12. But no one from the State prevented her testimony, and the State did not inform the defense. The State had an obligation to disclose this impeaching information about Yezzo.

10. On May 12, 1994, Ms. Yezzo provided the critical testimony against Keith. Yezzo issued her report two months earlier, linking Keith's girlfriend's grandfather's car to the crime scene by tire tracks and a partial license plate impression. Yezzo rendered her conclusions after receiving input from Bucyrus Police Captain Michael Corwin.  Ex. 23.  There was no peer review of her findings.

11. Yezzo testified in a deposition on May 12, 1994, concerning the imprint evidence from the crime scene. The Criminal Rules allow for a witness's testimony "be taken by deposition" only when that witness is unavailable at trial and when her "testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice." Crim. R. 15(A). In 1994 at the time of Keith's trial, the State argued and the trial court found Yezzo's testimony so material that *justice* required allowing her to testify by deposition.

12. Yezzo testified that she was "able to identify the numbers "043" in the region of the license plate area."  Dep. Tr. 13. The numbers were "similarly placed on the vehicle as the license plate is placed on [Alton Davison's car]."  *Id.*

13. Yezzo also testified that the tread designs from the tires that were previously on Alton Davison's car were similar in tread design to the tire imprints left at the crime scene.  Dep.

Tr. 23.  Yezzo did not actually physically examine a tire to make this comparison; she relied on a picture from a brochure to make her determination.  Dep. Tr. 22.

14. Alton Davison's granddaughter was Keith's girlfriend, and she drove her grandfather's car on occasion. The prosecution maintained that Keith's association to Davison's granddaughter meant Keith had access to Davison's car.  Davison's granddaughter never testified.

15. Keith denied ever being in Davison's car, and Yezzo conducted forensic testing on the inside of that car. *See* Dep. tr, pp. 18-19, 27.  As the prosecutor put it, they attempted to "gather every shred of possible evidence in this case."  Tr. 853.  Still, there was not a scrap of evidence inside the car that linked it to Keith or to the scene.  Dep. Tr., pp. 18-19, 27. Without evidence from inside the car linking Keith to the scene, the State had to rely on Yezzo's analysis of the tire treads and the license plate impression left in the snow.

16. The prosecution's evidence linking Davison's car to the crime scene, as well as linking Davison's car to Keith, strengthened its case considerably. The police had found no fingerprint, blood, or DNA evidence that linked Keith to the car or crime scene.

17. Yezzo's conclusions allowed the State to bolster the purported eyewitness testimony provided by Warren and Smathers. The State argued in closing that neither Warren nor Smathers, the two witnesses who identified Keith as the shooter, had "the motive or opportunity to fabricate. Their statements are corroborated by each other and by other witnesses. *There is no way they can be lying because their statements are backed by the facts as we have seen from other sources*." Tr. 841 (emphasis added). The State went on to argue that "Yezzo gave us several exhibits which I have been referring to." *Id.* at 840. Yezzo was an "other source" – a forensic expert bearing the court's imprimatur – that the State used to claim that Warren and Smathers were telling the truth.

22

18. Yezzo was a material expert witness at trial, and the State relied heavily on her conclusions to connect Keith to this crime. Had the State given Keith her personnel file as it was required to do, he would have been able to severely undermine her conclusions and her credibility. Without her unimpeached testimony linking Keith to this crime and bolstering questionable witness identification of Keith as the shooter, the outcome of this case very likely would have been different.

19. On March 9, 1994, Captain Corwin faxed Yezzo a receipt for the type of tires purchased by Alton Davison the previous year and put on his car, and he also sent her a brochure picture of the tires. Ex. 22.  Corwin specifically pointed out to her which tire picture in the brochure was the tire previously put on the car.  *Id.* at 3-5.  He wrote a note to Yezzo, dated March 11, 1994, that he "hope[d] this will do the trick for us." *Id.* at 6.

20. Five days later, Yezzo rendered her conclusion—based upon the brochure pictures of tires—that the tires formerly on Davison's car were similar in tread design to the tire tracks at the scene.

