**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **KEVIN KEITH,** | : | |
| | : | |
| **Petitioner,** | : | **CASE NO.  1:18-cv-634** |
| | : | |
| **v.** | : | |
| | : | **Judge Solomon Oliver, Jr.** |
| **LYNEAL WAINWRIGHT, WARDEN** | : | |
| | : | **Magistrate Judge James R. Knepp, II** |
| **Respondent.** | : | |

---

**WARDEN'S RETURN OF WRIT TO KEITH'S**
**SUCCESSIVE HABEAS PETITION (ECF.1)**

---

The Warden, respectfully opposes Petitioner Kevin Keith's Successive Petition for Writ of Habeas Corpus. Pet., ECF.1 PAGEID#:1-37. For the reasons contained in the attached memorandum, the Successive Petition must be denied.

Respectfully submitted,

**DAVE YOST**
**Ohio Attorney General**

/s/ *Brenda S. Leikala*

**Brenda S. Leikala (0072635)**
Senior Assistant Attorney General
Criminal Justice Section, Capital Crimes Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-3428
(614) 995-1930; (877) 469-0567 (Facsimile)
Brenda.Leikala@ohioattorneygeneral.gov
**COUNSEL FOR RESPONDENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................v

I.    CERTIFICATION OF CUSTODY AND GENERAL DENIAL ...........................1

II.   STATEMENT OF FACTS ...............................................................................2

III.  PROCEDURAL HISTORY .............................................................................5

IV.  28 U.S.C. §2244(b) ........................................................................................14

   A.  Standard of Review ....................................................................................14

   B.  Keith cannot satisfy 28 U.S.C. §2244(b) ...................................................17

      1.  Diligence under §2244(b)(2)(B)(i) .......................................................18

         a.  Yezzo personnel file ........................................................................18

         b.  Police Department subpoena............................................................19

         c.   Conclusion ....................................................................................20

      2.  Actual innocence under §2244(b)(2)(B)(ii) ..........................................20

         a.  Legal standard ..................................................................................20

         b.  The three-steps of analysis...............................................................23

           (i)  Evidence introduced at trial .........................................................23

              (a)    Events leading up to the murders................................................23

              (b)    Warren identified Keith as the shooter. .....................................25

              (c)    Nancy Smathers identified Keith. ...............................................27

              (d)    Nancy Smathers described the vehicle she saw flee the scene. ...................28

              (e)    Police found the imprint of "043" and tire tracks in the snow bank............30

              (f)    Police recover evidence from the murder scene. ...............................31

              (g)    Police recover a shell casing across from the General Electric plant on the other side of town..................................................................................32

(h)     Police arrest Keith's other girlfriend, Melanie Davison, in a 1982 Oldsmobile Omega with a license plate containing "043." ........................................................ 33

(i)     1982 Oldsmobile Omega matched Ms. Smathers' description. ....................... 34

(j)     The license plate on the Omega was consistent with the impression in the snow. 35

(k)     The tires on the Omega were not the same as those the owner had purchased six months before the murders. ................................................................. 36

(l)     Keith's alibi did not hold up to scrutiny. ........................................... 37

(m)     In addition to an alibi, Keith suggested to the jury several "alternate suspects" that he alleged committed the murders, including Rodney Melton. ......... 38

(ii) The evidence the State allegedly improperly withheld in violation of *Brady v. Maryland.* ....................................................................................... 40

(a)     Keith's newest allegations as contained in his current petition ................... 40

(b)     Prior allegations ............................................................. 41

(iii) Even in light of the allegedly suppressed evidence, Keith still cannot establish that no reasonable juror would have found him guilty. ....................................... 42

V.    ALTERNATIVE DEFENSES ............................................................ 45

A.   Keith's petition violates the AEDPA's one-year statute of limitations and no tolling provision exists to save his claims. .......................................................... 46

1.   Keith's claims are barred by the AEDPA statute of limitations ................... 46

2.   Statutory tolling cannot render Keith's petition timely ............................ 47

3.   Keith cannot establish entitlement to equitable tolling ............................ 51

a.   No extraordinary circumstance prevented diligent presentation ............. 51

b.   No showing of actual innocence equitable tolling ................................... 53

B.   Keith's claims are procedurally defaulted and lack merit. ......................... 54

1.   Standard ....................................................................... 54

2.   Application ...................................................................... 56

3.   Keith cannot establish cause and prejudice to excuse his default, nor can he establish a fundamental miscarriage of justice has occurred. ................................. 58

4.   Keith's claims lack merit ........................................................ 61

VI.    CONCLUSION ........................................................................ 65

CERTIFICATE OF SERVICE ......................................................... 65

APPENDIX ........................................................................................ 66

State Court Record Citations  ............................................. 66

Evidence of Guilt Chart ........................................................ 69

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Siebert*,
   552 U.S. 3 (2007)....................................................................................................49, 50

*Artuz v. Bennett*,
   531 U.S. 4 (2000)....................................................................................................48, 49

*Atkins v. Chappell*,
   No. CV 13-9576 PA(SS), 2016 U.S. Dist. LEXIS 23306 at *14 (C.D. Cal. Jan.
   22, 2016) .................................................................................................................18

*Barker v. Yukins*,
   199 F.3d 867 (6th Cir. 1999) ..................................................................................63

*Beard v. Kindler*,
   130 S. Ct. 612 (2009)..............................................................................................58

*Benchoff v. Colleran*,
   404 F.3d 812 (3d Cir. 2005)....................................................................................16

*Bennett v. United States*,
   119 F.3d 468 (7th Cir. 1997) ..................................................................................16

*Bobby v. Dixon*,
   565 U.S. 23 (2011)..................................................................................................62

*Bousley v. United States*,
   523 U.S. 614 (1998)................................................................................................58

*Brady v. Maryland*,
   373 U.S. 83 (1963).........................................................................................*passim*

*Burt v. Titlow*,
   571 U.S. 12 (2013)..................................................................................................62

*Calderon v. Thompson*,
   523 U.S. 538 (1998)................................................................................................61

*Caldwell v. Lafler*,
   No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 25364 (W.D. Mich. Mar. 31, 2008)...20, 21, 22, 43

*Case v. Hatch*,
   731 F.3d 1015 (10th Cir. 2013) .....................................................................*passim*

v

*Caver v. Straub,*
    349 F.3d 340 (6th Cir. 2003) ...............................................................................55

*Coleman v. Thompson,*
    501 U.S. 722 (1991)......................................................................................56, 58

*Cullen v. Pinholster,*
    563 U.S. 170 (2011)............................................................................................62

*Davis v. Bradshaw,*
    No. 1:14-cv-2854, 2016 U.S. Dist. LEXIS 184081 (N.D. Ohio June 16, 2016) ............ *passim*

*Early v. Packer,*
    537 U.S. 3 (2002)...............................................................................................63

*In re Elliot,*
    No. 17-1496, 2017 U.S. App. LEXIS 22314 (6th Cir. Nov. 7, 2017) ......................................43

*Engle v. Isaac,*
    456 U.S. 107 (1982).....................................................................................55, 58

*Franklin v. Rose,*
    811 F.2d 322 (6th Cir. 1987) ................................................................................54

*Garcia v. Quarterman,*
    454 F.3d 441 (5th Cir. 2006) ................................................................................62

*Gonzalez v. Thaler,*
    132 S. Ct. 641 (2012).........................................................................................16

*Griffin v. Rogers,*
    308 F.3d 647 (6th Cir. 2002) ................................................................................51

*Harrington v. Richter,*
    562 U.S. 86 (2011)............................................................................................61

*In re Herrington,*
    No. 17-3194, 2017 U.S. App. LEXIS 20008 (6th Cir. Oct. 12, 2017) ....................................19

*Holland v. Florida,*
    560 U.S. 631 (2010)...............................................................................51, 52, 53

*Johnson v. Dretke,*
    442 F.3d 901 (5th Cir. 2006) ................................................................................18

*Johnson v. United States,*
    544 U.S. 295 (2005).........................................................................................52

*Jurado v. Burt*,
    337 F.3d 638 (6th Cir. 2003) ........................................................................... 51

*Keith v. Bobby*,
    551 F.3d 555 (6th Cir. 2009) ........................................................................ 9, 42

*Keith v. Bobby*,
    618 F.3d 594 (6th Cir. 2010) ............................................................................. 9

*Keith v. Houk*,
    549 U.S. 1308 (2007) ........................................................................................ 7

*Keith v. LaRose*,
    No. 1:13-cv-1718, 2014 U.S. Dist. LEXIS 42125 (N.D. Ohio Mar. 28, 2014) ...................... 12

*Keith v. Mitchell*,
    455 F.3d 662 (6th Cir. 2006) ............................................................. 6, 7, 42, 63

*Keith v. Ohio*,
    523 U.S. 1063 (1998) ........................................................................................ 6

*LaFevers v. Gibson*,
    238 F.3d 1263 (10th Cir. 2001) ....................................................................... 46

*Lott v. Bagley*,
    No. 1:04-cv-822, 2007 U.S. Dist. LEXIS 91762 (N.D. Ohio Sept. 28, 2007) ............ 17, 20, 22

*Lynch v. Wilson*,
    No. 1:07 CV 2742, 2009 U.S. Dist. LEXIS 6702 (N.D. Ohio Jan. 30, 2009) ...................... 52

*Martinez v. Ryan*,
    132 S.Ct. 1309 (2012) ..................................................................................... 12

*Mason v. Mitchell*,
    320 F.3d 604 (6th Cir. 2003) ........................................................................... 58

*Maupin v. Smith*,
    785 F.2d 135 (6th Cir. 1986) ...................................................................... 55, 58

*McCray v. Vasbinder*,
    499 F.3d 568 (6th Cir. 2007) ...................................................................... 46, 53

*In re McDonald*,
    514 F.3d 539 (6th Cir. 2008) ........................................................................... 45

*McQuiggin v. Perkins*,
    133 S. Ct. 1924 (2013) .................................................................................... 53

*Morris v. Carlton,*
    No. 1:04-cv-247, 2006 U.S. Dist. LEXIS 65443 (E.D. Tenn. Sep. 13, 2006)........................17

*Murray v. Carrier,*
    477 U.S. 478 (1986)......................................................................................................7, 55, 56, 58

*O'Sullivan v. Boerckel,*
    526 U.S. 838 (1999)........................................................................................................55, 58

*Pace v. DiGuglielmo,*
    544 U.S. 408 (2005).............................................................................................. *passim*

*Panetti v. Quarterman,*
    551 U.S. 930 (2007)........................................................................................................16, 17

*Picard v. Connor,*
    404 U.S. 270 (1971)...............................................................................................................54

*Pillette v. Foltz,*
    824 F.2d 494 (6th Cir. 1987) ...............................................................................................54

*Rust v. Zent,*
    17 F.3d 155 (6th Cir. 1994) ..................................................................................................54

*Schlup v. Delo,*
    513 U.S. 298 (1995)........................................................................................22, 53, 56, 59

*Schriro v. Landrigan,*
    550 U.S. 465 (2007)........................................................................................................62, 64

*Seymour v. Walker,*
    224 F.2d 542 (6th Cir. 2000) ...............................................................................................55

*Souter v. Jones,*
    395 F.3d 577 (6th Cir. 2005) ................................................................................21, 43, 53

*State v. Keith,*
    119 Ohio St.3d 161 (2008).......................................................................................................8

*State v. Keith,*
    123 Ohio St.3d 1508 (2009)...............................................................................................8, 9

*State v. Keith,*
    131 Ohio St.3d 1484 (2012)...............................................................................................11

*State v. Keith,*
    151 Ohio St.3d 1456 (2017)...............................................................................................13

*State v. Keith,*
    176 Ohio App.3d 260 (2008) ........................................................................................7

*State v. Keith,*
    192 Ohio App.3d 231 (2011) ................................................................................10, 42

*State v. Keith,*
    79 Ohio St.3d 514 (1997) ..................................................................................4, 5, 42

*State v. Keith,*
    84 Ohio St.3d 1447 (1998) .........................................................................................6

*State v. Keith,*
    No. 3-08-15, 2008 Ohio App. LEXIS 5176, 2008-Ohio-6187 (Dec. 1, 2008) .........................9

*State v. Keith,*
    No. 3-17-01, 2017 Ohio App. LEXIS 2545, 2017-Ohio-5488 (Jun. 26, 2017) .............. *passim*

*State v. Keith,*
    No. 3-94-14, 1996 Ohio App. LEXIS 1720 (Apr. 5, 1996) ........................................................5

*State v. Keith,*
    No. 3-98-05, 1998 Ohio App. LEXIS 3836 (Aug. 19, 1998) ....................................................6

*Sumner v. Mata,*
    449 U.S. 539 (1981) .................................................................................................62

*Swearingen v. Thaler,*
    No. H-09-300, 2009 U.S. Dist. LEXIS 108058 (S.D. Tex. Nov. 18, 2009) ...........................18

*In re Swearingen,*
    556 F.3d 344 (5th Cir. 2009) .....................................................................................16

*United States v. Frady,*
    456 U.S. 152 (1982) ............................................................................................56, 58

*Vinson v. Jackson,*
    No. 16-2760, 2017 U.S. App. LEXIS 25141 (6th Cir. Dec. 13, 2017) ............................16, 19

*Vroman v. Brigano,*
    346 F.3d 598 (6th Cir. 2003) ................................................................................49, 51

*Wainwright v. Sykes,*
    433 U.S. 72 (1977) .........................................................................................55, 56, 58

*White v. Woodall,*
    572 U.S. 415 (2014) ............................................................................................62, 63

*In re Whittaker*,
    No. 17-2135, 2018 U.S. App. LEXIS 4804 (6th Cir. Feb. 26, 2018) ....................................43

*Williams v. Bagley*,
    380 F.3d 932 (6th Cir. 2004) ...................................................................55

*Williams v. Birkett*,
    670 F.3d 729 (6th Cir. 2012) ...................................................................50

*Williams v. Taylor*,
    529 U.S. 362 (2000)...............................................................................63

*In re Williams*,
    330 F.3d 277 (4th Cir. 2003) ...................................................................16

*Wong v. Money*,
    142 F.3d 313,322 (6th Cir. 1998) ............................................................55

*Wood v. Allen*,
    558 U.S. 290 (2010)...............................................................................63

*Woodford v. Ngo*,
    548 U.S. 81 (2006)................................................................................54

*Woods v. Donald*,
    __ U.S. __, 135 S. Ct. 1372 (2015).....................................................62, 63

*Yarborough v. Alvarado*,
    541 U.S. 652 (2004)...............................................................................64

**Statutes**

28 U.S.C. §2244...................................................................................9, 12, 16

28 U.S.C. §2244(b) .......................................................................... *passim*

28 U.S.C. §2244(b)(2) ...................................................................16, 22, 46

28 U.S.C. §2244(b)(2)(B)(i) ...................................................17, 18, 20, 45

28 U.S.C. §2244(b)(2)(B)(ii) ............................................................ *passim*

28 U.S.C. §2244(b)(3)(A)...................................................................15

28 U.S.C. §2244(b)(3)(C)...............................................................15, 16

28 U.S.C. §2244(b)(4) ..................................................................... *passim*

28 U.S.C. §2244(d).............................................................................46

28 U.S.C. §2244(d)(1) ................................................................................46

28 U.S.C. §2244(d)(1)(D) ..........................................................................47

28 U.S.C. §2244(d)(2) ....................................................................48, 49, 50

28 U.S.C. §2254(b) ....................................................................................54

28 U.S.C. §2254(c) ....................................................................................54

28 U.S.C. §2254(d) ...............................................................................61, 64

28 U.S.C. §2254(d)(1) ...............................................................................63

28 U.S.C. §2254(d)(2) ...............................................................................62

28 U.S.C. §2254(e)(1).........................................................................2, 19, 62

**Other Authorities**

Alan Johnson, *Governor Commutes Death Sentence to Life*, Columbus Dispatch,
    Sept. 3, 2010,
    https://www.dispatch.com/content/stories/local/2010/09/02/keith-
    clemency.html (last accessed March 25, 2019) .................................................11

Keith Clemency Report (Aug. 19, 2010), publicly available at
    https://www.drc.ohio.gov/Portals/0/Clemency/clemency_keithaug2010.pdf?ve
    r=2016-11-04-085148-970 (last accessed March 22, 2019)..........................11, 44

Ohio Criminal Rule 33(B) ...............................................................................48, 58

I.    **CERTIFICATION OF CUSTODY AND GENERAL DENIAL**

The Warden denies each and every allegation in the instant Successive Petition for Writ of Habeas Corpus, except as may be expressly admitted in this Return of Writ. The Warden has custody of Kevin Keith by virtue of the trial court's opinion sentencing him to death issued by the Court of Common Pleas of Crawford County in the *State of Ohio v. Kevin Keith* (94 CR-042). Entry, ROW Apx., ECF.20-1, PAGEID#:523-529. It should be noted that Keith is no longer under a sentence of death following the commutation to a sentence of life without the possibility of parole he received from Governor Ted Strickland in 2010. Warrant, ROW Apx., ECF.20-2, PAGEID#:1378.

1

## II.   STATEMENT OF FACTS

On direct appeal, the Ohio Supreme Court set forth the facts of this case. These binding factual findings "shall be presumed to be correct." 28 U.S.C. §2254(e)(1). Keith "has the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id*. The court's statement of facts is reproduced below:

> On the evening of February 13, 1994, Marichell Chatman, her seven-year-old daughter, Marchae, and Richard Warren, who had been living with Marichell and Marchae for several weeks, were at Marichell's apartment in the Bucyrus Estates. At the time, Marichell was babysitting her young cousins, Quanita and Quinton Reeves. At approximately 8:45 p.m., Marichell's aunt, Linda Chatman, arrived at the apartment to pick up Quanita and Quinton, Linda's niece and nephew.

> A few minutes after Linda arrived, Warren, momentarily diverted from a basketball game he was watching on television, noticed a man standing outside the apartment door. Although the man began to walk away without knocking, Warren opened the door. The man turned and asked for Linda.

> While Linda went outside and spoke with the man, Marichell told Warren the man's full name. Although Warren could recall only the first name, Kevin, he later identified appellant as the man at the door. Marichell also mentioned that Kevin had been involved in a big drug bust.

