**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND**

| | | |
|---|---|---|
| Kevin Keith, | : | Case No. Case No. 1:18-cv-634 |
| *Petitioner,* | : | |
| -vs- | : | **Judge Solomon Oliver, Jr.** |
| Lyneal Wainwright, Warden Marion Correctional Institution, | : | **Magistrate Judge James R. Knepp, II** |
| | : | |
| *Respondent.* | : | |
| | : | |

---

**TRAVERSE**

---

Respectfully Submitted,

*/s/ James R. Wooley*
James R. Wooley (003850)
Calland M. Ferraro (0093439)
Jones Day – Cleveland
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-7345
*jrwooley@JonesDay.com*
*cferraro@JonesDay.com*
Trial Attorney

And

*/s/ Zachary M. Swisher*
Zachary M. Swisher (0076288)
Sybert, Rhoad, Lackey Swisher, LLC
153 South Liberty Street
Powell, Ohio 43065
(614) 785-1811
*zach@law153group.com*

And

*/s/ Rachel Troutman*
Rachel Troutman (0076741)
Supervising Attorney, Death Penalty Dept
Office of the Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215
*Rachel.Troutman@OPD.ohio.gov*

And

*/s/ James M. Petro*
James M. Petro (0022096)
Attorney-at-Law
6573 Marissa Loop #405
Naples, FL 34108
*Jimpetro73@gmail.com*

**Counsel for Petitioner Kevin Keith**

# Table of Contents

**Table of Contents** ................................................................................................. i

**Table of Authorities** ........................................................................................ iv

**I.   Introduction** ..................................................................................................1

**II.  Statement of Facts** .......................................................................................3

    A. Police believed Kevin Keith was the perpetrator and attempted to build a
    case around him ...............................................................................................3

    B. Evidence contradicted the police's theory, but Keith was already arrested ......................4

    C. Even though this evidence raised serious doubts about Keith's guilt, the
    state nonetheless proceeded quickly to trial. ..................................................7

        i.      Testimony of Richard Warren .............................................................7

        ii.     Testimony of Nancy Smathers..............................................................9

        iii.    Testimony of Ohio BCI forensic analyst G. Michele Yezzo .................10

        iv.    Spent bullet casing ..............................................................................12

    D. Keith's Evidence at Trial................................................................................12

**III. Since his conviction, Keith has repeatedly discovered exculpatory or
impeachment evidence that was suppressed by the State.** ................................14

    A. 2004: discovery of evidence that cast doubt on how the name "Kevin"
    came into the case...........................................................................................14

    B. 2007: discovery of evidence that strongly points to Rodney Melton as the
    shooter. ...........................................................................................................15

    C. 2010: discovery of evidence that the bullet casing was reportedly
    discovered elsewhere; evidence that undercuts the State's claim that
    Warren's nurse introduced the name "Kevin" into the case............................17

    D. 2016: discovery of evidence of G. Michele Yezzo's bias, mental
    imbalance, reputation among her peers as an expert who will "stretch the
    truth to satisfy a department." .......................................................................18

    E. 2017: discovery that the State ignored a defense subpoena ...........................22

**IV.  Keith's litigation of suppressed evidence**................................................22

**V.   Requirements under 28 U.S.C. §2244** .......................................................23

    A. The factual predicate for the claim could not have been discovered
    previously through the exercise of due diligence ...........................................23

        1. Sixth Circuit's standard for due diligence ..................................................23

        2. Keith meets his burden under § 2244(b)(2)(B)(i) ......................................27

    a.   Until he obtained it, Keith had no knowledge of the existence of the evidence at issue. ....................................................................28

    b.   Keith made diligent efforts to obtain all favorable evidence ....................................30

    c.   Ohio law prevented Keith from circumventing the rules of discovery with public records requests. ...........................................47

    d.   Keith's efforts were thwarted by the State's conduct ....................................49

B.  The facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense ....................................................................56

    1.  The Standard ....................................................................56

    2.  The three-step analysis demonstrates Keith meets the standard. ................................60

       a. The evidence produced at trial was weak, at best ..................................60

**Nancy Smathers** ....................................................................60

**Richard Warren** ....................................................................63

**The car** ....................................................................68

**The bullet casing** ....................................................................69

**Keith's indictment from the drug raid** ....................................................................69

**The defense case** ....................................................................70

    a.   The evidence kept from the jury, due to a constitutional violation, undermined every aspect of the State's core case. ....................................72

**Yezzo evidence** ....................................................................72

**Ignored subpoena** ....................................................................74

**Previously uncovered evidence** ....................................................................74

    b.   But for the suppressed evidence, by clear and convincing evidence, no reasonable factfinder would have found Keith guilty of the underlying offense. ....................................................................76

**Yezzo evidence** ....................................................................77

**Ignored subpoena** ....................................................................79

**Previously uncovered evidence** ....................................................................80

VI.   **Review under AEDPA** ....................................................................85

  A.  The standard ....................................................................85

  B.  Keith is entitled to habeas relief on his Brady claim. ....................................................89

    1.  The Suppressed Evidence ....................................................................89

2. Clearly Established Federal Law ...................................................91

3. The Court of Appeals' Decision .................................................92

4. Unreasonable Application of the Clearly Established Federal Law Regarding Prejudice...........................................................92

5. Unreasonable Determination of the Facts in Light of Evidence Presented...............................................................................95

6. The Merits of the Claim ..............................................................99
   i. Bias and Untruthfulness ........................................................99
   ii. Erroneous Conclusion ........................................................100

7. An Uninvestigated Suspect........................................................102

8. Conclusion ....................................................................................103

**VII.** **Response to the Warden's Alternative Defenses**................103

A. Exhaustion...................................................................................103

1. Keith fairly presented his claims in State court .....................104

B. Procedural Default ....................................................................107

C. Statute of Limitations...............................................................110

**Conclusion** ...............................................................................................116

**Certificate of Service** .............................................................................117

## Table of Authorities

**CASES**

*Amadeo v. Zant*, 486 U.S. 214 (1988) .............................................................. 108

*Arizona v. Youngblood*, 488 U.S. 51 (1988)............................................... 29, 55

*Ayers v. Hudson*, 623 F.3d 301 (6th Cir. 2010)................................................ 87

*Baldwin v. Reese*, 541 U.S. 27 (2004) ............................................................ 103

*Banks v. Dretke*, 540 U.S. 668 (2004) ............................................. 29, 53, 107

*Barker v. Yukins*, 199 F.3d 867 (6th Cir. 1999)............................................... 89

*Bennett v. United States*, 119 F.3d 468 (7th Cir. 1997)................................... 59

*Berger v. United States*, 295 U.S. 78 (1935) ................................................... 29

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014)................................................. 80

*Bowling v. Haeberline (In re Bowling)*, 422 F.3d 434 (6th Cir. 2005) ................................... 2

*Bracy* v. *Gramley,* 520 U.S. 899 (1997)........................................................... 53

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... passim

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)................................................. 109

*Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001)............................................. 108

*Burkett v. Thaler,* 2010 U.S. Dist. LEXIS 83905 (S.D. Tex. 2010) ............... 100

*Carey v. Musladin*, 549 U.S. 70 (2006)............................................................ 87

*Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013)......................................... 60, 77

*Castille v. Peoples*, 489 U.S. 346 (1989)....................................................... 104

*Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004)....................................... 104

*Coleman v. Thompson*, 501 U.S. 722 (1991).................................................. 108

*Compare Pace v. DiGuglielmo*, 544 U.S. 408 (2005)..................................... 115

*Davis v. Commonwealth,* 147 S.W.3d 709 (2004) ......................................... 101

*DiCenzi v. Rose*, 452 F.3d 465 (6th Cir. 2006)................................................ 24

*Duke v. Wingo*, 386 F.2d 304 (6th Cir. 1967)................................................ 104

*Duncan v. Henry*, 513 U.S. 364 (1995) .......................................................... 103

*Frankenfield v. State,* 2008 Tex. App. LEXIS 7920 (Oct. 16, 2008).............. 101

*Franklin v. Rose*, 811 F.2d 322 (6th Cir. 1987)............................................. 104

*Gravely v. Mills*, 87 F.3d 779 (6th Cir. 1996) ............................................... 108

*Gray v. Mississippi*, 481 U.S. 648  (1987)....................................................... 60

iv

*Gray v. Netherland*, 518 U.S. 152 (1996)..........................................................................104

*Hereford v. Warren*, 536 F.3d 523 (6th Cir. 2008).............................................................86

*Herrera v. Collins*, 506 U.S. 390 (1993) ..........................................................................109

*Hill v. Hofbauer*, 337 F.3d 706 (6th Cir. 2003) .................................................................86

*Holland v. Florida*, 560 U.S. 631 (2010) .................................................................111, 112

*In re Byrd*, 269 F.3d 561 (6th Cir. 2001)............................................................................58

*In re Elliot*, No. 17-  1496, 2017 U.S. App. LEXIS 22314 (6th Cir. Nov. 7, 2017)..................................................................................................................................58

*In re Freeman*, No. 17-1280, 2017 U.S. App. LEXIS 19043 (6th Cir. Oct. 2, 2017)..................................................................................................................................25

*In re Herrington*, No. 17-3194, 2017 U.S. App. LEXIS 20008 (6th Cir. Oct. 12, 2017).............................................................................................................................26

*In re Keith*, 2018 U.S. App. LEXIS 30517, (6th Cir. Oct. 26, 2018) ...............................1, 3

*In re Keith*, No. 18-3544 ............................................................................................passim

*In re Kevin Keith*, Case No. 14-3290 (6th Cir. Ohio)..........................................................44

*In re Lott*, 366 F.3d 431 (6th Cir. 2004) .............................................................................59

*In re McDonald*, 514 F.3d 539  (6th Cir. 2008) ...............................................................2, 3

*In re Whittaker*, No. 17-2135, 2018 U.S. App. LEXIS 4804 (6th Cir. Feb. 26, 2018)..................................................................................................................................58

*In re Wogenstahl*, 902 F.3d 621 (6th Cir. 2018)..........................................................passim

*Jefferson v. United States*, 730 F.3d 537 (6th Cir. 2013) ........................................26, 27, 49

*Jones v. Warden, Leb. Corr. Inst.*, No. 2:13-CV-155, 2014 U.S. Dist. LEXIS 29601 (S.D. Ohio March 7, 2014) ..................................................................................24

*Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009).........................................................41, 94, 95

*Keith v. Bobby*, Case No. 08-3908 (6th Cir. Ohio).............................................................40

*Keith v. Bobby*, Case No. 1:08-cv-1687 (N.D. Ohio) ...................................................40, 115

*Keith v. Houk*, 549 U.S. 1308 (2007) .................................................................................36

*Keith v. LaRose*, 1:13-cv-1718 (N.D. Ohio).......................................................................44

*Keith v. Mitchell*, 1:99-cv-657 ......................................................................................35, 36

*Keith v. Mitchell*, 2006 U.S. App. LEXIS 25881 (6th Cir. 2006) ........................................36

*Keith v. Mitchell*, 455 F.3d 662 (6th Cir. 2006) ..........................................................passim

*Keith v. Ohio*, 523 U.S. 1063 (1998) .................................................................................47

*Keith v. Yezzo, et al.,* 1:18-cv-00047 .........................................................................46, 114

*Kyles v. Whitley,* 514 U.S. 419 (1995)........................................................................passim

*Layton v. Johnson,* 2001 U.S. Dist. LEXIS 13976 (N.D. Tex. Sep. 6, 2001) ...................... 101

*Lockyer v. Andrade*, 538 U.S. 63 (2003) ............................................................... 87

*Lonchar v. Thomas*, 517 U.S. 314 (1996).............................................................. 112

*Lott v. Bagley,* No. 1:04 CV 822, 2007 U.S. Dist. LEXIS 91762 (N.D. Ohio
     Sep. 28, 2007) ....................................................................................... 111

*Lucas v. Michigan*, 420 F.2d 259 (6th Cir. 1970)........................................ 104, 107

*Maples v. Stegall*, 340 F.3d 433 (6th Cir. 2003) ...................................................... 88

*Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) ..................................................... 108

*McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000)................................................ 104

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) ...................................... 57, 110, 111

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ..................................................... 87, 88

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ............................................................. 88

*Montgomery v. Bobby*, 654 F.3d 668 (6th Cir. 2011).............................................. 25

*Munchinski v. Wilson*, 694 F.3d 308 (3d Cir. 2012)............................................... 24

*Murray v. Carrier*, 477 U.S. 478 (1986) ......................................................... 60, 108

*Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014) ................................................... 87

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) .............................................. 103, 106

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ........................................................ 87

*People v. Cunningham,* 773 N.E.2d 682 (2002)................................................... 101

*People v. Kraybill,* 14 N.E.3d 1131 (2014) ......................................................... 100

*People v. Sutherland,* 860 N.E.2d 178 (2006)..................................................... 100

*Person v. Clipper*, 2019 U.S. Dist. LEXIS 64970 (N.D. Ohio Jan. 23, 2019) ............ 24

*Picard v. Connor*, 404 U.S. 270 (1971)............................................................... 103

*Porter v. McCollum*, 130 S. Ct. 447 (2009)........................................................... 88

*Ramonez v. Berghuis*, 490 F.3d 482 (6th Cir. 2007) ................................ 62, 89, 97

*Reed v. Ross*, 468 U.S. 1 (1984) ....................................................................... 108

*Rhines v. Weber*, 544 U.S. 269 (2005) .............................................................. 114

*Rompilla v. Beard*, 545 U.S. 374 (2005) .............................................................. 88

*Sanders v. United States*, 373 U.S. 1 (1963) ...................................................... 109

*Sawyer v. Hofbauer*, 299 F.3d 605 (6th Cir. 2002) ...................................... 88, 110

*Schlup v. Delo*, 513 U.S. 298 (1995) ................................................ 57, 109, 110, 111

*Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005)........................................................ 57

*Starns v. Andrews*, 524 F.3d 612 (5th Cir. 2008) ................................................. 112

vi

*State ex rel. Caster v. City of Columbus*, 151 Ohio St. 3d 425, 89 N.E.3d 598 (2016) .................................................................................... 48

*State ex rel. Caster v. City of Columbus,* 89 N.E.3d 598 (2016) ......................... 22

*State ex rel. Clark v. Toledo*, 54 Ohio St. 3d 55 (1990) ....................................... 47

*State ex rel. Steckman v. Jackson*, 70 Ohio St. 3d 420 (1994) ................................. 47, 48, 52

*State ex. rel. Clark v. Toledo*, 54 Ohio St. 3d 55 (1990) ....................................... 47

*State of Ohio, Ex. Rel., Edwin Davila v. The City of Bucyrus*, 2011-Ohio-1731, 194 Ohio App. 3d 325, 956 N.E.2d 332 ................................. 43

*State v. Gillard*, 533 N.E.2d 272 (Ohio 1988) ....................................................... 30

*State v. Jones,* 681 S.E.2d 580 (S.C. 2009) ....................................................... 101

*State v. Keith,* 1996 Ohio App. LEXIS 1720 (Ohio Ct. App., Crawford County Apr. 5, 1996) ........................................................................ 94

*State v. Keith,* 684 N.E.2d 47 (Ohio 1997) ......................................................... 94

*State v. Keith*, 79 Ohio St. 3d 514, 684 N.E.2d 47 (1997) .................................... 61, 67, 80, 95

*State v. Keith,* 891 N.E.2d 1191 (Ohio Ct. App., Crawford County 2008) .......................... 94

*State v. Melton,* 1982 Ohio App. LEXIS 14948 (Ohio Ct. App. Crawford County) ................................................................................ 83

*State v. Parsons*, Huron C.P. No. CRI 9300098 (Mar. 23, 2016) ....................... 115

*State v. Smith,* 807 A.2d 500 (2002) ................................................................... 100

*State v. Williams,* 1991 Ohio App. LEXIS 3883 (6th Dist. l99l) ....................... 101

*Strickler v. Greene,* 527 U.S. 263 (1999) ................................................. 28, 91, 108

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004) ............................................. 87, 88

*Taylor v. Withrow*, 288 F.3d 846  (6th Cir. 2002) ............................................... 86

*United States v. Bagley,* 473 U.S. 667 (1985) ....................................................... 91

*United States v. Frady*, 456 U.S. 152 (1982) ..................................................... 109

*United States v. Pace*, 544 U.S. 408 (2005) ..................................................... 111

*Van Tran v. Colson*, 764 F.3d 594 (6th Cir. 2014) ............................................... 88

*Vasquez v. Bradshaw*, 345 F. App'x 104 (6th Cir. Sept. 2, 2009) ......................... 89

*Vinson v. Jackson*, No. 2017 U.S. App. LEXIS 25141 (6th Cir. Dec. 13, 2017 ............ 26, 89

*Whiting v. Burt*, 395 F.3d 602 (6th Cir. 2005) ................................................... 103

*Wiggins v. Smith*, 539 U.S. 510 (2003) ....................................................... 87, 88, 89

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................................................. 86

*Williams v. Taylor*, 529 U.S. 420 (2000) ............................................................. 25

*Youngblood v. West Virginia,* 547 U.S. 867 (2006) ..................................... 91, 107

vii

**STATUTES**

28 U.S.C. § 2244 ................................................................................................ passim

28 U.S.C. § 2254 ................................................................................................ passim

42 U.S.C. § 1983 ........................................................................................ 46, 113, 114

Ohio Rev. Code § 149.43 ............................................................................................. 47

Ohio Rev. Code § 2953.23 ........................................................................... 45, 54, 113

**RULES**

Ohio Crim. R. 15 ................................................................................................. 11, 20

Ohio Crim. R. 16 ................................................................................................. 27, 49

**OTHER AUTHORITIES**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") ......................................... 85

## I.    Introduction

Kevin Keith has spent over 25 years of his life paying for the crimes of another person, and this Court should grant his successive habeas corpus petition and order the State to vacate his conviction.

The Sixth Circuit here found a prima facie case that Keith met the burden in 28 D.SC. § 2244:

> The evidence concerning Yezzo's psychological instability, professional integrity, and racial bias reduces the credibility of her testimony. The impeachment value of this evidence cannot be understated, particularly given that Yezzo's forensic analysis of the license plate was one of the "core" elements of the government's case against Keith. *Keith*, 551 F.3d at 558. The evidence regarding the Bucyrus Police Department's deliberately ignoring the subpoena is also significant impeachment evidence; it undermines the government's theory that the police learned about Keith's identity as the shooter from a nurse who called the Bucyrus Police Department after Warren emerged from surgery.

*In re Keith*, 2018 U.S. App. LEXIS 30517, *19 (6th Cir. Oct. 26, 2018).

"Prima Facie" is an adjective that means "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted."  Black's Law Dictionary (10th ed.). In other words, as of October 26, 2018, Keith had already been found to have established sufficient evidence for the presumption that he could not have discovered the factual predicate of his claims previously through due diligence and that no reasonable factfinder would have found him guilty but for constitutional error at trial.  The Warden's arguments regarding diligence are flat wrong, and the Warden has not actually produced any evidence to disprove or rebut the evidence relied upon by the Sixth Circuit in rendering its conclusions.

A Court of Appeals may authorize the filing of a second or successive habeas petition only if it determines that the petition "makes a prima facie showing" that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and

that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B) and (3)(C).

A "prima facie showing requires the presentation of sufficient allegations of fact together with some documentation that would warrant a fuller exploration by the district court."  *Bowling v. Haeberline (In re Bowling)*, 422 F.3d 434, 436 (6th Cir. 2005) (internal quotation marks omitted).  In other words, and as Black's Law dictionary explains, prima facie means "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted."  Black's Law Dictionary (10th ed.); *In re McDonald*, 514 F.3d 539, 545 (6th Cir. 2008) ("McDonald's motion for permission to file a second habeas corpus petition also *requires a finding* that the facts surrounding Harris's perjured testimony, *if found to be true*, would indeed constitute a constitutional violation." (emphasis added)).  Thus, in performing this inquiry, the Sixth Circuit determines whether the facts contained in the petition and supporting documents, if true, would meet the standard outlined in 28 U.S.C. § 2244(b)(2)(B).  Once authorization is granted, the district court can then order the Warden to respond and can hold an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2).  The district court also considers certain procedural defenses that the appeals court may not consider in the prima-facie inquiry, such as the statute of limitations.  *See McDonald*, 514 F.3d at 543 ("[I]nvestigating compliance with the one-year statute of limitations outlined in 28 U.S.C. § 2244(d) -- clearly a separate subsection from 28 U.S.C. § 2244(b) -- is not within the purview of the court of appeals' consideration of applications requesting authorization to file a second or successive habeas corpus petition pursuant to 28 U.S.C. § 2244(b).").

2

Here, the Sixth Circuit had nearly all of the record before it and was "require[d]" to "evaluate [the] new evidence in light of the evidence as a whole." *McDonald*, 514 F.3d at 546. In its Return of Writ, the Warden does not challenge the truth of the allegations in Keith's petition and supporting materials. For example, she does not argue that the State, in fact, turned over the materials at issue. Nor does the Warden offer any new evidence that would not have been before the Sixth Circuit. Instead, she quibbles with the *weight* that the Sixth Circuit accorded that evidence. And her procedural defenses lack merit for a multitude of reasons, as further explained below. The Warden has therefore failed to offer any argument or evidence that would alter the Sixth Circuit's calculus, and so this Court should similarly find that "in light of the evidence as a whole," "no reasonable fact finder would have found [Keith] guilty." *In re Keith*, 2018 U.S. App. LEXIS 30517 at *19.

## II.    Statement of Facts

Shortly after 8:45 p.m.[1] on February 13, 1994, a gunman entered a Bucyrus Estates' apartment and shot all six people inside. Three were killed: Marichell Chatman; her five-year-old daughter, Marchae; and Marichell's aunt, Linda Chatman. The other three victims survived: Marichell's boyfriend Richard Warren, and Marichell's young cousins, Quanita and Quinton Reeves.

### A.  Police believed Kevin Keith was the perpetrator and attempted to build a case around him.

At the scene of the crime that night, police officers mentioned Kevin Keith and other members of the Keith family as potential suspects. ROW Appx., ECF 21-1, PageID 10434,

---

[1] Richard Warren testified that Linda Chatman arrived at the apartment at "about 8:45," and the shooter arrived shortly after that. ROW Appx., ECF 21-1, PageID 10023.

1090.[2]  At first, the suspicion seemed logical.  The victims' family member, Rudel Chatman, was the informant for a cocaine drug raid that had occurred a couple of weeks prior, and Keith had been one of the eight people arrested in that raid.[3]  Also, witnesses told the police that they had seen a "large black man"—described as about 6' 1", 350 lbs. in the area.[4]  ROW Appx., ECF 21-1, PageID 9901-02, 9994-95, 9999, 10327.  Keith was 6', 300 lbs. and one of the few black men in the small city of Bucyrus.

The police acted quickly: on February 15, less than two days after the shootings, Kevin Keith was arrested at his home in Crestline, Ohio.  The Bucyrus Chief of Police conducted a press conference announcing Keith's arrest, referencing carpet fibers, shoe prints, and shoes that had been collected as evidence and submitted to Ohio's Bureau of Criminal Investigation ("BCI").  The Chief explained, "What we have is some evidence that we have collected that we hope we will be able to link him to the crimes." ECF 1, Ex. 2, Clip 2.[5]

### B.  Evidence contradicted the police's theory, but Keith was already arrested.

Weeks after Keith's arrest, however, the police discovered that the "large black man" described by witnesses was not Kevin Keith.  *See* ROW Appx., ECF 21-1, PageID 10444-45 (Captain Corwin acknowledged that they "determined it was Karie Walker," not Keith).  And none of the witnesses had actually seen that man do anything criminal; they had all been

---

[2] ECF No. 21-1.

[3] Keith was charged with selling what equaled to less than 3 grams of crack cocaine.  Though Keith was never ultimately tried for this, the sentencing outcome of the others charged demonstrates that the harshest punishment he likely would have received would have been two years in prison. Ex. 1, Sentencing Entries.

[4] Richard Warren testified that the person was between 6' and 6'2" and was between 250 and 275 pounds.  ROW Appx., ECF 21-1, PageID.10047.

[5] This was filed manually. ECF 4, PageID 228-29.

describing a man who was simply a bystander at the scene. That bystander was Karie Walker, who had just moved in to the apartment complex a few days earlier.

This was not the only thing that should have given the police pause about their quick decision to arrest Keith. Two days after Keith's arrest, surviving victim Quanita Reeves told her nurse that the person who shot them was "Bruce," who was "Daddy's friend." ROW Appx., ECF 21-1, PageID.10427. Quanita then reiterated to detectives that "Daddy's friend Bruce" was the man who shot them. ROW Appx., ECF 21-1, PageID.10407. Because Quanita told detectives that she would recognize a picture of the shooter, she was shown a photo lineup containing Keith's picture, along with five other individuals. ROW Appx., ECF 21-1, PageID.10412. Quanita, however, was clear that "none" of the pictures were of the man who shot them. *Id.* She was also clear that Keith was not the man she knew as "Bruce." ROW Appx., ECF 21-1, PageID 10413.

Then, in March, BCI completed its analysis of the evidence collected by the Bucyrus Police. Despite Chief Beran's "hope" that the swath of collected forensic evidence would "link [Keith] to the crimes," none of that evidence implicated Keith. ROW Appx., ECF 21-1, PageID 10171, 10179-80; Yezzo Dep., ROW Appx., ECF 20-1, PageID 577-79, 584.

Not only that, Keith had an alibi that was supported by several people. Judith Rogers, the neighbor of Keith's girlfriend Melanie Davison, noticed Keith and Davison leaving Davison's apartment in Mansfield at about 8:45 p.m. that evening. ROW Appx., ECF 21-1, PageID.10383. In other words, Rogers saw Keith at a location over a half an hour away from the crime scene at the same time the shootings occurred. Rogers was clear about the timing, because she recalled the television show she was watching and knew it came on at 8:30 p.m. *Id.*

Around 9:00 p.m., Keith and Davison arrived in Crestline at the home of Keith's aunt,

Grace Keith.  Grace Keith testified to seeing Keith at her house around 9:00 p.m.[6]  ROW Appx., ECF 21-1, PageID.10377. Yolanda Price, who was also at Grace's house at that time (*see* ROW Appx., ECF 21-1, PageID 10376), confirmed Keith was there.  ECF 1-3, PageID 43-44.  Price also saw Davison waiting outside in the car.  *Id.*

Davison additionally provided the police a detailed account of her time with Keith that night.  ECF 1-4, PageID 45-46.  She said that Kevin got to her apartment in Mansfield around 7:00 p.m.  *Id.*  Right after he got there, they both stood at the kitchen window and watched the police arrest a drunk driver who had alcohol bottles in his car; she even remembered that the police placed the man in police "car #10."  *Id.*  A contemporaneous police report for that night precisely corroborated her account regarding the drunk-driving incident. Ex. 2.   Davison stated that they then left her house at around 8:45 p.m. and drove to Grace Keith's house, arriving around 9:00 p.m.  ECF 1-4, PageID 45.  They stayed there for around 10 minutes and arrived back to her apartment at 9:25 p.m.  *Id.*  Thus, Keith was accounted for before, during, and after the shootings that took place around 8:45 p.m.

---

[6] Throughout the years, the State has repeatedly mischaracterized Grace Keith's account.  For example, at Keith's clemency proceedings the State insisted that Grace had done a television interview where she indicated that she "didn't know what time it was."  State's Clemency Brief at 20. In fact, Grace said in the interview that she did not know what time the *murders were*—she never said she did not know when Keith was at her house.  *See* ROW Appx., ECF 21-1, PageID 10380-81 ("And do you remember in response to the question, 'You are saying he was with you during the time of the killing?' and your answer being, 'I can't say that cause I don't know what time it was, not more than what I seen in the news and paper, that's all I know.").  To the contrary, she was positive she saw Kevin at 9:00 p.m.  *Id.*

Even now, in her Return of Writ, the Warden leaves out and uses ellipses to represent the part of Grace's statement that makes clear that she did not have independent knowledge of what time the *murders* were.  *Compare* ROW, ECF 26, PageID 10859-60 and State's Exhibit 146.

**C. Even though this evidence raised serious doubts about Keith's guilt, the state nonetheless proceeded quickly to trial.**

Less than three months after the shootings, Keith's trial began.  The state relied entirely on the following evidence:

### i.  Testimony of Richard Warren

The surviving adult, Richard Warren, testified that Kevin had been the shooter, but his testimony was riddled with problems.  Warren had escaped from the crime scene to a nearby restaurant where he told no less than four different witnesses—including a police officer—that he did not know who shot him, only that it was a "masked man."  *See* ROW Appx., ECF 21-1, PageID. 9928-31, 9993, 10312, 10315.[7]  For that reason, he told the police that he would only be able to identify the man by his build and size.  *Id.* at 10040.[8]  The hospital security guard report, created the next day at 1:00 p.m., reflected Warren's description of the shooter: "The perpetrator whos [sic] name is still unknown is still at large. The only description of the perpetrator is that it is a black male approximately 6' 3" in hiegth [sic] and about 260 lbs." ECF 1-2, PageID 42.

Despite having initially told four witnesses that he did not know who shot him, Warren later recalled that his shooter's name was "Kevin."  It is unclear as to when or how he recalled the name, however.  At trial, the state relied on the testimony of Warren's nurse, John Foor, who testified that when Warren came out of surgery at 5 a.m. the morning after the shootings, Warren immediately wrote down the name "Kevin" on a piece of paper, and that Foor then called the

---

[7] Warren changed his account at trial, stating that the shooter was not, in fact, wearing a mask but instead wore "a turtleneck shirt pulled up over the bottom part of his face."  ROW Appx., ECF 21-1, PageID.10036.  Warren also testified that, while the shooter was in the apartment, Warren saw him drink a glass of water "through" his turtleneck, which did not have a mouth opening. *Id.* at 10060.