21. Keith hired retired FBI agent William Bodziak, who specializes in forensic examinations of footwear and tire tread impressions, to review Yezzo's work and conclusions in this case. Bodziak determined that Yezzo used incorrect procedures in conducting her analysis, that Davison's bumper was not consistent with the markings left in the snow, that Yezzo's tire analysis was useless because she did not compare the impressions to an actual tire, and that Rodney Melton's car could not be excluded as the car that caused the impressions left in the snow. Ex. 24.

22. Bodziak determined that Alton Davison's car bumper was **not consistent** with the car bumper impressions left in the snow bank at the crime scene. "The photographs referred to

by the State as the bumper impressions in the snow bank are not consistent with the profile of the front of Alton Davison's car." Ex. 24, p. 2. "The license plate on Davison's car was mounted fairly flush with the bumper." *Id.* "Contact with the license plate to the degree that it pushed the snow enough to produce an impression, would also have produced impressions of the remainder of the bumper." *Id.* "No evidence of the other areas of the bumper appear in the photographs; instead, the snow is undisturbed in those areas." *Id.*

23. Bodziak's conclusions about Davison's car and the crime scene, rendered after reviewing the same evidence that Yezzo reviewed, are quite different than Yezzo's. Ex. 24, pp. 1-2. The State would not have had the car and license plate evidence implicating Keith if the forensic analysis had been conducted properly.

24. There is a strong case to be made against Rodney Melton. The Bucyrus Police Department never investigated him, as they quickly settled on Keith as their suspect. It was Yezzo's conclusions, however, that allowed them to disregard one of the biggest pieces of evidence against Melton: his light yellow car with the license plate 043LIJ. *See* Ex. 8, pp. 11, 31.

25. Nancy Smathers had seen the shooter get into a cream or light yellow car and then get stuck in the snow bank, and the police later found what they determined to be a "043" impressed in the snow bank from the car's license plate. Tr. 388, 389. According to confidential informant working with the Galion Police Department, Rodney Melton insisted on using his Chevy Impala with a new yellow paint job in their criminal transactions. Ex. 8, p. 11. This car had two license plates registered to it: JKL218 and 043LIJ. *Id.* at 31.

26. The Bucyrus Police Department quickly ruled out Melton's car because the numbers came before the letters in Melton's license plate. Yezzo had concluded that the snow impression of the license plate had "spacing and orientation similar to the license plate 'MVR043' on

[Davison's car]." State's Trial Ex. 1, attached here as Ex. 6.  Based on that, the police officers determined it could not have been a license plate in which the numbers came first.

27. Had the police not relied on the "spacing and orientation" of the numbers, they would not have been able to rule out Melton's car by the organization of the numbers and letters. Bodziak's findings demonstrate that the police were wrong to exclude Melton's car as the getaway car.  As Bodziak concluded, "[B]ased on the limited detail, a distinction could not be made between a license plate that reads 'MVR043' versus others that have '04' somewhere on the plate."  Ex. 24, p. 4.

28. To determine materiality, "suppressed evidence [must be] considered collectively, not item by item."  *Kyles,* 514 U.S. at 436.  Keith's case "involves additional *Brady* violations that were not considered by [any] court" in previous filings.  *Schledwitz v. United States,* 169 F.3d 1003, 1012 (6th Cir. 1999).  All of the *Brady* claims he has raised should be evaluated together, not item by item.

29. Prior to discovering the Yezzo file in 2016, Keith has unsuccessfully litigated his discovery of material evidence suppressed by the State on several prior occasions. Keith has no control over when he finds the evidence hidden by the State, and he could not have litigated it all together.

30. First, Keith litigated his 2004 discovery of handwritten hospital notes that undermine the State's claim that Richard Warren first introduced the name "Kevin" into this case.  At trial, Nurse John Foor testified that he witnessed Warren writing down the name "Kevin" as his attacker, but he claimed he destroyed the document.  In 2004, a public records request led Keith to the handwritten notes that, according to the sworn testimony of John Foor, had supposedly been destroyed years ago. The notes were from Warren's hospital stay, and the

name "Kevin" was written in handwriting different from the other handwritten notes that are clearly attributable to Warren. Warren's handwriting was nearly illegible, included misspelled words, and the words he wrote were haphazardly strewn across the pages. In contrast, "Kevin" was written neatly and clearly, and in handwriting that was the same as the words "Captain Stanley" and "Bucyrus Police." Ex. 25.