> After a short time, Linda and appellant returned to the apartment, where appellant and Warren had a brief conversation. According to Warren, appellant appeared to have his turtleneck shirt pulled up over the bottom part of his face and even drank a glass of water through it.

> After drinking the glass of water, appellant pulled a nine-millimeter handgun from a plastic bag he carried and ordered everyone to lie on the floor. Appellant repeatedly scolded Marichell for using his first name when she asked what he was doing and why. Despite Marichell's pleas with appellant on behalf of the children, appellant placed the gun to her head. After ordering Marichell to be quiet, appellant said, "Well, you should have thought about this before your brother started ratting on people." Marichell responded, "Well, my brother didn't rat on anybody and even if he did, we didn't have anything to do with it." Testimony at trial confirmed that Marichell's brother, Rudel Chatman, was a police informant in a drug investigation involving appellant. According to the presentence report, the month prior to the murders, appellant was charged with several counts of aggravated trafficking.

2

Next, Warren heard a gunshot but was forced to turn away when a bullet struck him in the jaw. Warren heard ten to twelve additional shots, two more striking him in the back. After he heard the apartment door close, Warren ran out of the apartment, across a snow-covered field to Ike's Restaurant, yelling for help. Four or five more shots were fired, one striking him in the buttocks and knocking him down. Warren was able to get up and obtain help from the restaurant.

Another Bucyrus Estates resident, Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's dome light and the light around the license plate did not work. The driver rocked the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.

When medical personnel arrived at the Bucyrus Estates apartment, Linda and Marichell Chatman were dead, having suffered multiple gunshot wounds, including fatal wounds to the neck or head. All three children initially survived the attack. However, Marchae's two gunshot wounds to her back proved fatal. The Reeves children each sustained two bullet wounds and serious injuries.

Approximately eight hours after the shootings, Warren was recovering from surgery at a Columbus hospital. During a postoperative interview with a nurse, Warren wrote "Kevin" on a piece of paper as the name of his assailant. Later that day, Bucyrus Police Captain John Stanley had two telephone conversations with Warren. During the second conversation, Stanley mentioned three or four possible last names for Kevin. At trial, Stanley could only recall that he mentioned the names Kevin Thomas and Kevin Keith. Warren stated that he was seventy-five percent sure the name he heard from Marichell was Kevin Keith. When shown a photo array of six suspects, Warren chose appellant's picture and told police he was ninety-five percent sure that appellant was the murderer.

Investigators recovered a total of twenty-four cartridge casings from the crime scene area, which had all been fired from the same gun. In addition to those, investigators recovered a casing found on the sidewalk across from the entrance to a General Electric plant. On the night of the murders, appellant picked up his girlfriend, Melanie Davison, from work at the entrance to the General Electric plant where the casing was found.

At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number -- "043." The indentation from the license plate matched the last three numbers of a 1982 Oldsmobile Omega seized from Melanie

3

Davison shortly after she visited appellant in jail, under the psuedonym of Sherry Brown, a few weeks after the murders.

The Oldsmobile was registered to Alton Davison, Melanie's grandfather, and was also regularly used by Melanie. Davison had put four new tires on the Omega six months prior to the murders. Davison estimated that by February 1994, the new tires had been driven less than 3,000 miles without any problems or need for replacement. Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast did match the tread of the tires purchased by Alton Davison as shown on the tire's sales brochures. Additionally, the tires found on the Oldsmobile Omega had been manufactured in January 1994 and showed a minimal amount of wear.

The grand jury indicted appellant on three counts of aggravated murder, each carrying a specification that the murder was committed as part of a course of conduct involving the killing of two or more persons. R.C. 2929.04(A)(5). Appellant was also indicted on three counts of attempted aggravated murder. R.C. 2923.02.

After a two-week trial, a jury found appellant guilty of all counts. Following the verdict, defense counsel requested a presentence investigation and a postconviction sanity hearing. During the penalty phase of the trial, defense counsel waived both opening and closing statements. The court submitted, without objection, the presentence investigation report and the results of the psychological examination to the jury. The jury recommended and the trial court imposed a death sentence for each of the aggravated murder counts. The court of appeals affirmed the convictions and the sentence.

*State v. Keith*, 79 Ohio St.3d 514, 514-17 (1997).

4

### III.    PROCEDURAL HISTORY

In February of 1994, the Crawford County Grand Jury indicted Keith for the deaths of Marichell Chatman, Linda Chatman, and Marchae Chatman. Indictment, ROW Apx., ECF. 20-1, PAGEID#:406-08. Specifically, Keith was charged with three counts of aggravated murder with death penalty specifications, and three counts of attempted murder. *Id*. On February 24, 1994, Keith entered an initial plea of not guilty to all charges. Judgment Entry/Arraignment, ROW Apx. ECF. 20-1, PAGEID#:449. Because Keith did not waive his speedy-trial rights, his jury trial commenced on May 10, 1994. Tr. Trans., ECF.21-1, PAGEID#:9677. On May 26, 1994, the jury returned verdicts of guilty on all counts. Verdict Forms, ROW Apx., ECF.20-1, PAGEID#:509-17. On May 31, 1994, following the mitigation phase, the jury recommended that a death sentence be imposed, and accordingly, the court sentenced Keith to death. Verdict Forms and Sentencing Entry, ROW Apx., ECF.20-1, PAGEID#:520-29.

Upon direct appeal to the Third District Court of Appeals, Keith presented nine assignments of error, arguing among other things: the trial court's error in jury instructions; the trial court's failure to properly determine that Keith was knowingly waiving his right to present mitigating evidence; the trial court's failure to suppress certain evidence; the trial court's failure to ensure Keith received a fair trial and had effective assistance of counsel; the trial court's error in allowing the jury to view evidence not admitted at trial; and juror misconduct. Brief, ROW Apx., ECF.20-2, PAGEID#:771-914. On April 5, 1996, the Third District Court of Appeals affirmed Keith's conviction and sentence. *State v. Keith*, No. 3-94-14, 1996 Ohio App. LEXIS 1720 (Apr. 5, 1996); Opinion, ROW Apx., ECF.20-2, PAGEID#:1199-254. The Ohio Supreme Court affirmed on October 1, 1997. *State v. Keith*, 79 Ohio St.3d 514 (1997); Entry and Opinion, ROW Apx., ECF.20-4, PAGEID#:1886-903. The United States Supreme Court denied Keith's

petition for a writ of certiorari on April 6, 1998. *Keith v. Ohio*, 523 U.S. 1063 (1998); Notice, ROW Apx., ECF.20-4, PAGEID#:1990.

In the meantime, on September 20, 1996, Keith filed a petition for postconviction relief with the trial court presenting two grounds for relief, and reasserting the eight claims he raised on direct appeal. Petition, ROW Apx., ECF.20-5, PAGEID#:2043-054. The two postconviction grounds were: that the trial court's failure to ensure Keith received a fair trial and had effective assistance of counsel; and that his trial counsel had a conflict of interest. *Id.* The trial court denied Keith's petition on February 4, 1998. Judgment Entry, ROW Apx., ECF.20-5, PAGEID#:2304-319. On August 19, 1998, the Court of Appeals affirmed the trial court's judgment. *State v. Keith*, No. 3-98-05, 1998 Ohio App. LEXIS 3836 (Aug. 19, 1998); Opinion, ROW Apx., ECF.20-6, PAGEID#:2547-564. On December 23, 1998, the Ohio Supreme Court declined to hear Keith's appeal. *State v. Keith*, 84 Ohio St.3d 1447 (1998); Entry, ROW Apx., ECF.20-7, PAGEID#:2830.

On September 3, 1999, Keith filed his first Habeas Petition presenting eight grounds for relief. Petition, N.D. Ohio Case No. 1:99-cv-657, ECF.11. These grounds included, among other things: the ineffective assistance of counsel; his involuntary waiver of his right to present mitigating evidence; improper removal of jurors with reservations about the death penalty; the trial court's incorrect and misleading instructions to the jury; improper voir dire questions; the use of unduly suggestive identification procedures; the admission of inauthentic evidence at trial; juror misconduct; and the trial court's failure to apply statutory procedures regarding Keith's sentencing. *Id*. On June 14, 2001, the District Court denied Keith's habeas petition. Order, N.D. Ohio Case No. 1:99-cv-657, ECF.62. On July 10, 2006, the Sixth Circuit affirmed the District Court's judgment. *Keith v. Mitchell*, 455 F.3d 662 (6th Cir. 2006); Opinion, 6th Circuit Case No.

6

01-4266, Doc.129. In denying Keith's claim that jurors with reservations about the death penalty were improperly excluded by the trial court, the Sixth Circuit rejected Keith's assertion that prejudice should be presumed, stating: "Finally, we note that this is not 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.' *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *Keith does not claim that he is actually innocent*. The aggravating circumstances in this case were extremely compelling[.]" *Id.* at 675 (emphasis added). On March 26, 2007, the United States Supreme Court denied Keith's petition for writ of certiorari. *Keith v. Houk*, 549 U.S. 1308 (2007).

While his case was pending in federal court, on August 19, 2004, Keith filed a successive petition for postconviction relief with the trial court presenting three causes of action. Petition, ROW Apx., ECF.20-8, PAGEID#:2876-887. The first cause of action presented by Keith was the prosecutor's alleged failure to provide defense counsel with all exculpatory evidence, including: police reports; a witness statement of a non-testifying witness; an eyewitness statement that Kevin Keith was too big to be the shooter; the handwritten notes of Richard Warren during his hospital stay; and information regarding Rudel Chatman, the informant connected to both Kevin Keith's case and a case against Rodney Melton. *Id.* at PAGEID#:2882-884. In his second cause of action, Keith claimed that new information received after his trial indicated that two persons were involved in the homicides, and that the lead investigator provided assistance to Rodney Melton at some point during the investigation. *Id.* at PAGEID#:2884-885. His third cause of action was a cumulative effects claim. *Id.* at PAGEID#:2885-886. On February 13, 2007, the trial court granted the State's motion for summary judgment and dismissed Keith's petition. Opinion & Judgment Entry, ROW Apx., ECF.20-16, PAGEID#:5299-333. On February 25, 2008, the Court of Appeals affirmed the trial court's judgment. *State v. Keith*, 176 Ohio App.3d

260 (2008); Opinion, ROW Apx., ECF.20-18, PAGEID#:5840-861. On December 2, 2009, the Ohio Supreme Court declined to hear Keith's appeal. *State v. Keith*, 123 Ohio St.3d 1508 (2009); Entry, ROW Apx., ECF.20-19, PAGEID#:5947.

Meanwhile, on July 20, 2007, Keith filed an application for reopening his direct appeal in the Third District Court of Appeals. Application, ROW Apx., ECF.20-18, PAGEID#:5774-783. On August 2, 2007, the Court of Appeals denied Keith's application. Journal Entry, ROW Apx., ECF.20-18, PAGEID#:5836-837. On August 7, 2008, the Ohio Supreme Court affirmed the court of appeals' judgment. *State v. Keith*, 119 Ohio St.3d 161 (2008); Opinion, ROW Apx., ECF.20-19, PAGEID#:6092-094.

On August 1, 2007, Keith filed a motion for leave to file a delayed motion for new trial based on newly discovered evidence, as well as a motion for new trial. Motion for Leave, ROW Apx., ECF.20-21, PAGEID#:6130-308. In his motion for new trial, Keith claimed that two weeks before the homicides, Rodney Melton allegedly told a confidential informant that he had been paid to "cripple" the man who was responsible for the recent drug raids in Crestline, Ohio. The responsible person was allegedly Rudel Chatman, a family member of the homicide victims. *Id*. at PAGEID#:6300. Additionally, Keith claimed that Rodney Melton was known to wear a mask that covered his mouth because he had a gap between his front teeth and could have been the murderer because both Quanita Reeves and Richard Warren recalled that the man who shot them wore a mask that covered his face. *Id*. at PAGEID#:6301. In addition, Keith claimed that the Grant Hospital Nurse, Amy Whisman (now Amy Petryk), did not tell Bucyrus Police Captain John Stanley that Richard Warren had named "Kevin" as the man who shot him, and that Captain Stanley lied about this during his trial testimony. *Id*. On July 2, 2008, the trial court denied Keith's motion. Opinion & Judgment Entry, ROW Apx., ECF.20-22, PAGEID#:6739-

750. The Third District Court of Appeals affirmed the trial court's judgment on December 1, 2008. *State v. Keith*, No. 3-08-15, 2008 Ohio App. LEXIS 5176, 2008-Ohio-6187 (Dec. 1, 2008); Opinion, ROW Apx., ECF.20-23, PAGEID#:6895-909. On December 2, 2009, the Ohio Supreme Court declined to hear Keith's appeal. *State v. Keith*, 123 Ohio St.3d 1508 (2009); Entry ROW Apx., ECF.20-23, PAGEID#:7026.

Based upon the same evidence raised in his August 2007 motion for leave to file a delayed motion for new trial, Keith filed his second Habeas Petition presenting two claims for relief on July 11, 2008. Petition, N.D. Ohio Case No. 1:08-cv-1687, ECF.1. In his first claim for relief, Keith alleged that newly discovered evidence exculpated him and indicated that the police provided false testimony during his criminal trial. *Id*. at PAGEID#:17-27. In his second claim for relief, Keith maintained that he was actually innocent of the crimes for which he was convicted and sentenced. Petition, N.D. Ohio Case No. 1:08-cv-1687, ECF.1, PAGEID#:28-29. Keith asserted that, at the time of the homicides, Rodney Melton's physical appearance and vehicle better fit the descriptions provided by eyewitnesses. *Id*. On July 18, 2008, the District Court transferred Keith's successive petition to the Sixth Circuit of Appeals for review pursuant to 28 U.S.C. §2244. Order, N.D. Ohio Case No. 1:08-cv-1687, ECF.6. And on January 13, 2009, the Sixth Circuit denied Keith permission to pursue his successive habeas petition. *Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009); Order, 6th Circuit Case No. 08-3908, Doc.31. On January 26, 2009, Keith filed a motion with the District Court to alter or amend the decision to transfer his case to the Sixth Circuit, Motion, N.D. Ohio Case No. 1:08-cv-1687, ECF.9, which the Court denied on June 24, 2009. Order, N.D. Ohio Case No. 1:08-cv-1687, ECF.14. Keith appealed, and the Sixth Circuit Court subsequently affirmed the District Court's judgment on August 31, 2010. *Keith v. Bobby*, 618 F.3d 594 (6th Cir. 2010); Order, 6th Circuit Case No. 09-3871, Doc.47.

9

Meanwhile, on February 2, 2010, the Ohio Supreme Court set Keith's execution date for September 15, 2010. Entry, ROW Apx., ECF.20-4, PAGEID#:2005.

On May 11, 2010, Keith filed with the trial court a second motion for leave to file a delayed motion for new trial based on newly discovered evidence. Motion for Leave, ROW Apx., ECF.20-24, PAGEID#:7027-130. Disregarding his earlier claims regarding Nurse Amy, Keith now alleged that "Amy Gimmets" was the name initially provided by the Bucyrus Police Department as the Grant Hospital nurse who treated Richard Warren after being shot, and claimed that Warren identified the name "Kevin" as the shooter. *Id.* at PAGEID#:7117-118. However, in 2007, his counsel discovered that no person by the name of "Amy Gimmets" was ever employed by Grant Hospital. *Id.* Additionally, Keith claimed that, contrary to Nurse Foor's testimony, that there was no evidence Nurse Foor ever made a telephone call to the Bucyrus Police Department regarding Richard Warren naming "Kevin" as the man who shot him. *Id.* at PAGEID#:7120. Specifically, Keith alleged that the recorded phone call was never copied for the parties in his criminal case, that the original recording was destroyed, and that the call was not reflected in the dispatch radio logs. *Id.* at PAGEID#:7120-122. In addition, Keith claimed that the bullet casing located near the General Electric plant may have actually been found at another location over a mile away. *Id.* at PAGEID#:7122.

The trial court denied Keith's motion for leave and his motion for new trial on August 9, 2010. Opinion & Judgment Entry, ROW Apx., ECF.20-24, PAGEID#:7182-196. On January 31, 2011, the Third District Court of Appeals affirmed the trial court's judgment, reiterating its earlier conclusion that "a jury of twelve citizens found the evidence presented sufficient to convict Keith, and this verdict has stood the test of time and an exhaustive series of both state and federal appeals." *State v. Keith*, 192 Ohio App.3d 231 (2011); Opinion, ROW Apx., ECF.20-

10

24, PAGEID#:7391-412. On March 21, 2012, the Ohio Supreme Court denied Keith's appeal. *State v. Keith*, 131 Ohio St.3d 1484 (2012); Entry, ROW Apx., ECF.20-24, PAGEID#:7513.

Meanwhile, on August 11, 2010, the Ohio Parole Board conducted a 12-hour-long clemency hearing, after which it unanimously recommended the Governor deny executive clemency to Keith. *See* Keith Clemency Report (Aug. 19, 2010), publicly available at https://www.drc.ohio.gov/Portals/0/Clemency/clemency_keithaug2010.pdf?ver=2016-11-04-085148-970 (last accessed March 22, 2019). Despite this recommendation, on September 2, 2010, Governor Strickland granted Keith executive clemency, commuting his death sentence to one of life without the possibility of parole.[1] Warrant of Commutation, ROW Apx., ECF.20-4, PAGEID#:2007; ROW Apx., ECF.20-24, PAGEID#:7218, 7220.

On April 3, 2012, Keith, *pro se*, filed a third motion for leave to file a delayed motion for new trial based on newly discovered evidence. Motion for Leave, ROW Apx., ECF.20-25, PAGEID#:7524-594. In his motion, Keith claimed the statements of non-testifying witness Jesse Delaney were fabricated by the Bucyrus Police Department in order to try to conform the evidence to fit their suspect. *Id*. at PAGEID#:7589-90. On May 24, 2012, the trial court denied Keith's *pro se* motion. Opinion & Judgment Entry, ROW Apx., ECF.20-25, PAGEID#:7621-625. Keith did not appeal this judgment.