[8] Two days later, police apparently still believed that the shooter had been masked, as they included "masks" in the list of items on the search warrant for Keith's house. Ex. 3.

police to tell them.   ROW Appx., ECF 21-1, PageID.10470-73.  Foor testified that he did not keep this piece of paper with the name "Kevin," and none was produced at trial.   ROW Appx., ECF 21-1, PageID.10072. Warren, on the other hand, denied that he wrote down the name Kevin; he said his hands were strapped down.   ROW Appx., ECF 21-1, PageID.10056.

After Warren came out of surgery, the police called him and gave him the last name of four or five "Kevins" from which to choose.   ROW Appx., ECF 21-1, PageID.10041.  They also showed him a lineup of six individuals—the same lineup showed to Quanita Reeves.   ROW Appx., ECF 20-32, PageID 9623.  Keith was by far the largest individual depicted in that lineup, and his face was by far the closest to the camera.[9]  Warren chose Keith's picture.

Warren ultimately admitted on cross-examination that he did not know whether he or the police first mentioned the name "Kevin" as the person who was the shooter.  *See* ROW Appx., ECF 21-1, PageID 10060 (Defense Counsel: "So you don't recall whether you mentioned the name to them or they mentioned it to you; do you?" Warren: "No, sir, I do not.").   Given this equivocation, the state at closing relied heavily on Nurse Foor's testimony to show that it was, in fact, Warren who first mentioned the name Kevin:

> Why should we believe Richard Warren? Well, I said he has no motive or opportunity to fabricate. His testimony, you will see, meets the facts completely. Where would he come up with the name Kevin. The testimony was that as he was coming out of the surgery at 5:00 O'clock in the morning, he can't even speak, yet he is giving John Foor, his nurse, the name Kevin. John Foor called the Bucyrus Police Department. **That is how the name Kevin found its way into this case**.

ROW Appx., ECF 21-1, PageID 10528-29 (emphasis added).

---

[9] According to thirteen memory and eye witness experts the lineup was highly biased toward Kevin Keith.  Over 75% of individuals with no memory for the crime selected Kevin Keith as the individual in the lineup that most resembled the description of a "big black guy." ROW Appx., Pro Se Memorandum In Support of Jurisdiction by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae in Support of Kevin Keith, ECF 20-30 PageID 9395.

## ii. Testimony of Nancy Smathers

Nancy Smathers, a Caucasian[10] resident of Bucyrus Estates, told the police that she saw a large man "of the black persuasion" run to a car shortly after the shootings.   ROW Appx., ECF 21-1, PageID.10073.  Smathers testified that she saw the man drive into a snow bank, get out of the car, rock the car to free it from the snow bank, and then drive away.   ROW Appx., ECF 21-1, PageID.10069-73.  The vehicle, she said, was a two-doored car that was "white, cream, light yellow" in color.   ROW Appx., ECF 21-1, PageID.10000, 10077.  She testified that she initially did not think much of it because it was just "how *the other people* behave in the project."   ROW Appx., ECF 21-1, PageID 10082 (emphasis added).

The first two times Smathers talked to the police, she said she could not recognize any "distinct features" of the person.  ROW Appx., ECF 21-1, PageID. 10078-79.  Indeed, when asked by police whether she would recognize the man if she saw him again, she replied "I don't think so."  ROW Appx., ECF 21-1, PageID.10085.  It was not until the *third* time that Smathers talked to the police—a month later and after she had seen Keith's picture on television—that she identified Keith as the person running to the car.[11]   ROW Appx., ECF 21-1, PageID.10079.  She made the same identification at trial, testifying (confusingly) that she was able to recognize Keith

---

[10] According to eye witness experts, "cross-race identifications are less accurate than same race identifications." Brief of Amici Curiae, Supreme Court of the United States Case No. 09-1052, p. 6.  Warren and Smathers, the only two witnesses that identified Keith, are both Caucasian.

[11] Smathers was only able to make a lineup identification of Kevin Keith after viewing him on TV.  According to seventeen memory and eye witness experts, her identification "had great prejudicial value and no probative value." ROW Appx., Pro Se Memorandum In Support of Jurisdiction by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae in Support of Kevin Keith, ECF 20-30 PageID 9384.  The eyewitness experts concluded that it is highly unlikely that Smathers' memory got better with time, because "[m]emory does not work like that."  *Id.* at PageID 9394.

by his "head shape," even though, she said, the person had been wearing a hat.   ROW Appx., ECF 21-1, PageID.10077.

### iii.   Testimony of Ohio BCI forensic analyst G. Michele Yezzo.

Based on Smathers' report, the police had taken impressions from the snow of the tire treads and a partial license plate imprint in the snow bank.   ROW Appx., ECF 21-1, PageID.10164-67.   The Bucyrus Police Department suspected that the partial license plate impression in the snow was a "043." Approximately three weeks after the shootings, Keith's girlfriend Melanie Davison drove her grandfather's Oldsmobile Omega to visit Keith in jail. Because the police saw that the license plate on Davison's Omega was "MVR043," the police impounded the Omega as the car used in the crime.  But Davison's Omega was **not** the two-door "white, cream, light yellow" of the getaway car as described by Smathers.  ROW Appx., ECF 21-1, PageID.10077.   It had four doors and was green.   ROW Appx., ECF 21-1, PageID 10219, 10138, 10139; *see also* ROW Appx., ECF 20-31, PageID 9540.

Smathers never identified Davison's car as the car she saw that night.  *See* ROW Appx., ECF 21-1, PageID.10067-90.   The forensic testing on the inside of Davison's car supported Keith's claims—there was not a scrap of evidence inside the Omega linking it to Keith, to the crime, or to the scene. Yezzo Dep., ROW Appx., ECF 20-1, PageID 576-79, 585. Still, the prosecution maintained that Keith's association to Davison's granddaughter meant Keith had access to Davison's car. It did not matter that Davison's Omega was the wrong color.

The State submitted to BCI analyst Michele Yezzo pictures of Davison's Omega and pictures of tire track and license plate impressions from the scene. Yezzo concluded and

ultimately testified[12] that the snow impression "bears the numbers '043' and is set toward the driver's side of the car with spacing and orientation similar to the license plate 'MVR043' on [Davison's car]."  ROW Appx., ECF 20-31, PageID 9450.

The tire-track impressions from the scene did not match the tires on Davison's car, but because Alton Davison recalled putting different tires on the car in August, the State's theory became that Keith changed the tires (but not the license plate) on the Omega to avoid being linked to the scene.  In correspondence not admitted at trial, Bucyrus Police Captain Michael Corwin faxed Yezzo a brochure picture of the tires Alton Davison had supposedly purchased for his car and specifically pointed out to Yezzo which picture in the brochure represented the tire to compare to the snow tracks.  ECF 1-23, PageID 181-86. He noted: "Michelle – Hope this will do the trick for us." ECF 1-23, PageID 186. Accordingly, Yezzo did not actually physically examine the tire for her comparison, relying entirely on the brochure picture. Yezzo Dep., ROW Appx., ECF 20-1, PageID 580; Yezzo Report, ROW Appx., ECF 20-31, PageID 9450. Yezzo testified that the tread designs from the tires that were previously on the Omega were similar in tread design to the tire imprints left at the crime scene. Yezzo Dep., ROW Appx., ECF 20-1, PageID 572, 581. She explained her conclusion of "similar in tread design" in a way that implied the tire track impression she examined was indeed a *match* with the tire tread from the brochure. Yezzo Dep., ROW Appx., ECF 20-1, PageID 572, 582-83; *see also id*. at 583 ("[I]t's similarity is it would have originated from the Triumph 2000.").  Yezzo's testimony connecting the Omega's license plate and former tires to the crime scene was therefore the forensic evidence that linked Keith to this crime.

---

[12] Yezzo testified at trial via her deposition, which is only available for "material" witnesses. Ohio Crim. R. 15(A).

### iv.  Spent bullet casing

Finally, the State introduced a spent bullet casing found outside the home of Fernelle Graham.  Graham lived in the house across from the General Electric ("G.E.") plant, and because that was where Keith picked up his other girlfriend Zina Scott on the night of the murders, the State argued that this linked Keith to the crime.[13]    ROW Appx., ECF 21-1, PageID.10534. During Keith's trial and subsequent appeals, however, the state has not heavily relied on this evidence, likely because the timing did not match up.  Ms. Graham testified that it was "a quarter to ten" when she looked out of her window and saw that someone had thrown "trash on the curb and on my sidewalk and out into the street."    ROW Appx., ECF 21-1, PageID.10117-120. According to her testimony, the bullet casing was found in that trash.  ROW Appx., ECF 21-1, PageID. 10124.  But Zina Scott testified that Keith picked her up at the GE plant 11 p.m. that night.  ROW Appx., ECF 21-1, PageID.10098.  Thus, the trash and bullet casing were supposedly on Ms. Graham's sidewalk an hour and fifteen minutes before Keith was even in the area.

The State rested its case on the above evidence.

### D.  Keith's Evidence at Trial

For his part, Keith used alibi witnesses (*see* Section II.B, *supra*) in addition to other evidence to show that he was not the shooter.  For example, it was elicited that Joyce Reeves, the mother of the two surviving children and a witness for the State, had told police that, after the murders and while Keith was in jail, a large black man in a light-colored car began stalking her, causing her to fear for her safety.  ROW Appx., ECF 21-1, PageID.10440.

---

[13] The father of the surviving children, Demetrius Reeves, also worked at the GE plant at the time.  ROW Appx., ECF 21-1, PageID.10400

In addition, Keith's counsel attempted to show that another person, Rodney Melton, was responsible for the shootings.  Rodney and his brother Bruce were known criminals in the area—indeed the police knew that Rodney had previously been convicted of murder, ROW Appx., ECF 21-1, PageID 10428—and were close friends with Quanita and Quinton's father, Demetrius Reeves.  ROW Appx., ECF 21-1, PageID.10365, 10396-97.  Even though Quanita told both the police and her nurse that the shooter was her "Daddy's friend Bruce," neither Bruce nor Rodney were included in the photo lineup shown to her and Richard Warren.  ROW Appx., ECF 21-1, PageID.10428-29.

Other facts also pointed to Rodney as the shooter.  Rodney (unlike Keith) had the same color car that the shooter drove, ROW Appx., ECF 21-1, PageID 10367, and his license plate even contained the same numbers the police say they lifted from the snow ("043"), ROW Appx., ECF 21-1, PageID.10371.  Rodney was seen around the area shortly after the shootings and made it a point to tell the police that his car (the one matching the description of the getaway car) was broken down.  ROW Appx., ECF 21-1, PageID. 10362-63.  When talking with the police that night, Rodney also knew the specific type of bullet used by the shooter (full jacket 9 mm) and made sure to tell the police that if the shooter used that type of bullet, he must have come in from Detroit.  *Id.* at 10363-64.  Additionally, Rodney showed up at the hospital and told a member of the victims' family, Tom Chatman, that the shooting happened because Rudel Chatman had been "setting people up."  ROW Appx., ECF 21-1, PageID. 10443.

Even Rodney's family believed that he was involved in the killings.  In the middle of trial, a member of Rodney's family contacted Keith's counsel and asked to meet in a private location out of fear for her safety.  She told counsel that she and others in the area believed Rodney was "in on the killings."  ROW Appx., ECF 21-1, PageID.10391.  Counsel relayed this conversation

13

to the Judge and the prosecutor during a sidebar at trial.  The family member had explained that Rodney is a "psychopathic killer" and listed out a string of murders that "the family knows and [it] is common knowledge that" Rodney committed: one at Gibson's bar, one of a German shopkeeper, one at a Jewelry store, two additional men in Detroit, and two additional men in Georgia.[14]  ROW Appx., ECF 21-1, PageID.10387-88.  Even the woman's daughter told counsel "you better be careful, you don't know who you are dealing with."   ROW Appx., ECF 21-1, PageID.10389.  The jury, however, heard none of this.  And the Court did not allow Keith's counsel to question Rodney about any of the prior murders, except the one for which he had been convicted.  ROW Appx., ECF 21-1, PageID 10452-53.

Persuaded by the eyewitness identification and Yezzo's testimony, the jury convicted Keith for the murders and recommended a sentence of death, which the judge imposed.  From crime to death sentence, only three-and-a-half months had passed.

### III.  Since his conviction, Keith has repeatedly discovered exculpatory or impeachment evidence that was suppressed by the State.

#### A.  2004: discovery of evidence that cast doubt on how the name "Kevin" came into the case

In April 2004, a public records request led Keith to handwritten notes that, according to the sworn testimony of John Foor, had supposedly been destroyed years ago. ROW Appx., ECF. 20-8, PageID 2895-98.  The notes were apparently from Warren's hospital stay, and the name "Kevin" was written in handwriting different from the other handwritten notes that are clearly attributable to Warren.  *Id.* at 2898.  Warren's handwriting was nearly illegible, included misspelled words, and the words he wrote were haphazardly strewn across the pages. *Id.* In

---

[14] A deputy involved in the side-bar conversation confirmed that "Rodney was in Georgia and he came back up here."  ROW Appx., ECF 21-1, PageID. 10392.

contrast, the name "Kevin" was written neatly and clearly, and in handwriting that was the same as the words "Captain Stanley" and "Bucyrus Police." *Id.*

### B. 2007: discovery of evidence that strongly points to Rodney Melton as the shooter.

From late 1993 to mid-1994, Rodney and Bruce Melton had been leading a pharmacy burglary ring, in which they and their associates stole controlled substances from pharmacies around Ohio. The Ohio Pharmacy Board spearheaded and documented that criminal investigation, and the Galion Police Department participated in the investigation. *See generally* ROW Appx., ECF 20-20, PageID 6139-93. Keith at his trial had not sought discovery regarding the investigation because it was not apparent that the pharmacy burglary ring was in any way related to the Bucyrus Estates shootings, and the full extent of the investigation became publicly known only after Keith's trial. Nonetheless, Keith's counsel in 2007 took a shot in the dark and made a public records request from the Pharmacy Board regarding the investigation. Ex. 4, ¶ 5.

As it turned out, the investigatory materials, which included a report dated the month before Keith's trial, showed that Rodney Melton not only had motive to injure the victims of the Bucyrus Estates shootings, but Melton also actually told a confidential informant two weeks before the Bucyrus Estates shootings that he had been paid $15,000 to "cripple" Rudel Chatman, whose actions as a police informant were the motive behind the shootings. *See* ROW Appx., ECF 20-20, PageID 6149 ("[Rodney Melton] also stated that he had been paid $15,000 to cripple 'the man' who was responsible for the raids in Crestline, Ohio last week."); ROW Appx., ECF 21-1, PageID 10280, 10524 (Rudel Chatman had been the informant behind the Crestline raids). The confidential informant told this information to Detective Jerry Hickman, ROW Appx., ECF 20-

15

20, PageID 6149, who a month later would play a role in the investigation against Keith.[15]  The suppressed documents also revealed that the Melton brothers had "spread the word that anybody that snitches on them would be killed," ROW Appx., ECF 20-20, PageID 6146, and that Melton and his associates knew about Rudel Chatman's status as a police informant before the Bucyrus Estates shootings.  In an interview with the police, Melton's associate, Milton James Parker, told the police, including Detective Hickman, "we know about Rudell [sic], you know? You might as well just keep him under wraps or whatever you're gonna do with him, Jerry,[16] you know? 'Cause he's done around here."  ECF 1-9, PageID 123.  Also, Parker had learned from Bruce Melton that Rodney was offered money to "off Rudell."  *Id.*  As it turns out, on April 11, 1994, only two months after the murders and before Keith's trial began, Rodney Melton was indicted for a drug trafficking offense, in which Rudel Chatman was a confidential informant.  ECF 1-11, PageID 127.

Various other evidence in the investigative materials would have been crucial for exposing the truth about Melton at trial.  According to the confidential informant, Melton was known to wear the particular type of mouth-covering mask that the shooter wore,[17] in order to hide a

_____

[15] According to police reports, Hickman was at the scene the night of the murders.  ROW Appx., ECF 20-20, PageID 6227.  He confirmed to other officers that Rudel Chapman "had done work for them," that "there could be a possible connection," and that "there had been rumors out that the people arrested had figured [] out he was the informant and made statements they were going to take care of him." At 23.  Hickman and another officer then went to the hospital to check on Rudel.  *Id.*  When they returned to the scene, they told other officers that Rudel had stated that Rodney Melton was at the hospital and "told Rudel in front of other family members that this happened because Rudel narcing on people in Crestline." *Id.* at 6228.

[16] "Jerry" is Detective Hickman.

[17] Quanita Reeves and Richard Warren both recalled that the man who shot them wore a mask or turtleneck that covered his mouth.  ROW Appx., ECF 21-1, PageID.10036, 10408

16

noticeable gap between his front teeth. ECF 1-12, PageID 134-35. Moreover, Melton's "cream to yellow" impala was often used in criminal activity. *Id.* at 134.

This suppressed evidence, especially when considered with the evidence presented at trial, points strongly to Rodney Melton as the shooter. Indeed, it provides powerful support for what Quanita Reeves told the police regarding her Daddy's friend Bruce (Rodney's brother), and what Rodney's family member told Keith's counsel. Rodney was a psychopathic killer with a strong motive (and stated intent) to inflict injury on Rudel Chatman and his family.

### C. 2010: discovery of evidence that the bullet casing was reportedly discovered elsewhere; evidence that undercuts the State's claim that Warren's nurse introduced the name "Kevin" into the case.

Two days into trial, Keith's counsel served a subpoena on the Bucyrus Police Department for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time." ECF 1-29, PageID 218. This evidence was necessary to rebut Warren's nurse's testimony that he had called the police the day after the murder to tell them that Warren had identified the shooter as a man named "Kevin." Keith's trial counsel never received materials in response.

Then, in 2007, Keith (through a high school friend) submitted public records requests to obtain those same call records, but the Bucyrus Police Department told him that the call logs did not exist and that any recordings were destroyed. ROW Appx., ECF 20-24, PageID 7045. In 2010, however, Keith discovered through sworn testimony in an unrelated case that the Bucyrus Police Department *does* keep radio dispatch call logs.[18] Keith therefore contacted the attorney in

---

[18]Testimony from that case demonstrated that it was the practice of the Bucyrus Police Department to prepare a "contemporaneous radio log" that recorded information about the police station's phone calls. ROW Appx., Proposed Findings of Fact and Conclusions of Law of Respondents, City of Bucyrus, Daniel F. Ross, and Kenneth Teets, ECF 20-24, PageID 7096. The radio logs "serve as another medium by which the same information was recorded" as the audio recordings. *Id.* at PageID 7102. The radio logs are "contemporaneous with the call" and could be used as an "index to the tapes." ROW Appx., Davila Hrng p. 77, ECF 20-24, PageID 7074.

17

the unrelated case and was able to obtain the call logs. Ex. 4, ¶ 49. The logs showed that the police had not received phone call from Nurse Foor, ECF 1-16, PageID 200-204, despite the State's assertion that "John Foor called the Bucyrus Police Department. That is how the name Kevin found its way into the case." ROW Appx., ECF 21-1, PageID.10529. The call logs also showed that the bullet casing purportedly linking Keith to the crime scene may have actually been found at a McDonald's, rather than at the home of Fernelle Graham. ECF 1-26, PageID 202.

Confronted with all this evidence, and still sitting on Ohio's death row after several attempts to challenge his conviction, Keith applied for clemency. On September 2, 2010, Governor Ted Strickland commuted Keith's death sentence to a life sentence, citing doubts about Keith's guilt as his reason for the commutation. Governor Strickland issued a statement lamenting that "the pending legal proceedings may never result in a full reexamination of his case, including an investigation of alternate suspects, by law enforcement authorities and/or the courts. That would be unfortunate – this case is clearly one in which a full, fair analysis of all of the unanswered questions should be considered by a court." Ex. 5-A, Strickland Affidavit. The State nonetheless still refused to reexamine the case.

### D. 2016: discovery of evidence of G. Michele Yezzo's bias, mental imbalance, reputation among her peers as an expert who will "stretch the truth to satisfy a department."

Then, in January 2016, Keith's counsel saw an article in the Cleveland Plain Dealer about defendant James Parsons, and it referenced BCI analyst G. Michele Yezzo, the expert who had linked Davison's car to the crime scene. ECF 1-13, PageID 138. The article quoted from a memo written by a state supervisor about Yezzo: "Yezzo's findings and conclusions regarding the truth maybe [sic] suspect. She will stretch the truth to satisfy a department." *Id*. This prompted Keith's

18

counsel to obtain Yezzo's personnel file from Yezzo's time at BCI.  Ex. 4, ¶ 98.  Counsel obtained Yezzo's file through a colleague who knew Parsons' attorney.  *Id.* at ¶ 99.

That file revealed a long history of mental instability and untrustworthy forensic analysis.  In January 2009, Yezzo received the last of many verbal reprimands of her career as a forensic scientist with Ohio's Bureau of Criminal Investigation. It referred to her "interpretational and observational errors" as "failures that could lead to a substantial miscarriage of justice."  ECF 1-14, PageID 140.  Yezzo tendered her resignation the following month.  ECF 1-15, PageID 142.

Problems with Yezzo's work was well known long before she testified at Keith's trial.  For example, a May 1989 memorandum from the BCI Assistant Superintendent to the BCI Superintendent documented that the "consensus" was that Ms. Yezzo's "findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department."  ECF 1-16, PageID 145.  As yet another example, an investigation of Yezzo occurring in the summer of 1993 (almost a year before Keith's trial) revealed that Yezzo had a "reputation of giving dept. answer wants if [they] stroke her." ECF 1-18, PageID 161.  During this time, other analysts reworked Yezzo's cases and seriously questioned the validity Yezzo's conclusions on a blood analysis and a partial footprint analysis.  *Id*.

 Other documents indicated that Yezzo did not respond well to "peer review."  ECF 1-19, PageID 168.  Yezzo had demonstrated hostile behavior on more than one occasion with more than one coworker, and at least one of those occasions came about during discussions of a peer review.  *See* ECF 1-20.  She was abusive verbally and physically to her co-workers, actually having attempted to physically assault at least two of her colleagues.  *Id*. at PageID 170-71.  She even used racial slurs ("nigger bitch," "nigger in a woodpile") when addressing an African-

American co-worker.  *Id*. at 173, 175.  By 1989, it was the "consensus of opinion" in her section at BCI that she "suffers a severe mental imbalance and needs immediate assistance."  *Id*. at 176.

Then in 1993, less than a year before she testified against Keith, Yezzo was placed on Administrative Leave for "threatening co-workers and failure of good behavior." ECF 1-17, PageID 148.  Yezzo had threatened that she was going to "kill some co-workers" on multiple occasions, which led to her suspension.  *Id*.  A hearing to determine the extent of Yezzo's suspension was stayed until May 26, 1994.  ECF 1-21, PageID 177.  Less than two weeks before this hearing, on May 12, 1994, Yezzo testified against Keith via deposition, which was only allowed for material witnesses.  Ohio Crim. R. 15(A).

After receiving all this information in Yezzo's personnel file in 2016, Keith's current counsel brought this information to the attention of the current Crawford County Prosecutor, Matthew Crall, and met with him in April 2016.  Ex. 4, ¶ 101.  Prosecutor Crall indicated he wished to look into the information he was provided, and Keith's counsel agreed not to file a new trial motion until Crall had some time to look into it.  *Id.*

In June 2016, Keith's counsel met with former Ohio Attorney General (and former Lieutenant Governor) Lee Fisher.  *Id.* at ¶ 104.  Fisher was the Attorney General during the time period that Keith was indicted, tried, and convicted.  In his role as Attorney General, he was the "chief legal officer and chief law enforcement officer for the state of Ohio." ECF 1-22, PageID 178. He was, effectively, the person in charge of Yezzo, as BCI is a section under the Office of the Attorney General.  *Id*.  Fisher "also hired and supervised the Superintendent of BCI."  *Id*. at 179.

Keith's counsel provided Fisher with documents from Yezzo's personnel file.  Before that, Fisher had not known about this troubling information regarding Yezzo, because he had

"relied upon the chain of command" and those in supervisory positions to appropriately handle personnel issues. *Id*. at 179.  On July 1, Fisher provided an affidavit stating his conclusions from reading about Yezzo and from reviewing information about Keith's case.  *See* ECF 1-22.

Fisher found the information about Yezzo "very troubling," and "concerning due to the fact that the opinions of BCI's forensic analysts are relied upon by law enforcement, judges, and juries. The character of the analyst is important." *Id*.  He expressed his belief that "Ms. Yezzo's opinions were very likely wrong and that the prejudice in [Keith's] case is very significant." *Id*. at 3.  Fisher is "deeply concerned that Ms. Yezzo's conclusions and testimony led to a miscarriage of justice in Mr. Keith's case." *Id*.  Fisher would not only have prevented Yezzo from testifying against Keith, but he would have ordered another analyst to re-examine the evidence submitted to Yezzo. *Id*.  Fisher recognized that the State had a duty to disclose to Keith this information about Yezzo: "Because Ms. Yezzo did testify as a witness for the State against Mr. Keith, the defense should have been notified about the information in her personnel file. It is my opinion that the State had a duty to disclose this information because it severely impacts Ms. Yezzo's credibility." *Id*.

Keith provided Prosecutor Crall with a copy of Fisher's affidavit on July 21, 2016.  Ex. 4, ¶ 105.  Counsel for Keith left messages with and sent emails to Prosecutor Crall regularly after that, but the only response he received from then on out was the State's court filings opposing Keith's attempt for a new trial. Ex. 4, ¶ 110.

On August 19, 2016, counsel for Keith met with Attorney General Mike DeWine and several members of his staff in order to discuss what was discovered in Yezzo's personnel file and how it impacted Keith. Ex. 4, ¶ 106.  In advance of that meeting, Keith provided a copy of his prepared but unfiled new trial motion to Stephen Schumaker, Deputy Attorney General for

Law Enforcement, for distribution to the meeting's attendees. *Id.* The meeting concluded with the Attorney General's indication that he wished to look into it, and Keith's counsel agreed not to file a new trial motion until the Attorney General had some time to do so.  *Id.* at ¶ 106.  The day following the meeting, counsel exchanged emails with members of the Attorney General's Office, indicating that they would be in touch.  *Id.* at ¶ 107.  Since that time, Counsel for Keith has not heard from the Attorney General's Office on this matter, and emails sent by Keith's counsel went unanswered. *Id.* at ¶ 108-109.

### E.  2017:  discovery that the State ignored a defense subpoena

On December 28, 2016, the Supreme Court of Ohio changed Ohio's public records law to provide defendants with a "clear legal right" to obtain the public records in their own cases. *State ex rel. Caster v. City of Columbus,* 89 N.E.3d 598, 610 (2016).  Accordingly, that same day, Keith made a public records request to obtain the Bucyrus Police Department's file in its entirety. Ex. 4, ¶ 112.  On February 2, 2017, Keith received the response to his public records request.  *Id.* at ¶ 115.  Those records revealed the subpoena dated May 12, 1994, for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time."  ECF 1-29, PageID 218.  Written on this subpoena were the words "Ignore For Now."  *Id.*

### IV.  Keith's litigation of suppressed evidence

In addition to presenting the State an opportunity to correct this miscarriage of justice, Keith has, over the years, filed three New Trial Motions based on the newly discovered evidence from 2007, 2010, and 2016.  The State has argued in response to the Keith's *Brady* claims that he should have discovered the evidence sooner, and that it was not material to his case.  Each time, the state courts agreed.  The Sixth Circuit, however, recently granted Keith's request to file a second or successive habeas petition based on the State's withholding of exculpatory and

impeaching evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Sixth Circuit found that Keith had "made a *prima facie* showing that no reasonable fact finder would have found him guilty." Order, Case No. 18-3544 (Oct. 26, 2018) at 11-12. The court explained that the "new evidence goes to the 'core' of the government's case" and that "Keith has diligently pursued exculpatory and impeachment evidence." *Id.* at 10; *see also id.* at 11 ("The impeachment value of this evidence cannot be understated, particularly given that Yezzo's forensic analysis of the license plate was one of the 'core' elements of the government's case against Keith."); *id.* ("The evidence regarding the Bucyrus Police Department's deliberately ignoring the subpoena is also significant impeachment evidence; it undermines the government's theory that the police learned about Keith's identity as the shooter from a nurse who called the Bucyrus Police Department after Warren emerged from surgery."). Thus, Keith was permitted to file his petition.

Despite all this, the Warden continues to vouch for Kevin's conviction—she filed a Return of Writ ("ROW") on March 26, 2019 raising a host of meritless, mostly procedural arguments. Indeed, out of the 65 pages comprising the ROW, only 4 go to the merits of Keith's *Brady* claim. Regardless, none of the arguments, procedural or otherwise, prevent this Court from righting the injustice done to Keith.

## V. Requirements under 28 U.S.C. §2244

### A. The factual predicate for the claim could not have been discovered previously through the exercise of due diligence.