31. Next, in 2007, Keith uncovered suppressed documents from an investigation spearheaded by the Ohio Pharmacy Board. In these documents, Keith learned that:

    a.  Rodney Melton had "spread the word that anybody that snitches on [him and his brother Bruce] would be killed;" Rudel Chatman was an informant on the Meltons; and Melton had told a woman two weeks before the shootings that "he had been paid $15,000 to cripple 'the man' who was responsible for the [drug] raids in Crestline, Ohio last week." Ex. 8, p. 8, 11. As noted earlier, revenge for the Crestline drug raids was the motive the State had attributed to *Keith*.

    b. Rodney and Bruce Melton were always together and were a part of the same criminal enterprise with Demetrius Reeves, the father of surviving victims Quanita and Quentin Reeves.  (Quanita had reported to her nurse and Detectives that the shooter was her "Daddy's friend, Bruce.")

    c. A confidential informant told police that Melton insisted on using his Chevy Impala "with a new yellow paint job" in his criminal transactions.  The license plates that were registered to Melton's light yellow Impala were JKL218 and <u>043</u>LIJ. Ex. 8, p. 31 (emphasis added).

    d. It was Melton's habit to wear a mask that covers his mouth because he has a noticeable gap between his front teeth. Ex. 12, p. 7, 8. Significantly, Quanita Reeves

and Richard Warren both recalled that the man who shot them wore a mask or turtleneck that covered his mouth. Tr. 348, 716.

   e.   After Keith was arrested for the murders, Melton's accomplice in the pharmacy burglary ring told the police that Melton was paid to kill Chatman. Ex. 8, p. 11.

32. In 2010, Keith discovered radio dispatch logs from the Bucyrus Police Department. Ex. 26. The Bucyrus Police Department stated in an unrelated case that these radio dispatch logs also served as daily phone logs.  These logs revealed:

   a.  There is no 5:00 a.m. phone call logged from Nurse Foor to the police.

   b.  The call that came into the station regarding Graham's finding of a bullet casing was different than her testimony.  Graham testified she found a bullet casing in front of her home, which was near where Keith's girlfriend worked. Tr. 428. But the corresponding entry on the Bucyrus Police radio dispatch logs shows that she "thinks she may have found it in the McDonalds area."  Ex. 26, p. 3.

33. Finally, in 2016, Keith discovered the Yezzo evidence that forms the basis of the requested relief in this petition. While discovery of the Yezzo evidence is worthy of relief on its own, it cannot be examined in isolation from the other suppressed evidence in this case that Keith discovered previously.

**Second Ground for Relief**

**The State violated Kevin Keith's due process rights when the police destroyed evidence and then suppressed documents demonstrating that it acted in bad faith.**

34. "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *California v. Trombetta*, 467 U.S. 479, 486 (1984). Therefore, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

35. Since before trial, Keith has maintained that the State used impermissibly suggestive techniques to ultimately get Warren to "recall" that his shooter's name was Kevin. They gave a man—who had initially told four different people he didn't know who shot him and that the man was masked—a name lineup of "Kevins" to choose from.

36. At trial, the State responded by claiming it was Warren who first used the name "Kevin," when he wrote it to his nurse—John Foor—upon coming out of surgery. The prosecutor claimed "John Foor called the Bucyrus Police Department. That is how the name Kevin found its way into the case." Tr. 835. The State claimed that Foor called the police and relayed this information immediately, and that it was only at that point that the police provided Warren with a name lineup of "Kevins." But Warren himself testified that he did not know whether he or the police first mentioned the name Kevin.

37. At trial, Keith cross-examined Foor about his claim that, upon coming out of surgery, Warren wrote down the name Kevin. Keith pointed out the absurdity that Foor would have questioned a post-surgical patient in ICU about who shot him, obtained a written name, and then—as Foor claimed he did—**thrown away** the documentation of it. Keith also pointed out

to Foor that Warren himself denied that he wrote the name down; Warren had pointed out that his hands were strapped down while he was intubated.  To that, Foor simply said, "Well, he did write something down." Tr. 779.