On October 12, 2012, Keith, *pro se*, filed a fourth motion for leave to file a delayed motion for new trial. Motion, ROW Apx., ECF.20-25, PAGEID#:7685-688. In his motion, Keith

---

[1] Keith alleges in his petition that Governor Strickland commuted his death sentence "citing doubts about Keith's guilt as his reasoning for the commutation." Pet., ECF.1, PAGEID#:9. However, as the Third District Court of Appeals found "[n]owhere in the Warrant of Commutation of Sentence, which is included in the record, does Strickland cite "doubts" specifically about Keith's "guilt." *Keith,* 2017 Ohio App. LEXIS 2545, at *7 n.5. Moreover, Strickland was quoted in the Columbus Dispatch on September 3, 2010 as saying: "It is my view, after a thorough review of the information and evidence available to me at this time, ***that it is far more likely that Mr. Keith committed these murders than it is likely that he did not.***" Alan Johnson, *Governor Commutes Death Sentence to Life*, Columbus Dispatch, Sept. 3, 2010, https://www.dispatch.com/content/stories/local/2010/09/02/keith-clemency.html (last accessed March 25, 2019).

claimed that in a 2010 interview conducted by the Ohio Attorney General's Office, Nurse Amy Petryk contradicted her prior sworn affidavit and stated that Richard Warren had given her the name of "Kevin" and that she did call the Bucyrus Police Department with this information. *Id.* at PAGEID#:7687. On November 1, 2012, Keith voluntarily withdrew his motion for leave to file a delayed motion for new trial. Notice, ROW Apx., ECF.20-25, PAGEID#:7797-799.

On August 8, 2013, Keith filed his third Habeas Petition presenting four grounds for relief. Petition, N.D. Case No. 1:13-cv-1718, ECF.1. Based upon the United States Supreme Court case of *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), Keith alleged he was denied the effective assistance of trial counsel by their failure to present certain witness testimony; their failure to use Richard Warren's statements to hospital staff to undermine his identification of Keith as his shooter; and their failure to investigate and present evidence that Rudel Chatman was an informant against Rodney Melton. *Id.* at PAGEID#:1-74. On March 28, 2014, the District Court ordered that Keith's case be transferred to the Sixth Circuit for review pursuant to 28 U.S.C. §2244. *Keith v. LaRose*, No. 1:13-cv-1718, 2014 U.S. Dist. LEXIS 42125 (N.D. Ohio Mar. 28, 2014); Order, N.D. Case No. 1:13-cv-1718, ECF.17. On December 8, 2014, the Sixth Circuit denied Keith's request for an order authorizing the pursuit of a successive habeas petition. Order, 6th Circuit Case No. 14-3290, Doc.16-2.

On October 28, 2016, Keith filed his fifth motion for leave to file a delayed motion for new trial. Motion for Leave, ROW Apx., ECF.20-26, PAGEID#:7818-864. In his motion, Keith alleged that sometime in January 2016, his counsel discovered a news article referencing the alleged questionable job performance of BCI Analyst Michele Yezzo, who had testified in Keith's criminal trial.  *Id.* at PAGEID#:7840-844. Thereafter, Keith's counsel obtained Yezzo's

personnel file and provided documentation to former Ohio Attorney General Lee Fisher[2], who subsequently provided an affidavit stating his belief that the State had an obligation to disclose Yezzo's personnel issues to Keith's trial counsel since she was a testifying witness against him. *Id*. at PAGEID#:7842-843. Fisher also stated that had he known about Yezzo's questionable job performance, he would not have allowed her to testify in Keith's trial, and he would have ordered the evidence to be re-examined by another BCI Analyst. *Id*.

On January 13, 2017, the trial court denied Keith's fifth motion for leave and the corresponding motion for new trial. Judgment Entry, ROW Apx., ECF.20-29, PAGEID#:9035-046. On June 26, 2017, the Third District Court of Appeals affirmed the trial court's judgment, finding "but one fact remains clear, the evidence against Keith was simply overwhelming." *State v. Keith*, No. 3-17-01, 2017 Ohio App. LEXIS 2545, 2017-Ohio-5488, at *27 (Jun. 26, 2017); Opinion, ROW Apx., ECF.20-30, PAGEID#:9281-306. On December 6, 2017, the Ohio Supreme Court declined to hear Keith's appeal. *State v. Keith*, 151 Ohio St.3d 1456 (2017); Entry, ROW Apx., ECF.20-30, PAGEID#:9445.

Based, in part, upon the information litigated in his 2016 motion for new trial, on March 19, 2018, Keith filed his fourth Habeas Petition in this Court. Petition, ECF.1. In his first ground for relief, as he did in state court, Keith claims that the State failed to disclose critical impeachment evidence of a key trial witness, BCI Analyst Michele Yezzo. *Id*. at PAGEID#:19-27. In his second claim for relief, raised for the first time in federal court, Keith claims that the Bucyrus Police Department destroyed evidence and then suppressed documents demonstrating it acted in bad faith. Petition, ECF.1, PAGEID#:28-30. On June 7, 2018, this Court transferred Keith's case to the Sixth Circuit Court of Appeals for authorization to proceed on a successive

---

[2] Lee Fisher was the Ohio Attorney General during the time period that Keith was indicted, tried and convicted. Motion, ROW Apx., ECF.20-26, PAGEID#:7842.

petition. Order, ECF.15. On October 30, 2018, the Sixth Circuit Court of Appeals granted Keith authorization to proceed on his successive habeas corpus petition in this Court on the claims that the State violated *Brady* in failing to turn over Yezzo's personnel file, and that the Bucyrus Police Department destroyed evidence and suppressed documents that it acted in bad faith. Order, ECF.16. The Warden now files this Return of Writ in response to Keith's fourth successive habeas petition.

## IV.    28 U.S.C. §2244(b)

### A.  Standard of Review

28 U.S.C. §2244(b) states as follows:

> (1)    A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

> (2)    A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

>> (A)    the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

>> (B)    (i)    the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

>> (ii)    the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

> (3)    (A)    Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

14

(B)    A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

(C)    The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

(D)    The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.

(E)    The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

(4)    A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.

"The filing of a second or successive §2254 application is tightly constrained by the provisions of AEDPA. Congress expressly established a two-step 'gate-keeping' mechanism for the consideration of second or successive habeas corpus applications in federal courts." *Case v. Hatch*, 731 F.3d 1015, 1026 (10th Cir. 2013). First, the petitioner must "move in the appropriate court of appeals for an order authorizing the district court to consider the application." §2244(b)(3)(A). If the court of appeals finds that the petitioner has made "a prima facie showing" that the application satisfies the requirements of §2244(b), the petitioner may attempt to pass through the second gate, and proceed with the claim in the district court. §2244(b)(3)(C). Thus, the "second gate" of §2244's gate-keeping requirements is that the district court must independently "review the proffered evidence, and 'shall dismiss any claim ... that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the

requirements of [§2244(b)].'" *Case*, 731 F.3d at 1027 (quoting §2244(b)(4)). The two-part gate-keeping requirements of §2244(b) are jurisdictional and must be considered prior to the merits of a successive §2254 petition. *Panetti v. Quarterman*, 551 U.S. 930, 942-47 (2007); *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006)).

Section 2244(b)(2) provides that a successive habeas corpus application "shall be dismissed" unless the gate-keeping requirements of the statute are met. Though the Sixth Circuit determined Keith made a "prima facie showing" under §2244(b)(3)(C), he still must pass through the second gate where this Court, aided by all the evidence now available, must determine whether Keith did, in fact, satisfy the requirements of §2244(b). *Vinson v. Jackson*, No. 16-2760, 2017 U.S. App. LEXIS 25141, at *7 (6th Cir. Dec. 13, 2017) (citing *In re McDonald*, 514 F.3d 539, 544 (6th Cir. 2008) and *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004)) ("The *prima facie* determination, however, is not a full-throated review—it only requires us to determine that the allegations 'warrant a fuller exploration in the district court.'"). *See also Case*, 731 F.3d at 1030-32 (citing *LaFevers v. Gibson*, 238 F.3d 1263, 1265 (10th Cir. 2001)); *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997); *In re Swearingen,* 556 F.3d 344, 347 (5th Cir. 2009) ("[B]efore addressing the merits of the successive petition, the district court must independently determine whether the petition actually satisfies the stringent §2244(b)(2) requirements."); *Benchoff v. Colleran*, 404 F.3d 812, 816 (3d Cir. 2005) ("Unless both the procedural and substantive requirements of §2244 are met, the District Court lacks authority to consider the merits of the petition."); *In re Williams*, 330 F.3d 277, 281-82 (4th Cir. 2003) ("[T]he §2244(b) inquiry must be resolved before the district court may consider the merits of a claim within a successive application."); *see also* 28 U.S.C. §2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has

authorized to be filed unless the applicant shows that the claim satisfies the requirement of this section."). Therefore, the fact that the Sixth Circuit found Keith made "a prima facie showing" that his petition met the stringent requirements of §2244(b) does not bind this Court. §2244(b)(4).

**B. Keith cannot satisfy 28 U.S.C. §2244(b)**

This petition must be dismissed because Keith has failed to show that his claims satisfy the stringent requirements of §2244(b).

As noted above, before this Court may proceed to evaluate Keith's *Brady* claims and any defenses against them, Keith must satisfy a two-pronged jurisdictional test. *See Panetti*, 551 U.S. at 942-47 (finding Section 2244's gate-keeping requirements to be jurisdictional in nature which must be considered prior to the merits of a §2254 petition); *Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 U.S. Dist. LEXIS 184081 at *49 (N.D. Ohio June 16, 2016); *Lott v. Bagley*, No. 1:04-cv-822, 2007 U.S. Dist. LEXIS 91762 at *13 (N.D. Ohio Sept. 28, 2007) (O'Malley, J.); *Morris v. Carlton*, No. 1:04-cv-247, 2006 U.S. Dist. LEXIS 65443 at *5 (E.D. Tenn. Sep. 13, 2006). **First**, Keith must show diligence; *i.e.*, that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence." §2244(b)(2)(B)(i). *See also Davis* at *49; *Lott*, 2007 U.S. Dist. LEXIS 91762 at *13; *Morris* at *5. **Second**, Keith must show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." §2244(b)(2)(B)(ii). *See also Davis* at *49; *Lott* 2007 U.S. Dist. LEXIS 91762 at *13; *Morris* at *5.

Keith must satisfy ***both*** prongs in order to satisfy §2244(b)(2)(B).

### 1.  Diligence under §2244(b)(2)(B)(i)

In order to proceed on his successive petition, Keith must establish he meets the diligence component of §2244(b)(2)(B)(i). Diligence for the purposes of proceeding on a successive petition is an *objective* standard. *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006) ("[T]he plain text of §2244(b)(2)(B) suggests that due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record."); *see also Atkins v. Chappell*, No. CV 13-9576 PA(SS), 2016 U.S. Dist. LEXIS 23306 at *14 (C.D. Cal. Jan. 22, 2016) (quoting *Johnson* at 908). The statute "asks whether diligent efforts *could have* uncovered the factual basis for claims 'previously.'" *Swearingen v. Thaler*, No. H-09-300, 2009 U.S. Dist. LEXIS 108058 at *35 (S.D. Tex. Nov. 18, 2009) (emphasis added). Thus, the test "looks at whether the inmate could have and should have uncovered and advanced his claims in his first federal habeas case" not whether he "acted with alacrity and ardor." *Id.* Therefore, the relevant question is whether the "new" evidence *could have been discovered* with the exercise of due diligence, not whether Keith was *prevented* from discovering it earlier than he did. *Johnson* at 908-10. As such, the diligence requirement for §2244(b)(2)(B)(i) is distinctly different than the subjective diligence standard required to prevail on a *Brady* claim. *Id.*

Under this objective standard, both of Keith's claims fail.

### a.  Yezzo personnel file

Keith's claim, that Yezzo's personnel file should have been turned over by the prosecution prior to his trial, necessarily concedes the fact that the file was in existence at the time of trial. And his ability to get the documents in 2016 shows that obtaining the file was possible.[3] Therefore, under the objective standard of §2244(b)(2)(B)(i), the content of the

---

[3] Keith neither states in his successive habeas petition exactly what date he received the documents or the exact method he used to obtain Yezzo's personnel file.

personnel file was discoverable at the time of trial. As such, Keith fails to show the requisite diligence—that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence"—to have his petition proceed. *See Vinson*, 2017 U.S. App. LEXIS 25141 at *8 (finding a lack of diligence when facts relied upon for successive petition were discoverable at the time of trial); *In re Herrington*, No. 17-3194, 2017 U.S. App. LEXIS 20008 at *4 (6th Cir. Oct. 12, 2017) (finding lack of diligence when facts were available both when petitioner filed his initial habeas action and at the time of trial).

Keith's lack of diligence is further supported by the reasonable state court finding that "[i]t was Keith's burden to establish that he was unavoidably prevented from obtaining Yezzo's personnel file and there is simply no indication other than pure speculation that he would have been unable to obtain Yezzo's personnel file through a public records request. *Keith*, 2017 Ohio App. LEXIS 2545, at *23, ¶33. Under the AEDPA, this state court's finding is entitled to deference. 28 U.S.C. §2254(e)(1) (The factual determinations made by the state courts must be presumed correct and may be rebutted only by clear and convincing evidence.)

### b. Police Department subpoena

Similarly, Keith has not shown that the factual predicate of his "police department subpoena claim" could not have been discovered previously with diligence. The level of compliance with the subpoena surely would have been known to the issuing party at the time of trial. As Keith was the party that issued the May 12, 1994 subpoena ordering the police department records custodian to appear in court on May 13, 1994 with "all records, including radio logs, of all call-ins from February 12, 1994 to the present time," he would have known if said subpoena had been followed or ignored. *See* Subpoena, Pet. Ex.29, ECF.1-29, PAGEID#:218. While the Warden does not condone ignoring a subpoena, the notation thereupon

19

to "ignore for now"—of which the author and time of placement on the subpoena are both unknown—does not alter the predicate fact of non-compliance with the subpoena. Keith had to know at the time of trial that the police did not comply with his subpoena. As such, Keith fails to show that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence," so his successive petition cannot proceed.

### c. Conclusion

Because both Yezzo's personnel file and the unfulfilled subpoena were in existence prior to trial, Keith cannot show that the predicate facts for his claims could not be discovered with the exercise of due diligence. Therefore, he fails the diligence requirement of §2244(b)(2)(B)(i), and his successive petition must be dismissed. §2244(b)(4).

### 2. *Actual innocence under §2244(b)(2)(B)(ii)*

In addition to not satisfying the requirement of §2244(b)(2)(B)(i), Keith fails to satisfy the "actual innocence" prong of §2244(b)(2)(B)(ii). Again, Keith cannot meet his burden.

### a. Legal standard

"The threshold articulated in §2244(b)(2)(B)(ii) has been described as an 'actual innocence' standard." *Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 U.S. Dist. LEXIS 184081 at *49-50 (N.D. Ohio June 16, 2016) (Vecchiarelli, MJ.), *adopted by*, 2017 U.S. Dist. LEXIS 21452 (N.D. Ohio Feb. 15, 2017) (Boyko, J.); *Caldwell v. Lafler*, No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 25364 at *2 (W.D. Mich. Mar. 31, 2008); *Lott*, 2007 U.S. Dist. LEXIS 91762 at *14; *see also Case,* 731 F.3d at 1031-32 (noting that "[t]his standard has been described as a 'strict form of innocence'") (quoting 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure §28.3[e], at 1628-29 (6th ed. 2011)).

20

The "actual innocence" standard of §2244(b)(2)(B)(ii) must be demonstrated through clear and convincing evidence. *Caldwell*, 2008 U.S. Dist. LEXIS 25364 at *2 (citing *Calderon v. Thompson*, 523 U.S. 538 (1998)). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

As the *Davis* Court detailed, there are two distinctly different "actual innocence" standards in habeas corpus cases:

> In *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Court held that "a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition." *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (citing *Schlup*, 513 U.S. at 317). Such a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 315).
>
> To satisfy the *Schlup* actual innocence standard, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 327). Moreover, "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 327). Such a claim "requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 324). The *Schlup* Court further cautioned that "the actual innocence exception should remain rare and only be applied in the extraordinary case." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 321).
>
> *In enacting the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Congress "adopted a more stringent actual innocence exception" in the context of second or successive petitions such as Caldwell's. Souter*, 395 F.3d at 590 [footnote omitted]. First, Petitioner must establish that the factual basis for his [successive habeas] claim[s] could not have been discovered previously through the exercise of due diligence. *See* 28 U.S.C. §2244(b)(2)(B)(i). This was not a requirement in the *Schlup* actual innocence analysis. Petitioner must also demonstrate not merely that "it is more likely than not" that no reasonable juror would have found him guilty, but instead Petitioner must establish by *clear and convincing* evidence that, *but for constitutional error*, no reasonable factfinder

would have found him guilty. *See* 28 U.S.C. §2244(b)(2)(B)(ii) (emphasis added). The Supreme Court has interpreted this provision as requiring a petitioner to demonstrate by clear and convincing evidence that he is innocent of the crimes for which he was convicted. *Calderon*, 523 U.S. at 558 ("a federal court can consider a claim presented in a second or successive application only if the prisoner shows, among other things, that the facts underlying the claim establish his innocence by clear and convincing evidence").

*Davis*, 2016 U.S. Dist. LEXIS 184081 at *50-52 (quoting *Caldwell v. Lafler*, No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 117863 at *8-10 (W.D. Mich. Mar. 7, 2008)) (first emphasis supplied in *Davis*, second emphasis supplied in *Caldwell*). *See also Case*, 731 F.3d at 1036 (observing that "[t]he *Schlup* standard appears to be more forgiving than subparagraph [§2244(b)(2)](B)(ii), since it allows a broader range of evidence to be evaluated by the court—old and new; admissible and inadmissible[.]"); *Lott*, 2007 U.S. Dist. LEXIS 91762 at *41 (noting that those courts that "have opined on this statutory requirement [*i.e.,* §2244(b)(2)(B)(ii)] have held that it is more stringent than the actual innocence standard set forth in *Schlup*.").