#### 1. Sixth Circuit's standard for due diligence

In the Sixth Circuit, whether the petitioner has exhibited "due diligence" pursuant to § 2244(b)(2)(B)(i) requires a fact-specific inquiry to determine whether that particular petitioner "has done as much as could reasonably be expected from someone in his circumstances." *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018) (internal quotation marks omitted). In other words,

23

"[t]he proper task in a case such as this one is to determine when a duly diligent person in petitioner's circumstances would have discovered" the factual predicate for his claim.  *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006).[19]  The petitioner "need not have practiced the maximum feasible diligence"; it is enough that his actions were reasonable under the circumstances.  *In re Wogenstahl*, 902 F.3d at 629; *see also Munchinski v. Wilson*, 694 F.3d 308, 330 (3d Cir. 2012) ("The diligence requirement 'does not demand a showing that the petitioner left no stone unturned.'"); *Jones v. Warden, Leb. Corr. Inst.*, No. 2:13-CV-155, 2014 U.S. Dist. LEXIS 29601, at *18 (S.D. Ohio March 7, 2014) ("[I]f a petitioner did what he reasonably thought was necessary to preserve his rights based on information he received then he can hardly be faulted for not acting more 'diligently' than he did." (internal quotation marks and ellipses omitted)).

The Warden cites a random mix of case law, mostly from outside the Sixth Circuit, to construct a proposed diligence standard.  Most egregiously, the Warden appears to frame the standard to require Keith to show that *no* petitioner could have discovered the factual predicate for his claim previously.  ROW, ECF 26, PageID 10840.  But that is not the standard, and especially not in the in the Sixth Circuit, which as explained above, is "fact specific." *Person v. Clipper*, 2019 U.S. Dist. LEXIS 64970, *23-24 (N.D. Ohio Jan. 23, 2019), and asks whether the petitioner "has done as much as could reasonably be expected from someone in his circumstances," *In re Wogenstahl*, 902 F.3d at 629.  The question is therefore not whether the evidence hypothetically

---

[19] Though the court in *DiCenzi* was performing a diligence inquiry under 28 U.S.C. § 2244(d)(1)(D), the analysis is the same under § 2244(b)(2)(B)(i).  Indeed, the language in the two sections is almost identical. *Compare* 28 U.S.C. § 2244(d)(1)(D) ("The limitation period shall run from…the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."), *with* 28 U.S.C. § 2244(b)(2)(B)(i) ("the factual predicate for the claim could not have been discovered previously through the exercise of due diligence.").  That is why the Sixth Circuit often cites § 2244(d)(1)(D) case law in performing the inquiry under § 2244(b)(2)(B)(i).  *See, e.g., In re Wogenstahl*, 902 F.3d at 629 (citing *DiCenzi*, 452 F.3d at 470).

could have been discovered at trial; it is whether the evidence could have been discovered *by a person in the petitioner's circumstances* exercising *reasonable* (not maximum) diligence.

For example, In *In re Wogenstahl*, the Court noted that the petitioner had requested discovery from the prosecution numerous times throughout his appeals, finding "[t]hat Wogenstahl did not obtain the evidence he now presents until that final request is hardly attributable to a lack of reasonable due diligence on his part." 902 F.3d at 629; *see also In re Freeman*, No. 17-1280, 2017 U.S. App. LEXIS 19043, at *6-8 (6th Cir. Oct. 2, 2017) (finding sufficient evidence to satisfy diligence threshold, despite the State's argument that the evidence was available due to prosecution's open file policy, because "Freeman's unsuccessful attempts to obtain the photos on direct appeal and collateral review call into question the completeness of the prosecution's file.").

The Warden also attempts to portray the State's conduct as essentially irrelevant to the due diligence inquiry. *See* ROW, PageID 10840. But that is not so. *See, e.g., In re Wogenstahl*, 902 F.3d at 629 ("The prosecution has a constitutional obligation under *Brady* to provide material exculpatory and impeachment evidence, *see, e.g., Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc), and the defendant is not required to request continuously *Brady* information in order to show due diligence."). The Sixth Circuit has not treated the § 2244(b)(2)(B)(i) diligence requirement as "distinctly different than the subjective diligence standard required to prevail on a *Brady* claim." ROW, PageID 10840. As the Supreme Court has explained, "a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Instead, "[f]ault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all." *Id.*

The Warden cites two cases that she suggests stand for the proposition that so long as the evidence was "available" or "discoverable" at trial, the petitioner fails the diligence test.   ROW, PageID 10841 (citing *Vinson v. Jackson*, No. 2017 U.S. App. LEXIS 25141, *8 (6th Cir. Dec. 13, 2017) and *In re Herrington*, No. 17-3194, 2017 U.S. App. LEXIS 20008 at *4 (6th Cir. Oct. 12, 2017)).   But if that were the rule, *Brady* evidence—by definition in existence at trial and hypothetically discoverable—could never form the basis of a second or successive petition.  That cannot be the case. Indeed, it is unsurprising that the cases she cites do not, in fact, propound such a rule.  For example, the court in *Vinson* was not considering *Brady* evidence; the petitioner instead argued that a second DNA test he performed *after* trial conflicted with a DNA test presented *at* trial.  2017 U.S. App. LEXIS 25141, at *8.  The court explained that "the technology existed" to perform the test at trial—indeed, one *was* performed prior to trial—and so this was not "newly discovered" evidence.  *Id.*  And in *In re Herrington*, the petitioner sought to file a second habeas petition based on evidence that he had admittedly discovered three years before he filed his *first* habeas petition, and yet he had failed to include the claim in his first petition.  2017 U.S. App. LEXIS 20008, *4.  This failure clearly exhibited a lack of due diligence in bringing the claim.

In the end, the Warden cannot escape the fact that the "due-diligence standard d[oes] not require [petitioners to] continuously to seek out evidence that the government had a constitutional duty to disclose."  *Jefferson v. United States*, 730 F.3d 537, 546 (6th Cir. 2013).[20]  Particularly where the government represents that it has disclosed all *Brady* material, a petitioner can "assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction."  *Id.* at 545 (internal quotation marks omitted).  In *Jefferson*, for example, the court held that "given the prosecution's representation that it would disclose impeachment

---

[20] *Jefferson* applied a nearly identical diligence standard in 28 U.S.C. § 2255(f)(4), applicable to federal prisoners.

evidence, [the defendant] had no basis for believing the prosecution had failed to comply with *Brady*." *Id.* (internal brackets and quotation marks omitted). Accordingly, the court rejected "the government's position that [the defendant] failed to exercise due diligence because he did not seek information 'the very existence of which the [government] had improperly withheld in violation of *Brady*.'" *Id.* at 546. In short, the "due-diligence standard d[oes] not require [petitioners to] continuously to seek out evidence that the government had a constitutional duty to disclose." *Id.*; *see also In re Wogenstahl*, 902 F.3d at 629 ("[T]he defendant is not required to request continuously *Brady* information in order to show due diligence.").

## 2. Keith meets his burden under § 2244(b)(2)(B)(i).

Keith has far exceeded what is required of him in the exercise of due diligence. The record before this Court also demonstrates that the State is the only party at fault for Keith's inability to obtain the evidence at issue.

Multiple times—in writing and in open court—the prosecutor assured Keith's trial counsel that the State would comply with its legal responsibility to disclose favorable material. *See, e.g.,* ROW Appx., State's Response to Defendant's Motion for Disclosure of Impeaching Information, ECF 20-1, PageID 462 (the State responded that it would "strictly adhere to Crim. R. 16 and to the Code of Responsibility. Defendant's Motions are therefore, unnecessary."); *see also* Judgment Entry, ECF 20-1, PageID 473 (the trial court noted that the State acknowledged in open court on March 15, 1994 that it had a continuing duty to disclose evidence pursuant to Ohio Criminal Rule 16). The prosecutor even provided a copy of his case file to appellate counsel in 1994, and that file contained none of the subsequently found evidence that was favorable, material information for Keith. *See* ROW Appx., ECF 20-8 to 20-16, Petitioner's Response to Motion for Summary Judgment and Appendix Vols. I-IX, PageID 2938-5103.

Keith cannot be faulted for relying on the State's representations. It was "conduct attributable to the State that impeded [] counsel's access to the factual basis for making a *Brady* claim." *Strickler v. Greene,* 527 U.S. 263, 283 (1999).  The record itself further details how Keith diligently sought discovery and an evidentiary hearing throughout his appeals.  And the affidavit of Rachel Troutman details Keith's extensive efforts over the years to have his day in court, including the multiple times Keith's counsel reached out to the State.  *See* Ex. 4.

### a. Until he obtained it, Keith had no knowledge of the existence of the evidence at issue.

The Warden acts as if Keith should have suspected all along that the Bucyrus Police would not only refuse to comply with defense subpoena, but actually instruct others to ignore it. She insists that "Keith had to know at the time of trial that the police did not comply with his subpoena." ECF 26, PageID 10842.  But that misses the point entirely.  It is not just that the phone records were not turned over. It is that the Bucyrus Police Department refused to comply with a defense subpoena and instructed others to ignore it. This evidence would have drastically affected the credibility of the police investigation in the eyes of the jury, especially when paired with other *Brady* evidence.

The reality is that, even after discovering suppressed, exculpatory evidence in 2004, 2007, and 2010, Keith had no way of knowing that evidence like the "Ignore For Now" subpoena existed. Nor should he have.

Throughout decades of litigation, the State repeatedly asserted that there was no evidence of bad faith on the part of the police officers. *See* ROW Appx., Brief of Appellee, ECF 20-4, PageID 1814-15; ECF 20-24, 2010 Brief of Appellee, PageID7377. *See also id.* at i, 20. In fact,

when Keith raised a *Youngblood*[21] claim because of the Bucyrus Police Department's destruction of the station's recordings of the calls, the State responded that Keith could not meet his burden because there was no evidence of impropriety by the police. Ex. 6, p. 21.  The prosecution described Keith's argument and then refuted it in the following way:

> Because [Keith's] request for discovery was filed before the time that the tapes containing those calls should have been overwritten, he continues, the fact that they were not preserved shows that the police acted in bad faith.  But the mere fact that the recordings were not preserved, by itself, does not establish bad faith. There may be an innocent explanation. Or perhaps the failure to preserve was the result of negligence or inattention.

*Id.*  Keith could not have imagined that the State would argue the above while simultaneously possessing evidence demonstrating the that the subpoena was blatantly ignored. The State cannot assert "an innocent explanation" and then blame Keith for not knowing that assertion was a falsehood.

Moreover, as described below and in the affidavit of Rachel Troutman, Keith had every reason to "anticipate that 'obligations [to refrain from improper methods to secure a conviction] plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.'" *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  Keith could not have anticipated that, in 1989, five years before Yezzo testified against Keith, there was a "consensus" among all the analysts at Ohio Bureau of Criminal Investigations that Yezzo would lie for a police department—and yet she still remained employed by the State and used to help convict and sentence people to death.  Similarly, Keith would never have thought that, in 1993, less than one year before Yezzo testified against him, BCI again noted that Yezzo

---

[21] *Arizona v. Youngblood*, 488 U.S. 51, 52 (1988) held that unless a defendant can show bad faith on the part of the police, the failure to preserve potentially useful evidence does not constitute a denial of due process of law.

would lie for the police. And yet, even after all this, Yezzo remained employed by the State and was used to help convict and sentence people to death.  Additionally, Keith would never have expected that in 2009, BCI documented that Yezzo's errors were "failures that could lead to a substantial miscarriage of justice"—and yet not one person on behalf of the State thought Keith should have this information before he was to be executed in 2010.

The state court focused on the fact that Keith never specifically requested Yezzo's personnel file. ROW Appx, Opinion, PageID 9359-60.  But Keith never had any suspicions regarding the personnel file, so there was no reason to request it.  And surely it cannot be a requirement that defendants must request personnel files for every state witness—defendants should be able to assume that the state would not offer up an expert witness to provide key testimony in a death penalty case when that witness had a personnel file like Yezzo's.  Additionally, the state court reasoned that Keith's trial attorney could have asked Yezzo about her disciplinary history on cross examination.  But again, Keith's counsel had no reason to do so because there was no reason to doubt Yezzo's integrity.  Indeed, the whole point of Keith's claim is that he did not have her personnel file, so he was not put on notice of these issues and could not cross examine her on them.  Without an inkling of the problems in Yezzo's past, trial counsel would have been prevented from even asking the right questions.  *See State v. Gillard*, 533 N.E.2d 272, 278 (Ohio 1988) ("[A] cross-examiner may [only] ask a question if the examiner has a good-faith belief that a factual predicate for the question exists.").

### b.  Keith made diligent efforts to obtain all favorable evidence.

Keith has done **more** than can reasonably have been expected from someone in his circumstances. *See In re Wogenstahl*, 902 F.3d at 629 (look at what could "reasonably be expected from someone in his circumstances;"). Within days of arraignment, trial counsel James Banks filed

30

a motion for *Brady* material, even though the law did not require an affirmative request by defense counsel.  Banks filed another motion shortly thereafter, requesting impeachment information on the State's witnesses.  In addition, counsel then filed a Motion to Compel, asking for the other last names given to Warren in the police's "name line-up" and "move[d] [the] Court to permit voir dire examination outside the hearing of the jury to determine the propriety of any identifying testimony and/or evidence related to statements of Richard Warren."  ROW Appx., ECF 20-1, PageID 483.

On May 12, 1994, counsel filed yet another motion to compel.  ECF 20-1, PageID 487-89.  He also issued a subpoena to the Bucyrus Police Department for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time."  ECF 1-29, PageID 218.  The court held a hearing that day, and Banks challenged how the police obtained Warren's identification of Keith. Banks specifically questioned the tactics the police used to obtain that identification and asking Bucyrus Police Officer John Stanley and Crestline Officer James David Smith about how they learned of and then provided the name "Kevin Keith" to Warren. ROW Appx., Tr. 211-229, ECF 21-1, PageID 9899-917.

At the conclusion of the hearing, defense counsel moved the court to provide him "the opportunity to support and supply this position with a brief and case law tomorrow morning."  ROW Appx., Tr. 230, ECF 21-1, PageID 9918.    The court did not provide him with that opportunity, denied the motion, and the trial began the next day.  *Id.* at PageID 9920.

Throughout trial, defense counsel challenged the State's case.  He challenged the police department's investigation, to the extent he could, given the information he had.  He told the court and prosecutor that he had been contacted by Rodney Melton's family and explained that Melton was likely the real killer, though the court did not permit that information to go to the jury.  He

even called Melton to the stand to ask him point blank if he was the killer, even though he lacked the evidence—like the Pharmacy Board report—that could have truly inculpated Melton.

He challenged John Foor's testimony and implied that Foor never had the information he claimed he did and that he never even called the police that morning. He did this even though he was not armed with the call records proving no such call occurred.

Keith was convicted and sentenced to death, and he filed a pro se motion requesting the appointment of the Ohio Public Defender—which has its own funding, investigators, and mitigation specialists—to conduct his appeals. *See* ROW Appx., pro se Motion-for-Appointment of Council [sic], ECF 20-1, PageID 557-58. But the Ohio Public Defender could not take Keith's case at that time, so the trial court then appointed private counsel Harry Reinhart and Carol A. Wright to represent Keith on appeal. *See* ROW Appx., Judgment Entry, ECF 20-1, PageID 591. Reinhart and Wright accepted the appointment, even though the hourly rate and fee cap would, at best, leave them with a net profit of $2 per hour. ROW Appx., 1994 Affidavit of Harry R. Reinhart, *Id.* at PageID 595; 1994 Affidavit of Carol A. Wright, *Id.* at PageID 598.

Because Keith was indigent, appellate counsel requested court funding for investigation, mitigation, and expert services. Both Wright and Reinhart spoke with Judge Kimerline about the need for funding and were assured they would be provided the necessary investigative funds. *Id.* at PageID 595-99. The trial court then refused to authorize those funds, however, so Wright and Reinhart moved for leave to withdraw as counsel. Motion for Leave to Withdraw as Counsel, *Id.* at PageID 592-600.

The court did not grant counsel's motion for leave, nor did it appear to rule on it at all. Despite the restriction in funding for defense counsel, however, the court issued an entry "to appoint two Special Assistant Prosecutors to assist the Crawford County Prosecuting Attorney

32

with regard to [Keith's appeal]." ROW Appx., Entry Appointing Special Assistant Prosecutors, ECF 20-1, PageID 657. After that, appellate counsel alerted the courts at multiple junctures that they were actually losing money in their representation of Keith, because they were not properly paid. *See* ROW Appx., ECF 20-2, PageID 1185-90. *See also* ECF 20-4, PageID 1938 ("Therefore, unlike the attorneys prosecuting this case or those assisting from the Attorney General's Office, assigned counsel defending a case or prosecuting an appeal actually loose [sic] money…[and] are, quite literally put in the position of subsidizing the prosecution of their own clients.").

Despite all this, appellate counsel timely filed Keith's direct appeal briefs in the state court of appeals and then the Ohio Supreme Court. Counsel continued what trial counsel had started and challenged the unreliable identification by Warren, highlighting the conduct of the investigating officers. *See* ROW Appx., ECF 20-2, Court of Appeals Merit Brief PageID 860-64; ECF 20-3, Supreme Court Merit Brief, PageID 1563-67. In response, the prosecutor argued that Keith had no evidence of bad faith on the part of the police officers. ROW Appx., Brief of Appellee, ECF 20-4, PageID 1814-15.

Even without promise of payment, Keith's appellate counsel apparently investigated and submitted the incurred costs for reimbursement. *See* ROW Appx., Journal Entry, ECF 20-1, PageID 659-70. This time counsel asked the state court of appeals for the funds. *Id.* The result, however, was the same; the court found "no need for the services of an investigator" and ordered that "reimbursement will not be made on counsel's $1,842.96 expense for 'investigation.'" *Id.* at PageID 659.

In addition to Keith's direct appeals, appellate counsel filed Keith's post-conviction petition on September 20, 1996, and requested an evidentiary hearing. ROW Appx, Petition to Vacate and Set Aside Judgment of Conviction and Sentence, ECF 20-5, PageID 2043-2105. In it,

Keith re-raised the issue of the unreliable identification by Warren, and the conduct of the investigating officers.  *Id.* at 2051-52.  Then "additional evidence became available to Mr. Keith after his direct appeal and within one month of filing his first petition for relief," so counsel filed a supplemental postconviction petition.  ROW Appx, Supplemental Petition to Vacate and Set Aside Judgment of Conviction and Sentence, ECF 20-5, PageID 2212.  Keith again requested an evidentiary hearing. *Id.* at PageID 2211, 2219.

The trial court summarily dismissed Keith's requests for a hearing and relief.  *See id.*, Judgment Entry, PageID 2316.  As Sixth Circuit Judge Clay noted many years later, referencing Keith's state court litigation, "the post-conviction trial court was clearly not interested in developing a factual record." *Keith v. Mitchell*, 455 F.3d 662, 686 n.2 (6th Cir. 2006) (dissenting, Clay, J.)

Keith appealed to the state appellate court, pointing out that the trial court denied him a hearing, and requesting that the appellate court reverse and remand "with instructions to proceed with discovery and hold an evidentiary hearing on the issues raised in the petition." ROW Appx, Merit Brief, ECF 20-6, PageID 2400. Like the trial court, the appellate court denied Keith's request. ROW Appx, Opinion, ECF 20-6, PageID 2551-56.

Keith then appealed the denial of a hearing and his postconviction petition to the Ohio Supreme Court. ROW Appx, Memorandum in Support of Jurisdiction, ECF 20-7, PageID 2717-48.  He again requested that he be provided with a hearing. *Id.* at PageID 2730-35.  On December 23, 1998, the Supreme Court declined to accept jurisdiction.  *Id.* at PageID 2830.

Keith tried again with the Ohio Supreme Court.  He filed a Motion for Reconsideration on January 4, 1999.  *Id.* at PageID 2832-39.  This, too, was unsuccessful.  *Id.* at PageID 2840.

On March 19, 1999, Reinhart and Wright filed in the District Court a "Notice by Petitioner of Intention to File a Habeas Corpus Petition," as well as a motion to be appointed as federal habeas counsel for Keith. *See Keith v. Mitchell*, 1:99-cv-657, dkt 2, 3.[22]  The District Court granted the motion for appointment (*id.* at dkt. 4), and on September 3, 1999, Keith filed his federal habeas petition. *Id.* at dkt 5.

On February 9, 2000, Keith moved the District Court for leave to conduct discovery, and throughout his Traverse (filed the same day), he requested an evidentiary hearing.  *Id.* at dkt. 38, 39.  In Keith's motion for discovery, Keith specifically noted the impermissibly suggestive identifications by Warren and by Smathers.  Dkt. 38, p. 12-13.  Keith requested leave to conduct discovery in the form of document requests and depositions, specifically seeking information from the police in order to determine exactly what occurred at the pretrial identification procedure. *Id.* at 13.

He also moved the Court to expand the record with the Grant Medical Center security guard report from February 14, 1994. *Id.* at dkt. 57.  The report, on a form titled "Safety and Security, Person of Interest," describes that the "perpetrator *whos [sic] name is still unknown* is still at large." *Id.* (emphasis added).  The report was created on February 14 "at 1300 hrs," (*id.*), which is eight hours after Warren had purportedly provided the name "Kevin" to his nurse, and less than one hour after he told Captain John Stanley that the last name was "Keith." ROW Appx, ECF 21-1, PageID 10466, 10470.

---

[22] These documents are not available electronically. Counsel for Keith requested that the Warden include in the Appendix to the Return of the Writ all of the federal court documents from Keith's previous federal litigation. The Warden indicated that she would not refile the federal documents, because it is already available to this Court and because it would clutter the docket.  Keith sought to obtain and file the file-stamped documents on his own, but because they are archived, there is a significant cost to obtaining them, and Keith is indigent.  *See* https://eservices.archives.gov/orderonline/help/civiil_item_details.htm.

The Warden opposed both of Keith's motions. *Keith,* 1:99-cv-657, dkt 43, 59. The District Court denied Keith's motion for discovery on March 7, 2000. *Id.* at dkt. 45. It granted his motion to expand the record, but then denied his federal habeas petition without a hearing on June 14, 2001. *Id.* at dkt. 60, 62.

Keith diligently prosecuted his habeas appeal in the Sixth Circuit.  That Court, in a divided opinion, upheld the denial of habeas relief by the District Court.  *See Keith v. Mitchell*, 455 F.3d 662 (6th Cir. 2006). Keith filed for en banc review, which was denied on October 19, 2006.  *Keith v. Mitchell*, 2006 U.S. App. LEXIS 25881 (6th Cir. 2006).  He also petitioned the Supreme Court of the United States for a writ of certiorari, which was denied on March 26, 2007.  *Keith v. Houk*, 549 U.S. 1308 (2007).

In the meantime, Keith's high school friend tried repeatedly to obtain public records from the Bucyrus Police Department regarding Keith's case. ROW Appx., Affidavit of Rev. Renard Torrence, ECF 20-16, PageID 5266-67.  He made a verbal request in 1998, and that was denied. *Id.* at PageID 5267.  Chief Michael Corwin explained in his response to Torrence's January 8, 2001 written request, that the request was denied because Keith's "case is still active in the courts" and "the requested items are presently exempt from a public records demand because of ongoing litigation." ROW Appx., Bucyrus Police Dept. Letter, ECF 20-16, PageID 5269.  Corwin carbon-copied the prosecutor on his letter to Torrence.  *See id.*

Despite this, Keith's friend made another public records request. On April 5, 2004, Torrence successfully obtained some public records from the Bucyrus Police. ROW Appx., 2006 hearing, ECF 21-1, PageID 10630.  Those documents became a part of Keith's 2004 successor post-conviction petition. *See id.*, PageID 10605-10724; *see also* ECF 20-8, 2004 petition, PageID 2876-5274.  The State argued that the items obtained through public records were "inadmissible"

because they were obtained in contravention of public records law. ROW Appx., State's Reply to Petitioner's Latest Filing; Motion to Strike Exhibits 6 &7, ECF 20-16, PageID 5273. (*See* (c) below for a discussion of public records law).

The trial court denied Keith's successor post-conviction petition on February 13, 2007. ROW Appx., ECF 20-16, PageID 5299-5333. Keith's friend Torrence tried again in May 2007 to obtain records from the Bucyrus Police. ROW Appx., ECF 20-24, 2010 Motion for Leave to File New Trial Motion, Ex. 4, PageID 7045. Torrence requested the police station's recording of the February 14, 1994 incoming phone call from John Foor. *Id.* Captain John W. Beal responded that "the recorded phone call from Nurse Foor was not copied for the prosecution or the defense at that time," and the necessary audiotapes had not been retained by the Department. *Id.*

In April of 2007, the Ohio Public Defender took over the representation of Keith. ROW Appx., Motion to Withdraw as Counsel and Substitution of Counsel, ECF 20-16, PageID5416-17. In her affidavit, Troutman describes in detail the investigation and the litigation that led to the discovery of the Yezzo material and the "Ignore for Now" subpoena. *See* Ex. 4.

On June 1, 2007, counsel filed the appeal concerning the denial of Keith's 2004 successor post-conviction petition. *See* ROW Appx., 2007 Merit Brief, ECF 20-17, PageID 5527-46. They had begun reviewing Keith's record and investigating as quickly as possible, because they anticipated that the Ohio Supreme Court would soon set Keith's execution date. Ex. 4, ¶ 4.

On July 2, 2007, Keith's counsel, on a whim, asked the Ohio Board of Pharmacy for public records regarding the Meltons. *Id.* at ¶ 5. Those documents contained evidence that was extremely incriminating of the Meltons, and Rodney Melton in particular. *See* ECF 20-20 to 20-22. Keith's counsel called the Crawford County Prosecutor's Office to alert the prosecutor. *See* Ex. 4, ¶ 6. The prosecutor was not interested. *See Id.* ("I believed it was significant enough that the prosecutor

would want to know, perhaps avoiding litigation, because it strongly indicated that Melton was the person who had committed the shootings in Bucyrus on February 13, 1994. I recall that the assistant prosecutor with whom I spoke seemed hostile toward me and told me to just file my motion.").

During this time, Keith's counsel continued trying to answer the questions the open questions concerning the police conduct leading up to Warren's identification of Keith. *See* Ex. 4. at ¶¶ 7-12, 18-21. The State had maintained that John Foor was the nurse who mattered. S*ee* ECF 21-1, PageID 10529 ("John Foor called the Bucyrus Police Department. That is how the name Kevin found its way into this case.")   But police officer Stanley had testified about his conversations with Nurse "Amy Gimmets."   Keith's counsel was struck by what appeared to be a violation of the Confrontation Clause, as well as the fact that no one ever interviewed this "Gimmets," and wanted to determine why the State did not call Nurse Amy to testify. Ex. 4, ¶ 7.

On July 19, 2007, Keith's counsel located a phone number for the one nurse named Amy listed in Warren's medical records—Amy Whisman (now Petryk). *Id.* at ¶ 9. Counsel contacted her by phone to see if she was indeed the one who called the police.  Counsel could not ask her questions regarding the police interaction with Warren before he "remembered" the name "Kevin," however, because she claimed she never called the police and never got a name from Warren.  *Id.* at ¶ 10. She signed and had notarized a statement swearing to those facts.  *Id.* at ¶ 11.

Keith's counsel reviewed medical records, interviewed nurses who might have known "Amy Gimmets," contacted the Ohio Human Health Resources, went to the Ohio Department of Vital Statistics, and could find no evidence of Gimmets. Ex. 4, ¶¶ 14, 26-30, 40. On August 1, 2007, Keith filed a Motion for Leave to File a Delayed Motion for New Trial and a Motion for New Trial Based on Newly Discovered Evidence, based on the evidence obtained from the

Pharmacy Board and nurse Amy Petryk's affidavit. ROW Appx., ECF 20-20 and 20-21, PageID 6130-6477. In his motion, Keith challenged Captain John Stanley's testimony that he spoke with "Amy Gimmets."

When the prosecutor responded in court that there was an audiotape of "Gimmets," Keith's counsel contacted the prosecutor so that Keith could obtain the tape. Ex. 4, ¶ 17; ROW Appx., ECF 20-22, PageID 6595. The prosecutor ignored Keith's counsel, so Keith filed a Motion to Compel production of the tape. ROW Appx., ECF 20-22, PageID 6590-6700.

Keith continued to investigate, and, on November 7, 2007, he filed a Motion to Supplement Motion for New Trial Based on Newly Discovered Evidence.  ROW Appx., ECF 20-22, PageID 6547-6570. Keith then filed yet another motion for an evidentiary hearing. *Id.* at PageID 6701.

The prosecution never provided the audiotape of Stanley and Gimmets, and the court did not order him to do so. A friend of Keith's was able to obtain the tape, and he sent it to Keith's counsel. Ex. 4, ¶ 18.  On December 31, 2007, Keith's counsel emailed Petryk again, this time asking her to listen to the tape. *Id.* at ¶19.  *See also* Ex. 4-B and 4-C.  After initially agreeing to do so, on January 14, 2008, Petryk then stated that her lawyer told her not to get involved, and she wished Keith good luck.  Ex. 4, ¶ 20, and Ex. 4-C.

The trial court denied all of Keith's motions on July 1, 2008.  ROW Appx., Opinion and Judgment Entry Denying Kevin Keith's Motion for Leave to Conduct Discovery and Denying Motion for New Trial and Denying Any and All Ancillary Motions, ECF 20-22, PageID  6739-50. Keith filed the notice of appeal within a week. ROW Appx., ECF 20-22, PageID 6752. He filed his state court appellate brief on September 2, 2008, and it was denied on December 1, 2008. ROW Appx., ECF 20-23, Merit Brief of Appellant, PageID 6801-32; *Id.* at PageID 6895-910.