38. Because police officers testified at Keith's trial that the police department's system automatically recorded all incoming calls, Keith had repeatedly attempted over the years to obtain confirmation of Foor's call to police. Keith was told that "[t]he recorded phone call from Nurse Foor was not copied for the prosecution or the defense at that time," and the recording has been destroyed.  Ex. 27.

39. An unrelated lawsuit revealed that, at the time of the crime, it was the practice of the Bucyrus Police Department to prepare a "contemporaneous radio log" that recorded information about the police station's phone calls. Ex. 28, Proposed Findings of Fact and Conclusions of Law of Respondents, City of Bucyrus, Daniel F. Ross, and Kenneth Teets, p. 2. According to David Robertson, the Bucyrus Police Department's records administrator from 1990 to 1996, "the dispatcher would answer the call and then she would put down the time of the call, who called, and who she assigned the call to."  *Id.*

40. In 2010, Keith obtained the radio dispatch logs.  They showed no call from Warren's nurses to the police. Ex. 26.

41. Keith attempted to challenge his conviction with these radio logs based in part on *Arizona v. Youngblood,* 488 U.S. 51, 58 (1988).  The calls were destroyed, and had they been produced, he would have been able to demonstrate that Foor's testimony was false. That would have cast further suspicion on the police department's act of providing Warren—medicated and just out of surgery—with four "Kevins" from which to choose.  It would have demonstrated the lack of reliability in Warren's "memory" of hearing the name "Kevin."

29

42. The State opposed Keith's *Youngblood* claim, disputing that the radio logs are the equivalent to the phone records, and arguing that Keith failed to establish bad faith on the part of the police department. Keith's *Youngblood* claim was denied.

43. On December 28, 2016, Keith made a public records request for the Bucyrus Police Department's complete file on his case.  On February 2, 2017, Keith received a copy of the Bucyrus Police Department's file. Those records revealed a subpoena dated May 12, 1994, for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time."  Written on this subpoena were the words "Ignore For Now." Ex. 29.

44. At the time of trial, Keith's defense attorney requested the phone records. Upon receipt, Bucyrus Police Department deliberately ignored a defense subpoena for the department's phone records.   Then, the police department destroyed those phone records. This demonstrates bad faith.

45. By suppressing this subpoena, the State prevented Keith from demonstrating that the police acted in bad faith by destroying the phone records. They refused to comply with a defense subpoena for the records at the time of trial.  Not only did they refuse to comply, but they then destroyed the evidence, despite knowing the defense requested it.

46. By suppressing this evidence, the State forced Keith to ask reviewing courts to infer bad faith when there was hard evidence in the police file.

**IV.    Keith's habeas petition is not "successive."**

"A habeas claim is second or successive if it was ripe for review when the first habeas petition was filed." *In re Tibbetts*, 869 F.3d 403, 406 (6th Cir. 2017) (citing *Panetti v. Quarterman,* 551 U.S. 930, 947 (2007). Keith could not have raised the habeas claims set forth in this petition in his initial habeas petition or in any prior habeas petitions. That is because the State at all times prior to, during, and after his trial hid the material evidence contained within Yezzo's file and suppressed the subpoena.

"Although Congress did not define the phrase 'second or successive,' as used to modify 'habeas corpus application under section 2254,' §§ 2244(b)(1)-(2), it is well settled that the phrase does not simply refe[r] to all § 2254 applications filed second or successively in time." *Magwood v. Patterson*, 561 U.S. 320, 331-32 (2010) (internal citations omitted). Keith has already fully litigated one federal habeas petition under § 2254, but that does not make this petition successive and subject to the standard under 28 U.S.C. § 2244(b)(1). The Supreme Court has rejected the argument that a habeas petition filed second in time must automatically be treated as successive. *Panetti v. Quarterman,* 551 U.S. 930, 944 (2007) (citing *Stewart v. Martinez-Villareal,* 523 U.S. 637, 643 (1998) ("The State argued that because the prisoner 'already had one fully-litigated habeas petition, the plain meaning of § 2244(b) … requires his new petition to be treated as successive.' We rejected this contention.") The statutory phrase "second or successive" is a term of art in the habeas context, not a mere mathematical computation.