Under this more exacting actual innocence standard of §2244(b)(2)(B)(ii), the Court must "consider the body of evidence presented at trial, 'add back' the evidence kept from the jury as the result of constitutional error, and then determine whether the evidence 'is clear and convincing, in light of the evidence as a whole, that no reasonable factfinder would have found [petitioner] guilty' but for the violation." *Davis*, 2016 U.S. Dist. LEXIS 184081 at *52 (quoting *Bell v. Tibbals*, No. 1:09-cv-1887, 2013 U.S. Dist. LEXIS 42485 at *12 (N.D. Ohio Mar. 26, 2013) (Gaughan, J.)) (citations omitted). As explained by the Tenth Circuit, "the analysis proceeds in three steps: (1) we start with the body of evidence produced at trial, (2) add 'evidence allegedly kept from the jury due to an alleged [constitutional] violation,' *Sawyer* [*v. Whitley*], 505 U.S. at 349, 112 S.Ct. 2514, and (3) determine whether it is 'clear and convincing,' 'in light of the evidence as a whole,' that 'no reasonable factfinder would have' convicted [petitioner]." *Case*, 731 F.3d at 1033.

This Court's task, therefore, is "to look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the constitutional violations] and then make a probabilistic determination about what reasonable, properly instructed jurors would do." *Davis*, 2016 U.S. Dist. LEXIS 184081 at *53 (quoting *Bell*, 2013 U.S. Dist. LEXIS 42485 at *12 (citing *House v. Bell*, 547 U.S. 518, 538 (2006))). "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

Keith cannot meet the stringent actual innocence standard of §2244(b)(2)(B)(ii).

**b.  The three-steps of analysis**

**(i)  Evidence introduced at trial**

The relevant evidence adduced at trial is as follows:

**(a)  Events leading up to the murders**

At approximately 8:45 p.m. on February 13, 1994, Linda Chatman arrived the Bucyrus, Ohio apartment of Marichell Chatman, to retrieve her seven-year-old niece, Quanita Reeves, and her four-year-old nephew, Quentin Reeves. Tr.T., ECF.21-1, PAGEID#:10021-023. Also in the apartment was four-year-old Marchae Chatman and Richard Warren, Marichell's boyfriend. Tr.T., ECF.21-1, PAGEID#:10022-23; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9627.

Shortly after Linda arrived at the apartment, Warren noticed a man he later identified as Keith outside the door. Tr.T., ECF.21-1, PAGEID#:10024; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9628-629. Keith did not knock on the door and started to walk away. *Id*. Warren went to the door to see who was there; Keith turned and asked if Linda was at the apartment and if he could speak to her. *Id*. After Warren got Linda, she briefly left the apartment to speak with Keith. Tr.T., ECF.21-1, PAGEID#:10024-025; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9631. While Linda

was outside with Keith, Warren asked Marichell who the man was, and Marichell told him the man's name. While Marichell told Warren Keith's first and last name, he initially only recalled the first name of "Kevin" and that he had been involved in a large drug bust. Tr.T., ECF.21-1, PAGEID#:10025-026; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9631-632; *see also*, Tr.T., ECF.21-1, PAGEID#:10037 (Warren testifying Marichell said the name "Kevin" three to four times).

Shortly thereafter, Linda and Keith re-entered the apartment. Tr.T., ECF.21-1, PAGEID#:10026; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9632-633. Keith had a turtleneck shirt pulled over the lower portion of his face and was carrying a green garbage bag in his hand. Tr.T., ECF.21-1, PAGEID#:10027, 10035, 10040, 10060-061; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9633. Keith asked Marichell for a glass of water, which she gave him. Tr.T., ECF.21-1, PAGEID#:10026; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9632. While he was drinking the water through his turtleneck, Keith was making small talk with Warren about the cold temperatures and the basketball game on television. Tr.T., ECF.21-1, PAGEID#:10026; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9632-633.

Without warning, Keith reached into the garbage bag he was carrying, pulled out a Tec-9, nine millimeter semi-automatic handgun with an extended barrel and heat dissipater. Tr.T., ECF.21-1, PAGEID#:10028-029; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9634-636. Keith ordered Warren to come over to him, ordered everyone to lie on the floor, and they complied. Tr.T., ECF.21-1, PAGEID#:10029-030; Def. Tr.Ex.8, ECF.20-32, PAGEID#:9636-637.

Warren testified that after everyone was ordered to the floor:

A:     Then Marichell was saying, you know, "What are you doing? Why are you doing this? We didn't have anything…" She used his name. She said, "You know, Kevin, we didn't do anything." He told her, "Don't say my name. Don't say my name." And then she said, "Well, you don't hurt us – you ain't going to hurt us while the children are here. I don't want anything to happen to those children." And then he said, "What the fuck would I do that for."

24

Q:      Is that a quote?

A:      That is a quote. Then he put the gun to her head and told her to shut up. There was just more conversation that went on and he said, "Well, you should have thought about this before your brother started ratting on people."

Q:      Then what happened?

A:      Then she said, "Well, my brother didn't rat on anybody and even if he did we didn't have anything to do with it."

        And then he put the gun to her head and began – that's when it went off.

Q:      Did you see it?

A:      I didn't see it. I seen him with the gun to her head but I didn't see him discharge the weapon.

Q:      How do you know it went off?

A:      I heard it.

Q:      Then what happened?

A:      Then, after that is when I got shot in my jaw right here. And after that I turned my head away from what was going on because when he shot me my head turned that way and I didn't see anything after that but I heard the gun going off maybe ten, twelve more times. Then I got shot two more times in my back. And after that I heard the door close and I looked and he was gone so that's when I got up and ran out of the apartment yelling to try to get help and running straight over to Ike's.

Tr.T., ECF.21-1, PAGEID#:10031-032; *see also* Def. Tr.Ex.8, ECF.20-32, PAGEID#:9637-639;

Tr.T., ECF.21-1, PAGEID#:10037.

        While running across the field, Warren heard four or five more gun shots, one of which

hit him in the buttocks causing him to fall to the ground. Tr.T., ECF.21-1, PAGEID#:10032; Def.

Tr.Ex.8, ECF.20-32, PAGEID#:9642-643. Despite being shot in the jaw, the back, and the

buttocks, Warren survived to get help at Ike's.

                **(b) Warren identified Keith as the shooter.**

        Paramedics arrived at Ike's and the apartment. Tr.T., ECF.21-1, PAGEID#:9953-955.

Both Linda and Marichell were already dead from multiple gunshot wounds, but all three

children, while shot multiple times, were alive when paramedics arrived; Marchae died of her injuries en route to the hospital. *Id.* at PAGEID#:9956-960.

Warren was transported by paramedics to Bucyrus Hospital before being airlifted to Grant Hospital in Columbus. *Id.* at PAGEID#:9973. In the ICU after surgery, Warren informed Nurse John Foor that the shooter's first name was "Kevin."[4] Tr.T., ECF.21-1, PAGEID#:10040, 10470; Lt. Beal Rpt., ROW Apx., ECF.20-20, PAGEID#:6210. Nurse Foor then called the Bucyrus Police Department to alert them Warren was communicating.[5] Tr.T., ECF.21-1, PAGEID#:10470; Lt. Beal Rpt., ROW Apx., ECF.20-20, PAGEID#:6210.

Several hours later, after being extubated, Warren "immediately began speaking upon the breathing [tube] being removed from his throat." Nurse Amy 2010 Aff't, ROW Apx., ECF.20-25, PAGEID#:7691. Warren told Nurse Amy Whisman ("Nurse Amy") the perpetrator of the crime was "Kevin" but that he did not remember Kevin's last name. *Id.*; Phone call transcript, Def. Tr.Ex.4, ROW Apx., ECF.20-32, PAGEID#:9616. Captain Stanley spoke to Warren after Nurse Amy called the Police Department to inform them that Warren had given the first name of the shooter.[6] Phone call transcript, Def. Tr.Ex.4, ROW Apx., ECF.20-32, PAGEID#:9616-618. Warren told Captain Stanley that, although he did not remember Kevin's last name, he would

---

[4] Nurse Foor testified that Warren wrote the name on the clipboard, Tr.T., ECF.21-1, PAGEID#:10470, but Warren testified that he used sign language once his father arrived and that someone else wrote the name on the clipboard. Tr.T., ECF.21-1, PAGEID#:10056. Regardless of who actually wrote the name on the clipboard, the evidence unequivocally demonstrates Warren indicated the first name of "Kevin" immediately after surgery. *Id.* at PAGEID#:10056, 10470; *see also* Handwritten Notes, ROW Apx., ECF.20-8, PAGEID#:2895-898.

[5] As Keith has in the past, he again mischaracterizes Nurse Foor's testimony, alleging he committed perjury. *See* Pet., ECF.1, PAGEID#:25, 28, ¶¶30, 37. Contrary to Keith's assertion, Nurse Foor never claimed to have "thrown away" the notes Warren wrote. Rather, the trial transcript quite clearly shows that Nurse Foor testified that *he* did not keep the notes, not that he threw them away or otherwise destroyed them. *See* Tr.T., ECF.21-1, PAGEID#:10472. In fact, Nurse Foor testified that the note "was with the patient's chart there and was just on a piece of scratch paper." Tr.T., ECF.21-1, PAGEID#:10471.

[6] While Captain Stanley testified he spoke to Amy Gimmetts, his police report indicated it was Nurse Amy Wishman (sic) that had called. However, there is no longer a dispute that the Nurse Amy he spoke to was Amy Whisman, nka Amy Petryk. Nurse Amy 2010 Aff't, ROW Apx., ECF.20-25, PAGEID#:7691-692.

recognize it if he heard it. *Id.* at PAGEID#:9617. Captain Stanley provided Warren four or five different last names; Warren indicated the shooter's last name was "Keith." Tr.T., ECF.21-1, PAGEID#:10350-354; Capt. Stanley Rpt., p.87, ROW Apx., 20-20, PAGEID#:6291.

In addition to the statements provided to Captain Stanley, Captain Corwin took a videotaped statement from Warren at the hospital wherein Warren was shown a photo array. Tr.T., ECF.21-1, PAGEID#:10354; Capt. Corwin Rpt, p.27, ROW. Apx., ECF.20-20, PAGEID#:6231. Warren identified Keith's photo, and indicated he was ninety-five percent sure the person he had just identified was the person that shot him. Tr.T., ECF.21-1, PAGEID#:10050; Capt. Corwin Rpt, p.27, ROW. Apx., ECF.20-20, PAGEID#:6231. Warren later told officers he was positive Keith was the shooter after seeing him on television and hearing his voice. Capt. Corwin Rpt, p.37, ROW. Apx., ECF.20-20, PAGEID#:6241.

Warren identified Keith in the courtroom as the person who entered the apartment, engaged in small talk, drank two glasses of water, pulled a Tec-9 gun from a trash bag, ordered everyone to the ground, and began shooting. Tr.T., ECF.21-1, PAGEID#:10024.

### (c) Nancy Smathers identified Keith.

Nancy Smathers, another resident of the apartment complex, testified that, after hearing several "popping noises," she looked out her door where she saw a "big, stocky" and "powerful" looking man. Tr.T., ECF.21-1, PAGEID#:10070-73; *see also* Smathers Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Police Rpt. p.3, ROW Apx., ECF.20-20, PAGEID#:6207. After seeing Keith's photograph on television and in the newspaper, Ms. Smathers was sure he was the same man she saw on the night of the shooting. Tr.T., ECF.21-1, PAGEID#:10073, 10079; Police Rpt. p.72, ROW Apx., ECF.20-20, PAGEID#:6287. Ms. Smathers also identified Keith in the courtroom as the man she saw. Tr.T., ECF.21-1,

27

PAGEID#:10073. And, Ms. Smathers unequivocally denied the man she saw was really Karie Walker. *Id.* at PAGEID#:10073, 10081 ("there is a distinct difference between [Keith and Walker].").

#### (d) Nancy Smathers described the vehicle she saw flee the scene.

Ms. Smathers testified that she watched Keith run across the parking lot, enter the driver's side of a mid-sized, light colored car, and start to speed out of the lot when he slid into a snow bank underneath a street light. Tr.T., ECF.21-1, PAGEID#:10069-70; *see also* Smathers Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Police Rpt. p.3, 12, 83, ROW Apx., ECF.20-20, PAGEID#:6207, 6216, 6287. Ms. Smathers watched as Keith rocked the car back and forth to get it out of the snow, and observed the particulars about the car. *Id.* Specifically, she testified at trial:

A:      I stepped back inside the door when I seen the car coming. And I stood there and watched.

Q:      Was there any illumination?

A:      Yes, there is a light pole right here.

Q:      Okay. … So you saw the vehicle hit the snowbank?

A:      Yes.

Q:      What did you see after that?

A:      At that time, it was like, he was there stuck and they kept rocking it back and forth, back and forth.

Q:      Let me ask you a couple of questions. Do you know the color of the car?

A:      It was a light colored car.

Q:      Obviously you just mentioned somebody rocking the car. Tell us in your own words what you actually observed after the car hit the snowbank.

A:      The car hit the snowbank and upon hitting the snowbank, you could tell it was stuck because the wheels were turning too fast because it was on ice. And at that time they kept, like how you rock it back and forth when you are stuck. And like, upon that, they opened the door and he had his hand up on where the metal meets the frame and the hood, holding there and stepped out and with one foot, rocked back and forth, pulling at the same time.

Q:      You say this person had a hand on it?

28

A:      Yes, whatever it is that connects the roof of the car to the base of the car where the door shuts, that metal part right there.

Q:      Okay. Was there any illumination when the door opened?

A:      No. It was dark other than the street light.

Q:      Was there a light on inside the car when the door opened?

A:      Not that I could see.

Q:      Other than the street light, there was no light on the car or anything like that inside of it?

A:      When the door was opened, no because I was like—usually you can tell when the dome light's on. There was no—it was dark inside the car.

Q:      Were you able to see the license plate?

A:      No.

Q:      Why not?

A:      Because the light by the license plate wasn't working.

Q:      How long did this go on, the car stuck in the snowbank?

A:      I would say five minutes maybe it was stuck and rocking it and they couldn't get it out so they pulled it out. The person was just like in a hurry and frantic kind of.

Q:      And he finally got it out?

A:      It seemed like they pulled it out.

Q:      What kind of a car was this?

A:      It was—wasn't like a mid-sized car, not a big one, wasn't a Cadillac and wasn't a small one, a mid-sized car.

Q:      Were you able to observe anything about the shape of the car other than just medium sized?

A:      It was a medium sized—the only thing brought to my attention was how most back lights (sic) slopes down. This one went down at a straight cut like that. (Indicating)

Tr.T., ECF.21-1, PAGEID#:10070-73; *see also* Smathers Written Stmt., Def. Tr.Ex.9, ROW

Apx., ECF.20-32, PAGEID#:9651-652; Police Rpt. p.3, 12, 83, ROW Apx., ECF.20-20,

PAGEID#:6207, 6216, 6287.

During cross examination, Keith placed into evidence Ms. Smathers' written statement

taken the day after the murders. Tr.T., ECF.21-1, PAGEID#:10083; Smathers' Written Stmt.,

29

Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651-652. Therein, Ms. Smathers indicated that, after hearing "six loud pops," she went to her door and watched Keith get into a car which he had been backed into a parking space. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651. When he went speeding out of the spot, he could not make the curve, and "he slid into the snow bank." *Id.* Ms. Smathers continued:

> When he slid into that he got out and was pulling on the frame rocking the car and shifting gears back and forth at the same time. He was panicked, trying to get it out in a hurry. After a couple times he got it backed out. He got in, gave it the gas, and sped out of here. When he was standing out of the car it was a 2 door, *crème color, real light, green, yellow or blue, light color car*. It wasn't a small or big car, just a medium size car. Most back windows slope. This one was cut straight down, then the trunk came out.

*Id.* (emphasis added).

Ms. Smathers further described the car's taillights as "rectangular[,] I think two with a round one in the middle," and that both the dome and license plate light did not function. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9652; Police Rpt. p.12, ROW Apx., ECF.20-20, PAGEID#:6216.

Based upon Ms. Smathers' description of the vehicle, officers determined they were probably looking for a 1980 to 1982 Oldsmobile Cutlass or Omega. Tr.T., ECF.21-1, PAGEID#:10512.

### (e)  Police found the imprint of "043" and tire tracks in the snow bank.

At the snow bank where Ms. Smathers observed Keith get his vehicle stuck, officers located a partial tire imprint, as well as a partial license plate imprint. At the scene, BCI Special Agent David Barnes observed with the naked eye the impression in the snow bank left by the vehicle's front bumper and license plate, as well as tire tracks leading to the snow bank. Tr.T., ECF.21-1,  PAGEID#:10164-165; *see also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883

("South of the office, on the south side of this drive, was a snow bank approximately two feet high. The impact of a motor vehicle was evidence in this snow bank, as an area of snow was apparently pushed back by a bumper, above a tire track."). Agent Barnes testified that, on the night of the murders, he saw the imprint of the numbers "zero, 4, 3" in the snow. *Id.* at PAGEID#:10165; *see also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883 ("Coexisting in the impression made by the bumper were three reversed numerals, consistent in size with those on a license plate. These numerals seemed to be 043."). Agent Barnes explained to the jury how he took measurements, photographs, and made plaster casts of the tire, license plate, and bumper impressions. *Id.* at PAGEID#:10166-168; *see also* plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#:9452-53; Photographs, States Tr.Exs.11-16,  ROW Apx., ECF.20-31, PAGEID#:9463-68; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883.

In addition, other officers described in their police reports their observances on the night of the murders of the bumper impression and the numbers "043" in the snow. *See* Koepke BPD Rpt. pg.3, Def. Tr.Ex.6, ROW Apx., ECF.20-20, PAGEID#:6207 ("There was 1 tire track imprint, scrapes of front underside, and poss[ible] partial front plate impression."); Harden Rpt., Def. Ex.10, ROW Apx., ECF.20-32, PAGEID#:9653 ("Examination of the snow bank revealed a partial license plate of _ _ _ 043 in the snow."); Beal BPD Rpt. pg.6, ROW Apx., ECF.20-20, PAGEID#:6210 ("I assisted in making a plaster cast of the tire print and a partial license plate print from the snow. The number appeared to be _ _ _046, 048, or 043.").