Keith had been simultaneously litigating multiple direct appeal issues that had not been previously raised. *See* ROW Appx., Application for Reopening, ECF 20-6, PageID 2551-680 (filed in 3rd District Court of Appeals on August 3, 2007) and Application for Reopening, ECF 20-19, PageID 5959 (filed in Ohio Supreme Court on January 25, 2008). The Supreme Court declined to review his claims on the merits on August 7, 2008. ROW Appx., ECF 20-19, PageID 6092.

Keith also had brought his newly discovered evidence to the Federal District Court. On July 11, 2008, he filed a second Petition for Writ of Habeas Corpus in the United States District Court for the Northern District of Ohio. *Keith v. Bobby*, Case No. 1:08-cv-1687 (N.D. Ohio), ECF 1.[23] The District Court transferred it to the United States Court of Appeals for the Sixth Circuit, to be reviewed as a successor application. *Id.* at ECF 6.

On August 25, 2008, Keith filed a "Corrected Second/Successive motion" in the Sixth Circuit. *Keith v. Bobby*, Case No. 08-3908 (6th Cir. Ohio), Doc.12. While continuing the litigation, Keith's counsel reached out to representatives from the Office of the Ohio Attorney General. Ex. 4, ¶ 26-30, 32; Ex. 4-D to 4-K. On December 2, 2008, they first requested a meeting. Keith's counsel continued communications, relaying all concerns about Keith's case, in meetings and in emails with the Assistant Attorneys General assigned to the case. The Assistant Attorneys General indicated that they would have their investigators look into the case. Ex. 4, ¶ 30. *See also* Ex. 4-J. Keith's counsel felt "hopeful that the channels of communication were open between the two sides." Ex. 4, ¶ 30.

Keith had requested that the Ohio Attorney General withdraw its opposition to his successor application, in order to allow Keith to at least litigate his newfound *Brady* claims. *Id.,*

---

[23] These items are electronically available.

Ex. I.  Before the Attorney General made a decision, on January 13, 2009, a divided panel from the Sixth Circuit denied Keith's first successor habeas application.  *Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009).  In the communication that followed, the Attorney General indicated to Keith's counsel that he would keep open their investigator on the claims for the time being, and "[i]f anything turns up that tends to support the claims that you have put forward, we will advance them to you immediately." Ex. 4-J, 1/13/09 email.

On January 15, 2009, Keith filed a Memorandum in Support of Jurisdiction in the Ohio Supreme Court. ROW Appx., ECF 20-23, PageID 6921-86. The Ohio Innocence Project and Ohio State law professor Douglas A. Berman filed a Memorandum of Amicus Curiae on Keith's behalf the same day. *Id.* at PageID 6987-99. Keith also continued to litigate his case in federal court, as well as investigate.  *See* Ex. 4, ¶¶ 33, 36-40.

In July 2009, the State moved the Supreme Court of Ohio to set Keith's execution date. ROW Appx., ECF 20-4, Motion to Set Execution Date, PageID 1991.  Keith opposed that motion and continued to litigate and investigate. *See* Ex. 4, ¶¶ 37-40.

In September 2009, Keith contacted retired FBI Special Agent William Bodziak to conduct a review of Yezzo's conclusions.  *Id.* at ¶ 39. Because Bodziak indicated he could not render his conclusions without reviewing Yezzo's work product, Keith's counsel contacted the Assistant Attorneys General with whom he had previously been communicating. Keith requested access to Yezzo's notes and the rest of the BCI file on Keith's case. Ex. 4-L, 10/20/09 email.  The Assistant Attorney General denied Keith's request, stating that the "merits review of the case is concluded," and "[i]n reviewing the items you have indicated below, we are unable to see what relevance they have post-disposition."  *Id.*

41

Keith did not stop there. The same day the Attorney General refused to provide the documents, Keith sent a public records request to BCI for the items. 10/21/09 letter, Ex. 4-M. He followed up with both another letter and an email. 10/30/09 letter, Ex. 4-O; 11/3/09 email Ex. 4-P. In the email, Keith's counsel explained that Ohio public records law should no longer bar Keith's access to public records, because the State moved for an execution date and stated that Keith had no available legal challenges left. Ex. 4-P. BCI denied Keith's public records request on November 9, 2009.

On December 2, 2009, the Supreme Court of Ohio declined to accept jurisdiction to review the courts' denial of Keith's new trial motion. ROW Appx., OSC Entry, ECF 20-23, PageID 7026. It granted the State's motion to set execution date on February 2, 2010. ROW Appx., OSC Entry, ECF 20-4, PageID 2005. Keith was scheduled to die on September 15, 2010. *Id.*

Keith's counsel continued their consistent pace of investigation and litigation. In February 2010, he learned about a citizen's public records lawsuit in Crawford County regarding a request for the Bucyrus Police Department's 911 calls. Ex. 4, ¶ 48. Keith obtained the Bucyrus Police Department's radio dispatch logs from that plaintiff's lawyer. *Id.* at ¶ 49. On March 3, 2010, Keith filed a petition for writ of certiorari in the Supreme Court of the United States. *Keith v. Ohio*, Case No. 09-1052. That same month, Keith's counsel traveled to Las Vegas from Columbus, Ohio to interview Richard Warren.

At the end of April, Keith's counsel attended a meeting with the Director of the Ohio Public Defender and Governor's Strickland's Chief Counsel. Ex. 4, ¶ 56. Keith had already provided the Governor's Office with materials about his case. *See* Ex. 8, Swisher Declaration, ¶ 8. Executions in Ohio at that point were occurring almost monthly, and Keith feared the Governor's Office would lack the time necessary to fully review the case. Ex. 4, ¶ 56. At that time, Keith sought assistance

from the Governor's Office in convincing the Attorney General and BCI to provide Keith with BCI's files concerning his case. *Id.* at ¶¶ 57-58, 60-62.

With the help of the Governor's Office, Keith eventually received BCI's file on his case. *Id.* at ¶¶62, 64. That file did not contain any of the information from Yezzo's personnel file, and Keith remained unaware of her biases, unprofessionalism, and unreliability. *Id.* at ¶ 64.

In the meantime, on May 11, 2010, Keith filed another Motion for Leave to File a Delayed Motion for New Trial and a Motion for New Trial Based on Newly Discovered Evidence. ROW Appx., ECF 20-24, PageID 7027-7130. Keith relied upon the radio dispatch logs that he had obtained through the plaintiff's attorney from the case *State of Ohio, Ex. Rel., Edwin Davila v. The City of Bucyrus. Id.* at PageID 7107-111. He also relied upon the Proposed Findings of Fact and Conclusions of Law of City of Bucyrus, Daniel F. Ross, ad Kenneth Teets[24] in which the City of Bucyrus asserted that "the information recorded on the radio logs evidences the same information which would have been contained on any audio tapes which the Relator sought." *Id.* at PageID 7102. Keith also submitted the sworn testimony from Bucyrus city officials and members of the police department at the February 19, 2010 hearing. *Id.* at PageID 7055-7106.

Keith's clemency process began on July 13, 2010, when the State submitted the judicial opinions and trial transcript to the Ohio Parole Board. On July 22, 2010, Keith had his interview with the parole board. Keith submitted his clemency materials to the parole board on August 4, 2010.

The Sixth Circuit held oral argument on Keith's remaining federal litigation on August 3, 2010. On August 9, 2010, the trial court denied Keith's second new trial motion. Keith's clemency

---

[24] This was filed on March 12, 2010. ROW Appx., ECF 20-24, PageID 7095.

hearing took place on August 11, 2010.  The parole board issued its decision denying clemency on August 19, 2010. The Governor, citing doubts about Keith's guilt, commuted Keith's sentence to life on September 2, 2010.  *See* Ex. __.

Keith's counsel continued to litigate and investigate even after Keith's commutation. Keith filed his appellate brief in the state court of appeals on September 23, 2010.  ROW Appx., ECF 20-24, PageID 7295.  On September 24, 2010, counsel interviewed Melanie Davison under oath with a court reporter. Ex. 4, ¶ 76.  That same day, Keith's counsel interviewed Wendy Tolar, who described that Rodney Melton threatened to throw the bodies of her and her children in the pond by his mother's house. *Id.* at ¶ 77.  On November 3, 2010, counsel interviewed Jesse Delaney, who provided a sworn statement that was directly contrary to the representations made by the State during the parole board hearing. *See* ROW Appx., ECF 20-28, Ex. 52 to 2016 Motion for Leave, PageID 8750-52.  Keith even hired a scuba-diving team to search the pond by Melton's mother's house, although the divers were hindered in their work due to ice. Ex. 4, ¶¶ 81, 86.

As detailed by the record and by the affidavit of Rachel Troutman, Keith's efforts to discover new evidence and obtain a new trial continued in the months and years that followed Keith's commutation.  *See id.* at ¶¶87-97; *see also* ROW Appx., ECF 20-24, PageID 7250 to ECF 20-30, PageID 9445; *see also Keith v. LaRose*, 1:13-cv-1718 (N.D. Ohio); *In re Kevin Keith*, Case No. 14-3290 (6th Cir. Ohio).  It was not until counsel for Keith received an alert from Google, set up to notify her of news articles referencing Yezzo, that Keith learned about the favorable, material evidence that was in Yezzo's personnel file. Ex. 4, ¶ 98; *see also* ROW Appx., ECF 20-26, PageID 7903.  Keith obtained Yezzo's personnel file that same day from a colleague who obtained the file through contacting the attorney representing James Parsons.

After multiple attempts to engage the State in correcting Keith's wrongful conviction, *see d. infra,* Keith filed his third Motion for Leave to File Delayed Motion for New Trial Based on Newly Discovered Evidence on October 28, 2016. *Id.* at PageID 7818.  He simultaneously filed a Motion for New Trial Based on Newly Discovered Evidence and/or Post-Conviction Relief Under Ohio Rev. Code § 2953.23.  *Id.* at 7832.

Keith continued to investigate. Ex. 4, ¶ 111.  In its response to Keith's motion, the State had faulted Keith for not specifically requesting Yezzo's personnel file.  ROW Appx, ECF 20-27, State's Response in Opposition to Motion for Leave, PageID 8110-11.  Thus, Keith investigated if any defendant had specifically requested Yezzo's personnel file, and whether the information of Yezzo's bias and improper actions had been disclosed.  On November 14, 2016, Keith's counsel found just such a request, made in 2003, on behalf of Vincent Calvert, and the negative personnel files concerning Yezzo had not been disclosed. ROW Appx, ECF 20-29, Motion to Supplement, PageID 8756-9034.  Keith filed a Motion to Supplement with this information on November 21, 2016, in order to further demonstrate he could not have obtained the evidence at issue earlier.  *Id.* at PageID 8756.

On December 28, 2016, the Ohio Supreme Court decided *Caster*, which marked a sea-change in public records law. S*ee c. infra.*  Keith took advantage of it.  That same day, Keith requested all public records from the Bucyrus Police Department regarding Keith's case, including all specific investigatory work product.  Ex. 4-CC.

The trial court denied Keith's Motion for Leave to File Delayed Motion for New Trial Based on Newly Discovered Evidence on January 13, 2017. ROW Appx, ECF 20-29, Judgment Entry, PageID 9035.

Approximately two weeks later, on February 2, 2017, the Bucyrus Police Department electronically provided Keith with its file. Ex. 4-DD. In the subfolder labeled "trial preparation," Keith located the police department's copy of the subpoena his defense counsel had sent on May 12, 1994, for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time." ECF. 1-29, Ex. 29 to habeas petition, PageID 218. On it was written the words "Ignore for Now." *Id.*

Keith appealed the denial of his Motion for Leave/Post-Conviction Petition to the state appellate court, which denied his appeal on June 26, 2017. ROW Appx, ECF 20-29, Opinion, PageID 9057. On August 10, 2017, he and two amici curiae moved the Ohio Supreme to exercise jurisdiction in Keith's case. ROW Appx, ECF 20-30, Keith Memorandum in Support of Jurisdiction, PageID 9321; Memorandum of Amicus Curiae Former Ohio Attorneys Genera Lee Fisher and James Petro, *id.* at PageID 9368; Pro Se Memorandum in Support of Jurisdiction by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae, *id.* at PageID 9381. The Court declined jurisdiction on December 6, 2017.

On January 8, 2018, Keith filed a lawsuit against the Bucyrus Police Department, BCI, the Crawford County Prosecutor, Yezzo, and other relevant parties under 42 U.S.C. § 1983, due to the parties' interference with and violation of Keith's access to the courts. *Keith v. Yezzo, et al.,* 1:18-cv-00047, ECF 1. Keith argued that the defendants blocked him from accessing material, favorable evidence and then faulted him for not finding it sooner. As a result, the parties interfered with his right to access the courts. *See, e.g.,* ECF 27, Keith's Response to Motions to Dismiss, PageID 440 ("With regard to the defense subpoena, Keith is challenging the constitutionality of the Defendants' actions in: (1) ignoring a defense subpoena; (2) instructing others to ignore the defense subpoena; (3) destroying the evidence that was the subject of the defense subpoena; (4)

46

failing to inform Keith that there is a document demonstrating the defense subpoena was ignored and that others were instructed to ignore it; and (5) using Keith's lack of knowledge of the ignored subpoena to demonstrate Keith could not show bad faith in the destruction of evidence.")

On March 19, 2018, Keith filed his fourth petition for writ of habeas corpus in this Court. After briefing and obtaining authorization from the Sixth Circuit, Keith is in front of this Court with this successor habeas petition.  Despite all of these efforts, the Warden now insists that Keith was not diligent in discovering the *Brady* evidence in his case, for the simple reason that this evidence was in existence at the time of trial.  That is not relevant to the standard in the Sixth Circuit, *see supra* III.a.1, and is certainly not enough to rebut this extensive record evidence and the Sixth Circuit's previous finding that Keith has made a prima facie case of diligence.

### c. Ohio law prevented Keith from circumventing the rules of discovery with public records requests.

The law prohibited Keith from obtaining evidence for his criminal case through public records. Keith's trial prosecutor did not provide Keith with the evidence, and Keith could not have circumvented the rules of discovery.  The case law surrounding the Public Records Act, Ohio Rev. Code § 149.43, did not allow it.  The Supreme Court of Ohio at that time specified that a criminal defendant had to first exhaust his direct appeals before he could avail himself of § 149.43.  *See State ex rel. Clark v. Toledo*, 54 Ohio St. 3d 55, 57 (1990).  Keith did not exhaust his direct appeals until April 6, 1998, *see Keith v. Ohio*, 523 U.S. 1063 (1998)—years after the 120-day period expired.  He thus could not have used public records to obtain and the evidence regarding Yezzo.

By the time Keith concluded his direct appeals, the law regarding a defendant's access to public records had become more restrictive.  In *State ex rel. Steckman v. Jackson*, 70 Ohio St. 3d 420 (1994), the Ohio Supreme Court expressly overruled *State ex. rel. Clark v. Toledo*, 54 Ohio St. 3d 55 (1990), changing the law to prohibit a defendant from using public records to challenge

his conviction *even after exhausting his direct appeals*. 70 Ohio St. 3d at 437. *Steckman* came out September 7, 1994, less than 100 days after Keith's trial concluded.

Indeed, the Bucyrus Police Department, the Ohio Attorney General, and Ohio BCI itself all denied Keith's public records request on the basis of *Steckman*: "the requested items are presently exempt from a public records demand because of the ongoing litigation.  They will not be provided to you at this time."  Letter from Corwin, ECF Doc. 20-16, PageID 5269.  The prosecutor also argued in 2004 and 2007 that Keith could not *use* any materials that he was inadvertently able to obtain through public records requests. In fact, it was the State's expressed position that items obtained through public records were "inadmissible" because they were "obtained through an invalid public records request in contravention of [*Steckman*]." ECF 20-16, PageID 5273.

It was not until December 28, 2016, in *State ex rel. Caster v. City of Columbus*, 151 Ohio St. 3d 425, 89 N.E.3d 598 (2016) that the Ohio Supreme Court reconsidered and changed its "admittedly harsh" law concerning a defendant using public records law to obtain evidence. Before that, defendants could not use the Public Records Act to obtain evidence that they did not obtain through criminal discovery.  A defendant such as Keith could only obtain public records through "an act of bureaucratic grace (or a bureaucratic mistake)."  *Caster*, 151 Ohio St. 3d at 437, 89 N.E.3d at 609.

By that point, Keith had already obtained the Yezzo personnel file, and his motion was pending in the trial court.  Still, without knowing there was anything to find, Keith took advantage of *Caster* and made a public records request for the Bucyrus Police Department's files on his case. For the first time, he was able to access work product materials and "trial preparation" documents. Keith's exceptional diligence paid off, and he obtained the evidence that the police deliberately ignored a defense subpoena and instructed others to do so as well.

48

### d.  Keith's efforts were thwarted by the State's conduct.

Keith's counsel was, on more than one occasion, induced to rely on the fact that the State was playing fair.  Multiple times—in writing and in open court—the prosecutor assured Keith's trial counsel that the State would comply with its legal responsibility to disclose favorable material.  Within days of arraignment, trial counsel filed a motion for *Brady* material. The State responded in opposition stating that it would provide evidence that is both favorable and material to either guilty or punishment, then said "the state has complied, is in the process of complying, or will comply with such legitimate requests." ECF 20-1, PageID 451. Then, in response to defense counsel's request for impeaching information on the State's witnesses, the State responded that it would "strictly adhere to Crim. R. 16 and to the Code of Responsibility. Defendant's Motions are therefore, unnecessary." ECF 20-1, PageID 462.  The State acknowledged in open court on March 15, 1994 that it had "a continuing duty to disclose evidence pursuant to Ohio Criminal Rule 16." *Id.* at PageID 473.

It was reasonable for trial counsel to rely on the prosecutor's expressed intention to adhere to his duties.  Indeed, "the defendant is not required to request continuously Brady information in order to show due diligence." *In re Wogenstahl*, 902 F.3d at 629; *see also Jefferson*, 730 F.3d at 546 (explaining that the "due-diligence standard d[oes] not require [petitioners to] continuously to seek out evidence that the government had a constitutional duty to disclose.").

Appellate counsel was then led to believe they had everything there was to see.  At the beginning of Keith's appeals, prosecutor Russell Wiseman provided Keith's appellate counsel with a copy of his file.  ECF 20-8, PageID 2946-49.  This file-sharing was not a typical occurrence at that time, nor is it now.  As *Strickler* instructs, appellate counsel were entirely reasonable for believing the State was properly discharging its constitutional duties, and "the non-disclosure and

the open file policy [] are both fairly characterized as conduct attributable to the State that impeded trial counsel's access to the factual basis for making a *Brady* claim." 527 U.S. at 283.

At no point should Keith's counsel have been required to assume that the prosecutor's disclosures were missing key *Brady* material. To the contrary, Keith was entirely reasonable in assuming that the State had no material, favorable evidence in its possession that had not been disclosed. BCI was, as the prosecutor put it, one of the "three agencies" acting on the government's behalf in this case, and Keith's counsel were right to believe that the prosecutor's files would contain any relevant materials regarding its BCI witnesses. ECF 21-1, PageID 9770-71.

Keith had every reason to believe that the State of Ohio would not go forward with executing him when it had something in its possession as crucial as this evidence regarding Yezzo. Even after Keith discovered that the police suppressed favorable, material evidence, he still trusted that the Ohio Attorney General's Office would at least play fair.

Instead, as Keith now knows (but did not know at the time), Yezzo received what appeared to be her final reprimand on January 30, 2009. The BCI Superintendent informed Yezzo that "[her] failures could lead to a substantial miscarriage of justice." ROW Appx., Ex. 10, ECF 20-26, PageID 7905. Yezzo tendered her resignation a month later. *Id.*, Ex. 11, PageID 7907. Just two weeks before that, an Assistant Attorney General indicated to Keith's counsel that, "[i]f anything turns up that tends to support the claims that you have put forward, we will advance them to you immediately." 1/13/09 email, Ex. 4-J.

At that time, Keith had no knowledge that Yezzo was known to be biased and lying for police departments. And thus, at that time, the "claims that [Keith had] put forward" did not include a specific claim regarding Yezzo. *Id.* Keith claims concerned violations of his rights under

50

*Brady* and *Napue,* but he also pointed out the absurdity of the car evidence that "linked" him to the crime scene:

> …The State's theory was that Alton Davison's car was the getaway car, and Keith supposedly changed the tires on the car to prevent being linked to the scene by tire tracks...
> The car itself did not even match the color given by the crime scene eyewitness. And she said she saw a two-door car, while Keith's supposed getaway car had four doors….
> [I]t is nonsensical to argue that Keith would change the tires but leave the license plate on.  This is all the more confusing, considering Smathers testified that Keith was supposedly there when they were taking the plaster cast of the snow imprint of the license plate numbers.  A conclusive match on a license plate would certainly be more compelling than tires that are "similar in tread design."

Doc. 12-3, Corrected Successor Habeas Application, p. 26-27 (internal citations omitted).

In 2008-2009, Keith's counsel engaged in multiple communications with the Attorney General's Office concerning his successor habeas litigation and their concerns about the State's case against Keith.  But no one bothered to tell them about Yezzo.  On October 20, 2009, Keith's counsel specifically requested from them Yezzo's work product and other items related to her analysis. Ex. 4, ¶ 42; *see also* Ex. 4-L.  Again, without any knowledge of what was in Yezzo's personnel file, Keith's counsel explained they were "specifically interested in anything that relates to the tire impressions and BCI's attempt to link them with the vehicle." Ex. 4-L. And again, the Attorney General did not provide Keith with the information about Yezzo's psychological instability, lack of professional integrity, and racial bias. In fact, the Attorney General refused to provide Keith even with the case-specific items requested, stating: "After extensive review on this case, we believe the merits review of the case is concluded.  In reviewing the items, you have indicated below, we are unable to see what relevance they have post-disposition.  Accordingly, we are at this time unable to assist you in acquiring the items."  *Id.*

51

It should be noted that, by this point, the State had requested that the Ohio Supreme Court set an execution date for Keith. ROW Appx., Motion to Set Execution Date, ECF 20-4, PageID 1991-94.

BCI then had the opportunity to provide Keith with the information about Yezzo. Keith made a public records request to BCI on October 21, 2009—the same day that the Attorney General refused to assist Keith in gathering the information he requested—asking for numerous materials and making it clear that Yezzo had provided a report and testimony in Keith's case. Ex. 4, ¶ 43; *see also* Ex. 4-M. At this point, less than nine months had passed since the BCI Superintendent had noted that Yezzo's "failures could lead to a substantial miscarriage of justice." ROW Appx., Ex. 10, ECF 20-26, PageID 7905. It had been only a little over six months since Yezzo resigned. *Id.*, Ex. 11, PageID 7907. Keith's counsel, in a follow-up email to the request, specifically alerted BCI to the fact that the State was trying to set an execution date. Ex. 4, ¶ 45; *see also* Ex. 4-P.

Still, no one told Keith about the extremely damaging information in Yezzo's personnel file. BCI, like the Assistant Attorneys General, denied Keith's request for the documents concerning Yezzo and his case. Ex. 4, ¶ 46; *see also* 11-9-09 BCI letter, Ex. 4-Q. BCI cited Ohio's public records law as its reason for denying the request. Ex. 4-Q. It explained that "*Steckman* hold that the Public Records Act cannot be used to circumvent the criminal discovery process." *Id.*

In May 2010—three months after the Ohio Supreme Court granted the State's motion to set Keith's execution date—both BCI and the Ohio Attorney General had additional opportunities to provide Keith with the information regarding Yezzo. Timothy Young, the Director of the Ohio Public Defender, personally contacted the Chief Counsel of the Attorney General's Office and renewed Keith's request for the BCI documents. Ex. 4, ¶ 58; *see also* Ex. 4-R. Young explained

in his email that Keith "is on death row and scheduled to be executed in September," but that he and those in his office have become convinced of Keith's innocence. Ex. 4-R. Two days later, an Assistant Attorney General responded that BCI still would not provide Keith with the requested records. 5-12-10 BCI letter, Ex. 4-S.

In fact, it was only after the Governor's Office intervened that the Attorney General and BCI provided Keith with BCI's file pertaining to Keith's case. Ex. 4, ¶ 58, 60-62. They still did not provide Keith any of the information in Yezzo's personnel file, nor did they disclose information about Yezzo's psychological instability, lack of professional integrity, and racial bias. Ex. 4, ¶ 64.

The State therefore pushed for Keith's execution, relying on Yezzo's conclusions in doing so, all while sitting on evidence of Yezzo's habit and reputation for falsifying her conclusions. In fact, when Keith discovered the evidence in Yezzo's personnel file many years later, there was a new county prosecutor and a new Ohio Attorney General. Keith was willing to "presume that" these "public officials" would "properly discharge[] their official duties." *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (citing *Bracy* v. *Gramley,* 520 U.S. 899, 909 (1997).

Counsel took about a month to go through the files and extract all relevant evidence. On March 3, 2016, approximately a month after discovering the relevant information in the Yezzo files, Keith's counsel called the Crawford County Prosecutor Matthew Crall and asked if he would be willing to have a meeting with Keith's counsel. Ex. 4, ¶ 100. He agreed, and the meeting was scheduled for April 12, 2016 at his office.

Keith's counsel discussed the case with Crall, and they explained the information contained in Yezzo's personnel files. Counsel for the Warden, Brenda Leikala, also attended that meeting. Keith's counsel told Crall that Keith would be filing a motion for leave to file a new trial motion

53

if necessary, based on this new material.  Crall agreed that he would review the case, and Keith's counsel agreed to hold off on filing the motion until he got that opportunity. Because this would delay the filing of Keith's motion, Crall agreed not to argue that Keith failed to file his motion within a reasonable amount of time after discovering the evidence.  *Id.* at ¶ 101.

Keith kept his end of the bargain and held off on the filing of his motion.  When his counsel did not hear back from Crall—even after multiple emails and voicemails—Keith set up a meeting with Ohio Attorney General Mike DeWine.  That meeting took place on August 19, 2016.  Counsel asked for his help and agreed not to file Keith's motion in court until they heard back from him.

The following day, on August 20, 2016, Keith's counsel James Wooley emailed two members of the Attorney General's team who had attended the meeting.  One of them responded that same day, stating that he was sure there would be some follow up questions in the coming weeks. Ex. 4-AA.  Keith's counsel replied to that email to encourage the Attorney General to feel free to ask any questions or request any materials.  Ex. 4-BB.  After two months passed, and Keith had heard nothing from the Attorney General or the county prosecutor, Keith filed his Motion for Leave to File Delayed Motion for New Trial Based on Newly Discovered Evidence (ROW Appx. ECF 20-26, PageID 7818) and his Motion for New Trial Based on Newly Discovered Evidence and/or Post-Conviction Relief Under Ohio Rev. Code § 2953.23. *Id.* at PageID 7832.

Keith still, by this point, had no knowledge that the Bucyrus Police Department had even more evidence in its possession that undermined the State's case against him. It was not until February 2, 2017 that he received Bucyrus Police Department's copy of a defense subpoena for their station's phone calls, with the words "Ignore for Now" written on it.  Ex. 4, ¶ 115.

The State had multiple opportunities to own up to its deliberate act of bad faith. When Keith's trial counsel had asked Captain John Stanley about why the calls he supposedly received

54

were not recorded, and about any improper police procedure in obtaining information from Warren, it would have been significant information that the police were deliberately ignoring a subpoena.  Chief Corwin testified about his investigation and evidence and suspects he ruled out, and it would have made a difference to a juror judging his credibility to add that the police were deliberately ignoring a subpoena for their calls.  When John Foor testified that he called the police at 5:00 a.m., and defense counsel pointed out the lack of anything in the chart to indicate that that had been done, it would have made a difference to add that the police deliberately ignored a subpoena for the phone records that would have confirmed that the call had not taken place.  When Keith challenged the unreliable identification by Warren in direct appeal, and the prosecutor argued that Keith had no evidence of bad faith on the part of the police officers, it would have made a difference to add that the police deliberately ignored a subpoena for their calls. *See* ROW Appx., ECF 20-2, Court of Appeals Merit Brief PageID 860-64; ECF 20-3, Supreme Court Merit Brief, PageID 1563-67. And when Keith raised a *Youngblood* claim because of the Bucyrus Police Department's destruction of the station's recordings of the calls, and the State responded that Keith could not meet his burden because there was no evidence of impropriety by the police, it would have made a difference to add that the police deliberately ignored a subpoena for their calls. Ex. 6, p. 21.

The Warden now has the gall to argue that Keith cannot show due diligence because he "had to know at the time of trial that the police did not comply with the subpoena." ROW, ECF 26, PageID 10842. But just four years before Keith obtained the "Ignore for Now" subpoena, the State argued that "[t]here may be an innocent explanation [for the State's failure to comply with Keith's request for that discovery]. Or perhaps the failure to preserve was the result of negligence or inattention." Ex. 6, p. 21.

Keith was induced to believe that the State would not blatantly ignore a subpoena, and now he is being faulted for not anticipating it.

Moreover, the "Ignore for Now" subpoena demonstrates that Keith really had no viable way of obtaining evidence in his favor.  Even with subpoena power, Keith could not force the State to provide him with anything it did not want to provide him.  The State chose what it provided to Keith, and it decided when.

Similarly, the Warden disputes that Ohio's public records law impeded Keith's access to obtaining public records.  But the State itself refused to honor Keith's public records requests multiple times, citing Ohio law's restrictions.

Keith "has done as much as could reasonably be expected from someone in his circumstances." *In re Wogenstahl*, 902 F.3d at 629.  He has, for 25 years, actively litigated and investigated his case.  State officials concealed information crucial to Keith's case, and their concealment and subsequent actions frustrated his ability to obtain redress through the courts. Keith did not learn of the helpful information in the State's possession until it was too late to use it at trial or in his initial appeals.  Because of the State's actions, Keith had to meet additional procedural hurdles before his claims could be considered on the merits, and his motions on the merits were either stricken or denied because he did not possess the evidence he needed. If not for his own diligence, he would not have survived his execution date to have found the evidence at issue.