The Sixth Circuit has, accordingly, recognized that a subsequent petition is not necessarily "second or successive" under AEDPA. For example, in *In re Salem*, 631 F.3d 809, 813 (6th Cir. 2011), the Court found that Salem's subsequent habeas application was not

31

"successive" and should be treated as a continuation of her initial habeas application.  *Salem*, 631 F.3d at 813.  *See also In re Bowen*, 436 F.3d 699, 704 (6th Cir. 2006).

"Ripeness" is the key to determining whether a habeas claim is successive.  As noted earlier, Keith did not have an inkling about Yezzo's documented biases until January 2016 when the Cleveland Plain Dealer published an article about her.  At that point, Keith worked to obtain and review all of Yezzo's available personnel files.

Keith completed the file review at the end of February 2016, and in March 2016, he brought this information to the attention of the current Crawford County Prosecutor Matthew Crall.  Prosecutor Crall indicated he wished to look into the information he was provided, and Keith's counsel agreed not to file a new trial motion until Crall had some time to look into it.

In June 2016, Keith's counsel met with former Ohio Attorney General (and former Lieutenant Governor) Lee Fisher. Fisher was the Attorney General during the time period that Keith was indicted, tried, and convicted. In his role as Attorney General, he was the "chief legal officer and chief law enforcement officer for the state of Ohio." Ex. 19, p. 1 He was, effectively, the person in charge of Yezzo, as BCI is a section under the Office of the Attorney General. *Id*. Fisher "also hired and supervised the Superintendent of BCI." *Id*. at 2.

Fisher provided an affidavit stating that he would not only have prevented Yezzo from testifying against Keith, but he would have ordered another analyst to re-examine the evidence submitted to Yezzo. *Id*. Fisher recognized that the State had a duty to disclose to Keith this information about Yezzo: "Because Ms. Yezzo did testify as a witness for the State against Mr. Keith, the defense should have been notified about the information in her personnel file. It is my opinion that the State had a duty to disclose this information because it severely impacts Ms. Yezzo's credibility." *Id*.

Keith provided Prosecutor Crall with a copy of Fisher's affidavit on July 21, 2016. Counsel for Keith left messages with and sent emails to Prosecutor Crall regularly after that time, but Crall did not respond.

On August 19, 2016, counsel for Keith met with current Attorney General Mike DeWine and several members of his staff in order to discuss what was discovered in Yezzo's personnel file and how it impacted Keith. In advance of that meeting, Keith provided a copy of his prepared but unfiled new trial motion to Stephen Schumaker, Deputy Attorney General for Law Enforcement, for distribution to the meeting's attendees. The meeting concluded with the Attorney General's statement that he wished to look into it, and Keith's counsel agreed not to file a new trial motion until the Attorney General had some time to do so. The day following the meeting, counsel exchanged emails with members of the Attorney General's Office, indicating that they would be in touch. Since that time, Counsel for Keith has not heard from the Attorney General's Office on this matter, and emails sent by Keith's counsel went unanswered.

On October 28, 2016, Keith stopped waiting and filed his *Brady* claim based on the Yezzo documents. At all times since then, Keith has been litigating the trial court's denial to consider his *Brady* claim on the merits. As for the subpoena on which a Bucyrus Police Officer wrote "Ignore for Now," Keith has long suspected that the State purposely withheld and then destroyed the station's phone call records. But it was not until February 2, 2017, that Keith received the Bucyrus Police Department's file in its entirety. Included in those documents was the subpoena.