### (f)  Police recover evidence from the murder scene.

Investigators recovered more than twenty bullets and shell casings from the crime scene. Tr.T., ECF.21-1, PAGEID#:10157. Sixteen bullets and casings were located inside the apartment, and six casings were located in the field between the apartment and Ike's. Tr.T.,

ECF.21-1, PAGEID#:10153, 10155-57, 10189-90; Diagrams, States Tr.Exs.40-41, ROW Apx., ECF.20-31, 9500-504. Analysis of these bullet fragments and casings, as well as the bullets recovered from the victims' bodies, revealed they were fired from the same gun. Tr.T., ECF.21-1, PAGEID#:10254, 10261-262; Lab Rpt., States Tr.Ex.142, ROW Apx., ECF.20-31, PAGEID#:9608-610. In addition to the bullet fragments and casings, officers located other evidence at the apartment—a drinking glass from which Richard and Quanita both stated Keith drank, a green trash bag, and broken glass from the door. Tr.T., ECF.21-1, PAGEID#:10094, 10193, 10241-242; Drinking glass, States Tr.Ex.55, ROW Apx., ECF.20-31, PAGEID#:9519; Lab Rpts., States Tr.Exs.139-140, ROW Apx., ECF.20-31, PAGEID#:9605-606.

### (g) Police recover a shell casing across from the General Electric plant on the other side of town

One of Keith's girlfriends, Zina Scott, worked at the General Electric plant on Walnut Street in Bucyrus. Tr.T., ECF.21-1, PAGEID#:10097. Ms. Scott testified Keith took her to work that day and then picked her up on Walnut Street at 11:00 p.m. on the night of the murders. *Id.* at PAGEID#:10098.

Farnella Graham testified that, at approximately 9:45 p.m. on February 13, 1994, she noticed trash on the sidewalk in front of her home which was directly in front of the driveway to the General Electric plant.[7] Tr.T., ECF.21-1, PAGEID#:10116-117. Ms. Graham testified that she picked up the trash from her sidewalk when she awoke the next morning. *Id.* at PAGEID#:10117. When she picked up the fast food trash, she located a spent shell casing. *Id.* at PAGEID#:10117-118, 10123-124. Not knowing the significance of the shell casing, Ms. Graham threw it and the trash into her kitchen garbage can. *Id.* at PAGEID#:10118, 10125-127. Ms.

---

[7] Contrary to Keith's contention, Ms. Graham did not say she saw the *shell casing* the night of the murders. Rather, she *saw the trash* the night of the murders and found the casing the next morning. There was no testimony to suggest the shell casing and the trash were thrown in Ms. Graham's yard at the same time.

Graham's daughter, having heard about the shootings which had occurred the night before, called the police to respond to her mother's home to retrieve the shell casing. *Id.* at PAGEID#:10118-119. Officer John Seif testified that he met with Ms. Graham and retrieved the spent shell casing from her trash can. Tr.T., ECF.21-1, PAGEID#:10128-129; Seif Rpt., ROW Apx., ECF.20-27, PAGEID#:8146. Scientific analysis of the shell casing Ms. Graham located on her walkway revealed it matched the casings located at the crime scene. Tr.T., ECF.21-1, PAGEID#:10254, 10261-262; Lab Rpt., States Tr.Ex.142, ROW Apx., ECF.20-31, PAGEID#:9608-610.

### (h) Police arrest Keith's other girlfriend, Melanie Davison, in a 1982 Oldsmobile Omega with a license plate containing "043."

Gail Cochran testified that she was a corrections officer with the Crawford County Sheriff's Department responsible for checking-in visitors to the county jail. Tr.T., ECF.21-1, PAGEID#:10103. Officer Cochran testified that one of Keith's visitors identified herself as Sherrie Brown and signed in at 10:30 a.m. on March 5, 1994. Tr.T., ECF.21-1, PAGEID#:10104, 10106-107; Sign-in Log, States Tr.Ex.45, ROW Apx.20-31, PAGEID#:9508. Officer Cochran identified a photo of the visitor, whose real name was Melanie Davison, not Sherrie Brown. Tr.T., ECF.21-1, PAGEID#:10107-108; States Tr.Ex.42, ROW Apx., ECF.20-31, PAGEID#:9505. Upon visiting the jail, Davison had brought a bag containing sweat pants for Keith. Tr.T., ECF.21-1, PAGEID#:10108-109. When Officer Cochran checked the sweat pants, she became suspicious and contacted another deputy for assistance.[8] *Id.* at PAGEID#:10108-109; *see also* Report, ROW Apx., ECF.20-11, PAGEID#:3890-897. Deputy Scott Robertson testified that after his conversation with Officer Cochran, he contacted the Crestline Police Department to have them be on the lookout for Davison. Tr.T., ECF.21-1, PAGEID#:10111. Crestline Officer

---

[8] The sweat pants contained a balloon of marijuana in the waistband. Cochran Rpt., ROW Apx., ECF.20-11, PAGEID#:3897.

Edward Wilhite testified that he located and stopped Davison's vehicle. *Id.* at PAGEID#:10113-114. Upon stopping her vehicle, Patrolman Wilhite noticed the last three numbers on the license plate matched the license plate numbers that the Bucyrus Police Department wanted in connection with the shootings. *Id.* at PAGEID#:10114; *see also* Robertson Rpt., ROW Apx., ECF.20-11, PAGEID#:3890. The car, a light-colored 1982 Oldsmobile Omega, with a license plate of MVR043, was subsequently impounded. Tr.T., ECF.21-1, PAGEID#:10115; *see also* Robertson Rpt., ROW Apx., ECF.20-11, PAGEID#:3890; Photos of Omega, States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543.

### (i)  1982 Oldsmobile Omega matched Ms. Smathers' description.

The 1982 Oldsmobile Omega was a light bluish-silver color. Photos of Omega, States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543. As described by Ms. Smathers, the vehicle had a nearly straight rear window, a trunk which extended from the rear glass, and rectangular tail lights with an emblem between the rectangles. Photos of Omega, States Tr.Exs.77-78, ROW Apx., ECF.20-31, PAGEID#:9541-542. Officers discovered the license plate light did not function, nor did the dome light when the driver's door was opened, just as Ms. Smathers reported. Tr.T., EFC.21-1, PAGEID#:10201-202; Photos of Omega, States Tr.Exs.74-75, ROW Apx., ECF.20-31, PAGEID#:9538-539; *see also* Corwin Rpt., p.60, ROW Apx., ECF.20-20, PAGEID#:6264; Harden Rpt., Def. Tr.Ex.10, ECF.20-32, PAGEID#:9658. Officers also located a hand print (without sufficient ridge detail for a comparison) on the driver's side door frame near the front windshield—precisely where Ms. Smathers indicated Keith grabbed the frame to rock the car out of the snow. Tr.T., EFC.21-1, PAGEID#:10200-201; Photos of Omega, States Tr.Exs.72-73, ROW Apx., ECF.20-31, PAGEID#:9536-537; *see also*

Corwin Rpt., p.60, ROW Apx., ECF.20-20, PAGEID#:6264; Harden Rpt., Def. Tr.Ex.10, ECF.20-32, PAGEID#:9658.

> **(j) The license plate on the Omega was consistent with the impression in the snow.**

Upon obtaining the 1982 Oldsmobile Omega when Ms. Davison was arrested, officers observed that the placement of the license plate, the numbers, and bumper appeared to match the impressions left in the snow. *See, e.g.,* Tr.T., ECF.21-1, PAGEID#:10199-200; States Tr.Exs. 8, 11-14, 79, PAGEID#:9460, 9463-466, 9543; *see also* Corwin Rpt, ROW Apx., ECF.20-21, PAGEID#:6434, 6435-436 (describing Agent Harden comparing the measurements taken from the snow bank to the vehicle). The measurements taken at the scene also appeared to match, but the car was sent for analysis to confirm the officers' observations. *Id.*

BCI Forensic Scientist, Michelle Yezzo, testified via deposition because she was out of town at the time of trial. Tr.T., ECF.21-1, PAGEID#:10277 (Yezzo "had to be in California this week to … conduct a class or attend a seminar. So the attorneys got together with her last week and had her deposition taken."). Yezzo testified that she analyzed the photographs of the snow bank, the plaster casts, and the vehicle. Yezzo Depo., ROW Apx., 20-1, PAGEID#:559-89; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9449-451. Based upon her analysis, she determined the license plate and bumper on the Omega were similarly placed on the vehicle as on the vehicle which made the impression in the snow bank. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9450. As such, Yezzo determined the license plate and bumper on the front of the 1982 Oldsmobile Omega was consistent with the placement of the impression left in the snow. *Id.*

**(k) The tires on the Omega were not the same as those the owner had purchased six months before the murders.**

Alton Davison, the owner of the 1982 Oldsmobile Omega, testified he purchased the car in June 1993, and in August 1993 he purchased four new tires for the vehicle from Firestone in Mansfield, Ohio. Tr.T., ECF.21-1, PAGEID#:10134-135; Receipt, States Tr.Ex.19; ROW Apx., ECF.20-31, PAGEID#:9471; Firestone Docs, States Tr.Ex.7; ROW Apx., ECF.20-31, PAGEID#:9456-459. Mr. Davison estimated the tires had 3000 miles usage between August 1993 and February 1994. Tr.T., ECF.21-1, PAGEID#:10136. He further testified he had no reason to replace the tires in that time period, nor did he authorize anyone to change the tires. *Id.*

However, when Yezzo analyzed the vehicle, she determined the tires Mr. Davison had purchased in August were no longer on the vehicle. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571-72, 574; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Photos, States Tr.Exs.9-10, 15-16, ROW Apx., ECF.20-31, PAGEID#:9461-462, 9467-468. In fact, the tires found on the Omega at the time it was impounded were not even manufactured until the third week of January 1994, making it impossible these were the tires Mr. Davison had purchased in August of 1993. Yezzo Depo., ROW Apx., 20-1, PAGEID#:574, 579-80; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451. Moreover, Yezzo indicated that the tires did not appear to be professionally balanced, and therefore, may not have been placed by a dealer. Yezzo Depo., ROW Apx., 20-1, PAGEID#:587-88.

Yezzo further testified that the tread designs on the tires on the Oldsmobile were not consistent with the tread from the photographs or the plaster cast. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571-72, 574; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Photos, States Tr.Exs.9-10, 15-16, ROW Apx., ECF.20-31, PAGEID#:9461-462, 9467-468. But, Yezzo testified the tread design was consistent with the tires Mr. Davison had purchased and placed on

36

the vehicle in August. Yezzo Depo., ROW Apx., 20-1, PAGEID#:572; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Tire documents, States Tr.Exs.7, 17-19, ROW Apx., ECF.20-31, PAGEID#:9456-459; 9469-471; Photos, States Tr.Exs.9-10, ROW Apx., ECF.20-31, PAGEID#:9461-462. The jury had the photographs of the snow bank, the plaster casts, and the tire documentation to review to make their own comparisons. Plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#: 9452-453; Photos, States Tr.Exs.9-16, ROW Apx., ECF.20-31, PAGEID#:9461-468.

### (l)  Keith's alibi did not hold up to scrutiny.

Keith called his aunt, Grace Keith as an alibi witness. Tr.T., ECF.21-1, PAGEID#:10375-381. Aunt Grace testified she was home with Yolanda Price, Dwayne Price, and "some girl Zena."[9] *Id.* at PAGEID#:10377. She testified that, while she did not know when Keith arrived at her house or when he left, she knew she saw him at 9:00 p.m. on the night of the murders because she looked at her watch. *Id.* at PAGEID#:10377-378.

On cross examination, Aunt Grace admitted she gave an interview with the media after Keith's arrest, but denied she said she did not know the time he was at the house. *Id.* at PAGEID#:10380-381. The prosecutor, in his rebuttal case, played Aunt Grace's interview for the jury. Tr.T., ECF.21-1, PAGEID#:10514-516; States Tr.Ex.146 (DVD manually filed). In that interview, jurors heard Aunt Grace tell reporters: "Sunday night he was in my house around 9:00 o'clock cause he came in and borrowed $5.00 from my son and then he hung around for a while and he had to pick his girlfriend up. He went to pick the girlfriend up and came back to my house." *Id.* at PAGEID#:10515; States Tr.Ex.146. In response to the reporter asking if Keith was at her house at the time of the murders, jurors heard Aunt Grace respond: "I can't say that … I

---

[9] This testimony was in direct contradiction to Zina Scott's testimony that she had been at work at the GE plant until 11:00 p.m. on the night of the murders. *See* Tr.T., ECF.21-1, PAGEID#:10098.

don't know what time it was … I didn't pay no attention to that part of it, but he was at my house maybe around 9:00 o'clock and my son came and say he came in and borrowed $5.00 from him." *Id.*

> **(m)  In addition to an alibi, Keith suggested to the jury several "alternate suspects" that he alleged committed the murders, including Rodney Melton.**

During his trial, Keith floated several "alternate suspects" for the jury to consider. He briefly suggested it could have been Karie Walker, Keith's half-brother. Tr.T., ECF.21-1, PAGEID#:10544. Then he suggested it was Bruce Melton. Tr.T., ECF.21-1, PAGEID#:10540-541. But his most consistent "alternate suspect" has been Rodney Melton. Tr.T., ECF.21-1, PAGEID#:10542. Keith called Rodney to testify twice during his trial. Tr.T., ECF.21-1, PAGEID#:10364-374;  PAGEID#:10448-456. He extensively questioned Rodney about his cream-colored Impala, his old license plate which had a "043" as the first three digits, his whereabouts on the night of the murders, and his involvement in criminal activities. *Id.*

Rodney testified that, on the night of the murders, he was at home in Crestline, and was awoken sometime between 10:30 and 11:00 p.m. to news of the shooting. Tr.T., ECF.21-1, PAGEID#:10365-366. After learning of the shooting, Rodney stated he got a ride to the scene. *Id.* at PAGEID#:10367. Rodney further testified that he had previously warned Rudel "to watch his back." *Id.* at PAGEID#:10455.

Trial counsel then asked Rodney about his vehicles—a cream-colored 1979 Chevy Impala and a 1974 Pontiac LeMans. *Id.* at PAGEID#:10367. Rodney stated that his Impala was inoperable on the night of the murders. *Id.* at 10372. Rodney told the jury that he once had a license plate with the numbers "043," but admitted he did not recall if the numbers preceded or followed the letters. *Id.* at PAGEID#:10371. He also testified that his current license plates on his

Impala did not contain the numbers "043." *Id.* at PAGEID#:10370. Trial counsel then recalled Rodney to ask if he had been indicted in a "pharmacy burglary ring," and to ask if he had previously murdered other people. *Id.* at PAGEID#:10449-455.

Several officers were also questioned about Rodney Melton's former 043 license plate. Captain Stanley testified that he had received information that Rodney had a license plate of LIJ043, but that when he ran that plate number, it came back to a different individual, not Rodney. Tr.T., ECF.21-1, PAGEID#:10355-356. Lieutenant Dayne testified that he investigated Rodney's Impala. Tr.T., ECF.21-1, PAGEID#:10483. Lt. Dayne observed the Impala had no front license plate, but that the mounting was in the center of the front bumper. *Id.* He further testified that the plate on the rear of the Impala did not contain the numbers "043." *Id.* Lt. Dayne detailed his investigation into Rodney's prior license plate, and testified that the plate was "an older plate, expired for some period of time, and the letters and numbers were oppositely displayed as to what they are here." *Id.* at PAGEID#:10484; *see also Id.* at PAGEID#:10485 ("The difference being the 043 on this plate [State's Exhibit 78] is on the right side and Rodney Melton's older registration, the 043 would be on the left or come first as you are reading left to right."). And Captain Corwin testified that he "discounted Rodney Melton's plates [because] [t]he 043 on Rodney's plates and the 043 in this case with the letters are different." Tr.T., ECF.21-1, PAGEID#:10437. Under intense cross-examination on the issue, Capt. Corwin explained that he knew Rodney's old license plate was not the plate they were looking for because "the plates Rodney Melton had, the numbers were where the letters were. In other words the plate said 043LAJ and the impression in the snow, the letters were before the numbers." *Id.* at 10438.

39

### (ii) The evidence the State allegedly improperly withheld in violation of *Brady v. Maryland.*

#### (a) Keith's newest allegations as contained in his current petition

#### (1) Yezzo personnel file

In Keith's first habeas claim, he alleges that the State violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), in not disclosing prior to trial the personnel file of BCI Forensic Scientist, Michelle Yezzo. Based upon hearsay-within-hearsay statements of co-workers detailing her interpersonal relationship problems, Keith alleges that Yezzo's scientific conclusions were suspect.[10] Other than these hearsay statements, Keith points to no findings from the time period around his trial that her work was actually suspect or that disciplinary action was taken based upon her scientific analysis. In fact, no such disciplinary action was taken until 2008 in relation to Yezzo's analysis of glass and paint—neither of which were in issue in Keith's case. *See* Letter, Pet. Ex.14, ECF.1-14, PAGEID#:140-141. Rather, Yezzo's file was replete with accomplishments and accolades for her scientific work. *See* Yezzo Evals., ROW Apx., ECF.20-27, PAGEID#:8218-261; Letters, ROW Apx., ECF.20-27, PAGEID#:8334-431.

Keith additionally maintains that, because of Yezzo's allegedly suspect testimony, police failed to investigate alternative suspects, particularly Rodney Melton. *See* Pet., ECF.1, PAGEID#:19-27. He does not, however, provide any information that Yezzo's testimony was faulty. The closest he gets is once again presenting to this Court the report of the expert he hired in 2010 to provide testimony in his clemency hearing, wherein Bodziak rendered an opinion

---

[10] Apparently Keith only believes her conclusions that tend to support his guilt are suspect, because he does not seem to doubt the veracity of her testimony which was in his favor, particularly that there were no fibers in the vehicle connecting him to the scene nor did the shoes Keith wore at the time of his arrest match the footprint found at the scene. *See* Yezzo Depo., ROW Apx., 20-1, PAGEID#:579, 584; Yezzo Rpt., States Tr.Ex.1, ROW Apx., ECF.20-31, PAGEID#:9451; *see also Keith*, 2017 Ohio App. LEXIS 2545, at *12, ¶13.

without examining either the vehicle or the plaster casts like Yezzo had done.[11] *See* Bodziak Rpt., Pet. Ex.24, ECF.1-24, PAGEID#:187-93.