**B. The facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense**

**1. The Standard**

56

The Warden attempts to reframe the standard in 28 U.S.C. § 2244(b)(2)(B)(ii) to suggest that Keith must show, by clear and convincing evidence, that he did not commit the crime in question. That is ***not*** the standard. The statute states that Keith must show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). This statute codified the "miscarriage of justice" or "actual innocence" exception under the common law. *See McQuiggin v. Perkins*, 569 U.S. 383, 396 (2013). Congress, however, heightened the standard in two respects: (1) it required a "higher level of proof" ("clear and convincing" as opposed to "more likely than not") and (2) it required the petitioner to "satisfy a diligence requirement that did not exist prior to AEDPA's passage." *Id.*

Accordingly, "actual innocence"—under both the common law and as codified in 28 U.S.C. § 2244(b)(2)(B)(ii)—has a specific meaning. It does ***not*** mean that the petitioner must show he did not commit the crime. Instead, "[t]o establish actual innocence, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty ***beyond a reasonable doubt***." *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (emphasis added); *see also Schlup v. Delo*, 513 U.S. 298, 329 (1995) (to show actual innocence, the petitioner must "persuade[] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty ***beyond a reasonable doubt***." (emphasis added)). The habeas statute simply heightens this standard to "clear and convincing" instead of "more likely than not." *Perkins*, 569 U.S. at 396. And the phrase "reasonable juror" is "not without meaning." *Schlup*, 513 U.S. at 329. "It must be presumed that a reasonable juror would consider fairly all of the evidence presented" and that "such a juror would conscientiously obey the instructions of the

57

trial court requiring proof beyond a reasonable doubt."  *Id.*  Here, Keith has certainly shown that "but for constitutional error,"—*i.e.*, if the state had turned over all of the *Brady* evidence withheld in his case—"no reasonable juror" would have found him guilty beyond a reasonable doubt, given the evidence presented at trial "as a whole."  28 U.S.C. § 2244(b)(2)(B)(ii).

The Warden appears to argue that impeachment evidence is never relevant to the standard enunciated in 28 U.S.C. § 2244(b)(2)(B)(ii).  ROW, ECF 26, PageID 10865.  In support, she relies on two unpublished, summary orders from the Sixth Circuit in other cases.  Those orders both rely on *In re Byrd*, 269 F.3d 561 (6th Cir. 2001), where the court held that impeachment evidence in that case did not "provide proof of 'actual innocence' sufficient to excuse an abuse of the writ."  *In re Byrd*, 269 F.3d at 577.  There, the court there found "absolutely no basis to disturb" the state court's finding that the "new evidence of actual innocence"—an affidavit from a co-defendant— "lacked any credibility."  *Id.* at 576.

As if there is any comparison, the Warden cites to *In re Whittaker*, No. 17-2135, 2018 U.S. App. LEXIS 4804, at *3 (6th Cir. Feb. 26, 2018) (citing  *In re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001)) and *In re Elliot*, No. 17-  1496, 2017 U.S. App. LEXIS 22314, at *4 (6th Cir. Nov. 7, 2017) to support that Keith's evidence cannot demonstrate his innocence.  First, the evidence in *Whittaker* and *Elliot* is drastically different—in kind and degree—than the evidence in Keith's case.  Keith's evidence is much different than a witness statement that differs—though "not significantly"—from the witness' trial testimony.  *Whittaker*, No. 17-2135, 2018 U.S. App. LEXIS 4804, at *3. It is also quite different from than belatedly learning that one of the government's witnesses was secretly acting as an informant. *Elliot,* 2017 U.S. App. LEXIS 22314, at *2-3.

But more importantly, both *Whittaker* and *Elliot* are Sixth Circuit cases in which the Court denied the movants' authorization to file a successor habeas petitions. The Sixth Circuit has

already determined **in this case,** pursuant to **Keith's** motion for authorization, that the new evidence **is** relevant to the inquiry under 28 U.S.C. § 2244(b)(2)(B)(ii).  In fact, the court's twelve-page opinion explored "the evidence as a whole" and found that "[t]he impeachment value of this ["suppressed"] evidence cannot be understated," because it "was one of the 'core' elements of the government's case against Keith" and therefore Keith had made a *prima facie* showing that "no reasonable fact finder would have found him guilty." 6th Cir. Opp. at 11-12.  Thus, there is no persuasive value to the Court's determination in other cases in the same posture.

It is true, as the Warden states, that "the fact that the Sixth Circuit found Keith made 'a prima facie showing' that his petition met the stringent requirements of §2244(b) does not bind this Court."  ROW, ECF 26, PageID 10839. But it is also true that Keith's case is not the typical successor authorization in which the Sixth Circuit was without the benefit of a full record.

As the Sixth Circuit has stated, "All that we usually have before us in ruling on such an application, which we must do under a tight deadline (see 28 U.S.C. § 2244(b)(3)(D)), is the application itself and documents required to be attached to it, consisting of the previous motions and opinions in the case. *In re Lott*, 366 F.3d 431, 432-33 (6th Cir. 2004) (citing *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997). The Warden does not deny that the record before the Sixth Circuit was extremely well-developed.  In other words, the Sixth Circuit—as is evident from its detailed Order—is well-informed about Keith's case.[25]

---

[25] The Warden, in her account of Keith's "procedural history," cited the Sixth Circuit's original opinion denying Keith habeas relief (*Keith v. Mitchell*, 455 F.3d 662, 675 (6th Cir. 2006)) and emphasized the Court's statement that "Keith does not claim that he is actually innocent."  *See* ROW, ECF 26, PageID 10829. It appears this is an attempt by the Warden to mislead the Court. The relevant passage of the Sixth Circuit's opinion was nothing more than a procedural default analysis. *See Keith*, 455 F.3d at 674-75. The Court found that Keith procedurally defaulted his claim that scrupled jurors were excluded, and then went through the various analyses to determine whether it could still examine the claim on the merits. *Id.* at 674. It examined whether default could be overcome by ineffective assistance of counsel, whether the rule in *Gray v.*

This Court's analysis should now "proceed[] in three steps: (1) we start with the body of evidence produced at trial, (2) add evidence allegedly kept from the jury due to an alleged [constitutional] violation,  and (3) determine whether it is clear and convincing, in light of the evidence as a whole, that no reasonable factfinder would have" convicted Keith. *Case v. Hatch*, 731 F.3d 1015, 1033 (10th Cir. 2013) (internal citations omitted).

### 2.  The three-step analysis demonstrates Keith meets the standard.

### a.  The evidence produced at trial was weak, at best.

The Warden does her best to stretch the evidence against Keith, but the reality is that the entire case against Keith boils down to five things:  Nancy Smathers, Richard Warren, the car, the bullet casing, and Keith's indictment following a drug raid supported by informant Rudel Chatman.  *See* ROW, PageID 10845-49 (the Warden's sub-parts (a) and (b) come from Warren; (c), (d), and (i) are from Smathers; (e), (h)-(k) are the car; and (f) and (g) concern the bullet casing.).

#### <u>Nancy Smathers</u>

This Court can accept as true the state court findings regarding Smathers and still find her testimony to be worth little, if any, weight in favor of Keith's guilt.  The Ohio Supreme Court stated:

> Another Bucyrus Estates resident, Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's

*Mississippi*, 481 U.S. 648, 668 (1987), "obviate[d] any requirement for him to demonstrate prejudice resulting from his procedural default," and finally whether *Murray v. Carrier*, 477 U.S. 478, 496 (1986)—an actual innocence exception—applied. *Keith*, 455 F.3d at 674-75. Keith's federal pleadings demonstrate that Keith did not believe the claim was defaulted. Moreover, Keith has always maintained his actual innocence. *See* e.g., 11/2/06 Hearing, ECF 21-1, PageID 10670, 10685, 10698 (previous counsel Reinhart describing that the case is about innocence).

dome light and the light around the license plate did not work. The driver rocked the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.
…

At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number -- "043."

*State v. Keith*, 79 Ohio St. 3d 514, 515-16, 684 N.E.2d 47, 54 (1997).

Keith does not dispute that there was a shooting at the Bucyrus Estates, nor does he dispute that it occurred at approximately 9:00 p.m.  He does not dispute that Smathers saw a black man get into a light-colored car, get stuck in the snow, and eventually drive away.  He does not dispute that Smathers told Corwin, after seeing Keith on television, that Keith was the man she saw that night.  He does, however, dispute that there is anything credible about Smathers' identification of Keith. Indeed, the Ohio Supreme Court did not make any finding that Smathers was a credible witness. .

Smathers' identification of Keith was entirely unreliable.  The first two times Smathers talked to the police, she said she could not recognize any "distinct features" of the person. ROW Appx. ECF 21-1, PageID 10078-79.  Indeed, when asked by police whether she would recognize the man if she saw him again, she replied "I don't think so." *Id.* at PageID 10085.  It was not until the *third* time that Smathers talked to the police—a month later and after she had seen Keith's picture on television—that she identified Keith as the person running to the car.  *Id.* at PageID 10079.

Moreover, "cross-race identifications are less accurate than same race identifications." Brief of Amici Curiae, Supreme Court of the United States Case No. 09-1052, p. 6. *See also* ROW Appx., Pro Se Memorandum In Support of Jurisdiction by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae in Support of Kevin Keith, ECF 20-30 PageID 9392.

61

Smathers is Caucasian, Keith is African-American.  Also, Smathers was only able to make a lineup identification of Kevin Keith after viewing him on TV.  According to seventeen memory and eye witness experts, Smathers identification "had great prejudicial value and no probative value." Brief of Amici Curiae, Supreme Court of the United States Case No. 09-1052, p. 3.  *See also* ROW Appx., Pro Se Memorandum In Support of Jurisdiction by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae in Support of Kevin Keith, ECF 20-30 PageID 9384. Seventeen eyewitness experts concluded that it is highly unlikely that Smathers' memory got better with time, because "[m]emory does not work like that."  *Id.* at PageID 9414.

As far as the findings of the state court of appeals, specifically with regard to the Yezzo evidence and Smathers, it found that "Smathers' testimony alone links Keith to the car, even if Yezzo had never testified at all in this case."  ROW Appx., Opinion, ECF 20-30, PageID 9363. First, this is not a "factual determination" entitled to § 2254(e)(1)'s limitations on review. *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007) ("[A] state court's decision that one interpretation of evidence is better than another, or the state court's determination that a jury would reach certain conclusions or would believe certain witnesses, are determinations reserved for the jury, not a judge, and thus such state court determinations are not 'factual determinations' entitled to § 2254(e)(1)'s limitations on review."). But even if it were considered a "factual determination," it is clearly rebutted by clear and convincing evidence.

Smathers' testimony alone does not "link" Keith and certainly does not support a conviction beyond a reasonable doubt.  ROW Appx., Opinion, ECF 20-30, PageID 9363. Smathers never identified Alton Davison's Omega (State's exhibit 76) as the car she saw.  It speaks volumes that the State did not show her the photograph to have her identify it as the car that the shooter was driving.

Smathers described that the car she witnessed to be the getaway car was a two-doored car that was "white, cream, light yellow" in color.  ROW Appx. ECF 21-1, PageID 10000, 10077. But this is Alton Davison's car, the car that the State claims was the getaway car:



ROW Appx., ECF 20-31, State's trial exhibit 76, PageID 9540.  Not only is it not the right color, but it has four doors.  Moreover, defense counsel asked her specifically: "Did you tell [Officer Koepke] light yellow or light blue?" Tr. 388, PageID 10076.  Smathers responded: "It was a light cream color, but I couldn't, you know, with the lights and stuff, see the exact color. **I know it was a white, cream, light yellow.**" Tr. 389, PageID 10077 (emphasis added).

### Richard Warren

Warren did not lose consciousness after he was shot, and he told four different witnesses—including a police officer—that he did not know who shot him, only that it was a "masked man." *See* Tr. 240-43, 305, 620, 623. Even at trial, Warren described that the shooter's face was covered by a mask or a turtleneck pulled up over his mouth and nose. *See* Tr. 348, 372, ECF 21-1, PageID 10060. Although he eventually told the police that he recalled the name

"Kevin," Warren ultimately admitted on cross-examination that he did not know whether he or the police first mentioned the name "Kevin" as the person who was the shooter.  *See* Tr. 372 (Defense Counsel: "So you don't recall whether you mentioned the name to them or they mentioned it to you; do you?" Warren: "No, sir, I do not.").

Warren chose Keith's face from a heavily biased photographic lineup, and despite the fact that the shooter was masked.  Keith's photo stands out of the lineup significantly.  Eyewitness experts have presented this lineup to hundreds of people with no knowledge of the crime, providing just the instruction to "choose the big black guy,"—"[o]ver 75% choose Keith." ROW Appx., MISJ by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae, ECF 20-30, PageID 9415.

The unfairness of the lineup is obvious:



ROW Appx., Def. Tr. Ex. 7, ECF 20-32, PageID 9623.  Moreover, the poor quality of the photo contributed to Warren's identification of Keith:

 

Keith's features are completely darkened.  The language used by the police officers implied that they had included in the lineup a person they believed was the shooter, and Warren just needed to pick him. ROW Appx., MISJ by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae, ECF 20-30, PageID 9415-16.  As stated by the Eyewitness ID and Memory Experts, "the poor quality of Keith's photo at #5 made it impossible to truly identify who that was with any assurance…As Keith was the only face that Warren could NOT exclude, his photo was the only one Warren could choose."  *Id.* at PageID 9416.

In fact, the only real identifying feature that is obvious from Keith's photograph in the lineup is the shape of his head.  That feature was what made Quanita Reeves rule him out as the shooter. Quanita was clear that the shooter "don't got a head like this."  Tr. 720, ROW Appx. ECF 21-1, PageID 10412.  She specified "he don't got a lump." *Id.*  Even when the detective then tried to suggest, "was he maybe wearing a hat?" Quanita responded "No." *Id.*

The Warden argues, "In the ICU after surgery, Warren informed Nurse John Foor that the shooter's first name was 'Kevin.'" ROW, PageID 10848.   She disputes the value of the

handwritten notes—and the value of the fact that the name "Kevin" is written in a handwriting that is clearly not Warren's—that were not disclosed by the State and only subsequently discovered by Keith.  *See* ROW Appx., ECF 20-8, Successor Post-Conviction Ex. 4, PageID 2898. The Warden dismisses this by claiming that "[Warren] used sign language once his father arrived and that someone else wrote the name on the clipboard. Regardless of who actually wrote the name on the clipboard, the evidence unequivocally demonstrates Warren indicated the first name of 'Kevin' immediately after surgery."  ROW, fn.4, PageID 10848.

There are a variety of reasons demonstrating why this attempt to twist the evidence answers nothing.  First, Foor himself testified that Warren wrote down the name Kevin.  ROW Appx. ECF 21-1, PageID 10470-71.  The Warden cannot really be asking this Court to believe Foor's testimony that Warren came out of surgery and immediately relayied the name "Kevin," while at the same time asking the court to discredit Foor's testimony that Warren wrote down the name.

Second, Warren's father was not even at the hospital at 5:00 a.m. on February 14, 1994, which defeats the explanation that Warren communicated the name in sign language to his dad at that time. The police documents demonstrate that, as of 3:10 a.m., neither the police nor Grant Hospital had even spoken to Warren's family, who were located in Indianapolis, Indiana. ROW Appx., 2007 NTM Ex. 3, PageID 6211. It appears from the State's documents that Warren's father did not see Warren at Grant Hospital until February 14 at approximately 9:00 a.m. ROW Appx., ECF 20-8, PageID 2894.  Warren's hospital records also support that Warren's family did not arrive until at least around 9:00 a.m.  *See* ROW Appx., ECF 20-10, PageID 3472 and PageID 3560.[26]  Foor's shift was over at 7:00 a.m.

---

[26] In the "Family Visits, Interaction, Involvement/Pastoral Care" section, there is a notation written that "Mom and Dad at [bedside]; spoke with security re: NRI status," and the time block in which it is written indicates their arrival was in the middle of first shift (0700 to 1500 hours).

In addition, Warren's medical records document that he was quite sedated and medicated after his surgery. Warren was on a steady stream of medications such as morphine, Demerol, Valium, and Versed around that time, and rightfully so. *See* ROW ECF 20-9, PageID 3444; ECF 20-10, PageID 3450, *Id.* at 3524-26. It strains credulity to suggest that Warren's memory of the shooter's name would get better after surgery and the administration of anesthesia and other powerful drugs.

The fact of the matter is that Warren did not "encode" much about the appearance of the shooter. ROW Appx., MISJ by Seventeen Memory and Eyewitness Identification Experts as Amici Curiae, ECF 20-30, PageID 9411-12. The hospital security guard report, created the day after the shooting at 1:00 p.m., reflected Warren's true, vague description of the shooter: "The perpetrator **whos [sic] name is still unknown** is still at large. The only description of the perpetrator is that it is a black male approximately 6' 3" in hiegth [sic] and about 260 lbs." Dkt. No 1-2, PageID 42 (emphasis added).

The state court factual findings regarding Warren are due no deference for multiple reasons. Some are rebutted by the record now before this Court. *See State v. Keith*, 79 Ohio St. 3d 514, 516, 684 N.E.2d 47, 54 (1997) ("During a postoperative interview with a nurse, Warren wrote 'Kevin' on a piece of paper as the name of his assailant.");[27] *but see* ROW Appx., ECF 20-8, Successor Post-Conviction Ex. 4, PageID 2898 ("Kevin" not in Warren's handwriting). Others are accurate recitations of what occurred, but for other reasons, they are unhelpful to the State's case. *See Keith,* 684 N.E.2d at 54 ("When shown a photo array of six suspects, Warren chose

ROW Appx., Successor Post-Conviction Appendix, ECF 20-10, PageID 3560. Though the date on this page hard to decifer, the "No Release of Information" (NRI) form is signed and dated February 14, 1994, at 1300 hours. ROW Appx., Successor Post-Conviction Appendix, ECF 20-9, PageID 3432.

[27] Even the Warden now apparently concedes this is not true. *See* ROW, fn.4, PageID 10848

appellant's picture and told police he was ninety-five percent sure that appellant was the murderer."); *but see* ROW Appx., MISJ by Seventeen Eyewitness Identification Experts, ECF 20-30, PageID 9417 (photo lineup is extremely biased, and "the eyewitness evidence presented against Keith was very weak."). And some of the findings by the state courts demonstrate the significance of the withheld evidence.  *See* c., *infra*.

### The car

As demonstrated above, Smathers' never identified Alton Davison's Oldsmobile Omega (State's trial exhibit 76) as the vehicle she witnessed leaving the scene of the crime. *See* Tr. 379-402, PageID 10067-90.  Forensic analyst Michele Yezzo connected the Omega to the scene.

The police determined that the partial license plate in the snow was "043." Keith's girlfriend Melanie Davison often drove the car that belonged to her grandfather, Alton Davison, and Davison's license plate was "MVR043." Approximately three weeks after the shootings, the police impounded Davison's Omega as the car used in the crime, despite the fact that it was not the color described by Smathers, the only eyewitness to the getaway car.  (Davison's car was described by BCI as gray (Tr. 509) or green (Tr. 448, 449).)

BCI analyst Yezzo rendered her conclusion—based upon the brochure pictures of tires— that the tires formerly on Davison's car were similar in tread design to the tire tracks at the scene. ROW Appx., State's Ex. 1, ECF 20-31,  PageID 9449-51.  She did not actually physically examine a tire to make this comparison; she relied entirely on the brochure picture.  ROW Appx, Yezzo .  Yezzo also provided the police with an opinion supporting what they already believed: that the license plate impression in the snow was a "043." She concluded that it had "spacing and orientation similar to the license plate 'MVR043' on the vehicle submitted as item #E1."  Ex. 8.  Item #E1 was Davison's car.

The State presented Yezzo's testimony through deposition. The Ohio Criminal Rules allow for a witness's testimony to "be taken by deposition" only when that witness is unavailable at trial and when his or her "testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice." Crim. R. 15(A).

Yezzo had explained her conclusion of "similar in tread design" in a way that implied the tire track impression she examined was indeed a *match* with the tire tread from the brochure. Dep. Tr. 14, 24-25; *see also id.* at 25 ("[I]t's similarity is it would have originated from the Triumph 2000.").

The State used Yezzo's testimony to bolster its shaky eyewitness testimony, asserting in closing that neither Warren nor Smathers had "the motive or opportunity to fabricate. Their statements are corroborated by each other and by other witnesses. There is no way they can be lying because their statements are backed by the facts as we have seen from other sources." ROW Appx., Tr. 841, ECF 21-1, PageID 10535.

The tire and license plate imprints in the snow were the key forensic evidence that allegedly linked Keith to this crime—and Yezzo is the witness who provided that for the State.

### The bullet casing

The State introduced a spent bullet casing purportedly found outside the home of Fernelle Graham. Graham lived in the house across from the General Electric ("G.E.") plant, and because that was where Keith picked up his other girlfriend Zina Scott later on the night of the murders, the State argued that this linked Keith to the crime.

### Keith's indictment from the drug raid

The victims' family member, Rudel Chatman, was the informant for a cocaine drug raid that had occurred a couple of weeks prior, and Keith had been one of the eight people arrested in

that raid.  Keith was charged with selling what equaled to less than 3 grams of crack cocaine.

ROW Appx., 6 NTM, PageID 6465.  Though Keith was never ultimately tried for this, the

sentencing outcome of the others charged demonstrates that the harshest punishment he likely

would have received would have been two years in prison.

### The defense case

Keith had an alibi that was supported by several people.  Judith Rogers, the neighbor of

Keith's girlfriend Melanie Davison, noticed Keith and Davison leaving Davison's apartment in

Mansfield at about 8:45 p.m. that evening.  ROW Appx., ECF 21-1, Tr. 691, PageID 10383.  In

other words, Rogers saw Keith at a location over a half an hour away from the crime scene at the

same time the shootings occurred.  Rogers was clear about the timing, because she recalled the

television show she was watching and knew it came on at 8:30 p.m.  *Id.*

Around 9:00 p.m., Keith and Davison arrived in Crestline at the home of Keith's aunt,

Grace Keith.  Grace Keith testified to seeing Keith at her house around 9:00 p.m.  ROW Appx.,

ECF 21-1, Tr. 684-85, PageID 10376-77. Yolanda Price, who was also at Grace's house at that

time (*see* Tr. 684, PageID 10376), confirmed Keith was there.  ECF No 1-3, PageID 43-44.  Price

also saw Davison waiting outside in the car.  *Id.*

The State attempted to discredit Grace by mischaracterizing her account.  Grace said in a

media interview that she did not know what time the *murders were*—she never said she did not

know when Keith was at her house.  *See* Tr. 688-89 ("And do you remember in response to the

question, 'You are saying he was with you during the time of the killing?' and your answer being,

'I can't say that cause I don't know what time it was, not more than what I seen in the news and

paper, that's all I know.").  To the contrary, she said it was 9:00 p.m. when Keith came by.  *Id.*

The Warden leaves out and uses ellipses to represent the part of Grace's statement that

makes clear that she was referring to the time of murders. The Warden wrote, "jurors heard Aunt Grace respond: 'I can't say that. … I don't know what time it was … I didn't pay no attention to that part of it, but he was at my house maybe around 9:00 o'clock [sic] and my son came and say he came in and borrowed $5.00 from him.'" ROW, ECF 26, PageID 10859-60.

State's exhibit 146[28] demonstrates that Grace Keith stated, in response to a reporter's question regarding whether she is Keith's alibi, "I don't know what time it was, **no more than what I seen on the news or in the paper** … I didn't pay no attention to that part of it, but he was at my house maybe around 9:00 and my son came and say he came in and borrowed $5.00 from him." VTS_01_3.VOB, starting at 04:22. Grace is obviously referencing her lack of personal knowledge regarding when the shootings occurred.

Between the news video and Grace's testimony, it is obvious that Grace is not trying to craft a story to support Keith. If anything, her hesitation to providing an alibi for Keith makes her more credible, not less. The news clip shows that Grace did not even realize she was providing Keith with an alibi. *See* VTS_01_3.VOB, starting at approximately 04:08.

The Warden placed emphasis on Grace's answer in response to the State's question as to who else was there that evening; Grace mentioned "Zena," but Zina Scott's testimony was that she was work until 11 p.m. *See* ROW, ECF 26, PageID 10859 (referencing ROW Appx., ECF 21-1, Tr. 684, PageID 10376). As an initial matter,. But in any event, as Grace explained in her media interview, Zina Scott **did** come to her house later that night:

> [Kevin] borrowed $5, then he hung around for a while, then he had to go pick his girlfriend up, and so he went picked his girlfriend up and they came back to my

---

[28] The DVD submitted by the Warden in ECF 23 contains multiple files of footage, other than just State's Exhibit 146. The DVD includes extensive footage such as the grieving family members and friends at the hospital. Keith can only assume this was a mistake. For the Court's convenience, the Grace Keith video is located on the file titled VTS_01_3.VOB, and her interview begins about 3 minutes and 35 seconds in.

house, and she gets off at 11, and she works over here at GE, and that's about all I can say.

ECF 23, VTS_01_3.VOB, 04:02 -04:13.[29]

Perhaps if the jury had been able to see the taped interview during deliberations, like it requested, the State would not have gotten away with its mischaracterization.

### a. The evidence kept from the jury, due to a constitutional violation, undermined every aspect of the State's core case.

The Sixth Circuit accurately summed up Keith's new evidence, so Keith incorporates that here.

### Yezzo evidence

Keith has presented evidence that would have greatly impeached Yezzo's credibility and called into question the accuracy of her findings, thus weakening the "core" of the state's case. Keith has presented several internal BCI memoranda from 1989 to 1994 that reveal significant concerns about Yezzo's mental state and professional integrity. For instance, a May 1989 report from BCI's assistant superintendent states that "the consensus opinion" is that Yezzo "suffers a severe mental imbalance and needs immediate assistance." (R. 1-16 at PageID #144.) The assistant superintendent also reported that Yezzo's "perceived problem affects her overall performance. Her findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." (*Id.* at PageID #145.) A report on September 1989 states that Yezzo threw a book at a co-worker and told her co-worker she was going to "deck her." (R. 1-20 at PageID #170.) Moreover, in August 1993, Yezzo was placed on administrative leave for "threatening co-workers and failure of good behavior" after Yezzo experienced several fits of rage and threatened to kill co-workers. (R. 1-17 at PageID #148.) Notes taken during the investigation into Yezzo's conduct in August 1993 report that Yezzo had a "reputation of giving dept. answer [it] wants if [it] stroke[s] her." (R. 1-18 at PageID #161.) The same notes indicate that an analyst assigned to one of Yezzo's cases would have reached a different result than Yezzo had reached on a footprint and blood analysis. (*Id.*) Yezzo also had a documented history of racist outbursts: she made a comment about a "ni**er in a woodpile" and once referred to a co-worker as a "ni**r bitch." (*See* R. 1-20 at PageID #173.) In fact, Yezzo was *still under investigation* when she testified against Keith. (*See* R. 1-21 at PageID #177.)

---

[29]Also, Keith drove Zina Scott's car to Grace's house. *See* Ex. 3 to Successor Habeas, Price Affidavit, ¶¶ 3-5, ECF 1-3, PageID 43 ("Kevin's girlfriend, Melanie Davison, was outside in the car…I noticed that Kevin and Melanie had driven there in Zina Scott's car.")

The state did not provide any of this evidence to Keith prior to his trial. Accordingly, Keith was unable to use any of this evidence to impeach Yezzo's credibility and contest her forensic analysis that linked Keith to the scene of the crime. Yezzo's testimony was particularly important because no physical evidence linked Keith to the murders.

Moreover, as demonstrated by expert Sunita Sah, MD MBA PhD, Yezzo's file in its entirety casts demonstrates that "Yezzo's work is subject to a high risk of bias and is compromised by the presence of conflicts of interest and irrelevant task information." Ex. 7, p. 17. "There are substantial issues with the analyses conducted by Michele Yezzo" regarding both her "reliability" and her "bias-ability." *Id.* at 2.

As documented by the United States National Commission on Forensic Science, of which Dr. Sah was a Commissioner (*id.* at 5), irrelevant task details "can bias forensic conclusions and can lead to *motivational* or *confirmation bias*." *Id.* at 3. The specific characteristics about Yezzo "that suggest she is especially vulnerable to bias" include the following:

- o She has expressed racial bias in slurs towards colleagues

- o The consensus from her colleagues is that "Her findings and conclusions regarding evidence may be suspect. She will stretch the truth to help satisfy a department."

- o She has stated that "she must seek gratification from outside" her own work environment due to substantial problems with her coworkers and supervisors that led to her being placed on administrative leave in 1993. Michele Yezzo was successful in obtaining outside gratification from law enforcement.

- o She has over 30 letters from prosecutors and law enforcement thanking her for her help. This relationship with law enforcement creates an inherent ***conflict of interest*** which can bias results.

  - ▪ Some of these letters document Michele Yezzo's role as a "collaborator," "partner," "important member of our law enforcement team" and going "far beyond the call of duty." Michele Yezzo performed tasks beyond her scientific role as documented in these letters such as providing background information on a defense expert witness and providing past testimonies of that witness to law enforcement. This is clear evidence that Michele Yezzo was behaving

73

as a member of the prosecution team rather than as an independent forensic scientist.