Keith's instant petition is not successive, it is not subject to 28 U.S.C. § 2244(b), and his claims are reviewable. *In re Tibbetts*, 869 F.3d at 405 (citing *Magwood* 561 U.S. at 330-31) ("If, however, [the] application [is] not second or successive, it [is] not subject to § 2244(b) at all, and

[the] claim [is] reviewable.")  As the Sixth Circuit has explained, court "generally apply the abuse of the writ doctrine to determine whether a petition is second or **successive**." *Id.* citing *In re Bowen*, 436 F.3d 699, 704 (6th Cir. 2006). "Under the abuse of the writ doctrine, a numerically second petition is 'second' when it raises a claim that could have been raised in the first petition but was not so raised, either due to deliberate abandonment or inexcusable neglect." *Id.* (citing *McCleskey v. Zant*, 499 U.S. 467, 489 (1991)).

 "In *Sanders v. United States*, 373 U.S. 1 (1948), the Supreme Court explained abuse of the writ: If a prisoner deliberately withholds one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground. … Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless, piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay." *Bowen*, 436 F.3d at 704.

The purpose of this instant petition is certainly not to "vex, harass, or delay."  In fact, Keith is no longer under a sentence of death, so a delay for him serves no purpose.  Furthermore, the issues contained in this petition are substantive, meritorious issues.

"The government has the burden of pleading abuse of the writ, and that once the government makes a proper submission, the petitioner must show that he has not abused the writ in seeking habeas relief." *McCleskey v. Zant*, 499 U.S. 467, 477 (1991).  "Under the abuse-of-the-writ doctrine, a subsequent petition is 'second or successive' when it raises a claim that was, or could have been, raised in an earlier petition." *James v. Walsh*, 308 F.3d 162, 167 (2d Cir. 2002).  The abuse-of-the-writ standard has been used by the majority of the circuits in determining whether to label a petition successive.  *See id.*; *Benchoff v. Colleran*, 404 F.3d 812,

34

817 (3d Cir. 2005) ("[W]e find that the abuse of the writ doctrine retains viability as a means of determining when a petition should be deemed 'second or successive' under the statute."); *Crouch v. Norris*, 251 F.3d 720, 723 (8th Cir. 2001) ("That Crouch's proposed petition is subject to § 2244(b)'s limitations is, however, not dispositive. Although Crouch's proposed petition neither relies on a new rule of constitutional law nor identifies newly-discovered facts that establish his innocence of the underlying sex offenses, Crouch may nevertheless be free to file his proposed petition in the district court if it is not 'second or successive'"); *Hill v. Alaska*, 297 F.3d 895, 898 (9th Cir. 2002) ("That a prisoner has previously filed a federal habeas petition does not necessarily render a subsequent petition 'second or successive'").

Keith has been the victim of the State's successful ability to suppress material evidence for decades. Had the State disclosed this evidence as the Constitution requires, Keith would not have been convicted, and would not need to seek relief from this Court. He has not abused the writ.

## V.     Conclusion

Kevin Keith has been imprisoned for 24 years for crimes he did not commit.   Due to State misconduct, this Court never had the opportunity to review some of Keith's most compelling claims. Keith has filed these claims timely and upon discovering them. As such, he has not abused the writ of habeas corpus, and this is not a successive petition.

Keith is entitled to the writ of habeas corpus, and to a new trial.

Respectfully Submitted,

/s/ James R. Wooley
James R. Wooley (003850)
Calland M. Ferraro (0093439)
Jones Day – Cleveland
901 Lakeside Avenue
Cleveland, Ohio 44114

35

(216) 586-7345
jrwooley@JonesDay.com
cferraro@JonesDay.com
Trial Attorney

And

/s/ Zachary M. Swisher
Zachary M. Swisher (0076288)
Sybert, Rhoad, Lackey Swisher, LLC
153 South Liberty Street
Powell, Ohio 43065
(614) 785-1811
zach@law153group.com

And

/s/ Rachel Troutman
Rachel Troutman (0076741)
Supervising Attorney, Death Penalty Dept
Office of the Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215
Rachel.Troutman@OPD.ohio.gov

And

/s/ James M. Petro
James M. Petro (0022096)
Attorney-at-Law
6573 Marissa Loop #405
Naples, FL 34108
Jimpetro73@gmail.com


Counsel for Petitioner

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was electronically filed this 19th day of March, 2018. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ Rachel Troutman
Rachel Troutman (0076741)
Counsel for Petitioner