### (2) Subpoena with note

In Keith's second habeas claim, he alleges the State suppressed the subpoena that *he issued* to the police at the time of trial for the radio and dispatch logs.[12] Pet., ECF.1, PAGEID#:28-30. Specifically Keith claims that the suppression of the subpoena with the notation to "ignore for now" prevented him from demonstrating that the police "acted in bad faith" in destroying the call sometime after the time of trial. *Id.* He makes absolutely no argument that this subpoena somehow shows he is actually innocent of the murders.

### (b) Prior allegations

Throughout the years, Keith has lodged multiple *Brady* claims against the State, but none of his allegations have ever gone directly to the issue of his alleged innocence. Rather, the majority of his allegations have been about additional evidence he could have used to impeach witnesses. From the notes Warren wrote in the hospital with the name "Kevin" written in a hand other than Warren's (despite Warren indicating in his testimony that *he did not write the name Kevin, that he used sign language* which his father then interpreted) (*see* Tr.T., ECF.21-1, PAGEID#:10056), to the pharmacy board records detailing additional impeachment evidence which he could have attempted to ask Rodney (despite asking Rodney during trial about his involvement in the pharmacy robberies) (*see* Tr.T., ECF.21-1, PAGEID#:10449), to his allegation that Ms. Graham lied about finding the shell casing in her yard across the street from

---

[11] Keith had presented this report in his third habeas petition, and the Sixth Circuit denied authorization to proceed on the successive petition, finding he had not met his burden to make a prima facie showing under §2244(b). Order, 6th Circuit Case No. 14-3290, Doc.16-2 (Dec. 8, 2014).

[12] As Keith has repeatedly done since 2010, he confuses radio and dispatch logs, referring to them as if the terms are interchangeable.

where Keith picked up Zina Scott from the GE plant, *none* of Keith's earlier *Brady* claims show he is *actually innocent* of these murders.

> **(iii) Even in light of the allegedly suppressed evidence, Keith still cannot establish that no reasonable juror would have found him guilty.**

As both the state and federal courts have repeatedly stated, the evidence against Keith was overwhelming. *See, e.g., Keith*, Opinion & Judgment Entry (Aug. 9, 2010), ROW Apx., ECF.20-24, PAGEID#:7182-196; Keith, 192 Ohio App. 3d 231, 244 (Jan.31, 2011) ("we reiterate this Court's prior finding that, 'a jury of twelve citizens found the evidence presented sufficient to convict Keith, and this verdict has stood the test of time and an exhaustive series of both state and federal appeals.'") (quoting *Keith*, No. 3-08-15, 2008 Ohio App. LEXIS 5176, 2008-Ohio-6187 (Dec. 1, 2008)); *Keith*, No. 3-17-01, 2017 Ohio App. LEXIS 2545, 2017-Ohio-5488, at *27 (Jun. 26, 2017) ("Over the years in his numerous appeals and post-conviction petitions Keith has challenged many aspects of his case and the evidence against him, but one fact remains clear, the evidence against Keith was simply overwhelming.") *Keith v. Mitchell*, 455 F.3d 662, 675 (6th Cir. 2006) ("Finally, we note that this is not 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.' Keith does not claim that he is actually innocent.") (citation omitted); *Keith v. Bobby*, 551 F.3d 555, 558 (6th Cir. 2009) ("it is a stretch to say that the fact that another person had a motive and that an eyewitness's original identification may have occurred during a police interview and not independent of it could constitute clear and convincing evidence that no reasonable fact finder could have returned a guilty verdict. … [Keith's new evidence] does not contradict *any* evidence that directly proves guilt.").

And it remains so even in light of Keith's repeated attacks on collateral matters. None of his prior *Brady* claims, nor his newest claims, have gone to the issue of Keith's guilt or

innocence. And both of his newest claims allege the material would have been beneficial for impeachment purposes. None of Keith's allegations—new or old—are sufficient to show by clear and convincing evidence that he is *actually and factually innocent* of these murders. *See Case v. Hatch*, 731 F.3d 1015, 1031-32 (10th Cir. 2013); *Caldwell v. Lafler*, No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 25364 at *2 (W.D. Mich. Mar. 31, 2008); *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). At best, Keith's attacks are all against the legal sufficiency of his conviction. While that *might* be enough to obtain relief in a first habeas petition, it is insufficient to obtain relief in a successive petition under §2244(b)(2)(B)(ii).

Keith ignores his obligation to show, by clear and convincing evidence, that he is *actually innocent* of these murders. Rather, he merely has attempted to *cast some doubt* on his guilt. As Keith has throughout the years, he attacks collateral matters, and alleges the State withheld evidence he could have used to impeach the witnesses. But, the Sixth Circuit has held that "[e]ven assuming that [petitioner] could not have discovered the proffered evidence sooner, we have held that new impeachment evidence *does not of itself provide proof of actual innocence.*" *In re Whittaker*, No. 17-2135, 2018 U.S. App. LEXIS 4804, at *3 (6th Cir. Feb. 26, 2018) (citing *In re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001)) (emphasis added); *see also In re Elliot*, No. 17-1496, 2017 U.S. App. LEXIS 22314, at *4 (6th Cir. Nov. 7, 2017) ("Even if we were to accept as true Elliot's allegation that the prosecution did not disclose Hendrix's use as an informant, that fact would only impeach Hendrix and would not establish Elliot's actual innocence. We have held that new impeachment evidence does not provide proof of actual innocence.").

In his latest habeas petition, Keith alleges Yezzo's personnel file would have provided impeachment evidence. Importantly, he does not and cannot allege that the Yezzo's interpersonal

problems with her co-workers or the unsupported hearsay-within-hearsay statements that her work was suspect show by clear and convincing evidence that he is *actually innocent* of these murders. Rather, he would have liked to have been able to attempt to impeach her with those records. Nor does he allege that the ignored subpoena for radio and dispatch logs show that he is *actually innocent*. Rather, he would have liked to have been able to impeach Nurse Foor who testified he called the police department after Warren gave the name "Kevin." Keith ignores the fact that the subpoena was one *he issued*, so he clearly knew the police had not complied at the time of trial. He also ignores the fact that he extensively cross-examined Nurse Foor about the notes Warren wrote and the phone call Nurse Foor made to the police. *See* Tr.T., ECF.21-1, PAGEID#:10473; *see also* Beal Rpt., p.6, ROW Apx., ECF.20-20, PAGEID#:6210.

Keith's prior *Brady* allegations also did not attack his guilt; rather all of Keith's allegations have been to collateral matters. He has repeatedly mischaracterized the strong evidence against him and alleged everyone that testified against him was lying—from the nurses, to the police, to the witnesses who provided identification testimony and found evidence linking him to the crime. In fact, each and every claim and each of his mischaracterizations of the record that Keith has raised throughout the years has been soundly rejected by every court which has reviewed them. Even the Ohio Parole Board, not bound by legal doctrines, procedural rules barring consideration, or state rules of evidence, did not find *any* of Keith's claims indicative of his innocence. Keith Clemency Report (Aug. 19, 2010), publicly available at https://www.drc.ohio.gov/Portals/0/Clemency/clemency_keithaug2010.pdf?ver=2016-11-04-085148-970 (last accessed March 22, 2019).

And, despite his repeated allegations, not only did the police investigate Rodney Melton as an alternate suspect in the murders, Keith himself extensively presented to the jury his theory

that Rodney was the real killer. As already detailed, *supra*, Keith extensively questioned Rodney about his car, his license plate, his actions on the night of the murders, and his criminal history. Far from preventing him from presenting to the jury his theory that Rodney was the "real killer," the record clearly shows Keith presented the theory and the jury rejected it.

In all, Keith's petition must be denied as being an impermissible successive habeas petition because Keith does not meet his burden under either the diligence prong of §2244(b)(2)(B)(i) or the actual innocence prong of §2244(b)(2)(B)(ii).

## V.    Alternative Defenses

The Sixth Circuit's October 26, 2018 finding was only that Keith had made a "prima facie" case of his claims, meaning he put forth "sufficient allegations" together with "some documentation" entitling him to further review by this Court. *In re McDonald*, 514 F.3d 539, 546 (6th Cir. 2008) (internal citations omitted). It was not a precedential finding that he exercised diligence in pursuing his claim. Nor was it a precedential finding that he could not have discovered the evidence before, or that the evidence would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the him guilty of the underlying offense. "It is important to note that our prima facie finding was not a 'preliminary merits assessment,' but rather a determination focused 'solely on the conditions specified in §2244(b) that justify raising a new habeas claim ... *not to any assessment regarding the strength of the petitioner's case*.'" *Case v. Hatch*, 731 F.3d 1015, 1028 (10th Dist. 2013) (quoting *Ochoa v. Sirmons*, 485 F.3d 538, 541–42 (10th Cir. 2007)) (emphasis supplied). Rather, it constitutes only authorization for Keith to proceed with his permitted claims here to allow this Court to "engage in additional analysis in order to ascertain whether but for the constitutional error, no reasonable factfinder would have found [him] guilty…." *In re McDonald*, 514 F.3d at 547. Moreover, with authorization to file a second petition granted, the case proceeds in this Court, which under §2244(b)(4), has the final say regarding

satisfaction of §2244(b)(2) conditions, subject to ordinary appellate review following the entry of judgment (in the event a certificate of appealability is granted with respect to the issue). *LaFevers v. Gibson*, 238 F.3d 1263, 1266-67 (10th Cir. 2001).

Thus, the Sixth Circuit did not undertake any analysis of potential defenses that Keith's claims violate the AEDPA's statute of limitations, that the claims are defaulted, or that the claims lack merit; those decisions are for this Court to make should it determine that Keith's petition survives the §2244(b) analysis. Therefore, in the event this Court allows Keith's claims to pass through to the second gate, the Warden alternatively argues Keith's petition is time-barred, and he cannot overcome his tardiness with equitable tolling to save the claims. Additionally, Keith's claims are defaulted and/or unexhausted, and are completely meritless.

### A. Keith's petition violates the AEDPA's one-year statute of limitations and no tolling provision exists to save his claims.

#### 1. Keith's claims are barred by the AEDPA statute of limitations

Keith's claims for which the Sixth Circuit permitted review are only those claims related to Yezzo's personnel file and the Bucyrus Police Department inaction on Keith's trial-time subpoena. Both claims violate the AEDPA statute of limitations.

The AEDPA created a one-year limitations period for habeas petitions brought by individuals challenging their state-court convictions. 28 U.S.C. §2244(d); *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007). Under 28 U.S.C. §2244(d)(1), the limitations period begins to run from the latest of four events:

> (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the

Supreme Court and made retroactively applicable to cases on collateral review; or

(D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Both of Keith's claims are time-barred. The only provision which would be applicable to Keith's case is §2244(d)(1)(D). However, by Keith's own admission, he learned of both the "Yezzo claim" and the "subpoena claim" more than a year before he filed his successive habeas petition (without Circuit Court approval) on March 19, 2018. According to Keith's petition, he first learned of the "Yezzo claim" in January 2016. Pet., ECF.1, PAGEID#:13. Keith does not disclose the date upon which he learned of the information. Giving Keith the most liberal calculation possible, he had until January 31, 2017 to bring his "Yezzo claim" in federal court.

Keith's "subpoena claim" fairs no better. Keith asserts he first learned about his "subpoena" claim when he received a response to his latest public records request from the police department on February 2, 2017. While the Warden disputes that assertion, giving him the most liberal calculation, Keith was required to raise his claim within one year of that alleged discovery—by February 2, 2018. Again, Keith filed his successive habeas petition with this Court on March 19, 2018—more than a month tardy for the "subpoena" claim.

Absent any permissible tolling, Keith's claims are time-barred.

### 2. *Statutory tolling cannot render Keith's petition timely*

Neither of Keith's claims are entitled to statutory tolling during the pendency of his motion for leave to file a motion for new trial based upon the "Yezzo claim." First, Keith's motion for leave to file a motion for new trial was not "properly filed." Second, Keith never raised in state court his "subpoena claim."

The running of the AEDPA limitations period may be tolled during the pendency of a "properly filed" application for state postconviction relief or other collateral relief with respect to

the pertinent judgment or claims under §2244(d)(2). The Supreme Court has held that an application is "'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings" such as the requirements concerning "the form of the document," applicable "time limits upon its delivery, the court and office in which it must be lodged, and payment of a filing fee." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). If Keith had "properly filed" a qualifying state collateral action during the relevant year presumed to run from January 2016 to January 2017 (for his "Yezzo claim") and February 2017 to February 2018 (for his "subpoena claim"), his AEDPA limitations period may have been entitled to tolling. But he did not.

For starters, Keith cannot claim any entitlement to statutory tolling for his "subpoena claim" because he failed to even attempt to raise that claim in state court. Based upon the state court's denial of his "Yezzo claim," it is unlikely the state court would find any additional motion for leave to file a delayed motion for new trial based upon the subpoena issue to be properly filed.

Moreover, the state courts held Keith's motion for leave to file a delayed motion for new trial based on the "Yezzo claim" was procedurally barred because he failed "to establish that he was unavoidably prevented from obtaining Yezzo's personnel file, and there is simply no indication other than pure speculation that he would have been unable to obtain Yezzo's file through a[n earlier] public records request." *State v. Keith*, No. 3-17-01, 2017-Ohio-5488, 2017 Ohio App. LEXIS 2545, at *23, ¶33 (Ohio App. June 26, 2017). As such, the state appellate court determined Keith's motion for leave to file a delayed motion for new trial was untimely under Ohio Criminal Rule 33(B), and it was not entitled to the benefit of the rule's time-limit exceptions. Thus, the Ohio courts denied his post-judgment motion as untimely.

48

In *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005), the Supreme Court specified that when a postconviction motion is determined to be untimely by state courts, it is not properly filed, and it may not provide statutory tolling under §2244(d)(2). *See also Allen v. Siebert*, 552 U.S. 3, 7 (2007) ("We therefore reiterate now what we held in *Pace*: 'When a postconviction petition is untimely under state law, "that [is] the end of the matter" for purposes of §2244(d)(2).'") (quoting *Pace*, 544 U.S. at 414 (quoting *Carey v. Saffold*, 536 U.S. 214, 226 (2002); alteration in original))). The issue in *Pace* was the same as that presented here—*i.e.,* "whether the existence of certain exceptions to a timely filing requirement can prevent a late application from being considered improperly filed." *Pace*, 544 U.S. at 413. Thus, the Supreme Court examined whether statutory tolling was permitted for collateral remedies provided by the state as exceptions to the general provisions for timely filing. *Pace* made clear that the state courts are the final arbiters of whether a state collateral action is to be considered timely, thus "properly" filed within the meaning of 28 U.S.C. §2244(d)(2). *Id.* at 414. This is a reiteration of pre-existing Sixth Circuit precedent that federal courts "defer to a state court's judgment on issues of state law and, more particularly, on issues of state procedural law." *Vroman v. Brigano*, 346 F.3d 598, 603 (6th Cir. 2003) (citing *Israfil v. Russell,* 276 F.3d 768, 771 (6th Cir. 2001) and *Godfrey v. Beightler*, 54 Fed. App'x 431, 433 (6th Cir. Dec. 10, 2002) ("The federal courts defer to the state courts' interpretation of state filing requirements.")).

*Pace* also made clear that exceptions to time limits, no matter their form, are "filing conditions" consistent with *Artuz. Pace*, 544 U.S. at 417. Even exceptions to time limitations requiring discretionary judicial review fall within the *Artuz* definition of "filing conditions." *Id.* at 414. And, the Sixth Circuit has recognized *Pace*'s applicability to state exceptions requiring

49

judicial scrutiny to determine whether an exception applies. *Williams v. Birkett*, 670 F.3d 729, 734 (6th Cir. 2012).

Revisiting the issue two years later in *Siebert*, the Supreme Court clarified and strengthened its *Pace* holding, reiterating that "[w]hether a time limit is jurisdictional, an affirmative defense, or something in between, it is a 'condition to filing' [that] places a limit on how long a prisoner can wait before filing a postconviction petition." *Siebert*, 552 U.S. at 6 (finding the holding in *Pace* "turned not on the nature of the particular time limit relied upon by the state court, but rather on the fact that time limits generally establish 'conditions to filing' a petition for state postconviction relief."). If the state court declines to apply the exception, the collateral proceeding is thus rejected as untimely and cannot be considered "properly filed" under §2244(d)(2). *Id*. at 7.

*Siebert* reiterated *Pace*'s directive "that time limits, no matter their form, are 'filing' conditions," and that a state postconviction petition is therefore not "properly filed" if it was rejected by the state court as untimely." *Id*. at 6 (quoting *Pace*, 544 U.S. at 417).

The *Pace* and *Siebert* decisions set forth that it does not matter that there is no set "time limitation" to file a permitted delayed "exception" to a state's ordinary timely action. *Pace* and *Siebert* mandate that the only consideration is what the state court ultimately decides regarding the "exception" to the general rule. *Siebert*, 552 U.S. at 7; *Pace* 544 U.S. at 414.

In sum, the Supreme Court clarified in *Pace* and *Siebert* that the state court's determination whether a state collateral action was timely filed is absolutely determinative of whether the action was "properly filed" for purposes of §2244(d)(2) tolling. The result is the *Pace* and *Siebert* decisions are dispositive of the question presented here. The state court's denial

of Keith's motion for leave to file a delayed motion for new trial under Ohio's Criminal Rule 33(B) exception to the general timely filing requirement may not provide statutory tolling.

Unless Keith receives the benefit of equitable tolling, his instant claims are time-barred and must be rejected.

### 3. *Keith cannot establish entitlement to equitable tolling*

The Supreme Court has held that the one-year statute of limitations is not a jurisdictional bar and is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 649 (2010). The doctrine of equitable tolling allows the court to toll a statute of limitations but "is used sparingly by federal courts" and "applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560-61 (6th Cir. 2000)). As a result, "'[a]bsent compelling equitable considerations, a court should not extend limitations by even a single day.'" *Vroman*, 346 F.3d at 604 (quoting *Graham-Humphreys*, 209 F.3d at 561). Keith bears the burden of establishing entitlement to equitable tolling. *See Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002) (citing *Dunlap v. United States*, 250 F.3d 1001, 1003 (6th Cir. 2001)) ("in the habeas context, the petitioner bears the ultimate burden of persuading the court that he or she is entitled to equitable tolling.").