*Id.* at 4.  Dr. Sah determined that "[t]he tire and license plate pattern impression analyses conducted by Michele Yezzo in this case are unvalidated, unreliable, subject to bias and unscientific. *Id.*

### Ignored subpoena

Keith also has presented evidence that suggests that the Bucyrus Police Department acted  in bad faith by ignoring his pre-trial subpoena. On May 13, 1994, Keith subpoenaed the Bucyrus Police Department for "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time." (R. 1-29 at PageID #218.) The government did not answer the subpoena at trial. (Br. in Sup. for Successive Habeas, p. 11.) Keith has obtained the Bucyrus Police Department's copy of the subpoena. (R. 1-29 at PageID #218) The words "ignore for now" are written towards the top of the document and underlined. (*Id.*) Keith states that because  of unrelated litigation, he obtained the call log records for the day in question. (Habeas Petition  at PageID #13.) The logs did not show a call from one of Warren's nurses to the Bucyrus Police  Department. (*Id.*)

This new evidence goes to the "core" of the government's case. At trial, the government  claimed that it first got Keith's name from John Foor, a nurse who called the Bucyrus Police  Department and reported that Warren, who had recently emerged from surgery, identified Keith  as the shooter. The Bucyrus Police Department's ignoring the subpoena—particularly coupled  with the fact that the logs did <u>not</u> show a call from Warren's nurses—undermines Warren's identification of Keith. If Foor did not call the Bucyrus Police Department and provide Keith's  name, it is less likely that Warren spontaneously remembered that Keith was the shooter and  more likely that Warren had been improperly influenced to identify Keith.

*In re Keith*, No. 18-3544, pp. 8-10.

### Previously uncovered evidence

Because "suppressed evidence [must be] considered collectively, not item by item," it is appropriate for Keith to include here the additional evidence kept from the jury due to the State's suppression.  *Kyles,* 514 U.S. at 436.

As described *infra*, in 2004, Keith obtained the handwritten notes from Warren's hospital stay, and the name "Kevin" was written in handwriting different from the other handwritten notes

that are clearly attributable to Warren. *See* ROW Appx., 2004 Successor Petition, Ex. 4, PageID 2898.  Warren's handwriting was nearly illegible, included misspelled words, and the words he wrote were haphazardly strewn across the pages. In contrast, "Kevin" was written neatly and clearly, and in handwriting that was the same as the words "Captain Stanley" and "Bucyrus Police." *Id.* This contradicts the sworn testimony of John Foor. *See* ROW Appx. 21-1, Tr. 778, PageID 10470.

Next, in 2007, Keith uncovered suppressed documents from an investigation spearheaded by the Ohio Pharmacy Board. In these documents, Keith learned that:

- Rodney Melton had "spread the word that anybody that snitches on [him and his brother Bruce] would be killed;" Rudel Chatman was an informant on the Meltons; and Melton had told a woman two weeks before the shootings that "he had been paid $15,000 to cripple 'the man' who was responsible for the [drug] raids in Crestline, Ohio last week." ROW Appx, ECF 20-26, PageID 7947, 7950. As noted earlier, revenge for the Crestline drug raids was the motive the State had attributed to *Keith*.

- Rodney and Bruce Melton were always together and were a part of the same criminal enterprise with Demetrius Reeves, the father of surviving victims Quanita and Quentin Reeves.  (Quanita had reported to her nurse and Detectives that the shooter was her "Daddy's friend, Bruce.")

- A confidential informant told police that Melton insisted on using his Chevy Impala "with a new yellow paint job" in his criminal transactions.  The license plates that were registered to Melton's light-yellow Impala were JKL218 and 043LIJ. ROW Appx, ECF 20-26, PageID 7947, 7970.

- It was Melton's habit to wear a mask that covers his mouth because he has a noticeable gap between his front teeth. Ex. 12, p. 7, 8. Significantly, Quanita Reeves and Richard Warren both recalled that the man who shot them wore a mask or turtleneck that covered his mouth. Tr. 348, 716.

- After Keith was arrested for the murders, Melton's accomplice in the pharmacy burglary ring told the police that Melton was paid to kill Chatman. Ex. 8, p. 11.

In 2010, Keith discovered radio dispatch logs from the Bucyrus Police Department. Ex. 26. The Bucyrus Police Department stated in an unrelated case that these radio dispatch logs also served as daily phone logs.  These logs revealed:

- There is no 5:00 a.m. phone call logged from Nurse Floor to the police.

- The call that came into the station regarding Graham's finding of a bullet casing was different than her testimony.  Graham testified she found a bullet casing in front of her home, which was near where Keith's girlfriend worked. Tr. 428. But the corresponding entry on the Bucyrus Police radio dispatch logs shows that she "thinks she may have found it in the McDonalds area."  Ex. 26, p. 3.

> **b. But for the suppressed evidence, by clear and convincing evidence, no reasonable factfinder would have found Keith guilty of the underlying offense.**

Each and every core aspect of the state's case has been significantly undermined or disproven by the discovery of suppressed evidence. At trial, the eyewitness identification testimony was shaky, at best.  Other than Yezzo's testimony and Graham's testimony regarding the location of the bullet casing, there was no physical evidence implicating Keith. Keith's alleged motive for the murders was avoiding, at most, two years in prison.

Since trial, the uncovered evidence has made the eyewitness testimony even more suspect,

if not completely implausible. The forensic evidence regarding the car, and the location of the recovered bullet, have been completely refuted. And there is now substantial evidence regarding the motive and opportunity of the alternate suspect, Rodney Melton. Considering this evidence as a whole, no reasonable factfinder would have convicted Keith.

### Yezzo evidence

Two people identified Keith, but only after reporting—more than once—that they could not identify the perpetrator.  A third eyewitness and survivor excluded Keith, by name and picture, as the shooter.  The State used Yezzo's testimony to bolster its shaky eyewitness testimony, asserting in closing that neither Warren nor Smathers had "the motive or opportunity to fabricate. Their statements are corroborated by each other and by other witnesses. **There is no way they can be lying because their statements are backed by the facts as we have seen from other sources."** ROW Appx., Tr. 841, ECF 21-1, PageID 10535 (emphasis added).

Without Yezzo's testimony to bolster the eyewitnesses, no reasonable factfinder would have found Keith guilty.  Add to that further evidence undermining the independence of—and, thus, reliability of—Warren's identification, there is no way Keith would have been convicted.

"The alleged constitutional error must have caused either (1) the wrongful exclusion of evidence that the applicant was entitled to introduce, or (2) the wrongful admission of evidence that the petitioner was entitled to exclude." *Case v. Hatch*, 731 F.3d 1015, 1034 (10th Cir. 2013). Keith can demonstrate both.

With regard to Yezzo, because of the State's unconstitutional suppression of favorable evidence, Keith was wrongfully deprived of the ability to introduce evidence that would have rendered Yezzo's testimony meaningless. Keith would have been able to introduce the evidence of her biases, improprieties, and unreliability.

77

In fact, had Keith been aware of the information in Yezzo's personnel file, it is very likely that her testimony and conclusions would have been excluded altogether.  Lee Fisher's affidavit demonstrates that, as Yezzo's employer and the State's top prosecutor at the time, would not have permitted her to testify. *See* ROW Appx., Ex. 3 to NTM, ECF 20-26, PageID 788-89.  The jury never would have heard the fraudulent conclusions that linked Davison's Omega to the scene in the first place.

A proper analysis of the evidence would have led an analyst to the conclusion that Davison's bumper was not consistent with the markings left in the snow, and Rodney Melton's car could not be excluded as the car that caused the impressions left in the snow.  Expert William Bodziak examined Yezzo's case files and work product, as well as photographs and the negatives, and determined:

> [The State's photographs of the snow bank] are not consistent with the profile of the front of the 1982 Oldsmobile in that, on that vehicle, the license tag is mounted fairly flush with the bumper, thus contact with the license tag to the degree that it pushed snow enough to produce an impression, would also have produced impressions of the remainder of the bumper.  No evidence of the other areas of the bumper appears in these photographs.  Instead, the snow appears to be undisturbed in those areas.

ROW Appx., Ex.4 to NTM, ECF 20-26, PageID 7891.

Yezzo had concluded that the snow impression of the license plate had "spacing and orientation similar to the license plate 'MVR043' on [Davison's car]." ROW Appx., State's Trial Ex. 1, ECF 20-31, PageID 9450.  Based on that, the police officers determined it could not have been a license plate in which the numbers came first.  Had the police not relied on the "spacing and orientation" of the numbers, they would not have been able to rule out Melton's car by the organization of the numbers and letters.

Yezzo's conclusions enabled the police to "discount [Melton's license] plate within a day." Tr. 745.  Bodziak's findings demonstrate that the police were wrong to exclude Melton's car as

78

the getaway car. As Bodziak concluded, "[B]ased on the limited detail, a distinction could not be made between a license plate that reads 'MVR043' versus others that have '04' somewhere on the plate." ROW Appx., Ex.4 to NTM, ECF 20-26, PageID 7893.

### Ignored subpoena

Concerning the "Ignore for Now" subpoena, as the Sixth Circuit stated, "The Bucyrus Police Department's ignoring the subpoena—particularly coupled with the fact that the logs did <u>not</u> show a call from Warren's nurses—undermines Warren's identification of Keith. If Foor did not call the Bucyrus Police Department and provide Keith's name, it is less likely that Warren spontaneously remembered that Keith was the shooter and more likely that Warren had been improperly influenced to identify Keith." *In re Keith*, No. 18-3544, at 10 (emphasis in original).

Keith could have had Warren's identification suppressed, due to insufficient indicia of reliability. Without that information, trial counsel was overruled when he challenged the reliability of Warren's identification, the tactics police used to obtain that identification, and how they provided the name "Kevin Keith" to Warren. ROW Appx., Tr. 211-229, ECF 21-1, PageID 9899-917.

Even if the trial court refused to suppress Warren's testimony, Keith would have been able to point to this evidence of the police's bad faith in his direct appeal. In evaluating Keith's claim that Warren's testimony should have been suppressed due to the police failure to disclose the name lineup, the Ohio Supreme Court had stated, "Unless appellant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law, nor should it lead to a presumption of suggestiveness." *Keith*, 79 Ohio St. 3d at 523, 684 N.E.2d at 58. The Court, in finding "sufficient indicia of reliability in Warren's identification" of

Keith, specifically relied in part upon the fact that "Warren identified appellant's name the day after the murders."  *Keith*, 79 Ohio St. 3d at 523, 684 N.E.2d at 58.  And

The evidence in favor of reliability is cast in a much different light when one can no longer trust that the police acted properly. With the evidence before them, the jury had every reason to believe that the police acted in accordance with their duties and the law. With this new evidence, however, that picture changes drastically.

Warren had been shot four times. Before surgery, he said he did not know who shot him and that it was a masked man. But right out of surgery, on a ventilator, at 5:00 a.m., only eight hours after the shooting took place, and on a steady stream of medications such as morphine, Demerol, Valium, and Versed, the State asked the jury to believe Warren wrote down "Kevin." To believe that requires the jury to put its faith in the police, assuming they did not take advantage of the situation.   No reasonable factfinder would believe that once the police's bad faith is laid bare.

### Previously uncovered evidence

The previously uncovered evidence – none of which has ever been refuted – further undermines the credibility of the State's case. This Court should also consider all of that suppressed evidence when it conducts its analysis of the impact of the newest evidence. *See Kyles* 514 U.S. at 436.  *See also Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014).

The Warden represents that Keith "extensively presented to the jury his theory" that Rodney Melton is the real killer, and he "extensively questioned" Rodney. ROW, Doc. 26, PageID 10866-67.  It is one thing to argue a "theory" to a jury.  It is quite another to be able to present the following evidence, which was suppressed by the State.

In 1993-94, Detective Jerry Hickman and Lieutenant David Dayne of the Galion Police Department were involved in a statewide investigation of pharmacy burglaries that ultimately

resulted in the arrest and conviction of five men:  Bruce Melton, Rodney Melton, Demetrius Reeves, Russell Gardner, and Milton James Parker.  ROW Appx. ECF 20-26, PageID 7996-97. Bruce Melton was suspected to be the ring leader of this pharmacy burglary ring.  The Galion Police had informants inside the inner circle of the Melton burglary ring.  *Id.* at PageID 7946.  The Galion Police had also spent "a large sum of money to purchase heroin from sources also connected with the Meltons." *Id.* at 7947.

Rudel Chatman—Marichell Chatman's brother—was acting as a police informant regarding the Meltons' drug activity.  Rudel Chatman had purchased morphine from Rodney Melton on August 31, 1993.  *Id.* at 7998.  The Meltons became aware of Rudel's role as an informant.  Although Rodney Melton was not indicted until 4/11/94 for the 8/31/93 drug sale to Rudel (*Id.* at 7999), word had gotten out about Rudel's role as an informant. When Milton James Parker—the first of the five pharmacy burglary suspects—was arrested, he told Detective Hickman, "we know about Rudell [sic], you know? You might as well just keep him under wraps or whatever you're gonna do with him, Jerry[30], you know? 'Cause he's done around here." *Id.* at 8015.

In January 1994, the Meltons had "spread the word that anybody that snitches on them would be killed." *Id.* at 7947.  On January 21, 1994, nine people (including Keith) in Crestline, Ohio were arrested for selling crack cocaine.  Tr. 591.  Rudel Chatman was the police informant. *Id.* at 588-589.

On January 31, 1994, Rodney Melton told a woman who was a confidential police informant that "he had been paid $15,000 to cripple 'the man' who was responsible for the raids in Crestline, Ohio last week." *Id.* at 7950.  Bruce Melton told another confidential informant that

---

[30] "Jerry" is Detective Jerry Hickman.

Rodney Melton was paid to kill Rudel. *Id.* at 8015. On February 13, 1994, before the Meltons were indicted for any of their criminal activities, a man entered the apartment of Rudel Chatman's sister and attacked those inside. He killed Rudel's sister Marichell Chatman, his aunt Linda Chatman, and his niece Marchae Chatman. Quanita Reeves, Quentin Reeves, and Richard Warren were also shot, but they survived.

Following the shootings, at the hospital, Rodney was overheard stating that this happened because of Rudel's "narcing." *Id.* at 8016.

When the shooter escaped from the apartment complex, neighbor Nancy Smathers saw him get into a cream or light yellow car and attempt to speed out of the parking lot. Tr. 388-89. That car got stuck in a snow bank at one point as the driver tried to get away. According to the State, the getaway car left a license plate impression in the snow bank – "043". Tr. 478, 818.

A confidential informant stated that Rodney Melton insisted on using his Chevy Impala with a new yellow paint job in their criminal transactions. *Id.* at 7947. *See also id.* at 8023. The Pharmacy Board investigator identified this car as having two license plates registered to it: JKL218 and 043LIJ. *Id.* at 7970.

Two of the three[31] survivors described that the shooter was wearing a mask over his face that covered his mouth completely. Tr. 348, 716. A confidential informant has described that it was Rodney Melton's practice to wear a mask that covered his mouth during his criminal activities, because Rodney has an identifiable gap between his teeth. ROW Appx. ECF 20-26, PageID 8023-24.

Melton's mugshot from when he was arrested on March 26, 1994, shows that he was 6'2" and 214 pounds. *Id.* at 8027. Survivor Richard Warren had described the shooter as "six to

---

[31] The third survivor was a 4-year-old child and provided no physical description.

six/two, 250, 275." Tr. 359. Another witness, who was never called to testify, saw the shooter from the waist down and described him as wearing clothing that was very large – "like they were insulated, or the person was wearing something underneath them." ROW Appx. ECF 20-26, PageID 8028. Insulated clothes or layers of clothing would make a person appear heavier than he is.

One of the three survivors was Quanita Reeves, a 7-year-old little girl. While Quanita was in the hospital being treated for her injuries, she told her nurse that she was shot by "Bruce," who was her "Daddy's friend." *Id.* at 8029. Quanita's father was one of the five men arrested along with Bruce and Rodney Melton for the pharmacy burglary ring. *Id.* at 7996-97. Quanita then told the police that "it was Bruce," her "Daddy's friend." Tr. 715. When they showed her the photo lineup they had put together (ROW Appx. ECF 20-26, PageID 8023), she excluded Kevin Keith's picture because the shooter did not have a "lump" on top of his head like Keith has. Tr. 720.

Rodney Melton had been seen around the Bucyrus Estates area shortly after the shootings Tr. 670. He knew the type of ammunition used in the shootings. *Id.* He affirmatively brought up to the police that his car (which fits the physical description of the car seen at the crime scene) was broken down. *Id.* at 671. When Rodney told police where he was during the time of the crime, he gave two conflicting alibis to the individual officers. ROW Appx. ECF 20-26, PageID 8031-33. Tr. 673-74.

During the middle of Kevin Keith's trial, Rodney Melton's own family members contacted Keith's trial attorney to express that they believed Melton was responsible for the shootings. Tr. 698-701. They told him that Melton is a "psychopathic killer." *Id.* at 700. Melton had previously been convicted of murder and other violent crimes. *See, e.g.* Ex. 34; *State v. Melton,* 1982 Ohio App. LEXIS 14948, 1-2 (Ohio Ct. App. Crawford County) (Prosecutor told the court that "the

aggravated robbery, what this man did to his friends in my opinion, is a very vicious crime, using a loaded 12 gauge shotgun.") The weapon he used in the murder for which he was convicted is the same gun used in another unsolved murder in Crestline, Ohio.  ROW Appx. ECF 20-26, PageID 8034.

After the Meltons were convicted for their role in the pharmacy burglaries, Melton again demonstrated his *modus operandi* of retaliating against "anybody that snitches on them."  *Id.*at 7947.  Rodney Melton found himself in the same prison as his co-defendant, Milton James Parker. Parker had expected a court-ordered separation in prison from Melton due to the fact that Parker had worn a wire to help the police get evidence on the Meltons. *See id.*at 8035. According to Parker:

> I remember that I was in the prison chapel one day, and Rodney came into the chapel. I remember he was wearing a state-issued winter coat. Rodney opened his coat as he confronted me, and I saw that he had a big shank. Right at that moment, the chaplain walked up beside me, and I hit the chaplain on the leg to signal him to get me out of there. I believe that Rodney would have killed me if the chaplain hadn't have saved me.

*Id.* at 8036-37. *See also* 8038. (Adult Parole Authority Update Presentence Investigation) ("Defendant was confronted in the prison chapel by Rodney Melton").

Despite all of this, the Warden calls the evidence against Keith "overwhelming," as if saying that will make it so. ROW, ECF 26, PageID 10864. She relies on hyperbole instead of actually demonstrating that that is true.  The Warden argues that Keith's claims are merely "attacks on collateral matters."  *Id.* The Sixth Circuit, however, opined that Keith's "new evidence goes to the 'core' of the government's case."  *In re Keith*, No. 18-3544, at 10.

The Warden points this Court to the findings of the Ohio Parole Board to support her position.  But those findings should offer the Warden no support. As explained by Zachary Swisher, who was Strickland's Deputy Legal Counsel at the time of Keith's commutation, "the

84

Parole Board typically does not have the same amount of time to review a case compared to the Governor's office. They typically do not have the same amount of time to digest the information and do as thorough of a review given the number of cases that come before the Parole Board." Ex. 8, ¶ 12. Moreover, as is explained in part by Swisher's affidavit, the State provided some information to the board and Governor that was not reliable. *Id.* at ¶ 9. The Governor's Office had the time to figure that out.

The Warden disputes that Strickland commuted Keith's sentence due to doubts of Keith's guilt. Strickland issued a "concurrent statement" to his commutation of Keith, and as he expressed in the attached affidavit, it explained his reasoning for commuting Keith's sentence. Ex. 5, Strickland affidavit. Strickland had "severe doubts" about Keith's guilt, and he still does. *Id.* at ¶5. The fact that Strickland did not get reelected is what prohibited him from going further than a commutation to life without parole. In fact, Strickland has "become convinced that Kevin Keith is very likely an innocent man." *Id.* at ¶8.

## VI.    Review under AEDPA

### A.    The standard

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the standard for the federal courts' review of Keith's claim for relief under 28 U.S.C. § 2254(a) because he is in custody in violation of the Constitution or law or treaties of the United States. Under the AEDPA, 28 U.S.C. § 2254(d) provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1)        resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or,

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Clearly established Federal law" has been defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). The Sixth Circuit has recognized that "[t]hat body of precedent includes 'not only bright-line rules but also the legal principles and standards flowing from precedent.'" *Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008) (citing *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)). The jurisprudence of appellate courts is not entirely irrelevant, however, as a federal court "may look to lower courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal precedent had been clearly established." *Hereford*, 536 F.3d at 528 (citing *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003)).

The U.S. Supreme Court has explained that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams*, 529 U.S. at 405. It also explained that a decision will be considered "contrary to" clearly established federal law "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 406.

Under the "unreasonable application" prong, a federal court can grant habeas relief if a state court decision on the merits "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. The "unreasonableness" of a decision is analyzed objectively. *See id.* at 409-11. To find a decision unreasonable, a federal

court is not required to find that "all reasonable jurists" would have reached a different conclusion than the state court. *Id.* at 410.

Even constitutional principles "stated in general terms" can be applied unreasonably by state courts. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment). A federal court can find that a state court unreasonably applied a principle to a set of facts, even if the facts are different from the precedent announcing the principle. *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).

Apart from the provisions in § 2254(d)(1), a federal court can also grant relief if the state proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, a federal court can grant habeas relief under § 2254(d)(2) if, for example, the state court unreasonably failed to make a factual determination that should have been made to reach its decision. *See Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014).

Likewise, the state court's decision is an unreasonable determination of the facts if the state court made an evidentiary finding without holding a hearing and giving the petitioner an opportunity to present evidence. *See, e.g.*, *id.* at 1001. A state court's determination of the facts upon which its decision is based will also be procedurally unreasonable if the state court misconstrued or misstated the record or overlooked or misconstrued evidence. *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Ayers v. Hudson*, 623 F.3d 301, 310 n.5 (6th Cir. 2010) (explaining that when the state court bases its determination to deny relief on, at least in part, a "demonstrably false" factual statement, that "error alone

undermines confidence in the result reached by the" state court). A state court's determination is also unreasonable if it discredits the unrefuted testimony of an expert witness. *Van Tran v. Colson*, 764 F.3d 594, 608 (6th Cir. 2014). The same is true if the state court applied an erroneous legal standard in making the factual determination. *See Taylor*, 366 F.3d at 1001.

Finally, a petitioner is entitled to relief under § 2254(d)(2) if the state court makes a factual determination using an adequate procedure to make that determination but where the resulting determination is substantively unreasonable because it is not supported by the evidence presented in the state court proceeding. *See Miller-El v. Dretke*, 545 U.S. 231, 257-58, 266 (2005); *Wiggins*, 539 U.S. at 528; *Cockrell*, 537 U.S. at 340.

These limitations on the federal court's power to grant habeas relief are not always applicable, however, and there are circumstances under which a federal court should grant relief after its *de novo* review of a habeas claim. If a state court "did not assess the merits of a claim properly raised in a habeas petition," then § 2254(d)'s limitations do not apply. *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). For instance, the Supreme Court applied *de novo* review to the prejudice element of ineffective-assistance-of-counsel claims in both *Wiggins* and *Rompilla*, and the performance prong in *Porter*, because the state courts had never assessed those issues. *See Porter v. McCollum*, 130 S. Ct. 447, 452-53 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins*, 539 U.S. at 534.

A determination of a particular factual issue made by a state court is presumed to be correct, but a habeas petitioner can overcome this presumption by showing clear and convincing evidence that the state court's factual determination was erroneous. *Sawyer v. Hofbauer*, 299 F.3d 605, 609 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1)). A state court, to have made a "determination of a factual issue" to which § 2254(e)(1) applies, may not simply provide conclusory recitations of the

88

background of the case, but instead must actually provide a "definitive statement of 'the facts'" and resolve any testimonial or evidentiary inconsistencies. *Vasquez v. Bradshaw*, 345 F. App'x 104, 113 (6th Cir. Sept. 2, 2009). In other words, the state court must actually "determine" the facts before § 2254(e)(1) might apply. *See Wiggins*, 539 U.S. at 530-31 (evaluating a state court's conclusory factual finding in light of its explanation and denying it deference under § 2254(e)(1)); *Vasquez*, 345 F. App'x at 113 ("The dispute over whether the district court accorded the proper deference [under § 2254(e)(1)] is limited to only [the] statements where the [state court's] 'determination of a factual issue' [is] actually discernable. . . .")

A state court fails to make factual determinations entitled to review under § 2254(e)(1)'s limitations when it simply provides the "background to its decision" that includes "a statement of the applicable legal rules, a summary of the factual testimony given by each witness . . . and portions of trial transcript relevant to certain . . . issues." *Vasquez*, 345 F. App'x at 113. Moreover, a state court's decision that one interpretation of evidence is better than another, or the state court's determination that a jury would believe certain witnesses, are determinations reserved for the jury, not a judge, and thus such state court determinations are not "factual determinations" entitled to § 2254(e)(1)'s limitations on review. *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007); *see also Barker v. Yukins*, 199 F.3d 867, 874-75 (6th Cir. 1999); *Vasquez*, 345 F. App'x at 114-15.

**B. Keith is entitled to habeas relief on his *Brady* claim.**

**1. The Suppressed Evidence**

The State failed to disclose critical impeachment evidence regarding forensic analyst Michele Yezzo. As discussed in detail in Section III D, *supra*, Yezzo's employment personnel file demonstrates that her forensic conclusions were untrustworthy, and her superiors were aware of that at the time of trial. Unbeknownst to Keith until only recently, Yezzo was not only mentally

unstable, she had a "reputation of giving dept. answer wants if stroke her" [sic] and was known to "stretch the truth to satisfy a department." ROW Appx., ECF 20-26, PageID 7496-98, 7510.

Yezzo's personnel files demonstrate that her forensic conclusions were contemporaneously questioned by her superiors and peers and that she had a reputation for untruthfulness. Five years before the State used Yezzo's evidence to convict Keith, for example, a BCI memorandum documented the "consensus" that Yezzo's "findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." *Id.* at 7867-68. ("The feelings and attitudes [about Yezzo] are shared by all of the labs, not merely London.") And a year before Yezzo's testimony in Keith's case, during an investigation of Yezzo for "threatening co-workers and failure of good behavior," it was noted in her file that Yezzo had the "reputation of giving dept. answer[s]" and other analysts question her conclusions. *Id*. at 7880, 7910-11.

Other documents indicate that Yezzo did not respond well to "peer review." *Id.* at 7912. She was abusive to her co-workers, attempting to physically assault at least two of them. *Id.* at 7914-15. She used racial slurs ("nigger bitch," "nigger in a woodpile") when addressing an African-American co-worker. *Id.* at 7917, 7919. By 1989, it was the "consensus of opinion" that she "suffers a severe mental imbalance and needs immediate assistance." *Id.* at 7918.

In 1993, less than a year before she testified against Keith, she was placed on Administrative Leave. *Id.* at 7910. A hearing to determine the extent of her suspension was set for May 26, 1994. *Id.* at 7921.  Nevertheless, on May 12, 1994—just two weeks before the hearing—Yezzo provided critical testimony against Keith. And a jury convicted him.

Keith did not learn of critical impeaching evidence regarding Yezzo until 2016 when his counsel saw a Cleveland Plain Dealer article about her. *Id.* at 7903. That article referenced a new-

trial motion filed by James Parsons, and counsel for Keith obtained Yezzo's personnel files from Parsons' counsel. *See supra.*

## 2.  Clearly Established Federal Law

A defendant's constitutional rights are violated when the State suppresses favorable evidence that is material to his case. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). When determining prejudice, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley.* 514 U.S. 419,434 (1995).

The "*Brady* duty extends to impeachment evidence as well as exculpatory evidence." *Youngblood v. West Virginia,* 547 U.S. 867, 869 (2006) (citing *United States v. Bagley,* 473 U.S. 667, 676 (1985)). The Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *Kyles,* 514 U.S. at 433. "Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood,* 547 U.S. at 869-70 (internal citations omitted).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1984)). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* If the suppression of the evidence "deprives the defendant of a fair trial," the constitutional standard has been met. *Id.* at 678.

Moreover, in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met. *Kyles*, 514 U.S. at 436.

### 3. The Court of Appeals' Decision

Because the Ohio Supreme Court declined jurisdiction over Keith's Motion for Leave to File a Delayed New Trial Motion, the final state court adjudication of the merits of these claims is the opinion issued by the Ohio Court of Appeals. ROW Appx., ECF 20-30, PageID 9281.

The Court of Appeals denied Keith's claim based on a lack of prejudice. *Id.* at 9302. The court stated that:

> Keith may claim that Yezzo was a critical witness tying him to the crime, but Yezzo provided testimony regarding a license plate number that was elicited elsewhere [through the testimony of law enforcement] … and she provided limited probative testimony regarding the tires at the scene. In fact, Yezzo actually provided one key piece of evidence for the defense, being that the footprints taken from the scene did not match later-acquired footwear from Keith.

*Id.* (emphasis in original). As "the primary testimony linking Keith to the crime was from Warren and Smathers," Yezzo's testimony was of limited value to the State's case. *Id.* The court concluded that "there is no reasonable possibility that the information contained in Yezzo's file would have made any difference in the outcome of the case. *Id.* at 9304.

### 4. Unreasonable Application of the Clearly Established Federal Law Regarding Prejudice.

The Court of Appeals unreasonably applied clearly established federal law when it assessed the materiality of only the suppressed personnel file, rather than the cumulative impact of all of the suppressed evidence, and applied an outcome-determinative test, rather than assessing the impact of all the suppressed evidence on the fairness of Keith's trial.