### a. **No extraordinary circumstance prevented diligent presentation**

Equitable tolling may only be available when a petitioner can demonstrate: "1) that he has been pursuing his rights diligently, and 2) that some extraordinary circumstance stood in his way." *Pace*, 544 U.S. at 418; *see also Holland*, 560 U.S. at 649. Diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize that he has an

interest in challenging his conviction. *Johnson v. United States*, 544 U.S. 295, 308 (2005). "The diligence required for equitable tolling purposes is "'reasonable diligence,'… not 'maximum feasible diligence.'" *Holland*, 560 U.S. at 653 (internal citations omitted).

Contrary to his portrayal of himself as a diligent pursuer of his rights, Keith did not initiate successive habeas proceedings in federal court upon his January 2016 discovery of the underlying factual predicate of his "Yezzo claim" or upon his February 2017 alleged discovery of his "subpoena claim." Indeed, he did not file his successive habeas petition in this Court (without Circuit Court approval) until March 19, 2018—more than two years after he discovered the "Yezzo claim," and more than a year after he allegedly discovered the "subpoena claim."

Moreover, as to the "subpoena claim," Keith failed to even attempt to diligently pursue his rights before the Ohio courts, and as to the "Yezzo claim," the state courts determined he did not diligently attempt to learn of the Yezzo materials prior to 2016. *See Keith*, 2017 Ohio App. LEXIS 2545, at *21-23, ¶¶31-33.

Rather than immediately file a timely "protective" habeas petition and seek a stay to exhaust his state remedies, Keith continued to run the risk that his habeas petition would be untimely by pursuing an appeal of the denial of his motion for leave to file a delayed motion for new trial. *See Pace*, 544 U.S. at 416 ("A prisoner seeking state postconviction relief might avoid this predicament, however, by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted."). This proved to be unwise, as Keith's appeal of the denial of an untimely collateral action cannot provide statutory tolling. *Lynch v. Wilson*, No. 1:07 CV 2742, 2009 U.S. Dist. LEXIS 6702, at *4–5 (N.D. Ohio Jan. 30, 2009) (Oliver, J.). Thus, it was Keith's risky and dilatory actions, rather than any external impediment, that resulted in the untimeliness of his instant petition.

In sum, Keith has no extraordinary circumstances outside of his own lack of diligence in seeking Yezzo's personnel file or in pursuing his claim that the police ignored his trial subpoena to explain why he failed to raise his habeas grounds in a timely filed petition. This proves fatal to him being able to receive equitable tolling consideration under *Holland* and *Pace*.

**b.  No showing of actual innocence equitable tolling**

Nor may Keith successfully invoke the miscarriage of justice exception pursuant to *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013) and *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). The *Perkins* Court "stress[ed] once again that the *Schlup* [*v. Delo,* 513 U.S. 298, 327 (1995)] standard is demanding." *Perkins*, 133 S. Ct. at 1936. "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id*.

As set forth in detail above, Keith has provided *no* new evidence demonstrating a lack of confidence in the outcome such "'that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *McCray v. Vasbinder*, 499 F.3d 568, 572 (6th Cir. 2007) (quoting *Schlup*, 513 U.S. at 327). As such, "actual innocence" equitable tolling is not available to excuse Keith's failure to comply with the AEDPA one-year statute of limitations.

In sum, Keith failed to properly file any qualifying tolling state collateral actions prior to the expiration of the one-year statute of limitations period, and he can demonstrate neither any extraordinary circumstance impeding his ability to diligently proceed, nor actual innocence "miscarriage of justice" to excuse his tardiness. Since Keith cannot establish entitlement to either

statutory or equitable tolling sufficient to save his untimely habeas petition, it must be dismissed as barred by the AEDPA one-year statute of limitations.

### B. Keith's claims are procedurally defaulted and lack merit.

Alternatively, Keith's "Yezzo claim" and his "subpoena claim" are procedurally defaulted and/or unexhausted.[13] As such, this Court cannot grant him habeas relief. His claims, alternatively, lack merit.

### 1. Standard

Before a state prisoner may seek a writ of habeas corpus in federal court pursuant to §2254, he must exhaust his state court remedies by fairly presenting all of his constitutional claims to the highest state court and to all appropriate state courts prior to that. 28 U.S.C. §2254 (b), (c); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). In order to fairly present habeas claims to the state courts, such claims must be presented at the first available opportunity. *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994). "In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability." *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161 (1996)).

When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to his failure to fairly raise that claim before the state courts while state remedies were still available, or by noncompliance with a state procedural rule which prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be

---

[13] The Warden expressly ***does not*** waive exhaustion. If the Court determines there was a state court remedy still available to Keith at the time he filed his successive habeas petition, the Warden asserts the claims are then unexhausted and the Court *cannot* grant habeas relief as a matter of law. *See* §2254(b)(1). As such, the Court should summarily deny relief on his meritless claims. *See* §2254(b)(2).

considered by the federal court on habeas review. *Wainwright v. Sykes,* 433 U.S. 72, 80, 84-87 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982); *Seymour v. Walker*, 224 F.2d 542, 550 (6th Cir. 2000).

A petitioner may procedurally default his constitutional claim by failing to fairly present it to the highest state court and to all appropriate state courts prior to that through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999). The time limitations for filing state actions and the requirement that all available claims be asserted at the first opportunity serve the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Additionally, fair presentation requires that the federal ground be presented under the same constitutional theory that was presented to the state court. *Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003); *Wong v. Money*, 142 F.3d 313,322 (6th Cir. 1998); *Williams v. Bagley*, 380 F.3d 932, 969 (6th Cir. 2004).

A petitioner can also procedurally default his claim by his noncompliance with a state procedural rule. In the Sixth Circuit, procedural default is analyzed under a four-part test: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the procedural sanction; (3) whether the state procedural bar is an adequate and independent state ground on which the state can foreclose federal review; and (4) whether the petitioner can demonstrate cause for and actual prejudice resulting from the procedural default. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

If, because of a procedural default, a petitioner can no longer present one or more of his federal claims to the state courts, he has waived those claims for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v.*

*Isaac*, *supra*; *Wainwright v. Sykes*, *supra*; *United States v. Frady*, 456 U.S. 152, 168 (1982). Demonstrating "cause" requires showing that an objective factor external to the defense impeded counsel's efforts to comply with the State procedural rule. *Murray*, 477 U.S. at 488. Demonstrating "prejudice" requires showing a disadvantage "infecting" the trial with constitutional error. *Frady*, 456 U.S. at 168.

In extreme cases, a federal habeas court may hear a defaulted constitutional claim where cause and prejudice cannot be shown if the petitioner shows that his conviction is the result of a fundamental miscarriage of justice. A fundamental miscarriage of justice means the conviction of one who is "actually innocent." *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 496.  That is, the petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in the light of the new evidence. *Schlup*, 513 U.S. at 327.

### 2.  *Application*

As previously stated, Keith entirely failed to present his "subpoena claim" to the state courts, and there is no longer a state court remedy available to him in order to now raise the claim. While Keith asserts that he did not learn the police put a notation on the subpoena to "ignore for now" until he obtained a copy of the subpoena in a 2017 public records request, the fact remains that *he is the one that issued the subpoena at the time of trial, and he should have known at the time of trial that the police failed to comply with the subpoena.* The fact that he has now obtained what he believes to be proof of the failure to comply is of little significance as there can be no doubt that, being the issuer of the subpoena, he would know on the date the records keeper was to appear before the trial court—9:00 a.m. on May 13, 1994—that no records

keeper appeared and no items were provided. *See* Subpoena, ECF.1-29, PAGEID#:218. As such, his "subpoena claim" is defaulted.

Additionally, while Keith presented his "Yezzo claim" in his untimely motion for leave to file a delayed motion for new trial, the state court dismissed the motion as untimely filed. The state court of appeals explained:

> We will address the trial court's second finding regarding Keith's ability to make a public records request as it is dispositive of this assignment of error. In its entry on the matter, the trial court noted that the record did not show that Keith's original defense counsel attempted to obtain any information concerning Yezzo's personnel file prior to trial. The trial court added that Keith did not establish by clear and convincing evidence that he could not obtain Yezzo's personnel file through a public records request prior to the time of his trial or within a reasonable time thereafter. The trial court further stated that Keith seemingly waited 15 years to request *any* public records regarding Yezzo and that when Keith made a public records request in 2009, the request still did not even include Yezzo's personnel file. Thus the trial court determined that Keith failed to meet his burden by clear and convincing evidence that he was unavoidably prevented from obtaining Yezzo's personnel file prior to 2016, as the record is devoid of any actual indication that such an attempt was made and denied.
>
> While Keith points to other cases where Yezzo's personnel file may have been left out of discovery or portions of Yezzo's file may not have been disclosed, as the trial court noted we have no true knowledge of what was sought and what was turned over in those cases thus those cases are of very little value. In addition, Keith cites to his own attempt to obtain public records regarding Yezzo in 2009, which was initially denied, but the denial, as stated in emails included in the record, was based on Keith's ongoing federal litigation. Nevertheless, Keith did eventually obtain the records he sought. Thus none of the cases cited by Keith, including his own 2009 attempt, establish that the trial court abused its discretion by determining that Keith did not establish by clear and convincing evidence that he was unavoidably prevented from obtaining Yezzo's personnel file via a public records request.
>
> On the basis of the record before us, we cannot find that the trial court abused its discretion. *It was Keith's burden to establish that he was unavoidably prevented from obtaining Yezzo's personnel file and there is simply no indication other than pure speculation that he would have been unable to obtain Yezzo's file through a public records request.* As we have found that the trial court did not abuse its discretion based on the public records request issue, we need not discuss the trial court's separate finding regarding cross-examination. Therefore, Keith's first assignment of error is overruled.

57

*Keith*, 2017 Ohio App. LEXIS 2545, at *21-23, ¶¶31-33 (first emphasis supplied).

As demonstrated by the appellate court's decision, Keith failed to meet the discretionary "reasonableness" exception to the general timely filing requirement of Ohio Criminal Rule 33(B), and the state courts enforced the state default by disallowing Keith to file the delayed motion for new trial. Because a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review, its discretionary character does not mean it is not "firmly established and regularly followed." *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009). As such, Keith's "Yezzo claim" is barred from merits review due to the Ohio courts' enforcement of Ohio Criminal Rule 33(B) following Keith's failure to timely pursue his claims in accordance with the state's established procedures. *O'Sullivan*, 526 U.S. at 847; *Maupin,* 785 F.2d 138.

### 3. Keith cannot establish cause and prejudice to excuse his default, nor can he establish a fundamental miscarriage of justice has occurred.

Since the Ohio courts were denied the opportunity to pass upon these claims due to Keith's failures to abide by Ohio's procedural rules, he must demonstrate some external factor as cause for the default and prejudice to obtain habeas review. *Murray v. Carrier, supra; Engle v. Isaac, supra; Wainwright v. Sykes, supra; United States v. Frady, supra.* Prejudice does not occur unless the petitioner demonstrates that there is a "reasonable probability" that the outcome would have been different. *Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003).

Alternatively, Keith must show that a fundamental miscarriage of justice has resulted in the conviction of someone who is "actually innocent." *Coleman*, 501 U.S. at 750. That is, he must establish that his is "an extraordinary habeas corpus case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent ...." *Murray*, 477 U.S. at 496. Again, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to

support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." *Schlup*, 513 U.S. at 324. Keith cannot meet this high burden.

As the state appellate court reasonably concluded, having Yezzo's personnel file at the time of trial would not have made any difference in the outcome of his case. *Keith*, 2017 Ohio App. LEXIS 2545, at *27, ¶41. In conducting an alternative merits analysis of Keith's untimely *Brady* claim (which is entitled to AEDPA deference) the state appellate court specifically found:

> In Keith's second assignment of error, he argues that the trial court erroneously rejected Keith's claim of a *Brady* violation in this case. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
>
> The Supreme Court of the United States has held that there are three essential components of a *Brady* violation: 1) the State either willfully or inadvertently suppressed evidence, 2) the evidence was favorable to the accused, and 3) there was resulting prejudice. *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).
>
> On appeal, Keith claims that the State at least inadvertently suppressed Yezzo's personnel file, that Yezzo's file contained evidence favorable to Keith as it was impeachment evidence of a witness he characterized as "critical," and he argues that absent Yezzo's testimony the evidence linking Keith to the crime was minimal.
>
> The State counters by stating that even assuming the evidence was favorable to Keith, and even assuming it had been inadvertently suppressed by the State, the information contained in Yezzo's personnel file would not have changed the outcome of this case. The State maintains that the statements in Yezzo's personnel file that Keith argues are damaging were statements made by coworkers and catalogued by administrators, making the statements hearsay within hearsay and inadmissible at trial even if they were discovered. The State also contends that Keith could not introduce the statements anyway as they were improper character evidence pursuant to Evid.R. 608(B).
>
> In our own review of the matter, even if we assumed, without finding, that the State inadvertently suppressed Yezzo's personnel file, and even if we assumed that Yezzo's personnel file contained evidence favorable to Keith, we absolutely could not find in the circumstances of this case that prejudice resulted here. Keith may claim that Yezzo was a critical witness tying him to the crime, ***but Yezzo provided testimony regarding a license plate number that was elicited elsewhere***

such as through the testimony of Patrolman Edward Wilhite of the Crestline Police Department and David Barnes of BCI, and she provided limited probative testimony regarding the tires at the scene. (Tr. At 424, 478-79). In fact, Yezzo actually provided one key piece of evidence *for the defense*, being that the footprints taken from the scene did not match later-acquired footwear from Keith.

A thorough review of the transcripts further reveals that the primary testimony linking Keith to the crime was from Warren and Smathers. Warren specifically identified Keith at trial as the man who shot him. As he woke up in the hospital after the shooting, Warren remembered the name "Kevin" as the person who shot him. He later gave the last name "Keith" when presented with possible last names of the shooter. Warren also recalled specific discussions on the night of the murder that the man who came to the house was Kevin Keith and that he had been part of a drug bust recently, which was actually true of Keith, giving further credibility to Warren's identification. Then, Warren also picked Keith out of a photo lineup. Warren was thus able to identify Keith through multiple means as the shooter.

Furthermore, Nancy Smathers identified Keith at trial as the man she saw getting stuck while trying to leave the scene. Smathers also testified that the dome light did not work on the car Keith was driving, and that the license plate light did not work. When the car Keith was using was seized, both of those things were found to be true, corroborating her story, and also adding credibility to Smathers' eyewitness identification. ***Smathers' testimony alone links Keith to the car, even if Yezzo had never testified at all in this case***. Moreover, a bullet casing was found near the area where Keith picked his girlfriend up from work that matched the bullet casings from the crime scene.

Over the years in his numerous appeals and post-conviction petitions Keith has challenged many aspects of his case and the evidence against him, ***but one fact remains clear, the evidence against Keith was simply overwhelming***. [FN 9] Based on the record we cannot find that, even assuming Yezzo's personnel file was suppressed, and that it contained information favorable to Keith, there is no reasonable possibility that the information contained in Yezzo's file would have made any difference in the outcome of this case. [FN 10]

For all of these reasons, Keith's second assignment of error is overruled.

--- Footnotes ---

FN9  Both at his trial and following his convictions Keith has strongly pursued the defense that another man committed the killings, specifically Rodney Melton. *That theory was presented at trial*, along with multiple other individuals the defense contended were the potential killers. Rodney Melton, along with the others, actually testified for the jury to see and hear and the jury rejected the defense's theories.

FN10  Although Keith presented a case out of the Huron County Common Pleas Court that found otherwise, the facts of that case, from what little we have available, indicate that Yezzo's testimony was absolutely critical in reopening a cold case and convicting the defendant. Those circumstances are not remotely present here. Further, one of the findings of Yezzo was *clearly* favorable to Keith in this matter, indicating perhaps a strong desire by defense counsel not to challenge Yezzo's credentials.

*Keith*, 2017 Ohio App. LEXIS 2545, at *23-27, ¶¶34-42 (second and last emphases supplied).

### 4. Keith's claims lack merit

Under the AEDPA, a federal court cannot grant a writ of habeas corpus for any claim that was adjudicated on the merits in state court unless it finds that the state court's adjudication either:

> (1)    resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the United State Supreme Court, or;
>
> (2)    resulted in a decision that was based upon an unreasonable determination of the facts in light of evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

The AEDPA significantly limits the ability of federal courts to grant relief in federal habeas corpus and is "designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Calderon v. Thompson*, 523 U.S. 538, 555–556 (1998) (quoting *Murray*, 477 U.S. at 487).

The correct use of §2254(d) is not as "a substitute for ordinary error correction through appeal," but rather as a "'guard against extreme malfunctions in the state criminal justice systems.'" *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5

61

(1979) (Stevens, J., concurring)). The Supreme Court has stressed that AEDPA's standard is "difficult to meet" and "demands that [state court] decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see also White v. Woodall*, 572 U.S. 415, 419-20 (2014). Put simply, federal courts are not free to second-guess the judgment of the state courts regarding the merits of any constitutional claim, unless the petitioner shows that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (per curiam) (quoting *Richter*, 562 U.S. at 103); *Woods v. Donald*, __ U.S. __, 135 S. Ct. 1372, 1376 (2015) (quoting *Richter*, 562 U.S. at 103).

The factual determinations made by the state courts must be presumed correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. §2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). This includes factual findings made by the Ohio Supreme Court, and those made by other Ohio appellate courts or the trial court. *See Sumner v. Mata*, 449 U.S. 539, 541-549 (1981); *see also Burt v. Titlow*, 571 U.S. 12, 19-21 (2013) (applying AEDPA deference to a Michigan Court of Appeals' factual finding). A state court's implicit findings are also entitled to a presumption of correctness. *Garcia v. Quarterman*, 454 F.3d 441, 444-445 (5th Cir. 2006).