The "overwhelming" evidence of Keith's guilt that the state court relied on was the testimony of Warren and Smathers, the evidence regarding a bullet casing found near the scene, and the rejection of the defense's theory that Melton was the actual killer. *Id.* at 9302-03. Since 2004, Keith's diligent efforts to prove his innocence have led to the discovery of evidence favorable to him which had been suppressed by the State. Not surprisingly, this evidence has been discovered in pieces, not all at once. The previously-litigated suppressed evidence, as discussed in Section II, *supra*, was given no consideration by the court in rejecting Keith's claim – even though that evidence **has never been refuted**. The court only compared the contents of Yezzo file to the testimony presented at trial, *Id.* at 9302-03, and ignored the fact that the evidence discovered in 2004, 2007, and 2010 seriously undermined the veracity of that testimony. Because of the failure to disclose the evidence, the State's "case was much stronger, and the defense case much weaker, than the full facts would have suggested." *Kyles,* 514 U.S at 429. Critically, the materiality determination is "not a sufficiency of evidence test." *Id.* at 434.

*Kyles* makes no distinction between newly discovered suppressed evidence and previously-litigated suppressed evidence. A materiality analysis must consider all suppressed evidence collectively and should not merely engage in a sufficiency of the evidence analysis. The suppressed evidence discovered in 2016 and the subject of Keith's new trial motion—Yezzo's personnel file—must be "considered collectively, not item by item," with the previously litigated suppressed evidence. *Id.* at 436. In other words, the suppressed evidence Keith discovered in 2004, 2007, and 2010 should have been factored into the state court's analysis of materiality.

The State court's materiality analysis of the Yezzo impeachment evidence also unreasonably applied an outcome-determinative test rather than examining how it impacted the fairness of Keith's trial. Evidence is material "if there is a reasonable probability that, had the

93

evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682. This does not require the defendant to demonstrate that the evidence "would have resulted ultimately in the defendant's acquittal"; rather, it requires only that the evidence "undermine confidence in the verdict." *Kyles,* 514 U.S. at 434-35.

This evidence meets that standard. Yezzo provided critical forensic findings that implicated Keith. The police could not link Keith to the crimes using the carpet fibers, shoe prints, or shoes it collected; nor did it have fingerprints that implicated Keith. Tr. 481, 489-90; Yezzo deposition, p. 19-21, 26. But relying on Yezzo's findings, it could link Keith to the crime using Davison's car. Reviewing courts throughout the years have relied on this evidence about the car and license plate, the car's link to Keith, and the imprint in the snow at the scene, to bolster their conclusion that Keith is guilty. *See State v. Keith,* 684 N.E.2d 47 (Ohio 1997); *Keith v. Bobby,* 551 F.3d 555, 558 (6th Cir. 2009); *Keith v. Mitchell,* 455 F.3d 662, 667 (6th Cir. 2006); *State v. Keith,* 1996 Ohio App. LEXIS 1720, *7 (Ohio Ct. App., Crawford County Apr. 5, 1996); *State v. Keith,* 891 N.E.2d 1191, 1196 (Ohio Ct. App., Crawford County 2008). Yezzo's findings were, in the words of the prosecution, "key." ROW Appx. ECF 20-28, PageID 8693.

But we now know that these findings were suspect at best. Yezzo was racist, unreliable, and untruthful-and the State had the evidence to prove it. If only the defense had it too, Keith could have impeached Yezzo and demonstrated the unreliability of her conclusions. Not only that, Keith could have shown that the police incorrectly ruled out Rodney Melton as the person who drove his car into the snow bank. In fact, this impeachment evidence may have prevented Keith's trial altogether and led instead to the indictment of Melton. But at the least, this evidence now greatly "undermine[s] confidence in the verdict." *Kyles,* 514 U.S. at 435. The Ohio Court of Appeals' opinion finding otherwise is unreasonable.

### 5. Unreasonable Determination of the Facts in Light of Evidence Presented.

In denying Keith relief, the Ohio Court of Appeals attempted to recreate the record in order to downplay the nature and significance of Yezzo's testimony. "The impeachment value of this evidence cannot be understated, particularly given that Yezzo's forensic analysis of the license plate was one of the 'core' elements of the government's case against Keith." *In re Keith,* No. 18-3544, at 11 (citing *Keith v. Bobby,* 551 F.3d 555, 558 (6th Cir. 2009).).

Yezzo's testimony unquestionably led the factfinder to the conclusion that the evidence from the crime scene matched Davison's Omega. The Ohio Supreme Court clearly credited her testimony. *See Keith*, 79 Ohio St. 3d at 516, 684 N.E.2d at 54 ("Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast **did match** the tread of the tires purchased by Alton Davison as shown on the tire's sales brochures.") (emphasis added).  *See also id.* ("The indentation of the license plate **matched** the last three numbers of the 1982 Oldsmobile Omega seized from Melanie Davison shortly after she visited appellant in jail. Under the pseudonym of Sherry Brown, a few weeks after the murders.") (emphasis added).

The Court of Appeals downplayed the significance of Yezzo's testimony about the license plate impression by pointing out that "on cross-examination Yezzo indicated that she could not state with certainty that the license plate from the vehicle linked to Keith was the one that made the impression in the snow." ROW Appx., ECF 20-30, PageID 9290. Yet the Ohio Supreme Court previously found that the trial evidence about the license plate showed that "[t]he indentation of the license plate **matched** the last three numbers" of the car linked to Keith. *Id.* at 9285 (emphasis

95

added). And the Sixth Circuit recognized the license plate **match** as part of the "core" of the State's case. *Keith*, 551 F.3d at 558.

The state court also unreasonably diminished the importance of Yezzo's testimony about the license plate by stating that "Yezzo acknowledged that defense counsel had a list of numerous vehicles containing the sequential digits '043' from Richland and Crawford Counties." While this suggests that Yezzo's testimony left open the possibility that another vehicle had made the impression, the Court of Appeals failed to consider the totality of Yezzo's opinion and its significance to law enforcement. Yezzo had found that the license plate impression in the snow not only was a "043," but that it also had "spacing and orientation similar to the license plate 'MVR043' on the vehicle submitted as [Kevin's girlfriend's grandfather's car]." ROW Appx., ECF 20-26, PageID 7900-02. When defense counsel cross-examined the police about another vehicle in the area that fit the description and belonged to a convicted murderer, the officers used Yezzo's conclusions to refute it. They had rejected the other car as a possibility because of Yezzo's conclusion about the "spacing and orientation" of the numbers in the plate. *See* Tr. 745, 822. Reasonable factfinders regarding Yezzo's testimony about the license plate must acknowledge how her opinion was received by the investigating officers and the Ohio Supreme Court – and the jury that convicted Keith.

The Court of Appeals also unreasonably characterized Yezzo's testimony regarding the tire tread as being of "limited probative" value. *Id*. at 8932. The court stated that "Yezzo testified that she could only state that the tread pattern from the impression left in the snow was 'similar' to those provide to her in a brochure because she only had a partial tread design from the print." *Id.* at 8921. But the Ohio Supreme Court had found that the evidence introduced at trial was that "the cast **did match** the tread of the tires" depicted in the brochure. *Id.* at 8915 (emphasis added).

As to the importance of Yezzo's testimony, the Court of Appeals unreasonably determined that she did not provide critical evidence, and that other witnesses had testified to essentially the same information. *Id.* at 8932 ("[T]he primary testimony linking Keith to the crime was from Warren and Smathers."). The State court's assessment is at odds with the State's position at trial. Yezzo was permitted to testify at Keith's trial by deposition. The Criminal Rules allow for a witness's testimony "be taken by deposition" only when that witness is unavailable at trial and when his "testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice." Crim. R. 15(A). Thus, in 1994, the State argued and the trial court found Yezzo's testimony so material that *justice* required allowing her to testify by deposition.

It is inconceivable that Yezzo's testimony could be so material at trial that her deposition was permitted, but the critical impeachment evidence establishing her bias and tendency for untruthfulness is now considered immaterial. She provided the only forensic evidence against Keith to the case; there were no fingerprints, fibers, or blood evidence linking Keith to the case. Tr. 490; *see also In re Keith*, No. 18-3544, at 9 ("Yezzo's testimony was particularly important because no physical evidence linked Keith to the murders."). The car purportedly linked to Keith would not have been linked to the scene, had a correct forensic analysis been conducted. Rodney Melton's cream-colored car with a "043" license plate would not have been ruled out, had a correct forensic analysis been conducted.

The Ohio Court of Appeals' stated that "Smathers' testimony alone links Keith to the car, even if Yezzo had never testified at all in this case." ROW Appx., Opinion, ECF 20-30, PageID 9363. First, this is not a "factual determination" entitled to § 2254(e)(1)'s limitations on review. *Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007) ("a state court's decision that one interpretation of evidence is better than another, or the state court's determination that a jury would

reach certain conclusions or would believe certain witnesses, are determinations reserved for the jury, not a judge, and thus such state court determinations are not 'factual determinations' entitled to § 2254(e)(1)'s limitations on review."). But even if it were considered a "factual determination," it is clearly rebutted by the following clear and convincing evidence.

Smathers described that the car she witnessed to be the getaway car was a two-doored car that was "white, cream, light yellow" in color.  Tr. 312, 389.  But Davison's car, the car that the State claims was the getaway car, was described by BCI as gray (Tr. 509) or green (Tr. 448, 449). ROW Appx., ECF 20-31, State's trial exhibit 76, PageID 9540. Defense counsel asked her specifically: "Did you tell [Officer Koepke] light yellow or light blue?" Tr. 388, PageID 10076. Smathers responded: "It was a light cream color but I couldn't, you know, with the lights and stuff, see the exact color. **I know it was a white, cream, light yellow.**" Tr. 389, PageID 10077 (emphasis added).

Moreover, Davison's car has four doors, not the two doors that Smathers described. Perhaps most significantly, Smathers never identified Alton Davison's Omega (State's exhibit 76) as the car she saw.  It is obvious that Smathers' testimony alone does not "link" Keith when she never even identified that as the car.  ROW Appx., Opinion, ECF 20-30, PageID 9363.

The state court also completely ignored the evidence of how knowledge of Yezzo's behavior would have impacted the State's willingness to use her as an expert. Lee Fisher, the Ohio Attorney General at the time of Keith's trial and who, by law, was the "chief legal officer and chief law enforcement for the state of Ohio," had not known about Yezzo's troubling reputation. ROW Appx., ECF 20-26, PageID 7887-89. He "would not have permitted Ms. Yezzo to provide testimony against Kevin Keith" had he been aware of this information. *Id.* Fisher recognized the duty of the State to "disclose this information, because it severely impacts Ms. Yezzo's

credibility." *Id.* Fisher also said he would have "ordered the submitted evidence to be reanalyzed by a separate analyst."  *Id.*

Yezzo also did more than link Keith to the crime scene for the State. Tr. 849. The State also used her to establish consciousness of guilt and to bolster the eyewitness testimony. The State argued that the tires found on the car driven by Keith that night were different from the tires the car owner put on the car, thus inferring that Keith must have changed the tires after the crime to conceal evidence. *Id*. It also asserted "[t]here is no way [Warren nor Smathers] can be lying because their statements are backed by the facts as we have seen from other sources." *Id*. at 841. It argued that "Yezzo gave us several exhibits which I have been referring to." *Id*. at 840. Yezzo was an "other source" – one with forensic expertise – that the State used to show that Warren and Smathers were telling the truth.

### 6.The Merits of the Claim

The Yezzo impeachment evidence was material to the outcome of Keith's trial. Keith could have demonstrated that Yezzo's biases and untruthfulness made her conclusions unreliable, that her conclusions were actually wrong, and that her findings caused the Bucyrus Police Department to ignore evidence implicating Rodney Melton.

### i.    Bias and Untruthfulness

Yezzo's documented use of racial slurs-in a professional environment, no less-would have been used to establish Yezzo's bias against Keith, an African American. *See* ROW Appx., ECF 20-26, PageID 7917, 7919. Imagine a jury hearing on cross-examination that a key state witness, testifying against an African-American defendant, had called another African American a "nigger bitch" and a "nigger in a woodpile." *Id*. That alone would substantially undercut Yezzo's credibility.

99

But there would have been more, much more. Yezzo's reputation for untruthfulness and the untrustworthy nature of her findings also would have undermined the credibility of her opinion. *See id.* 7866-68; 7880. Recall that her opinion rested on the tire brochure Captain Corwin had given her. Corwin also gave her a receipt for the type of tires purchased by Davison the previous year and specifically pointed out which tire picture in the brochure was Davison's tire. *Id.* at 7924-26. He then told Yezzo that he "hope[d] this will do the trick for us." *Id.* at 7927. Days later, Yezzo provided her opinion supporting the State's case against Keith.

A jury could have easily inferred that Yezzo "stretch[ed] the truth," as she was known to do, to satisfy Corwin. *Id.* at 7880. There was no peer review of her findings, and Yezzo had a "reputation of giving dept. answer wants if stroke her." *Id*. If that information came out at trial – which it would have had the State disclosed it – the jury would have known that the State told Yezzo that it wanted certain evidence to do the trick, and that Yezzo was known to make evidence do exactly that.

### ii.    Erroneous Conclusion

 Not only would a jury have had ample reason to disbelieve Yezzo, it would have learned that her conclusions were wrong. Former Attorney General Fisher "would not have permitted Ms. Yezzo to provide testimony against Kevin Keith" and "would have ordered the submitted evidence to be reanalyzed by a separate analyst." *Id.* at 7889. That separate analyst would have discovered that Yezzo's conclusions were unsupported or, simply, wrong.

A separate analyst in this case, Bodziak, came to exactly that conclusion. Bodziak is a retired FBI Special Agent and an expert witness throughout the country (usually on behalf of the government) concerning footwear and tire tread impressions. *See e.g. People v. Kraybill,* 14 N.E.3d 1131, 1139 (2014) (State's witness); *Burkett v. Thaler,* 2010 U.S. Dist. LEXIS 83905, at

*18-20 n.123 (S.D. Tex. 2010) (State's witness); *People v. Sutherland,* 860 N.E.2d 178, 220 (2006) (State's witness); *State v. Smith,* 807 A.2d 500, 504 (2002) (State's witness); *People v. Cunningham,* 773 N.E.2d 682, 688 (2002) (State's witness); *Layton v. Johnson,* 2001 U.S. Dist. LEXIS 13976, at *23 (N.D. Tex. Sep. 6, 2001) (State's witness); *State v. Williams,* 1991 Ohio App. LEXIS 3883, at *31 (6th Dist. l99l) (State's witness); *Davis v. Commonwealth,* 147 S.W.3d 709, 728 (2004) (State's witness). He is described by prosecutors as an "internationally renowned" and a "world class" expert in impression evidence. *State v. Jones,* 681 S.E.2d 580, 583 (S.C. 2009); *see also Frankenfield v. State,* 2008 Tex. App. LEXIS 7920, at *34 (Oct. 16, 2008). He even trains BCI analysts. ROW Appx., ECF 20-26, PageID 7939.

Bodziak reviewed the same evidence that Yezzo reviewed and concluded that Davison's car bumper was *not consistent* with the car bumper impressions left in the snow bank at the crime scene. *Id.* at 7891. He also concluded that "based on the limited detail, a distinction could not be made between a license plate that reads 'MVR043' versus others that have '04' somewhere on the plate." *Id.* at 7893.

As for the tires, Bodziak also disagreed with Yezzo's conclusions. Yezzo had explained her conclusion of "similar in tread design" in a way that implied the tire track impression she examined was indeed a *match* with the tire tread from the brochure. Dep. Tr. 14, 24-25 ("[I]t's similarity is it would have originated from the Triumph 2000."). But Bodziak explained that "the forensic use of the word similar has no further meaning than it would for a layman in that it can only attest to a visual likeness of sorts." ROW Appx., ECF 20-26, PageID 7895. In the field, "the term 'similar in tread design' does not include the tread dimension and that particular tire was made in many different sizes." *Id.* Contrary to Yezzo, Bodziak determined that "it is not possible

to conclude whether the license tag and tire impressions represent one simultaneous event or two unrelated and independent events." *Id.*

Bodziak, conducting a proper analysis of the evidence not influenced by bias and not trying to stretch the truth, concluded there was no forensic connection between the scene and Davison's car. Discrediting Yezzo's conclusions would have cast serious doubt on the case against Keith. It also would have implicated another suspect: Rodney Melton.

### 7. An Uninvestigated Suspect

Yezzo's opinions stifled the strong case to be made against Rodney Melton. His car matched the State's evidence of the getaway car even better than Davison's car did: it was light yellow car with the license plate 043LIJ. *Id.* at 7950, 7970; Tr. 388, 389. But the Bucyrus Police Department never investigated him. Yezzo's conclusions instead allowed them to settle on Keith, indeed "within a day." Tr. 745. Yezzo had concluded that the snow impression of the license plate had "spacing and orientation similar to the license plate 'MVR043' on [Davison's car]." ROW Appx., ECF 20-26, PageID 7900-02. Based on that, the police determined that it could not have been a license plate in which the numbers came first, as they did on Melton's car.

But this conclusion was faulty. Bodziak's findings demonstrate that the numbers in the snow could have come before the letters, as they did on Melton's car. *Id.* at 7893. Had the Bucyrus Police not wrongly excluded Melton's car as the getaway car by relying on Yezzo's opinion, they not only could have placed him at the crime scene; they also could have investigated and discovered the damning evidence against him. *See id.* at 7940-8029, 8031-38.

Yezzo's superiors warned that her "interpretational and observational errors" were "failures that could lead to a substantial miscarriage of justice." *Id.* at 7905-06. That is precisely what they led to here.

### 8. Conclusion

Keith is entitled to relief on his *Brady* claim. As the Ohio Court of Appeals unreasonably applied the law and unreasonably determined the facts, this Court need not defer to its conclusion. As Keith has demonstrated that the exculpatory, suppressed evidence had a prejudicial effect on his trial, his conviction should be reversed and his case remanded for a new trial.

### VII.  Response to the Warden's Alternative Defenses

### A.  Exhaustion

Under 28 U.S.C. § 2254(b)(1), a state prisoner seeking a writ of habeas corpus must first give the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)). A prisoner provides such an "opportunity" by "'fairly present[ing]' his claim in each appropriate state court, thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Duncan*, 513 U.S. at 365-66. To preserve claims for federal review, the petitioner must present the claims to the state's highest court, even if the only review available is discretionary under ordinary appellate procedure. *O'Sullivan*, 526 U.S. at 847-48.

The claims presented in state and federal court need not be identical. A prisoner exhausts his claim by presenting "the substance of a federal habeas corpus claim" to the state courts. *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005) (citing *Connor*, 404 U.S. at 277-78). Variations in legal theory or factual allegations do not render a claim unexhausted, as long as the ultimate question for disposition remains the same. *Id.* at 613.

A petitioner can take four actions which are "significant to the determination of whether a claim has been 'fairly presented.'" *Whiting*, 395 F.3d at 612-13. To analyze whether the factual

and legal bases of the claim have been exhausted, courts look to the state court briefing for a petitioner's:

1. reliance upon federal cases employing constitutional analysis;

2. reliance upon state cases employing federal constitutional analysis;

3. phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or,

4. alleging facts well within the mainstream of constitutional law.

*McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)).

Exhaustion is satisfied if the petitioner has fairly presented the claim and is not dependent on how the state court adjudicates the claim. *Clinkscale v. Carter*, 375 F.3d 430, 438 (6th Cir. 2004) ("[I]t is beyond peradventure that exhaustion does not require a state court adjudication on the merits of the claim at issue."). The requirement of exhaustion is satisfied "if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (citing *Castille v. Peoples*, 489 U.S. 346, 341 (1989)).

The exhaustion requirement is not absolute. *Lucas v. Michigan*, 420 F.2d 259, 261 (6th Cir. 1970). "Where there are circumstances rendering the State corrective process ineffective to protect a prisoner's rights, habeas corpus relief may be granted without requiring a futile exhaustion of remedies." *Id.* at 261. "Once an issue of asserted constitutional violation has been presented to the State's highest court, the doctrine of exhaustion of remedies does not require future repetitive presentations to such court by additional attempts through a variety of successive motions." *Duke v. Wingo*, 386 F.2d 304, 306 (6th Cir. 1967).

**1.  Keith fairly presented his claims in State court.**

104

Keith's claim based on the exculpatory evidence in Yezzo's personnel file was fairly presented to the state courts through his Motion for Leave to File a New Trial Motion. ROW Appx., Motion, ECF 20-26, PageID 7818-8067. While the Warden alleges that this claim is procedurally defaulted, she does state that "Keith presented his 'Yezzo claim' in his untimely motion for leave to file a delayed motion for new trial." ECF 26, PageID 10879.

Keith's *Youngblood* claim, regarding calls allegedly made by Warren's nurses to the police, was fairly presented to the state court in a 2010 Motion for Leave to File a Delayed Motion for New Trial and a Motion for New Trial Based on Newly Discovered Evidence. ROW Appx., ECF 20-24, PageID 7027-7130. The substance of this claim alleged that the Bucyrus Police Department acted in bad faith when it destroyed the station's recordings of calls, even after trial counsel requested them in discovery and issued a subpoena for them. *Id.* at 7126-28.

Keith had made repeated attempts to obtain the recorded phone call at issue, through public records requests, but none of these requests were honored by the police department. The agency cited restrictions in Ohio's public records law to justify its failure to honor these requests. *See supra*. Eventually Keith's friend, Rev. Torrence, received a response from Captain Beal that the recording had been destroyed, and that "no such daily phone log existed at that time." *Id.* at 7045.

In 2010, Keith obtained information from an unrelated civil lawsuit regarding the call-log practices of the Bucyrus police department at the time of the crime. *Id.* at 7095-7106. According to David Robertson, the Bucyrus Police Department's records administrator from 1990 to 1996, "the dispatcher would answer the call and then she would put down the time of the call, who called, and who she assigned the call to." *Id.* at 7068. Keith then obtained the radio dispatch logs, which showed no call from Warren's nurses to the police. *Id.* at 7107-11. These newly discovered logs were the subject of a motion for leave to file a new trial motion. ROW Appx., Motion, ECF 20-

105

24, PageID 7027-7130. The state trial court denied the motion to file, finding that the "issue of [Nurse] John Foor's testimony has been so thoroughly explored and dissected as to be foreclosed and resolved as res judicata." *Id.*at 7195.

Throughout decades of litigation, the State repeatedly asserted that there was no evidence of bad faith on the part of the police officers. *See* ROW Appx., ECF 20-4, PageID 1814-15; ECF 20-24, PageID 7377, 7499, 7505. The State denied Keith's "implications" that there were "nefarious reasons" for the recordings being destroyed, or that Nurse Foor never even made such a call. *Id.* at 7500. The State claimed that they had allowed Keith and his previous attorneys full access to the prosecutor's files and the evidence held by the Bucyrus Police Department, and that "Keith fails to offer any rationale [sic] basis for any bad faith in the present case." *Id.* at 7505.

The State argued that Keith could not demonstrate an improper motive merely because the request was made while the calls should have still been available, because "the mere fact that the recordings were not preserved, by itself, does not establish bad faith. There may be an innocent explanation. Or perhaps the failure to preserve was the result of negligence or inattention." Ex. 6, p. 21.

The Warden correctly asserts that "there is no longer a state court remedy available to him in order to now raise the claim" regarding the ignored subpoena. ECF 26, PageID 10878. But the lack of an available remedy is not due to any failure on Keith's part. It is the direct result of the State withholding the information that the failure to respond to his subpoena for call recordings was a deliberate act of bad faith.

The exhaustion requirement ensures that petitioners give state courts a "**fair** opportunity to act on their claims." *O'Sullivan*, 526 U.S. at 844 (emphasis in original). Keith gave the state courts such an opportunity by filing his new trial motions alleging that the State suppressed material,

exculpatory evidence, and acted in bad faith by destroying potentially exculpatory evidence. The state court's ultimate determination that any claims regarding the veracity of Nurse Foor were *res judicata* closed the door on any further state court remedies available to Keith – even though he had not yet discovered the evidence of bad faith that the State had been concealing for decades.

After a change in Ohio's public records law in 2017, Keith was able to obtain the 'ignore for now' subpoena – evidence of the police department's willful refusal to provide him with potentially exculpatory evidence. *See supra.*  In *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court rejected "a rule thus declaring prosecutor may hide, defendant must seek," as it is "not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696 (internal citations omitted). Defense counsel cannot be required to "scavenge for hints of undisclosed Brady material. ..." *Id.* at 695. In other words, the State cannot mislead and then fault Keith for not discovering the truth earlier: that there was clear evidence of bad faith.

Keith fairly presented his *Youngblood* claim, and the doctrine of exhaustion does not require him to engage in "an exercise in futility." *See Lucas*, 420 F.2d at 261-62. The State's active concealment of the evidence of bad faith rendered the state court process ineffective to protect Keith's rights. Keith fairly presented his claim that the State suppressed material evidence about the phone recordings and logs, and the new evidence regarding the subpoena is direct evidence of the police department's bad faith. The State cannot assert "an innocent explanation" and then blame Keith for not knowing that assertion was a falsehood.

### B.  Procedural Default

Assuming *arguendo* that Keith's claims are defaulted, he can establish cause and prejudice. Though a federal court is typically precluded from reviewing a claim that was dismissed based

upon an adequate and independent state procedural bar, the court may do so where the petitioner demonstrates cause and prejudice. *Wainwright*, 433 U.S. at 87.

"Because of the broad range of potential reasons for an attorney's failure to comply with a procedural rule, and the virtually limitless array of contexts in which a procedural default can occur, [the Supreme Court] has not given the term 'cause' precise content." *Reed v. Ross*, 468 U.S. 1, 13 (1984).  A petitioner may meet the "cause" requirement by if he "can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  "Cause" is "something external to the petitioner, something 'that cannot fairly be attributed to him.'" *Gravely v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (citation omitted).

"Cause" can run the gamut from state concealment of evidence (*see Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988); *Strickler v. Greene*, 527 U.S. 263, 283 (1999)), to "a showing that the factual or legal basis for a claim was not reasonably available to counsel" at the time the default occurred (*Coleman*, 501 U.S. at 753 (internal citations omitted)), to ineffective assistance of trial counsel (*see Gravely*, 87 F.3d at 785), to ineffective assistance of appellate counsel.  *See Buell v. Mitchell*, 274 F.3d 337, 351-52 (6th Cir. 2001).

The State's concealment of the Yezzo evidence and the "Ignore for Now" subpoena prevented Keith from discovering the evidence that supported his motion for leave filed in state court and his first, second, and fourth grounds for relief.  *See Strickler v. Greene*, 527 U.S. 263, 283 (1999) ("[C]onduct attributable to the State that impeded trial counsel's access to the factual basis for making a *Brady* claim" is just such a factor that can "ordinarily establish the existence of cause for a procedural default").

When assessing whether a petitioner has suffered "prejudice," a federal court should

assume that the petitioner's constitutional claims are meritorious.  *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986).  The court must then determine if the federal constitutional claim meets the test for prejudice set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) – that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Id*.  In *United States v. Frady*, 456 U.S. 152, 169 (1982), the Supreme Court explained that prejudice is established where the constitutional error "so infected the entire trial that the resulting conviction violates due process," when considered in the context of the entire trial.  *Id*.

Keith has established cause and prejudice and this Court should review his claims de novo.

Moreover, Keith has proven his actual innocence.  If this Court determines that his first, second, and fourth claims are procedurally defaulted, Keith's innocence is a gateway through which he may pass and have his claims considered on their merits.  *Schlup v. Delo*, 513 U.S. 298, 314-15.  In *Schlup*, the Supreme Court distinguished the innocence claim brought by Schlup from the innocence claim in *Herrera*.  Unlike Herrera's free-standing claim of actual innocence, Schlup's innocence claim was accompanied by an assertion of constitutional error at his trial.  *Schlup*, 513 U.S. at 316, citing *Herrera*, 506 U.S. at 419.  The court explained the importance of the distinction:

> [I]f a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

*Schlup*, 513 at 316.  Due to the nature of Schlup's innocence claim, the court determined he need not meet the standard presumed in *Herrera*, but instead "must establish sufficient doubt about his guilt to justify the conclusion that his [incarceration] would be a miscarriage of justice *unless* his conviction was the product of a fair trial."  *Id*.

The *Schlup* decision was a result of the principle that habeas corpus is an equitable remedy, to which strict rules should not apply when doing so would frustrate the 'ends of justice'.  *Id*. at 319, citing *Sanders v. United States*, 373 U.S. 1 (1963).  To that end, the Supreme Court chose to adopt a less stringent standard of actual innocence than is set forth in *Sawyer* or §2244(b), instead requiring a petitioner seeking to pass through the gateway to show "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Id.* at 327.

Keith has provided sufficient proof of his innocence such that there can be no confidence in his conviction, unless it is also determined that he received a trial free from constitutional error. *Schlup*, 513 U.S. at 316.  Thus, should this Court determine that Keith's claims are procedurally defaulted, to prevent a fundamental miscarriage of justice, it should permit him to pass through the actual innocence gateway, and consider his claims on the merits.

### C.  Statute of Limitations

When a petitioner files an untimely petition, but can establish his actual innocence, the statute of limitations should be equitably tolled, and his claims considered on the merits. *Perkins,* 569 U.S. at 399, citing *Schlup*, 513 U.S. at 327. In *Perkins*, the Supreme Court held that actual innocence, where proved, is a gateway in which a federal habeas petitioner may pass an impediment such as a procedural bar or the expiration of the statute of limitations. 569 U.S. at 386. To utilize this "actual innocence gateway," a petitioner must demonstrate that, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id*. at 395, citing *Schlup*, 513 U.S. at 329. This demonstration is the threshold requirement to overcome the impediment of the expiration of the statute of limitations. *Perkins*, 569 U.S. at 386.