The same limitations apply when a petitioner asserts that §2254(d)(2) applies because the state court allegedly made an unreasonable determination of the facts. The petitioner "bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Titlow*, 571 U.S. at 18. The reviewing court is to examine the state court's findings "in light of the evidence presented in the State court proceeding," 28 U.S.C. §2254(d)(2), keeping in mind that a

factual finding is not unreasonable "merely because the federal court would have reached a different conclusion in the first instance," *Wood v. Allen*, 558 U.S. 290, 301 (2010).

If a petitioner challenges the state court's application of federal law, the habeas court must determine whether the state court's adjudication was "contrary to" or involved an "unreasonable application of" clearly established Supreme Court precedent before determining whether there was a constitutional error, and whether the error affected the verdict. *Early v. Packer*, 537 U.S. 3, 10-11 (2002); 28 U.S.C. §2254(d)(1). A state court's adjudication is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (O'Connor, J., concurring).

A state court's adjudication is reviewed under the "unreasonable application" clause to determine if the state court unreasonably applied the correct legal standard to the facts. *Id*. at 407-408 (O'Connor, J., concurring). "And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woodall*, 572 U.S. at 419 (internal quotation marks omitted); *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999) (finding state court's decision amounts to an objectively unreasonable application of federal law only when "reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes."). Consequently, in order to overcome this high bar, a habeas petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Donald*, 135 S. Ct. at 1376 (quoting *Richter*, 562 U.S. at 103); *Keith v. Mitchell*,

455 F.3d 662, 669 (6th Cir. 2006) (finding the habeas court must honor the state court's analysis unless the "decision was objectively unreasonable and not simply erroneous or incorrect.").

When examining a claim, the federal habeas court does not ask whether it "believes the state court's determination was *incorrect* but whether that determination was *unreasonable—a substantially higher threshold.*" *Landrigan*, 550 U.S. at 473 (emphasis added). When applying general rules—like *Brady* and *Strickland*—state courts have "more leeway * * * in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

As set forth throughout this Return, Keith's claims lack merit. Keith has failed to produce any new evidence that would demonstrate that no reasonable juror would have found him guilty. In light of the state court's reasonable alternative merits determination of the "Yezzo claim," this Court must defer to the decision of the state court of appeals. §2254(d).

Additionally, as has been explained, the fact the police did not provide him with the radio and call logs does not establish that Keith is actually innocent of the brutal killing of three people; therefore, he cannot show a miscarriage of justice has resulted in the conviction of someone actually innocent.

Therefore, in addition to being barred by §2244(b), Keith's "Yezzo claim" and his "subpoena claim" must alternatively be dismissed as being raised in violation of the one-year statute of limitations, being procedurally defaulted, and being meritless.

## VI.    Conclusion

Based upon the aforementioned reasons, the Warden respectfully submits that Keith's successive habeas petition must be dismissed under 28 U.S.C. §2244(b)(4). Alternatively, Keith's claims violate the statute of limitations, are procedurally defaulted, and entirely lack merit.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

/s/ *Brenda S. Leikala*
_____
**Brenda S. Leikala (0072635)**
Senior Assistant Attorney General
Criminal Justice Section, Capital Crimes Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-3428
(614) 995-1930; (877) 469-0567 (Facsimile)
Brenda.Leikala@ohioattorneygeneral.gov

**COUNSEL FOR RESPONDENT**

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2019, a copy of the forgoing document was filed electronically.  Notice of this filing has been sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

/s/ *Brenda S. Leikala*
_____
**Brenda S. Leikala (0072635)**
Senior Assistant Attorney General

# State Court Record Citations

**Because of the voluminous nature of the state court record, the Warden highlights the following pages as being potentially useful in the Court's review.** *(Where a document appears in the record in more than one place, generally only one record location will be listed below.)*

| Document | Description | ECF No. | PAGEID# |
|---|---|---|---|
| **State's Trial Exhibits** | **State's Trial Exhibits** | **20-31** | **9449-9615** |
| State's Trial Exhibit 1 | Yezzo lab report | 20-31 | 9449-9451 |
| State's Trial Exhibit 3-4 | Plaster Casts | 20-31 | 9452-9453 |
| State's Trial Exhibit 6 | 1982 Omega Registration | 20-31 | 9455 |
| State's Trial Exhibit 7 | Firestone Documentation | 20-31 | 9456-9459 |
| State's Trial Exhibit 8 | Photograph of front of 1982 Omega | 20-31 | 9460 |
| State's Trial Exhibit 9 | Enlargement of tire from Firestone document | 20-31 | 9461 |
| State's Trial Exhibit 10 | Photograph of tire on 1982 Omega | 20-31 | 9462 |
| State's Trial Exhibits 11-14 | Photographs of snow bank (license/bumper) | 20-31 | 9463-9466 |
| State's Trial Exhibits 15-16 | Photographs of tire track | 20-31 | 9467-9468 |
| State's Trial Exhibit 17 | Tire documentation | 20-31 | 9469 |
| State's Trial Exhibit 18 | Tire warranty | 20-31 | 9470 |
| State's Trial Exhibit 19 | Tire receipt - Aug. 1993 | 20-31 | 9471 |
| State's Trial Exhibit 20 | Aerial Photo of apartment complex | 20-31 | 9472 |
| State's Trial Exhibit 21 | Drawing of scene | 20-31 | 9473 |
| State's Trial Exhibit 39 | Aerial Photo of apartment complex | 20-31 | 9499 |
| State's Trial Exhibit 40 | Drawing of scene | 20-31 | 9500-9501 |
| State's Trial Exhibit 41 | Drawing of scene | 20-31 | 9502-9504 |
| State's Trial Exhibit 42 | Photograph of Melanie Davison | 20-31 | 9505 |
| State's Trial Exhibit 43 | Shell casing from Farnella Graham house | 20-31 | 9506 |
| State's Trial Exhibit 45 | Jail sign-in log | 20-31 | 9508 |
| State's Trial Exhibit 72 | Photograph of driver's side frame of Omega | 20-31 | 9536 |
| State's Trial Exhibit 73 | Photograph of driver's side of Omega | 20-31 | 9537 |
| State's Trial Exhibit 74 | Photograph of license plate light on Omega | 20-31 | 9538 |
| State's Trial Exhibit 75 | Photograph of driver's side dome light switch | 20-31 | 9539 |
| State's Trial Exhibit 76 | Photograph of driver's side of Omega - front | 20-31 | 9540 |
| State's Trial Exhibit 77 | Photograph of driver's side of Omega - rear | 20-31 | 9541 |
| State's Trial Exhibit 78 | Photograph of rear of Omega | 20-31 | 9542 |
| State's Trial Exhibit 79 | Photograph of front of Omega | 20-31 | 9543 |
| State's Trial Exhibit 142 | Lab report - bullets/shell casings | 20-31 | 9608-9610 |
| State's Trial Exhibit 143 | Bullet comparisons | 20-31 | 9611 |
| State's Trial Exhibit 144 | Bullet comparisons | 20-31 | 9612 |
| State's Trial Exhibit 145 | License plate numbers printout | 20-31 | 9613-9615 |
| Yezzo Trial Deposition | Trial Deposition | 20-1 | 559-589 |
|  |  |  |  |
| **Defense Trial Exhibits** | **Defense Trial Exhibits** | **20-32** | **9616-9673** |
| Defense Trial Exhibit 4 | Transcript of Warren telephone stmt | 20-32 | 9616-9618 |
| Defense Trial Exhibit 5 | License plate printouts | 20-32 | 9619-9621 |
| Defense Trial Exhibit 6 | Police rpt. p.3 - Smathers stmt | 20-32 | 9622 |

# State Court Record Citations

| Document | Description | ECF No. | PAGEID# |
|---|---|---|---|
| Defense Trial Exhibit 7 | Photo line-up | 20-32 | 9623 |
| Defense Trial Exhibit 8 | Transcript of Warren video stmt | 20-32 | 9624-9650 |
| Defense Trial Exhibit 9 | Smathers' written stmt | 20-32 | 9651-9652 |
| Defense Trial Exhibit 10 | SA Harden Report | 20-32 | 9653-9658 |
| Defense Trial Exhibit 13 | Police rpt. p.14 - Nurse Amy | 20-32 | 9660 |
| Defense Trial Exhibit 14 | Police rpt. p.20 | 20-32 | 9661 |
| Defense Trial Exhibit 15 | Police rpt. p.30 | 20-32 | 9662 |
| Defense Trial Exhibit 16 | Police rpt. p.87 - last names of Keith/Thomas | 20-32 | 9663 |
| Defense Trial Exhibit 18 | Police rpt. p.18 - Warren Stmt; search warrant | 20-32 | 9664 |
| Defense Trial Exhibit 19 | Police rpt. p.44 - Rudel rpts Keith robbed him | 20-32 | 9665 |
| Defense Trial Exhibit 20 | Police rpt. p.47 - Rodney Melton stmt | 20-32 | 9666 |
| Defense Trial Exhibit 22 | Nurse Foor notes in Warren chart | 20-32 | 9673 |
|  |  |  |  |
| **Police Report** | **Majority of Police Report** | **20-20** | **6205-6291** |
| Page 3 - Ptl. Koepke | Smathers' Stmt #1; Snow bank | 20-20 | 6207 |
| Page 6 - Lt. Beal | "043"; Nurse Foor | 20-20 | 6210 |
| Page 12 - Ptl. Koepke | Smathers' Stmt #2 | 20-20 | 6216 |
| Page 14 - Capt. Stanley | Plate; Nurse Amy; Warren Stmt (phone) | 20-20 | 6218 |
| Page 18 - Capt. Blankenship | Warren Stmt (video/audio) | 20-20 | 6222 |
| Page 23-24 - Capt. Corwin | Plate "043"; Rodney Melton | 20-20 | 6227-6228 |
| Page 25 - Capt. Corwin | Warren Stmt  (same as p.14); lineup | 20-20 | 6229 |
| Page 26-27 - Capt. Corwin | Warren Stmt  (video/audio)(same as p.18) | 20-20 | 6230-6231 |
| Page 29-30 - Capt. Corwin | Zina Scott; Farnella Graham; Rodney | 20-20 | 6233-6234 |
| Page 35-37 - Capt. Corwin | Rodney; Quanita and Quinton Reeves Stmt | 20-20 | 6239-6241 |
| Page 38 - Capt. Corwin | Warren Stmt | 20-20 | 6242 |
| Page 56 - Capt. Corwin | Nurse Foor Stmt | 20-20 | 6260 |
| Page 58 - Capt. Corwin | Melanie brings drugs to jail; Impound Omega | 20-20 | 6262 |
| Page 59 - Capt. Corwin | Plate and bumper appear to be visual match | 20-20 | 6263 |
| Page 60 - Capt. Corwin | Owner bought tires Aug '93; Car match description | 20-20 | 6264 |
| Page 61 - Capt. Corwin | Plate appears to be visual match | 20-20 | 6265 |
| Page 62-63 - Capt. Corwin | Yezzo findings - tires new, not match to cast | 20-20 | 6266-6267 |
| Page 65 - Capt. Corwin | Yezzo findings - tires not balanced | 20-20 | 6269 |
| Page 69 - Capt. Corwin | Owner bought tires Aug '93 | 20-20 | 6273 |
| Page 70 - Capt. Corwin | Aunt Grace alibi to news media | 20-20 | 6274 |
| Page 72 - Capt. Corwin | Smathers Stmt #3 | 20-20 | 6276 |
| Page 82 - Capt. Corwin | All bullets and casings match same gun | 20-20 | 6286 |
| Page 83 - Capt. Corwin | Smathers Stmt #4 | 20-20 | 6287 |
| Page 84 - Capt. Corwin | Graham shell casing | 20-20 | 6288 |
| Ptl Seif Report | Farnella Graham shell casing | 20-27 | 8146 |
| SA Harden Report | Harden Rpt (also at Def. Tr.Ex.10) | 20-11 | 3877-3822 |
| SA Barnes Report | Barnes Rpt | 20-11 | 3883 |
| Warren Hospital Notes | Notes written during Warren hospital stay | 20-8 | 2893-2898 |
| Ofc. Cochran/Dep. Robertson Rpt. | Melanie Davison bringing drugs into jail | 20-11 | 3890-3897 |
| Call/Radio logs | Call/Radio logs (in multiple places in record) | 20-24 | 7107-7111 |
| Warren Statement at Clemency | Warren stmt to AGO investigator Shaffer | 20-27 | 8126 |

# State Court Record Citations

| Document | Description | ECF No. | PAGEID# |
|---|---|---|---|
| Commutation | Governor Strickland Commutation of Sentence | 20-24 | 7218 |
| Nurse Amy 2007 Affidavit | 2007 Affidavit | 20-19 | 6012 |
| Nurse Amy 2010 Affidavit | 2010 Affidavit acquired at clemency | 20-25 | 7691-7692 |
| Pharmacy Board Investigation | (in multiple places in record) | 20-20 | 6139-6204 |
| Bodziak Report | Report prepared for clemency (multiple locations) | 20-25 | 7578-7584 |
| **Yezzo Personnel File** | **Complete (as submitted by state in response)** | **20-27/20-28** | **8218-8684** |
| Evaluations | | 20-27 | 8218-8261 |
| Complaints | | 20-27 | 8262-8333 |
| Letters/accolades | | 20-27 | 8334-8431 |
| Certifications | | 20-28 | 8432-8495 |
| Routine files | | 20-28 | 8496-8684 |
| | | | |
| **State Court Case Citations** | | | |
| Indictment | | 20-1 | 406-408 |
| Sentencing entry | | 20-1 | 520-529 |
| Direct Appeal | Third District Court of Appeals | 20-2 | 1199-1254 |
| Direct Appeal | Ohio Supreme Court | 20-4 | 1886-1903 |
| Postconviction relief #1 | Postconviction Relief Petition | 20-5 | 2043-2054 |
| Postconviction relief #1 | Trial Court Decision | 20-5 | 2304-2319 |
| Postconviction relief #1 | Third District Court of Appeals | 20-6 | 2547-2564 |
| Postconviction relief #2 | Successive Postconviction Petition | 20-8 | 2876-2887 |
| Postconviction relief #2 | Trial Court Decision | 20-16 | 5299-5333 |
| Postconviction relief #2 | Third District Court of Appeals | 20-18 | 5840-5861 |
| App to Reopen Direct Appeal | Application to reopen direct appeal | 20-18 | 5774-5783 |
| App to Reopen Direct Appeal | Third District Court of Appeals | 20-18 | 5836-5837 |
| App to Reopen Direct Appeal | Ohio Supreme Court | 20-19 | 6092-6094 |
| Motion for New Trial #1 | Motion for Leave #1 | 20-21 | 6130-6308 |
| Motion for New Trial #1 | Trial Court Decision #1 | 20-22 | 6739-6750 |
| Motion for New Trial #1 | Third District Court of Appeals #1 | 20-23 | 6895-6909 |
| Motion for New Trial #2 | Motion for Leave #2 | 20-24 | 7027-7130 |
| Motion for New Trial #2 | Trial Court Decision #2 | 20-24 | 7182-7196 |
| Motion for New Trial #2 | Third District Court of Appeals #2 | 20-24 | 7391-7412 |
| Motion for New Trial #3 | Motion for Leave #3 (pro se) | 20-25 | 7524-7594 |
| Motion for New Trial #3 | Trial Court Decision #3 (pro se) | 20-25 | 7621-7625 |
| Motion for New Trial #4 | Motion for Leave #4 (pro se) | 20-25 | 7685-7688 |
| Motion for New Trial #4 | Voluntary withdrawal of Motion for Leave | 20-25 | 7797-7799 |
| Motion for New Trial #5 | Motion for Leave #5 | 20-26 | 7818-7864 |
| Motion for New Trial #5 | Trial Court Decision #5 | 20-29 | 9035-9046 |
| Motion for New Trial #5 | Third District Court of Appeals #5 | 20-30 | 9281-9306 |

# EVIDENCE OF GUILT

- **Smather's description of car**
  - Light colored car
  - Driver put his hand on door frame for leverage while rocked car out of snow
  - No working dome light
  - No working license plate light
  - Rear tail lights rectangular with an emblem between the two rectangles
  - Back window mostly vertical, not slanted
  - Trunk which extended from glass

- Officer determines from description of car looking for '80-'82 Oldsmobile Cutlass or Omega

- **Identification**
  - Richard Warren, Nancy Smathers

- **Bullets**
  - More than 20 bullets/casings found all fired from same gun
  - Casing found in front of where Keith picked up Zina Scott from work

- **Snow Bank – License Plate**
  - **Officers observations**
    - Bumper and plate imprint visible to naked eye
    - "043" visible to naked eye
    - Placement/size indicated license plate
    - Placement indicated numbers at end of plate not beginning
    - Placement indicated plate on left side of bumper

- **Snow Bank – Tire tread**
  - **Officers observations**
    - Found tire tracks leading to imprint of plate in snow
    - Appeared similar to tires on car from visual observation

- **Vehicle Located**
  - Melanie Davison arrested for bringing drugs to Keith in jail in light colored '82 Omega
    - Matches description given
    - Plate on left side of front bumper
    - No working dome/license plate light
    - Hand print on door frame
    - Plate on car ended in "043"
    - Owner of car bought tires in Aug '93 and had about 3000 miles

- **Keith's Motive**
  - Drug bust
    - Victims related to CI who was involved in Keith's drug case and for which he was out on bond at the time of the aggravated murders
    - Keith told victims before shot that brother should not have snitched

## MICHELLE YEZZO TESTIMONY

- Testimony provided by deposition read into the record due to her unavailability for trial because out of state at a conference

- **Plate**
  - Bumper and plate on Omega consistent with impression in snow **(duplicative)**

  - Identified numbers "043" in snow bank **(duplicative)**

  - Plate similarly oriented on car as impression found in snow **(duplicative)**

- **Tires**
  - Tires on Omega were not consistent with tire tracks at scene
  - Tire tracks consistent with make/model of tires owner bought in Aug '93
  - Tires on car were not the same model owner put on the car in Aug '93
    - Not professionally balanced
    - Not manufactured until after Aug '93
    - Still had rubber nodules on tires indicating new tires with few miles