The Petitioner in *Perkins* did not obtain equitable tolling at the District Court level for his petition that was filed well beyond the AEDPA's limitation period because he could not make a

showing of exceptional circumstances nor diligence. The Supreme Court then addressed the question as to "whether reasonable diligence is a precondition to reliance on actual innocence as a gateway to adjudication…on the merits." *Perkins*, 569 U.S. at 401. It vacated the lower court's decision and held that timeliness is not an "unyielding ground" for dismissal of a petition, but rather, "does bear on the credibility of evidence proffered to show actual innocence." *Id.* Finally, the Supreme Court held that to invoke the equitable tolling exception to AEDPA's statute of limitations, "a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence.'" *Perkins*, 569 U.S. at 399.

Keith has demonstrated by clear and convincing evidence that, but for constitutional errors, he would not have been found guilty of the underlying offenses.  *See* Section III(B), *supra*. Because Keith has met the more stringent "clear and convincing" standard, it is presumed that he meets the "more likely than not" standard to equitably toll the statute of limitations pursuant to *Perkins* and *Schlup. See Lott v. Bagley*, No. 1:04 CV 822, 2007 U.S. Dist. LEXIS 91762, at *42 n.13 (N.D. Ohio Sep. 28, 2007) (The District Court in *Lott* held that if the petitioner could meet the "more stringent § 2244(b)(2)(B)(ii) actual innocence standard, then it stands to reason that he could equitably toll the statute of limitations, thereby preserving his claims for federal habeas review."). Keith's petition for federal habeas review should not be barred by the one-year statute of limitations.

Moreover, Keith is entitled to equitable tolling.  In *Holland v. Florida*, 560 U.S. 631 (2010), the United States Supreme Court held that because equitable principles had traditionally governed the substantive law of habeas corpus, the timeliness provision of AEDPA should be subject to equitable tolling. *Id.* at 645-46.  "A 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way' and prevented timely filing. *Id.* at 649, citing *United States v. Pace*, 544 U.S. 408, 418 (2005). "The diligence required for equitable tolling purposes is 'reasonable diligence.' *Holland*, 560 U.S. at 653, citing *Lonchar v. Thomas*, 517 U.S. 314, 326 (1996). 'Maximum feasible diligence' is not required. *Holland*, 560 U.S. at 653, citing *Starns v. Andrews*, 524 F.3d 612, 618 (5th Cir. 2008) (quotation omitted).

Keith has, at all times, been "pursuing his rights diligently." *Holland*, 560 U.S. at 649. On March 3, 2016, approximately a month after discovering the relevant information in the Yezzo files and two months after obtaining the files, Keith's counsel called the Crawford County Prosecutor Matthew Crall and asked if he would be willing to have a meeting with Keith's counsel. Ex. 4, ¶ 100. He agreed, and the meeting was scheduled for April 12, 2016 at his office.

Keith's counsel discussed the case with Crall, and they explained the information contained in Yezzo's personnel files. Counsel for the Warden, Brenda Leikala, also attended that meeting. Keith's counsel told Crall that Keith would be filing a motion for leave to file a new trial motion if necessary, based on this new material. Crall agreed that he would review the case, so Keith's counsel stated that they would hold off on filing the motion until he got that opportunity. Because this would delay the filing of Keith's motion, Crall agreed not to argue that Keith failed to file his motion within a reasonable amount of time within discovery of the evidence. Ex. 4, ¶ 101.

Keith held off on the filing of his motion, but when counsel did not hear back from Crall— even after multiple emails and voicemails—Keith set up a meeting with Ohio Attorney General Mike DeWine. That meeting took place on August 19, 2016. Counsel asked for his help, and agreed not to file Keith's motion in court until they heard back from him.

The following day, on August 20, 2016, Keith's counsel James Wooley emailed two members of the Attorney General's team who had attended the meeting. One of them responded

112

that same day, stating that he was sure there would be some follow up questions in the coming weeks.  **Ex. AA**.  Keith's counsel replied to that email to encourage the Attorney General to feel free to ask any questions or request any materials.  **Ex. BB**.  After two months passed, and Keith had heard nothing from the Attorney General or the county prosecutor, Keith filed his Motion for Leave to File Delayed Motion for New Trial Based on Newly Discovered Evidence (ROW Appx. ECF 20-26, PageID 7818) and his Motion for New Trial Based on Newly Discovered Evidence and/or Post-Conviction Relief Under Ohio Rev. Code § 2953.23. *Id.* at PageID 7832.

Keith continued to investigate. Ex. 4, ¶ 111.  In its response to Keith's motion, the State had faulted Keith for not specifically requesting Yezzo's personnel file.  ROW Appx, ECF 20-27, State's Response in Opposition to Motion for Leave, PageID 8110-11.  Thus, Keith investigated if any defendant had specifically requested Yezzo's personnel file, and whether the information of Yezzo's bias and improper actions had been disclosed.  On November 14, 2016, Keith's counsel found just such a request, made in 2003, on behalf of Vincent Calvert, and the negative personnel files concerning Yezzo had not been disclosed. ROW Appx, ECF 20-29, Motion to Supplement, PageID 8756-9034.  Keith filed a Motion to Supplement with this information on November 21, 2016, in order to further demonstrate he could not have obtained the evidence at issue earlier.  *Id.* at PageID 8756.

On December 28, 2016, the Ohio Supreme Court changed the law regarding public records, and Keith immediately took advantage of it.  That same day, Keith requested all public records from the Bucyrus Police Department regarding Keith's case, including all specific investigatory work product.  Ex. 4-CC.

Keith litigated his claims in every state court, as well as the Supreme Court of the United States. *See* ROW Appx, ECF 20-29, Judgment Entry, PageID 9035. ROW Appx, ECF 20-29,

113

Opinion, PageID 9057.  While he was litigating his petition for writ of certiorari, he also filed a lawsuit against the Bucyrus Police Department, BCI, the Crawford County Prosecutor, Yezzo, and other relevant parties under 42 U.S.C. § 1983, due to the parties' interference with and violation of Keith's access to the courts.  *Keith v. Yezzo, et al.,* 1:18-cv-00047, ECF 1.  Keith argued that the defendants blocked him from accessing material, favorable evidence and then faulted him for not finding it sooner.

While still litigating the § 1983 suit, on March 19, 2018, Keith filed his fourth petition for writ of habeas corpus in this Court. After briefing and obtaining authorization from the Sixth Circuit, Keith is in front of this Court with this successor habeas petition.

The Warden disputes that Keith is entitled to equitable tolling or tolling based on his innocence, because "Keith did not initiate successive habeas proceedings" upon the discovery of the Yezzo evidence or the "Ignore for Now" subpoena.  ROW, ECF 26, PageID 10874. The Warden is correct that Keith did not file a placeholder petition, because he assumed it would be dismissed before he even exhausted his state court remedies.

A habeas petition containing unexhausted claims can be dismissed.  Keith could not simply file a petition "and seek a stay to exhaust his state remedies," as the Warden describes. ROW, ECF 26, PageID 10874.  As the Supreme Court has stated, "stay and abeyance should be available only in limited circumstances.  Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Keith had every reason to believe that his claims would be considered on the merits in state court.  The case law concerning public records in Ohio was clear; the case law concerning *Brady*

is settled; and the exact scenario had been presented to another court, which considered the claims on the merits after finding that the defendant had been unavoidably prevented from discovery of the evidence.  *See* ROW Appx., Motion for Leave, ECF 20-26, PageID 7825 (citing *State v. Parsons*, Huron C.P. No. CRI 9300098, p. 2 (Mar. 23, 2016)).  Because of this, he had no good cause for not first exhausting his claims in the Ohio courts.

At best, Keith could expect that his case would be transferred to the Court of Appeals, buying him time to exhaust. But Keith's experience with filing subsequent habeas petitions demonstrated that the petition could be dismissed and transferred quickly.  For example, on July 11, 2008, when Keith filed a second Petition for Writ of Habeas Corpus in this Court (*Keith v. Bobby*, Case No. 1:08-cv-1687 (N.D. Ohio), ECF 1), it was transferred within a week to the United States Court of Appeals for the Sixth Circuit, to be reviewed as a successor application.  Similarly, when Keith this Petition for Writ of Habeas Corpus in this Court (ECF 1), it was transferred within three months.  ECF. 15. Moreover, the 28 U.S.C. § 2244(b)(3)(D) mandates that "the court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion."

The fact of the matter is that Keith's case is unique.  Keith has sought relief through every available channel, and he has never sat on his rights.  *Compare Pace v. DiGuglielmo*, 544 U.S. 408, 419, 125 S. Ct. 1807, 1815 (2005) ("And not only did petitioner sit on his rights for years *before* he filed his PCRA petition, but he also sat on them for five more months *after* his PCRA proceedings became final before deciding to seek relief in federal court.")  Keith has been diligent, and he is entitled to equitable tolling.

## Conclusion

Kevin Keith has sat in prison for over 25 years for a crime he did not commit.  He has diligently pursued every form of relief, and yet has been stymied at every turn.  For all the reasons above, this Court should grant Keith's successive habeas corpus petition and vacate his conviction.

Respectfully Submitted,

*/s/ James R. Wooley*
James R. Wooley (003850)
Calland M. Ferraro (0093439)
Jones Day – Cleveland
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-7345
*jrwooley@JonesDay.com*
*cferraro@JonesDay.com*
Trial Attorney

And

*/s/ Zachary M. Swisher*
Zachary M. Swisher (0076288)
Sybert, Rhoad, Lackey Swisher, LLC
153 South Liberty Street
Powell, Ohio 43065
(614) 785-1811
*zach@law153group.com*

And

*/s/ Rachel Troutman*
Rachel Troutman (0076741)
Supervising Attorney, Death Penalty Dept
Office of the Ohio Public Defender
250 E. Broad Street, Suite 1400
Columbus, Ohio 43215
*Rachel.Troutman@OPD.ohio.gov*

And

*/s/ James M. Petro* _____
James M. Petro (0022096)
Attorney-at-Law
6573 Marissa Loop #405
Naples, FL 34108
*Jimpetro73@gmail.com*

**Counsel for Petitioner Kevin Keith**

## Certificate of Service

The undersigned hereby certifies that on May 9, 2019, a copy of the foregoing Traverse was filed electronically with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Rachel Troutman* _____
Rachel Troutman (0076741)
Supervising Attorney, Death Penalty Dept

**Counsel for Petitioner Kevin Keith**

117

# Rebuttal to Warden's "Evidence of Guilt" Chart

| Warden's "Evidence of Guilt" | What the evidence, including *Brady* evidence, actually shows |
|---|---|
| **Smather's [sic] description of car**<br>    o  Light colored car<br>    o  Driver put his hand on door frame for leverage while rocked car out of snow<br>    o  No working dome light<br>    o  No working license plate light<br>    o  Rear tail lights rectangular with an emblem between the two rectangles<br>    o  Back window mostly vertical, not slanted<br>    o  Trunk which extended from glass<br><br>• Officer determines from description of car looking for '80-'82 Oldsmobile Cutlass or Omega | **Smathers' Description of the Car**<br>    o  Smathers described the car as "white, cream, light yellow."  ECF 21-1, PageID 10000, 10077.<br>    o  The Omega that the state says Kevin used, however, was green.  ECF 21-1, PageID 10138, 10139.<br>    o  Rodney Melton has a "cream to yellow" car that he used in criminal activity.  ECF 1-12, PageID 134.<br>    o  Smathers testified that "it was dark inside the car," not that the dome light did not work.  ECF 21-1, PageID 10071.<br>    o  Smathers never identified Alton Davison's Omega (State's exhibit 76) as the car she saw<br>    o  Smathers described the car she saw as having 2 doors. ECF 21-1, PageID 10000, 10517. |
| **Identification**<br>    o  Richard Warren, Nancy Smathers | <u>**Warren**</u><br>•  Right after the shooting, Warren told four different witnesses, including a police officer, that he did not know who shot him, only that it was a "masked man."  ECF 21-1, PageID 9928-31, 9993, 10312, 10315.<br>    o  Warren was able to answer other questions coherently, like the apartment number where the shooting occurred.  ECF 21-1, PageID 10315.<br>•  Warren also initially told the police that he was only able to identify the shooter by his build and size.  ECF 21-1, PageID 10040.<br>•  Warren could not recall whether the police first mentioned to Warren that the first name of the shooter was Kevin.  ECF 21-1, PageID 10060.<br>•  To prove that Warren was the first person to mention the name Kevin, the state offered the testimony of Nurse John Foor, who testified that Warren wrote down the name "Kevin" on a piece of paper, after which Foor proceeded to call the police.  ECF 21-1, PageID 10470-73; *see also* ECF 21-1, PageID 10528-29 (the state saying in closing argument that "John Foor called the Bucyrus |

# Rebuttal to Warden's "Evidence of Guilt" Chart

|  |  | Police Department.  That is how the name Kevin found its way into this case").<br><br>○ Warren denied that he wrote the name Kevin, as his hands were strapped down.  ECF 21-1, PageID 10056.  And Warren could not have spoken the name to Nurse Foor because he was not off the ventilator until Foor's shift ended.  ECF 20-10, PageID 3594 (Foor worked the 2300-0700 shift, Warren extubated after 1135 on 2-14-94).  Indeed, Warren testified that he "tried to do sign language and none of the nurses knew it" but when his "father got there he translated [his] sign language to the nurses [and] then they wrote it down on paper."  ECF 21-1, PageID 10056.  Nurse Foor's shift had already ended by the time Warren's father arrived at the hospital. *See* ECF 20-20, PageID 6211; ECF 20-8, PageID 2894; ECF 20-10, PageID 3472 and PageID 3560<br><br>○ Keith discovered radio dispatch logs, which the state had represented were destroyed, that show no call from Nurse Foor to the Bucyrus Police Department.  ECF 1-26, PageID 200-204.  Keith also discovered a defense subpoena for those radio dispatch logs that had the words "Ignore For Now" written on top.  ECF 1-29, PageID 218.<br><br>• Warren initially told the police that he did not remember what the shooter was wearing, but then testified at trial that he was wearing gloves, a coat, and a turtleneck.  ECF 21-1, PageID 10053.<br><br>• The police provided Warren a photo lineup containing only six pictures, and Keith's pictures was the only one that can be described as depicting a large black man.  His photo was darker and framed much closer than all the other photos.  ECF 20-32, PageID 9623.<br><br>○ Memory experts presented the lineup to over 100 people and asked them to choose the big black guy—over 75% choose Keith's picture.  ECF 20-30, PageID 9415.<br><br>○ Neither Rodney Melton nor Bruce Melton were included in this lineup, despite the fact that Quanita had already identified the shooter as her daddy's friend Bruce.  ECF 21-1, PageID 10428-29. |

# Rebuttal to Warden's "Evidence of Guilt" Chart

| | |
|---|---|
| | o  Quanita was shown the same lineup and said that "none" of the pictures were of the man that shot them, and that the picture of Kevin was not the man she knew as Bruce.  ECF 21-1, PageID 10412-13.  Quanita had met Kevin previously, but Warren had not.<br>• Warren is Caucasian, and studies have shown that cross-racial identification is particularly suspect.  ECF 20-30, PageID 9392, 9412.<br><br>**Smathers**<br>• The first two times Smathers talked to the police, she said she could not recognize any "distinct features" of the person.  ECF 21-1, PageID 10078-79.  When asked whether she would recognize the man if she saw him again, she replied "I don't think so."  ECF 21-1, PageID 10085.<br>• When she spoke with police for a third time, about a month later and after she had already seen Kevin's face on television, she became 90% sure that Kevin was the person she had seen.  ECF 21-1, PageID 10079.<br>• Smathers' description of the car she saw does not match the car the state claimed Kevin used (see above).<br>• Smathers is caucasion, and studies have shown that cross-racial identification is particularly suspect.  ECF 20-30, PageID 9392. |
| **Bullets**<br>o  More than 20 bullets/casings found all fired from same gun<br>o  Casing found in front of where Keith picked up Zina Scott from work | • **Timing does not line up**<br>  o  The bullet casing was found outside the home of Fernelle Graham, who lived across from the GE plant.  Graham testified that it was "a quarter to ten" when she looked out her window and saw someone had thrown trash in front of her house.  ECF 21-1, PageID 10117-120 ("on the curb and on my sidewalk and out into the street").  According to Graham's testimony, the bullet was found in that trash.  ECF 21-1, PageID 10124.<br>  o  Zina Scott testified that Keith picked her up at the GE plant at 11 p.m.  ECF 21-1, PageID 10098.  This means the trash |

## Rebuttal to Warden's "Evidence of Guilt" Chart

|  |  |
|---|---|
|  | and bullet were supposedly on Graham's sidewalk an hour and fifteen minutes before Keith was even in the area.<br>o The Warden's counsel now claims that the bullet was not tied to the trash, but the same counsel at Kevin's clemency proceedings argued that the bullet and trash *were* connected—counsel offered a statement by a McDonalds employee that she had seen a man matching Kevin's description in the drive-thru, and that a McDonalds bag and wrappers were found at Graham's home. State's Clemency Br. at 14.<br>• **Call logs say McDonald's**<br>o Police dispatch call logs—the same ones showing no call from Nurse Foor—show that the bullet casing may have actually been found at a McDonald's over a mile away, not at Graham's home in front of the GE plant. ECF 1-26, PageID 202.<br>• **Demetrius Reeves**<br>o The father of the surviving children, Demetrius Reeves, also worked at the GE plant at the time. ECF 21-1, PageID 10400.<br>o Demetrius Reeves was friends with the Meltons, having went to school with them, and also assisted them in the Pharmacy Burglary Ring as a driver. ECF 21-1, PageID 10365, 10396-97.; ECF 20-20, PageID 6158.<br>o Demetrius Reeves threatened to kill his wife and his children because his wife was living with a white man, and he asked friends for money to get out of town because he killed his wife and kids. ECF 21-1, PageID 10300. Joyce Reeves, Demetrius' wife, testified that there was a large black man following her in a light colored car after the murder which caused her to fear for her safety. ECF 21-1, PageID 10440.<br>• **Rodney Melton**<br>o Rodney Melton appeared at the crime scene after the police arrived and revealed knowledge of the bullets. Melton knew the specific type of bullet involved (9mm) and told the police |

# Rebuttal to Warden's "Evidence of Guilt" Chart

| | |
|---|---|
| | that if the shooter used that type of bullet, he must have come in from Detroit.  ECF 21-1, PageID 10363-64. |
| **Snow Bank – License Plate**<br>  o  **Officers observations**<br>      ▪  Bumper and plate imprint visible to naked eye<br>      ▪  "043" visible to naked eye<br>      ▪  Placement/size indicated license plate<br>      ▪  Placement indicated numbers at end of plate not beginning<br>      ▪  Placement indicated plate on left side of bumper | **Snow Bank – License Plate**<br>  o  Rodney Melton's license plate also contains "043" and the color of his vehicle, unlike Kevin, actually matches the description of the vehicle.  ECF 21-1, PageID 10367, 10371.<br>  o  The Warden in her brief states that Agent Barnes "testified that, on the night of the murders, he saw the imprint of the numbers 'zero, 4, 3' in the snow.'"  ECF 26, PageID 10853.  But that is not so.  At trial, Barnes was shown a picture of the impression and asked what the picture "depicted," and Barnes described the picture as "showing" those three numbers.  ECF 21-1, PageID 10165.<br>  o  The Warden also cites the cast and the photographs submitted as trial exhibits, but those, if anything, undercut her claim that these numbers'—let alone the numbers' positioning on the plate—were "visible to the naked eye."  *See* PageID #: 9452-53, 9464-66.<br>  o  The other evidence the Warden cites (ECF 26, PageID 10853) was not submitted at trial, and therefore did not play into the weight the jury would have accorded Yezzo's testimony (see below).  ECF 20-31, PageID 9450-51. |
| **Snow Bank – Tire tread**<br>  o  **Officers observations**<br>      ▪  Found tire tracks leading to imprint of plate in snow<br>      ▪  Appeared similar to tires on car from visual observation | **Snow Bank – License Plate**<br>  o  Keith is unable to discern what the Warden means when she says that the tire tread at the scene "[a]ppeared similar to tires on car from visual observation."  ECF 26, PageID 10891.<br>  o  To the contrary, the state's own theory is that "the tread designs on the tires on the Oldsmobile were not consistent with the tread from the photographs or the plaster cast."  ECF 26, PageID 10858.<br>  o  To the extent the Warden means that the tire tracks appeared consistent with the brochure used by Yezzo, nowhere does the Warden show where that was put in front of the jury other than through Yezzo's testimony. ECF 20-1, PageID 572, 581-83. |

## Rebuttal to Warden's "Evidence of Guilt" Chart

| | |
|---|---|
| **Vehicle Located**<br>o Melanie Davison arrested for bringing drugs to Keith in jail in light colored '82 Omega<br>  ▪ Matches description given<br>  ▪ Plate on left side of front bumper<br>  ▪ No working dome/license plate light<br>  ▪ Hand print on door frame<br>  ▪ Plate on car ended in "043"<br>  ▪ Owner of car bought tires in Aug '93 and had about 3000 miles | **Vehicle Owned by Alton Davison**<br>o The vehicle owned by Alton Davison does not match the description given by Nancy Smathers, who said the car she had seen was a "white, cream, light yellow" two-door car.  The '82 Omega was a green four-door car.  ECF 21-1, PageID 10077, 10138-39, 10219.<br>o Rodney Melton's license plate also contains "043" and the color of his vehicle, unlike Kevin, actually matches the description of the vehicle.  ECF 21-1, PageID 10367, 10371.<br>o Yezzo's testimony regarding the placement of the numbers on the license plate is unreliable for the reasons explained below. |
| **Keith's Motive**<br>o Drug bust<br>  ▪ Victims related to CI who was involved in Keith's drug case and for which he was out on bond at the time of the aggravated murders<br>  ▪ Keith told victims before shot that brother should not have snitched | **Kevin Keith's motive**<br>• As a result of the drug raid, Keith was charged with selling what equaled to less than 3 grams of crack cocaine. The sentencing outcome of the others charged demonstrates that the harshest punishment he likely would have received would have been two years in prison. Ex. 1<br>• The only evidence of "Kevin" telling the victims that Rudel should not have snitched is Warren's testimony that the shooter made this statement before pulling the trigger, and his later identification of Kevin as the shooter, which, for the reasons explained above and in the brief, would carry little weight given the newly discovered evidence in this case.<br><br>**Rodney Melton's motive**<br>• Rodney Melton had a far stronger motive to kill Rudel Chatman.  Not only that, he professed an actual plan to do so.<br>• Rudel Chatman was also an informant in relation to the Meltons, and the Meltons knew this before the murders. ECF 20-26, PageID 7998, 7999, 8015, 8036-37.<br>• In the weeks preceding the murders, Rodney Melton expressed to multiple people that anyone who snitched on him would be killed. Rodney had told Yolanda Price before the murders that "if Rudel ever snitched on me, I'd kill him."  ECF 1-3, PageID 43. |

## Rebuttal to Warden's "Evidence of Guilt" Chart

|  |  |
|---|---|
|  | <ul><li>Rodney had also told a confidential police informant that "he had been paid $15,000 to cripple 'the man' who was responsible for the raids in Crestline, Ohio last week." ECF 20-20, PageID 6149.  Rudel Chatman was the man responsible for the Crestline drug raids on January 21, 1994.  ECF 21-1, PageID 10279-81, 10524.</li><li>After the murders, Rodney went to the hospital and told a member of the victims' family, Tom Chatman, that the shooting happened because Rudel Chatman had been "setting people up." ECF 21-1, PageID 10443.</li></ul> |
| **MICHELLE YEZZO TESTIMONY**<br><br><ul><li>Testimony provided by deposition read into the record due to her unavailability for trial because out of state at a conference</li><li>**Plate**<ul><li>Bumper and plate on Omega consistent with impression in snow **(duplicative)**</li><li>Identified numbers "043" in snow bank **(duplicative)**</li><li>Plate similarly oriented on car as impression found in snow **(duplicative)**</li></ul></li><li>**Tires**<ul><li>Tires on Omega were not consistent with tire tracks at scene</li><li>Tire tracks consistent with make/model of tires owner bought in Aug '93</li><li>Tires on car were not the same model owner put on the car in Aug '93<ul><li>Not professionally balanced</li><li>Not manufactured until after Aug '93</li><li>Still had rubber nodules on tires indicating new tires with few miles</li></ul></li></ul></li></ul> | **Yezzo:**<ul><li>Yezzo was permitted to testify via deposition because she was a "material" witness. (Ohio Crim. R. 15(A).</li><li>Yezzo is an unreliable witness.  The consensus among her colleagues was that "[h]er findings and conclusions regarding evidence may be suspect.  [And s]he will stretch the truth to satisfy a department."  This was in a memorandum from 1989, *before* Kevin's trial.  ECF 1-13, PageID 138.</li><li>In the notes detailing the investigation of Yezzo for "threatening co-workers and failure of good behavior," ECF 20-26, PageID 7910, it was noted that Yezzo had a "reputation of giving dept. answer wants if stroke her." ECF 20-26, PageID 7496-98, 7510.  In the same notes, it was recorded that the analysts reworking Yezzo's cases questioned Yezzo's conclusions on a blood analysis and a partial footprint analysis.  This documentation, again, is dated *before* Kevin's trial.  ECF 12, PageID 161.</li><li>A reprimand in Yezzo's personal file revealed that Yezzo's "interpretational and observational errors" were "failures that could lead to a substantial miscarriage of justice."  ECF 20-26, PageID 7905.</li><li>Yezzo was biased.  Not only was Yezzo both verbally and physically abusive to her coworkers, Yezzo's documented use of racial slurs ("nigger bitch," "nigger in a woodpile") when addressing an African-American co-worker in a professional environment is strong evidence of her bias.  ECF 20-26, PageID 7914-15, 7917, 7919.</li></ul> |

# Rebuttal to Warden's "Evidence of Guilt" Chart

|  |  |
|---|---|
|  | • Lee Fisher—the Ohio Attorney General at the time of Kevin's trial—would not have "permitted Ms. Yezzo to provide testimony against Kevin Keith" had he been aware of the information about her that was in her personnel file.  ECF 20-26, Page ID 7889. He expressed his belief that "Yezzo's opinions were very likely wrong and that the prejudice in [Keith's] case is very significant."  ECF 20-26, PageID 7889.  Mr. Fisher was "deeply concerned that Ms. Yezzo's conclusions and testimony led to a miscarriage of justice in Mr. Keith's case."  ECF 20-26, PageID 7889. |
|  | **Plate:** |
|  | • Rodney Melton's license plate also contains "043" and the color of his vehicle, unlike Kevin, actually matches the description of the vehicle.  ECF 21-1, PageID 10367, 10371. |
|  | • Report by William J. Bodziak (expert in forensics) challenges Yezzo's process and conclusions. |
|  |     o  Bodziak concludes that there was no evidence of any numeral "3."  ECF 20-26, PageID 7893. |
|  |     o  Bodziak also concludes that there was no way of knowing where the "4" and the "0" appeared on the license plate because no reference areas appear on the photographs, which were the only things Yezzo examined.  ECF 20-26, PageID 7893. |
|  |     o  Bodziak also concludes that the bumper impressions in the snow bank were not consistent with the profile of the front of the Omega.  ECF 20-26, PageID 7891. |
|  | **Tires:** |
|  | • Yezzo never actually examined the tires, she rendered her conclusions based off a brochure.  ECF 20-1, PageID 580 and ECF 20-31, PageID 9450. |
|  | • Yezzo rendered her conclusions after receiving input from Bucyrus Police Captain Michael Corwin.  ECF 1-23, PageID 181-86 and ECF 20-1, PageID 572, 581-83. |

Rebuttal to Warden's "Evidence of Guilt" Chart

|  |  |
|---|---|
|  | <ul><li>o Captain Corwin faxed Yezzo a receipt for the type of tires purchased by Alton Davison (the owner of the Omega) the previous year and put on his car, and he also sent her a brochure picture of the tires.  ECF 1-23, PageID 181-86 and ECF 20-26, PageID 7924-26.</li><li>o Corwin specifically pointed out to Yezzo which tire picture in the brochure was the tire previously put on the car.  Corwin wrote a note to Yezzo that he "hope[d] this will do the trick for us."  ECF 1-23, PageID 186.  Five days later, Yezzo rendered her conclusion—based upon the brochure pictures of tires—that the tires formerly on Davison's car were similar in tread design to the tire tracks at the scene.  ECF 20-1, PageID 572, 581.</li></ul><ul><li>As for the evidence that the tires were changed on the Omega, Melanie Davison (the granddaughter of the car owner) provided a sworn statement that she changed the tires because they were slashed.  If Melanie had gone through the trouble of changing the tires to avoid the tire evidence, she surely would have also gotten rid of the license plate, since it was widely publicized that the car had left a license plate impression at the scene  Ex. .9</li></ul>**Not Duplicative:**<ul><li>A forensic expert's testimony that purportedly scientific techniques proved the numbers—and the spacing of those numbers—in a license plate imprint is not duplicative of a lay officer's testimony that a picture shows those numbers (see above).  It goes without saying that expert testimony holds particular sway over juries, which no doubt is why the state offered and relied on Yezzo's testimony at trial.</li></ul> |