# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **KEVIN KEITH,** | : | |
| | : | |
| **Petitioner,** | : | **CASE NO.  1:18-cv-634** |
| | : | |
| **v.** | : | |
| | : | **Judge Solomon Oliver, Jr.** |
| **LYNEAL WAINWRIGHT, WARDEN** | : | |
| | : | **Magistrate Judge James R. Knepp, II** |
| **Respondent.** | : | |

---

## WARDEN'S SUR-REPLY TO KEITH'S TRAVERSE (ECF.28) TO HIS SUCCESSIVE HABEAS PETITION (ECF.1)

---

The Warden respectfully submits a Sur-Reply consistent with this Court's case management order. Order, ECF.19, PAGEID#:365. For the reasons contained in the attached memorandum, and in the previously filed Return of Writ (ECF.26), Keith's Successive Habeas Petition (ECF.1) must be denied.

Respectfully submitted,

**DAVE YOST**
**Ohio Attorney General**

*/s/ Brenda S. Leikala*

**Brenda S. Leikala (0072635)**
Senior Assistant Attorney General
Criminal Justice Section, Capital Crimes Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-3428
(614) 995-1930; (877) 469-0567 (Facsimile)
Brenda.Leikala@ohioattorneygeneral.gov
**COUNSEL FOR RESPONDENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................iii

SUMMARY ...................................................................................................................1

SUR-REPLY .................................................................................................................4

I.    Keith misstates the applicable law relative to successive petitions......................4

   A.   Diligence under §2244(b)(2)(B)(i)............................................................7

   B.   Actual innocence under §2244(b)(2)(B)(ii) ...............................................9

II.    Keith continues to mischaracterize and misstate the trial evidence. ...................11

   A.   Speedy trial.............................................................................................12

   B.   Description of the getaway vehicle. .........................................................12

   C.   The imprints in the snow.........................................................................15

       1.   License Plate ............................................................................ 15

       2.   Tires ....................................................................................... 18

   D.   Forensic evidence, both *implicating* and tending to *exclude* Keith, provided by Yezzo. ...................................................................................................21

   E.   Richard Warren's identification of Keith, the "nurse controversies," and the calls to the Bucyrus Police Department. .................................................................22

       1.   Warren's identification of Keith ................................................ 22

       2.   Nurse Amy and Nurse Foor controversies and calls to the police department.............. 23

   F.   Shell casing found by Graham. ................................................................24

   G.   Keith's "alibi" and alternate-suspect theories. ........................................26

III.   Keith's overstates the impact of Yezzo's personnel file and the post-it note reference on the subpoena he issued at the time of trial............................................................ 28

   A.   Yezzo's personnel file.............................................................................28

   B.   Subpoena with note .................................................................................30

   C.   Prior allegations......................................................................................31

IV.   Even with the allegedly improperly suppressed evidence, Keith still cannot show by clear and convincing evidence, in light of the evidence as a whole, that no reasonable juror would have convicted him..................................................................................... 32

V.    Alternate defenses. .......................................................................................... 36

VI.   Conclusion ...................................................................................................... 36

CERTIFICATE OF SERVICE ..................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atkins v. Chappell*,
No. CV 13-9576 PA(SS), 2016 U.S. Dist. LEXIS 23306 (C.D. Cal. Jan. 22,
2016) ...................................................................................................................7

*Benchoff v. Colleran*,
404 F.3d 812 (3d Cir. 2005) ...............................................................................5

*Bennett v. United States*,
119 F.3d 468 (7th Cir. 1997) ...............................................................................5

*Calderon v. Thompson*,
523 U.S. 538 (1998) ..............................................................................10, 32, 33

*Caldwell v. Lafler*,
No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 117863 (W.D. Mich. Mar. 7, 2008) ......................9

*Caldwell v. Lafler*,
No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 25364 (W.D. Mich. Mar. 31, 2008) ................9, 33

*Case v. Hatch*,
731 F.3d 1015 (10th Cir. 2013) ................................................................... *passim*

*Davis v. Bradshaw*,
No. 1:14-cv-2854, 2016 U.S. Dist. LEXIS 184081 (N.D. Ohio June 16, 2016) ............ *passim*

*In re Elliot*,
No. 17-1496, 2017 U.S. App. LEXIS 22314 (6th Cir. Nov. 7, 2017) ...................................34

*Gonzalez v. Thaler*,
132 S. Ct. 641 (2012) ...........................................................................................4

*In re Herrington*,
No. 17-3194, 2017 U.S. App. LEXIS 20008 (6th Cir. Oct. 12, 2017) ...................................8

*Jaffal v. Bradshaw*,
No. 1:11CV1549, 2013 WL 3337404 (N.D. Ohio Jul. 2, 2013) .........................................2, 29

*Johnson v. Dretke*,
442 F.3d 901 (5th Cir. 2006) ...............................................................................7

*Keith v. Bobby*,
551 F.3d 555 (6th Cir. 2009) .............................................................................32

*Keith v. Mitchell*,
    455 F.3d 662 (6th Cir. 2006) ................................................................27, 32

*Lott v. Bagley*,
    No. 1:04-cv-822, 2007 U.S. Dist. LEXIS 91762 (N.D. Ohio Sept. 28, 2007) ................6, 7, 9

*Marsh v. Bradshaw*,
    No. 4:14CV2206, 2017 WL 68514 (N.D. Ohio Jan. 6, 2017) ...........................................2, 29

*Morris v. Carlton*,
    No. 1:04-cv-247, 2006 U.S. Dist. LEXIS 65443 (E.D. Tenn. Sep. 13, 2006).....................6, 7

*Nouri v. McQuiggin*,
    535 F. App'x 513 (6th Cir. 2013) ......................................................................2, 29

*Palmer v. Bagley*,
    No. 1:00-cv-882, 2005 WL 3965400 (S.D. Ohio Dec. 16, 2005)....................................2, 29

*Panetti v. Quarterman*,
    551 U.S. 930 (2007).........................................................................................4, 6

*Schlup v. Delo*,
    513 U.S. 298 (1995).........................................................................................9, 10

*Smith v. Bagley*,
    No. 1:00CV1961, 2014 WL 1340066 (N.D. Ohio Apr. 3, 2014) ....................................2, 29

*Souter v. Jones*,
    395 F.3d 577 (6th Cir. 2005) ...........................................................................10, 33

*Swearingen v. Thaler*,
    No. H-09-300, 2009 U.S. Dist. LEXIS 108058 (S.D. Tex. Nov. 18, 2009) ............................7

*In re Swearingen*,
    556 F.3d 344 (5th Cir. 2009) .................................................................................5

*Tyler v. Mitchell*,
    416 F.3d 500 (6th Cir. 2005) ...........................................................................2, 29

*Vinson v. Jackson*,
    No. 16-2760, 2017 U.S. App. LEXIS 25141 (6th Cir. Dec. 13, 2017).................................5, 8

*Welch v. Lazaroff*,
    No. 1:14CV2328, 2016 WL 1367894 (N.D. Ohio Feb. 10, 2016) ....................................2, 29

*In re Whittaker*,
    No. 17-2135, 2018 U.S. App. LEXIS 4804 (6th Cir. Feb. 26, 2018) ....................................33

*In re Williams*,
  330 F.3d 277 (4th Cir. 2003) ................................................................5

**Statutes**

28 U.S.C. §2244(b) ..................................................................... *passim*

28 U.S.C. §2254...............................................................................4, 6

Ohio Rev. Code §2945.71...............................................................12

**Other Authorities**

Keith Clemency Report (Aug. 19, 2010), publicly available at
  https://www.drc.ohio.gov/Portals/0/Clemency/clemency_keithaug2010.pdf?ve
  r=2016-11-04-085148-970 (last accessed March 22, 2019)..................................................35

## SUMMARY

The Warden makes only a limited response to the claims in Keith's Traverse. For any claim or argument which the Warden makes no additional argument in this pleading, the Warden relies entirely on the previous arguments already made in the Return of Writ (ECF.26). The Warden's silence in this pleading on any claim, subclaim, or argument should not be viewed as a concession as to any point; rather this pleading is meant only to respond to certain limited arguments to which the Warden believes a response would be beneficial to the Court. Additionally, for any claim, subclaim, or argument for which the Warden makes only limited additional arguments, the Warden incorporates the arguments contained in the Return of Writ as if fully rewritten herein.

While the Warden appreciates the passion and the advocacy of Keith's attorneys, counsel still has a duty to the Court to accurately state, summarize, and quote the record. The Warden believes Keith's counsel has not always done so. The two most egregious examples of this are contained in the same paragraph in the chart attached to Keith's traverse wherein Keith asserts:

> Demetrius Reeves threatened to kill his wife and his children because his wife was living with a white man, and he asked friends for money to get out of town because he killed his wife and kids. ECF 21-1, PageID 10300. Joyce Reeves, Demetrius' wife, testified that there was a large black man following her in a light colored car after the murder which caused her to fear for her safety. ECF 21-1, PageID 10440.

Traverse, ECF.28, PAGEID#:11025. However, the statement about Demetrius Reeves (and the citation Keith includes as reference) is *not* to testimony, but rather to the *opening statement* of Defense Counsel James Banks. Opening Stmt., Tr.T., ECF.21-1, PAGEID#:10300. In fact, when Attorney Banks asked Demetrius about that alleged matter on direct examination Demetrius *denied* he ever threatened to kill his wife and children and *denied* he requested money to flee town because he had murdered his wife and children. *See* Demetrius Testimony, Tr.T., ECF.21-

1

1, PAGEID#:10398. And the statement about Joyce Reeves *testifying* she was afraid for her safety because she was being followed is patently false. Joyce never was asked, nor did she offer any such testimony. *See* Joyce Testimony, Tr.T., ECF.21-1, PAGEID#:10284-287. In fact, Defense Counsel did not ask Joyce *any* questions at all. *See id.* Rather, the page citation Keith gives, and the only testimony regarding any allegation that Joyce was fearful for her safety, came from Captain Corwin testifying about hearsay statements he received. *See* Corwin Testimony, Tr.T., ECF.21-1, PAGEID#:10440. Other examples of mischaracterizations of the record are noted throughout this Sur-Reply and in the chart at the end of this document.

Additionally, the Warden takes issue with Keith submitting new evidence in support of his petition via attachments to his traverse. Arguments raised for the first time in a traverse are not properly raised. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("Because [this] argument was first presented in Tyler's traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining address it."); *see also Nouri v. McQuiggin*, 535 F. App'x 513, 514 (6th Cir. 2013) (district court properly declined to address petitioner's claim because he failed to raise the issue in his habeas petition or seek leave to amend the petition to include the claim) (per curiam); *Marsh v. Bradshaw*, No. 4:14CV2206, 2017 WL 68514, at n.2 (N.D. Ohio Jan. 6, 2017); *Welch v. Lazaroff*, No. 1:14CV2328, 2016 WL 1367894, at *6 (N.D. Ohio Feb. 10, 2016); *Smith v. Bagley*, No. 1:00CV1961, 2014 WL 1340066, at n.15 (N.D. Ohio Apr. 3, 2014); *Jaffal v. Bradshaw*, No. 1:11CV1549, 2013 WL 3337404, at n.8 (N.D. Ohio Jul. 2, 2013); *Palmer v. Bagley*, No. 1:00-cv-882, 2005 WL 3965400, at *8 (S.D. Ohio Dec. 16, 2005) ("A traverse, however, is not the proper vehicle in which to raise new claims or sub-claims in habeas corpus."), *report and*

*recommendation adopted,* 2006 WL 1027733 (S.D. Ohio Apr. 17, 2006). As such, the attachments to his traverse are not properly before the Court and should be disregarded.

The Warden takes particular offense to the following:

1) the affidavits of Keith's attorneys, Troutman and Swisher, which should be disregarded entirely, as they teeter on the edge of making counsel fact-witnesses in his case. Swisher Aff't, ECF.28-8, PAGEID#:11134-138; Troutman Corrected Aff't, ECF.29-1, PAGEID#:11166-242;

2) The May 6, 2019 affidavit of former-Governor Strickland, attempting to relay his completely irrelevant belief that he had doubts of Keith's guilt is belied by the attachment of the newspaper article to the affidavit wherein the former-Governor is quoted as saying "Mr. Keith's conviction has been repeatedly reviewed and upheld by Ohio and federal courts at the trial and appellate level. The Ohio Parole Board recommended against clemency in this case. There is evidence which links him to the crimes that, while circumstantial, is not otherwise well explained. ***It is my view, after a thorough review of the information and evidence available to me at this time, that it is far more likely that Mr. Keith committed these murders than it is likely he did not.***"[1] Strickland Aff't, ECF.28-5, PAGEID#:11070-072;

3) The entirely new "expert report" of Dr. Sunita Sah, which was never presented to the state courts and which Keith offers as "proof" that the hearsay-within-hearsay statements contained in Yezzo's personnel file indicate that her forensic analysis was flawed. Sah Rpt., ECF.28-7, PAGEID#:11104-133; and

4) The never-before-presented September 24, 2010 sworn statement of Keith's girlfriend, Melanie Davison (the same person arrested in the getaway car after conveying drugs to Keith at the jail). Davison Stmt, ECF.28-9, PAGEID#:11140-163.[2]

Keith cannot circumvent the proper-filing of his claims, allegations, and arguments at his leisure, and this Court should decline to permit such disregard for the pleading rules.

---

[1] This same statement is also attached as a press release to Swisher's affidavit. *See* Swisher Aff't, ECF.28-8, PAGEID#:11138-139.

[2] Interestingly, Keith has had this statement since September 2010, yet he never presented this to the state courts and did not attach it to his petition.

### SUR-REPLY

**I.      Keith misstates the applicable law relative to successive petitions.**

Despite Keith's contention otherwise, his successive petition must be dismissed because he has failed to show that his claims satisfy the stringent requirements of §2244(b).

"The filing of a second or successive §2254 application is tightly constrained by the provisions of AEDPA. Congress expressly established a two-step 'gate-keeping' mechanism for the consideration of second or successive habeas corpus applications in federal courts." *Case v. Hatch*, 731 F.3d 1015, 1026 (10th Cir. 2013). First, the petitioner must "move in the appropriate court of appeals for an order authorizing the district court to consider the application." §2244(b)(3)(A). If the court of appeals finds that the petitioner has made "a *prima facie* showing" that the application satisfies the requirements of §2244(b), the petitioner may attempt to pass through the second gate, and proceed with the claim in the district court. §2244(b)(3)(C). Thus, the "second gate" of §2244's gate-keeping requirements is that ***the district court must independently review*** "the proffered evidence, and 'shall dismiss any claim ... that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of [§2244(b)].'" *Case*, 731 F.3d at 1027 (quoting §2244(b)(4)). ***The two-part gate-keeping requirements of §2244(b) are jurisdictional*** and must be considered prior to the merits of a successive §2254 petition. *Panetti v. Quarterman*, 551 U.S. 930, 942-47 (2007); *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006)).

Section 2244(b)(2) provides that a successive habeas corpus application "shall be dismissed" unless the gate-keeping requirements of the statute are met. Though the Sixth Circuit determined Keith made a "*prima facie* showing" under §2244(b)(3)(C), he still must pass through the second gate where this Court, aided by all the evidence now available, must

4

determine whether Keith did, in fact, satisfy the requirements of §2244(b). *Vinson v. Jackson*, No. 16-2760, 2017 U.S. App. LEXIS 25141, at *7 (6th Cir. Dec. 13, 2017) (citing *In re McDonald*, 514 F.3d 539, 544 (6th Cir. 2008) and *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004)) ("The *prima facie* determination, however, is not a full-throated review—it only requires us to determine that the allegations 'warrant a fuller exploration in the district court.'"). *See also Case*, 731 F.3d at 1030-32 (citing *LaFevers v. Gibson*, 238 F.3d 1263, 1265 (10th Cir. 2001)); *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997); *In re Swearingen,* 556 F.3d 344, 347 (5th Cir. 2009) ("[B]efore addressing the merits of the successive petition, the district court must independently determine whether the petition actually satisfies the stringent §2244(b)(2) requirements."); *Benchoff v. Colleran*, 404 F.3d 812, 816 (3d Cir. 2005) ("Unless both the procedural and substantive requirements of §2244 are met, the District Court lacks authority to consider the merits of the petition."); *In re Williams*, 330 F.3d 277, 281-82 (4th Cir. 2003) ("[T]he §2244(b) inquiry must be resolved before the district court may consider the merits of a claim within a successive application."); *see also* 28 U.S.C. §2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirement of this section.").

The fact that the Sixth Circuit found Keith made "a *prima facie* showing" that his petition met the stringent requirements of §2244(b) ***does not bind this Court***. §2244(b)(4). Keith misleads this Court when he implies that, because the Sixth Circuit had before it a more detailed account in which to make a *prima facie* showing than in a "normal" request for a successive petition, its *prima facie* determination somehow elevates to a determination which negates this Court's duty to separately determine, in light of the *entire record* (which was *not* before the

5

Sixth Circuit and has been filed in the *extensive* 9,303-page appendix to the Return of Writ (ECF.20) and 1,090 pages of trial transcripts (ECF.21))[3], whether Keith has indeed met §2244(b)'s stringent requirements. *See, e.g.,* Traverse, ECF.28, PAGEID#:10907. The fact remains, this Court **must** "dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed **unless** the applicant shows that the claim satisfies the requirements of this section." §2244(b)(4) (emphasis added).

As explained in detail in the Warden's Return of Writ (ECF.26), before this Court may proceed to evaluate Keith's *Brady* claims and any defenses against them, Keith **must** satisfy the above-described two-pronged jurisdictional test. *See Panetti*, 551 U.S. at 942-47 (finding §2244's gate-keeping requirements to be jurisdictional in nature which must be considered prior to the merits of a §2254 petition); *Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 U.S. Dist. LEXIS 184081 at *49 (N.D. Ohio June 16, 2016); *Lott v. Bagley*, No. 1:04-cv-822, 2007 U.S. Dist. LEXIS 91762 at *39-40 (N.D. Ohio Sept. 28, 2007) (O'Malley, J.); *Morris v. Carlton*, No. 1:04-cv-247, 2006 U.S. Dist. LEXIS 65443 at *14-15 (E.D. Tenn. Sep. 13, 2006). In order to do so, Keith must meet the following requirements: **First**, Keith must show diligence; *i.e.*, that "the factual predicate for his claim **could not have been discovered previously through the exercise of due diligence**." §2244(b)(2)(B)(i) (emphasis added); s*ee also Davis* at *49; *Lott*, 2007 U.S. Dist. LEXIS 91762 at *39-40; *Morris* at *14-15. **Second**, Keith must show that "*the facts underlying the claim*, if proven and viewed in light of the evidence as a whole, *would be sufficient to establish **by clear and convincing evidence*** that, but for constitutional error, ***no***

---

[3] Keith falsely contends the Sixth Circuit had "nearly all of the record before it" when it made its *prima facie* determination. *See*, Traverse, ECF.28, PAGEID#:10907. Rather, the Sixth Circuit had only those parts of the record *Keith felt supported his allegations* of State wrong-doing. This Court, *unlike* the Sixth Circuit, has the *complete record* which includes such items as the trial transcripts, the *police reports*, and trial exhibits (including the written statement of Nancy Smathers taken the day after the murders). *See* ROW Apx., ECF.20; Tr.Trans, ECF.21.

*reasonable factfinder would have found the applicant guilty* of the underlying offense." §2244(b)(2)(B)(ii) (emphasis added). *See also Davis* at *49; *Lott*, 2007 U.S. D'[ist. LEXIS 91762 at *39-40; *Morris* at *14-15.

Keith must satisfy *both* prongs in order to satisfy §2244(b)(2)(B) and to have this Court even reach the question of procedural defenses or the merits of the claims.

### A.    Diligence under §2244(b)(2)(B)(i)

In order to proceed on his successive petition, Keith *must* establish he meets the diligence component of §2244(b)(2)(B)(i). Diligence for the purposes of proceeding on a successive petition is an *objective* standard. *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006) ("[T]he plain text of §2244(b)(2)(B) suggests that due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record."); *see also Atkins v. Chappell*, No. CV 13-9576 PA(SS), 2016 U.S. Dist. LEXIS 23306 at *14 (C.D. Cal. Jan. 22, 2016) (quoting *Johnson* at 908). The statute "asks whether diligent efforts *could have* uncovered the factual basis for claims 'previously'." *Swearingen v. Thaler*, No. H-09-300, 2009 U.S. Dist. LEXIS 108058 at *35 (S.D. Tex. Nov. 18, 2009) (emphasis added). Thus, the test "looks at whether the inmate *could have and should have uncovered and advanced his claims* in his first federal habeas case *not* whether he "acted with alacrity and ardor." *Id.* (emphasis added). Therefore, the relevant question is whether the "new" evidence *could have been discovered* with the exercise of due diligence, not whether Keith was *prevented* from discovering it earlier than he did. *Johnson* at 908-10. As such, the diligence requirement for §2244(b)(2)(B)(i) is distinctly different than the subjective diligence standard required to prevail on a *Brady* claim. *Id.* Keith incorrectly suggests otherwise.

Under this *objective* standard, both of Keith's claims fail.

As detailed in the Warden's Return of Writ, Keith's claim regarding Yezzo's personnel file naturally concedes the file (or parts thereof) was in existence at the time of his trial, and *it is Keith's burden* to show that it was impossible to discover the file with the exercise of due diligence. §2244(b)(2)(B)(i). Keith fails to show the requisite diligence—that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence"—to have his petition proceed. *See Vinson*, 2017 U.S. App. LEXIS 25141 at *8 (finding a lack of diligence when facts relied upon for successive petition were discoverable at the time of trial); *In re Herrington*, No. 17-3194, 2017 U.S. App. LEXIS 20008 at *4 (6th Cir. Oct. 12, 2017) (finding lack of diligence when facts were available both when petitioner filed his initial habeas action and at the time of trial).[4]

As to Keith's claim regarding the "ignored subpoena," as the Warden explained in detail in the Return of Writ, Keith has not shown that the factual predicate of his "police department subpoena claim" could not have been discovered previously with diligence. Clearly, as Keith was the party issuing the subpoena for dispatch and call logs, the fact that he never received those requested documents was obviously known to him. Moreover, a review of the trial transcripts reveals that Keith did not bring to the trial court's attention the fact that the subpoena he issued had not been fulfilled, nor did he question any of the officers if they brought the logs to trial in compliance with his subpoena. Because Keith had to know at the time of trial that the police did not comply with his subpoena, he fails to show that "the factual predicate for his claim

---

[4] Keith asserts this Court should not follow *Vinson* or *Herrington* because the Sixth Circuit in those cases declined to grant the petitioners leave to file a successive petition based on the lack of diligence when the facts were discoverable at the time of trial, whereas in his case, the Sixth Circuit granted leave to file a successive petition. The difference in procedural posture does not change the legal significance when this Court is required by the statute to ***independently review*** "the proffered evidence, and 'shall dismiss any claim ... that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of [§2244(b)].'" *Case*, 731 F.3d at 1027 (quoting §2244(b)(4)).

*could not have been discovered previously* through the exercise of due diligence," so his successive petition cannot proceed. Additionally, Keith never presented this claim to the state courts.

### B. Actual innocence under §2244(b)(2)(B)(ii)

Even if Keith could satisfy the diligence requirement of §2244(b)(2)(B)(i), Keith fails to satisfy the "actual innocence" prong of §2244(b)(2)(B)(ii).

As the Warden extensively explained in the Return of Writ, "[t]he threshold articulated in §2244(b)(2)(B)(ii) has been described as an 'actual innocence' standard." *Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 U.S. Dist. LEXIS 184081 at *49-50 (N.D. Ohio June 16, 2016) (Vecchiarelli, MJ.), *adopted by*, 2017 U.S. Dist. LEXIS 21452 (N.D. Ohio Feb. 15, 2017) (Boyko, J.); *Caldwell v. Lafler*, No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 25364 at *2 (W.D. Mich. Mar. 31, 2008); *Lott*, 2007 U.S. Dist. LEXIS 91762 at *14; *see also Case,* 731 F.3d at 1031-32 (noting that "[t]his standard has been described as a 'strict form of innocence'") (quoting 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure §28.3[e], at 1628-29 (6th ed. 2011)).

In the arena of habeas corpus, there exists two distinctly different "actual innocent" standards: the more lenient standard under *Schlup v. Delo*, 513 U.S. 298, 317 (1995), in which a petitioner must demonstrate that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt; and the more stringent standard under §2244(b)(B)(ii) requiring a petitioner to establish by *clear and convincing* evidence that, *but for constitutional error*, no reasonable factfinder would have found him guilty. *See Davis*, 2016 U.S. Dist. LEXIS 184081 at *50-52; *Caldwell v. Lafler*, No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 117863 at *8-10 (W.D. Mich. Mar. 7, 2008); *Lott*, 2007 U.S. Dist. LEXIS 91762 at *41 (noting

that those courts that "have opined on this statutory requirement [*i.e.,* §2244(b)(2)(B)(ii)] have held that it is more stringent than the actual innocence standard set forth in *Schlup*.").

In *Calderon v. Thompson*, 523 U.S. 538, 558 (1998), the Supreme Court interpreted the §2244(b)(2)(B)(ii) standard as requiring a petitioner to demonstrate by clear and convincing evidence that he is *actually innocent* of the crimes for which he was convicted. *Calderon*, 523 U.S. at 558 ("a federal court can consider a claim presented in a second or successive application *only if the prisoner shows*, among other things, that *the facts underlying the claim* ***establish his innocence by clear and convincing evidence***") (emphasis added). Moreover, "actual innocence means ***factual innocence***, ***not mere legal insufficiency***." *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998) (emphasis added). Keith's contention that he need not show he is factually innocent of the crime completely ignores the clear holding of the Supreme Court in *Calderon v. Thompson*. In fact, Keith fails to even cite to this controlling authority in his Traverse which arguably he had a duty to bring to the Court's attention.

Under this more exacting actual innocence standard of §2244(b)(2)(B)(ii), the Court must "consider the body of evidence presented at trial, 'add back' the evidence kept from the jury as the result of constitutional error, and then determine whether the evidence 'is clear and convincing, in light of the evidence as a whole, that no reasonable factfinder would have found [petitioner] guilty' but for the violation." *Davis*, 2016 U.S. Dist. LEXIS 184081 at *52 (quoting *Bell v. Tibbals*, No. 1:09-cv-1887, 2013 U.S. Dist. LEXIS 42485 at *12 (N.D. Ohio Mar. 26, 2013) (Gaughan, J.)) (citations omitted). As explained by the Tenth Circuit, "the analysis proceeds in three steps: (1) we start with the body of evidence produced at trial, (2) add 'evidence allegedly kept from the jury due to an alleged [constitutional] violation,' *Sawyer* [*v.*

10

*Whitley*], 505 U.S. at 349, 112 S.Ct. 2514, and (3) determine whether it is 'clear and convincing,' 'in light of the evidence as a whole,' that 'no reasonable factfinder would have' convicted [petitioner]." *Case*, 731 F.3d at 1033.

This Court's task, therefore, is "to look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the constitutional violations] and then make a probabilistic determination about what reasonable, properly instructed jurors would do." *Davis*, 2016 U.S. Dist. LEXIS 184081 at *53 (quoting *Bell*, 2013 U.S. Dist. LEXIS 42485 at *12 (citing *House v. Bell*, 547 U.S. 518, 538 (2006))). "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* As the Warden already extensively explained, Keith cannot meet the stringent actual innocence standard of §2244(b)(2)(B)(ii).[5]

## II.  Keith continues to mischaracterize and misstate the trial evidence.[6]

Step one in the §2244(b)(2)(B)(ii) analysis is the evidence produced at trial. Despite being repeatedly called-out on his misrepresentations, Keith persists in his endeavor to mischaracterize and misstate the testimony, police reports, and physical evidence which led police to Keith as the perpetrator and which was placed before the jury.

---

[5] The Warden does not reprint the complete analysis of the three-step process which this Court must conduct. Rather, the Warden relies on the content contained in the Return of Writ. *See* Return, ECF.26, PAGEID#:10845-10867.

[6] The Warden will not repeat here the thorough analysis of the facts which has already been presented to the Court in the Return of Writ. *See* Return, ECF.26, PAGEID#:10845-861. Rather, the Warden addresses only those points which the Warden believes additional argument will assist the Court's analysis. For any factual allegation made by Keith which the Warden does not specifically address here, the Warden does not concede Keith's version is accurate, but rather incorporates as if fully rewritten herein the full factual analysis contained in the Return of Writ.

11

### A.  Speedy trial.

As an initial matter, Keith implies in his traverse that the government rushed to begin his trial "[l]ess then three months after the shootings[.]" Traverse, ECF.28, PAGEID#:10911. What Keith fails mention is that Keith caused the prosecution to bring him to trial quickly by not waiving his statutory right to a speedy trial; as such, the State *was required* by Ohio law to begin his trial within 90 days of his arrest. *See* Ohio Rev. Code §2945.71(C), (E) (mandating a person charged with a felony be brought to trial within 120 days, but that each day a defendant is incarcerated pre-trial counts as three days, thereby requiring an incarcerated defendant to be tried within 90 days of the arrest). Therefore, the speed with which Keith was brought to trial was entirely due to Keith's enforcement of his rights, and was not because the State was looking to railroad him, as Keith seems to imply.

### B.  Description of the getaway vehicle.

In his traverse, as he has done throughout his case, Keith again attacks Smathers' description of the car she saw Keith get stuck in the snow before fleeing the scene of the murders. Keith's counsel continually tout Smathers' testimony that the car was white, cream, or a light colored car as support that it was not the Omega that Smathers saw and that the police impounded the Omega despite it not matching Smathers' description. However, Keith's same counsel in 2007 recognized that Smathers told officers immediately following the murders that she had seen a "yellow, green, or blue car." *See* Jun. 27, 2007 Appellant Reply Br., ROW Apx., ECF.20-18,  PAGEID#:5703;  July  20,  2007  App.  to  Reopen,  ROW  Apx.,  ECF.20-18, PAGEID#:5782; Aug. 1, 2007 Mtn. New Trial, ECF.20-21, PAGEID#:6298. Even Keith, in a *pro se* filing, acknowledged Smathers told the police the car was yellow, green, or blue. *See* Apr.

3, 2012 *Pro se* Mtn. New Trial, ROW Apx., ECF.20-25, PAGEID#:7587. Thereafter, Keith seems to ignore the description of the car Smathers gave immediately after the murders.

The record shows that the day after the murders Smathers gave officers a written statement regarding the events of the night before. *See* Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651. In that statement, which Keith's defense attorney placed into evidence for the jury to read, Smathers advised police that the car she had seen was a mid-size "*crème color, real light, green, yellow or blue, light color car.*" Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651 (emphasis added); Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6216.

Smathers also described other features of the car she saw besides the color. While it is true that Smathers did not use the words "the dome light was burned out" in her trial testimony, *see* Tr.T., ECF.21-1, PAGEID#:10071, she did tell officers in her written statement the day after the murders that "*the dome light was burnt out, when the door was open it wasn't on.*" Smathers Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9652 (emphasis added); Koepke Rpt., p.3, 12, ROW Apx., ECF.20-20, PAGEID#:6207, 6216; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622. Smathers told officers that the vehicle she saw had no working license plate light. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6206. Smathers described the car's taillights as "rectangular[,] I think two with a round one in the middle." Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9652; Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6216. Smathers told officers that the vehicle she saw had a back window which was mostly vertical and not slanted. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Koepke Rpt., p.3, 12 ROW Apx., ECF.20-20, PAGEID#:6207, 6216; Def. Tr.Ex.6, ROW Apx.,

ECF.20-32, PAGEID#:9622. Smathers explained that the vehicle she saw had a trunk which extended from glass. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651.

Based on Smathers' thorough description of the car she saw, police officers determined that the car they were looking for was most likely a 1980-1982 Oldsmobile Cutlass or Omega. Tr.T., ECF.21-1, PAGEID#:10512; *see also* Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6216.

Smathers also told officers in her written statement that the car she saw slid into and become stuck in a snow bank underneath a street light while attempting to speed away. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Koepke Rpt., p.3, ROW Apx., ECF.20-20, PAGEID#:6207; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622. Smathers explained that the driver, in order to gain the leverage needed to release the car from the snow bank, put his hand on door frame and rocked the car out of the snow. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651-652; Corwin Rpt., p.72,  ROW Apx., ECF.20-20, PAGEID#:6276.

Despite Keith's attempts to suggest otherwise, police searched for the vehicle Smathers described to them on the night of and the day after the murders. Again, that description was:

- A two-door, light-colored vehicle, possibly cream, yellow, light green or light blue;
- A vehicle with no working dome light;
- A vehicle with no working license plate light;
- A vehicle with rear tail lights rectangular with an emblem between the two rectangles;
- A vehicle with a back window mostly vertical, not slanted;
- A vehicle with a trunk which extended from the rear glass; and
- A vehicle with evidence of someone grabbing the frame of the car.

14

The fact remains that, other than the number of doors on the vehicle and the fact that it had trim on the sides, the 1982 Omega which police recovered after Melanie Davison brought drugs to Keith in jail fits every major detail given by Smathers. The Omega is indeed a light colored car—in some of the photographs the car appears either light silver-grey, light greenish-blue, or cream. *See* States Tr.Ex.8, ROW Apx., ECF.20-31, PAGEID#:9460; States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543. It indeed had no working dome or license plate light. States Tr.Exs.74-75, ROW Apx., ECF.20-31, PAGEID#:9538-539; Tr.T., ECF.21-1, PAGEID#:10201-202. It had a mostly-vertical rear window with a trunk that extended from the glass. States Tr.Exs.77-78, ROW Apx., ECF.20-31, PAGEID#:9541-542. There was a smudge of a hand print on the door frame, exactly where Smathers said Keith grabbed when he was rocking the car out of the snow. States Tr.Exs.72-73, ROW Apx., ECF.20-31, PAGEID#:9536-537; Tr.T., ECF.21-1, PAGEID#:10200-201. And, as will be explained *infra*, the license plate ended in "043" just like the numbers the officers observed in the snow bank.  States Tr.Exs.78-79, ROW Apx., ECF.20-31, PAGEID#:9542-543; Tr.T., ECF.21-1, PAGEID#:10200.

    **C. The imprints in the snow.**

        *1. License Plate*

At the snow bank where Smathers observed Keith get his vehicle stuck, officers located a partial tire imprint, as well as a partial license plate imprint. At the scene, BCI Special Agent David Barnes observed with the naked eye the impression in the snow bank left by the vehicle's front bumper and license plate, as well as tire tracks leading to the snow bank. Tr.T., ECF.21-1, PAGEID#:10164-165; *see also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883 ("South of the office, on the south side of this drive, was a snow bank approximately two feet high. The impact

of a motor vehicle was evident in this snow bank, as an area of snow was apparently pushed back by a bumper, above a tire track."). Agent Barnes testified that he

> [w]ent to see what kind of physical evidence could be recorded or collected there. And there appeared to be two different types. One was a tire track and immediately in front of that, an indentation in the snow which appeared to be made by the front bumper or a bumper of a motor vehicle, and also impacted in farther was an indentation vertically in the snow bank were apparently three numbers, that because of their size, I felt most probably came from the license plate.

Tr.T., ECF.21-1, PAGEID#:10164-165. Agent Barnes took measurements, photographs, and made plaster casts of the tire tread, license plate, and bumper impressions. *Id.* at PAGEID#:10166-168; *see also* plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#:9452-53; Photographs, States Tr.Exs.11-16, ROW Apx., ECF.20-31, PAGEID#:9463-68; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883.

During his testimony, Agent Barnes described the photograph showing the indentation he observed in the snowbank "showing the three numbers: zero, 4, 3." *Id.* at PAGEID#:10165. Keith's assertion in the chart attached to his Traverse implying that Agent Barnes did not actually observe the numbers "0, 4, 3" with his eyes on the night of the murders is completely contradicted by the record. *See also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883 ("Coexisting in the impression made by the bumper were three reversed numerals, consistent in size with those on a license plate. These numerals seemed to be 043."). Agent Barnes explained to the jury how he took the measurements, photographs, and made plaster casts of the tire, license plate, and bumper impressions. Tr.T., ECF.21-1, PAGEID#:10166-168; *see also* plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#:9452-53; Photographs, States Tr.Exs.11-16, ROW Apx., ECF.20-31, PAGEID#:9463-68; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883.

16

The plaster casts and the photographic evidence submitted at trial, rather than "undercut[ting the Warden's] claim that these numbers'—let alone the numbers' positioning on the plate—were 'visible to the naked eye'" show that the jury had the ability to actually see what the officers saw. The fact that those plaster casts did not photograph well for the purposes of the habeas record does not mean the numbers are not clearly visible to someone actually looking at the fragile casts. Keith's implication otherwise is disingenuous.

In addition, other officers described in their police reports their observances of the bumper impression and the numbers "043" in the snow. *See* Koepke Rpt. pg.3, Def. Tr.Ex.6, ROW Apx., ECF.20-20, PAGEID#:6207; ECF.20-32, PAGEID#:9622 ("There was 1 tire track imprint, scrapes of front underside, and poss[ible] partial front plate impression."); Harden Rpt., Def. Ex.10, ROW Apx., ECF.20-32, PAGEID#:9653 ("Examination of the snow bank revealed a partial license plate of _ _ _ 043 in the snow."); Beal Rpt. pg.6, ROW Apx., ECF.20-20, PAGEID#:6210 ("I assisted in making a plaster cast of the tire print and a partial license plate print from the snow. The number appeared to be _ _ _046, 048, or 043."). These reports show that officers were able to determine—without the assistance of Yezzo or any other expert—that they were looking for a vehicle with "0,4,3" in the license plate and that they were able to determine from visual inspection of the snow bank that the numbers came at the end of the plate rather than in the beginning of the plate.

Keith misleads the Court in repeatedly saying "Rodney Melton's plate *also contains '043'*." Rather, the testimony clearly shows that it was Rodney's *former and expired* plate that contained the numbers "043" in the beginning of the plate. Rodney Melton's *former* 043 license plate was "an older plate, expired for some period of time, and the letters and numbers were oppositely displayed as to what they are here." Tr.T., ECF.21-1, PAGEID#:10484. ("The

17

difference being the 043 on this plate [State's Exhibit 78] is on the right side and Rodney Melton's older registration, the 043 would be on the left or come first as you are reading left to right."). Rodney's valid plate at the time of the murders was "JKZ218." Pharm. Rpt., ROW Apx., ECF.20-20, PAGEID#:6149.

Moreover, the theories that Keith expounds here—that the placement of the numbers could have matched Rodney's plate and that that police could not really determine that the 043 came at the end of the plate rather than the beginning of the plate—were both placed before the jury and obviously rejected.

### 2. Tires

It is undisputed that the tires on the Omega were not the same as those the owner had purchased six months before the murders.

Alton Davison testified he purchased the 1982 Omega in June 1993, and in August 1993 he purchased four new tires for the vehicle from Firestone in Mansfield, Ohio. Tr.T., ECF.21-1, PAGEID#:10134-135;  Receipt, States Tr.Ex.19;  ROW  Apx.,  ECF.20-31,  PAGEID#:9471; Firestone Docs, States Tr.Ex.7; ROW Apx., ECF.20-31, PAGEID#:9456-459. Alton estimated the tires had 3000 miles of usage between August 1993 and February 1994. Tr.T., ECF.21-1, PAGEID#:10136. He further testified he had no reason to replace the tires in that time period, nor did he authorize anyone to change the tires. *Id.*

But when Yezzo analyzed the vehicle, she determined the tires Alton had purchased in August were no longer on the vehicle. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571-72, 574; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Photos, States Tr.Exs.9-10, 15-16, ROW Apx., ECF.20-31, PAGEID#:9461-462, 9467-468. Rather, the tires found on the Omega at the time it was impounded were *not even manufactured until the third week of January 1994*,

18

making it impossible these were the tires Alton had purchased in August of 1993. Yezzo Depo., ROW Apx., 20-1, PAGEID#:574, 579-80; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451. Yezzo also found that the tires did not appear to be professionally balanced, and therefore, may not have been placed by a tire dealer. Yezzo Depo., ROW Apx., 20-1, PAGEID#:587-88.

Moreover, the tread designs on the tires on the Oldsmobile were not consistent with the tread from the photographs or the plaster cast which Yezzo had in her possession. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571-72, 574; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Photos, States Tr.Exs.9-10, 15-16, ROW Apx., ECF.20-31, PAGEID#:9461-462, 9467-468. The tread design *was* consistent, however, with the tires Alton had purchased and placed on the vehicle in August. Yezzo Depo., ROW Apx., 20-1, PAGEID#:572; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Tire documents, States Tr.Exs.7, 17-19, ROW Apx., ECF.20-31, PAGEID#:9456-459; 9469-471; Photos, States Tr.Exs.9-10, ROW Apx., ECF.20-31, PAGEID#:9461-462. Even Bodziak, who did not review the plaster cast of the tire tread or an actual tire either, stated in his report: "The photograph revealed similar design features to the Firestone Triumph 2000 tire." Bodziak Rpt., ROW Apx., ECF.20-26, PAGEID#:7894.

Keith seems to ignore the fact that the jury had the photographs of the tire track, the plaster cast, and the tire documentation to review in order to make their own comparisons. Plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#: 9452-453; Photos, States Tr.Exs.9-16, ROW Apx., ECF.20-31, PAGEID#:9461-468.

For the first time ever, Keith acknowledges the tires *were* changed without the knowledge of Alton Davison, the owner of the 1982 Oldsmobile Omega. In the chart included in his

traverse, and in the "sworn statement of Melanie Davison" attached to his traverse, Keith expounds that it was not him that changed the tires, rather it was Melanie. *See* Traverse, ECF.28, PAGEID#:11030; Davison 2010 Stmt, ECF.28-9, PAGEID#:11140-163. In his chart, Keith states:

> As for the evidence that the tires were changed on the Omega, Melanie Davison (the granddaughter of the car owner) provided a sworn statement that she changed the tires because they were slashed. If Melanie had gone through the trouble of changing the tires to avoid the tire evidence, she surely would have also gotten rid of the license plate, since it was widely publicized that the car had left a license plate impression at the scene Ex.9

Traverse, ECF.28, PAGEID#:11030. However, this statement does not help Keith at all, a fact that most certainly Keith's counsel recognized at some point since Keith failed to raise this argument anytime in state or federal court since he first obtained the statement in September 2010. Perhaps that is because it is *Keith's timing* that does not line up. Keith misses the obvious problem with Melanie's statement regarding changing the tires: her "sworn statement" indicated that she changed the tires in ***January***, but the murders occurred on ***February 13.*** *See* Davison 2010 Stmt, ECF.28-9, PAGEID#:11149. Therefore, the obvious question is, if Melanie changed the tires in *January* and the murders occurred in *February*, would not the tires that were on the car when Melanie was arrested in *March* be the same tires that left the tire tracks at the scene in *February*? Yet, simple comparison of the photographs of the tires on the vehicle with the photographs of the tire tracks at the scene show even a non-tire-expert that the treads are markedly different. *Compare* Photo of Tire, States Tr.Ex.10, ROW Apx., ECF.20-31, PAGEID#:9462 *with* Photos of Tire Track, States Tr.Exs.15-16, ROW Apx.20-31, PAGEID#:9467-468.

### D.  Forensic evidence, both *implicating* and tending to *exclude* Keith, provided by Yezzo.

In his traverse, Keith takes the contradictory stance that Yezzo's testimony regarding the tire tread and license plate must be rejected because of the hearsay-within-hearsay contents of her personnel file, but Keith uses as support for his alleged innocence her lack of finding any fibers, fingerprints, or shoe prints which could be connected to Keith. *See, e.g,* Traverse, ECF.28, PAGEID#:10998. Keith wants it both ways—to discredit Yezzo's inculpatory findings, but embrace her exculpatory findings. Such a dichotomy is completely inconsistent with his allegation that her entire analysis must be discredited because Yezzo was not liked by her coworkers and had frequent outbursts at work. While Keith asserts, that in hindsight, former Attorney General Lee Fisher would not have permitted Yezzo to testify in light of the hearsay statements contained in her personnel file, *see* Traverse, ECF.28, PAGEID#:11002, Keith fails to recognize that excluding Yezzo's inculpatory testimony also excludes her exculpatory findings.

Moreover, Keith's allegation that Yezzo would "stretch the truth to satisfy a department" *see* Traverse, ECF.28, PAGEID#:10923, makes no logical sense in light of the fact that she found *no* fibers, fingerprints, or shoe prints which matched Keith. Yezzo Depo, ROW Apx., ECF.20-1, PAGEID#:574, 577, 584. If Yezzo truly would give departments the evidence that they wanted, why then did she find the lack of inculpatory evidence which would *directly* link to Keith and only found *circumstantial* evidence linking Keith to the crime by way of his girlfriend's car?

Keith cannot escape the fact that, while Yezzo testified regarding the impressions in the snow, so did the officers. *See, e.g.,* Tr.T., ECF.21-1, PAGEID#:10164-165. And while she testified about the tire tread at the scene appearing similar to the tire brochure, Keith fails to acknowledge that the tire brochure, the plaster casts, and the photographs were all placed before

21

the jury through other witnesses—namely Alton Davison (the brochure), Tr.T., ECF.21-1, PAGEID#:10135; States Tr.Ex. 7, ROW Apx., ECF.20-31, PAGEID#:9456-459, and Agent Barnes (the photographs and the plaster cast). Tr.T., ECF.21-1, PAGEID#:10164-168; *see also* plaster cast, States Tr.Ex. 4, ROW Apx., ECF.20-31, PAGEID#:9453; Photographs, States Tr.Exs.15-16, ROW Apx., ECF.20-31, PAGEID#:9467-468; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883. The jury, therefore, had the necessary evidence in the jury room for them to make a comparison themselves. And that is what we expect juries to do—to review the evidence they receive in the courtroom and to independently weigh and evaluate that evidence.

### E. Richard Warren's identification of Keith, the "nurse controversies," and the calls to the Bucyrus Police Department.

In his traverse, as he has for years, Keith attacks Warren's identification of Keith as the shooter, asserts the nurses lied that Warren gave them the name "Kevin," and that the nurses lied about calling the police. The Warden has already explained in detail in the Return of Writ the fallacy of those claims. *See also* the chart at the end of this Sur-Reply. Despite that lengthy analysis, the Warden feels compelled to respond to a few points.

#### 1.  *Warren's identification of Keith*

Again, Keith asserts that Warren's identification of Keith is faulty because he did not tell the first people he met after being shot multiple times—including in the face and in the rear-end—the name of the shooter. *See* Chart, Traverse, ECF.28, PAGEID#:11022. Apparently the fact escapes Keith that immediately after being shot multiple times, Warren was more concerned with not dying than with giving the name of the shooter. Keith placed his allegation that Warren's identification of Keith was faulty before the jury, and the jury soundly rejected it. Then Keith has repeatedly challenged Warren's identification in both state and federal court. Each and

every court to review Keith's case has rejected as completely unfounded his challenges to Warren's identification.

### 2. *Nurse Amy and Nurse Foor controversies and calls to the police department*

Keith again alleges the nurses are liars in that either they did not call the police or that Warren did not tell them the shooter's name was Kevin. As the Warden has explained in both the Return of Writ and the chart attached at the end of this Sur-Reply, these allegations have also been soundly rejected by the jury and the courts.

As for Nurse Amy, Keith went from denying her existence to harassing her into signing an affidavit denying she told police Warren had given the name "Kevin" after being extubated. While initially Keith asserted that the police made up a call from Nurse Amy, Keith's defense counsel put the police report regarding the phone call from Nurse Amy into evidence which was then given to the jury. *See* Def. Tr.Ex.13, ROW Apx., ECF.20-32, PAGEID#:9660. As Nurse Amy explained in the second affidavit she provided, Keith's counsel did not play the recording of the phone call she made years earlier to the police. *See* Nurse Amy 2010 Aff't, ROW Apx., ECF.20-25, PAGEID#:7691-692, ¶9.

Keith's latest "nurse controversy" returns to Nurse Foor. Earlier it was that Nurse Foor lied about Warren giving the name "Kevin" regardless who wrote the name down when Warren gave the name.[7] Now Keith challenges whether Nurse Foor called the police at all. Keith maintains that, because the dispatch logs (which he conflates with telephone call logs) do not

---

[7] Keith previously alleged, and again implied in his traverse, that Nurse Foor testified that he destroyed the handwritten notes. However, Nurse Foor never testified he *destroyed* the notes, or that he *threw them away* as Keith has previously alleged. Rather, the trial transcript quite clearly shows that Nurse Foor testified that *he did not keep* the notes, not that he threw them away or otherwise destroyed them. *See* Tr.T., ECF.21-1, PAGEID#:10472. In fact, Nurse Foor testified that the note "was with the patient's chart there and was just on a piece of scratch paper." Tr.T., ECF.21-1, PAGEID#:10471.

have an entry for a telephone call from Nurse Foor, then he must have never called, and thus perjured himself by testifying that he did. Nurse Foor testified he called the police after Warren communicated the name "Kevin." Tr.T., ECF.21-1, PAGEID#:10473. Yet, Keith gives no explanation for the conflict in his theory that Nurse Foor never called the police and Nurse Foor's testimony that he did call. Moreover, Keith fails to acknowledge that there is a police report detailing the telephone call from Nurse Foor. *See* Beal Rpt., p.6, ROW Apx., ECF.20-20, PAGEID#:6210.

Even if dispatch logs and telephone call logs were the same, which they are not, Keith fails to recognize the human element in any log-system. In the fast-pace of a police dispatcher's day, no log system could ever be 100 percent accurate. The fact remains, Nurse Foor testified that he personally called the police around 5:00 a.m. after Warren came out of surgery, and there is a police report detailing that 5:00 a.m. call. In light of Nurse Foor's testimony and the police report, the fact that the call is not memorialized in the dispatch log (most likely because no officer was dispatched as a result of the telephone call) does not remotely suggest that the call did not occur.

**F.  Shell casing found by Graham.**

In his traverse, Keith argues that the timing does not line up because Farnella Graham saw trash in her yard at 9:45 p.m.—before he arrived to pick Zina Scott up from work at the GE plant at 11:00 p.m.—that it means the shell casing was already in Graham's yard when she saw the trash. However, there is no evidence in the record to support that conclusion. In fact, the first time Graham saw the casing was when she picked up the trash from her yard. Tr.T., ECF.21-1, PAGEID#:10117-118, 10123-124.

Specifically, Graham testified that, at approximately 9:45 p.m. on February 13, 1994, she noticed trash on the sidewalk in front of her home which was directly in front of the driveway to the General Electric plant. Tr.T., ECF.21-1, PAGEID#:10116-117. Graham **did not** say she saw the *shell casing* the night of the murders. Rather, she testified that she *saw the trash* the night of the murders and found the casing, "laying by itself" the next morning. *See* Tr.T., ECF.21-1, PAGEID#:10124. Graham testified that she picked up the trash from her sidewalk when she awoke the next morning. *Id.* at PAGEID#:10117. It was when she picked up the fast food wrappers that she located the spent shell casing. *Id.* at PAGEID#:10117-118, 10123-124. Not knowing the significance of the shell casing, Graham brought it into her house and threw it away along with the fast food wrappers into her kitchen garbage can. *Id.* at PAGEID#:10118, 10125-127.

It was *Graham's daughter*, having heard about the shootings which had occurred the night before, who called the police to respond to her mother's home to retrieve the shell casing. *Id.* at PAGEID#:10118-119.  The fact that it was Graham's daughter and not Graham that called the police is one plausible explanation for why the dispatch log has a notation (presumably taken by a dispatcher at the time of the call) that the caller believed she found a casing in the "McDonald's area").[8] *See* Log, ROW Apx., ECF.20-24, PAGEID#:7109.

Officer John Seif testified that he met with Graham and retrieved the spent shell casing from her trash can. Tr.T., ECF.21-1, PAGEID#:10128-129; Seif Rpt., ROW Apx., ECF.20-27, PAGEID#:8146.; Police Rpt. p.29, ROW Apx., ECF.20-20, PAGEID#:6233.

---

[8] Keith still confuses "dispatch logs" which detail calls whereby officers are dispatched to a location or radio from a location with "call logs" which record incoming telephone calls. While Keith maintains these are one-in-the-same, he provides no proof of that assertion.

25

Scientific analysis of the shell casing Graham located on her walkway revealed it matched the casings located at the crime scene. Tr.T., ECF.21-1, PAGEID#:10254, 10261-262; Lab Rpt., States Tr.Ex.142, ROW Apx., ECF.20-31, PAGEID#:9608-610.

Again, Keith's assertion that the "timing does not add up" because Graham saw trash in her yard before Keith had to pick Zina up from work is not supported by the evidence. The evidence which was before the jury was that Graham found the bullet casing the morning *after* the murders, and consequently, *after* Keith picked up Zina, not before. Additionally, Keith asks this Court to believe a one-line notation by a police dispatcher over the testimony by the witness that found the evidence and the officer that recovered the evidence. This is a stretch which the Court should not make and which is not supported by the testimony.

### G.  Keith's "alibi" and alternate-suspect theories.

Keith still maintains he had an alibi for the night of the murders. But Keith's alibi did not hold up to scrutiny. Keith called his aunt, Grace Keith, as an alibi witness. Tr.T., ECF.21-1, PAGEID#:10375-381. Aunt Grace testified she was home with Yolanda Price, Dwayne Price, and "some girl Zena." *Id.* at PAGEID#:10377. She testified that, while she did not know when Keith arrived at her house or when he left, she knew she saw him at 9:00 p.m. on the night of the murders because she looked at her watch. *Id.* at PAGEID#:10377-378. (This testimony was in direct contradiction to Zina Scott's testimony that she had been at work at the GE plant until 11:00 p.m. on the night of the murders. *See* Tr.T., ECF.21-1, PAGEID#:10098.)

On cross examination, Aunt Grace admitted she gave an interview with the media after Keith's arrest, but denied she said she did not know the time he was at the house. *Id.* at PAGEID#:10380-381. The prosecutor, in his rebuttal case, played Aunt Grace's interview for the jury. Tr.T., ECF.21-1, PAGEID#:10514-516; States Tr.Ex.146 (DVD manually filed). In that

26

interview, jurors heard Aunt Grace tell reporters: "Sunday night he was in my house around 9:00 o'clock cause he came in and borrowed $5.00 from my son and then he hung around for a while and he had to pick his girlfriend up. He went to pick the girlfriend up and came back to my house." *Id.* at PAGEID#:10515; States Tr.Ex.146. In response to the reporter asking if Keith was at her house at the time of the murders, jurors heard Aunt Grace respond: "I can't say that … I don't know what time it was … I didn't pay no attention to that part of it, but he was at my house maybe around 9:00 o'clock and my son came and say he came in and borrowed $5.00 from him."[9] *Id.* Keith now implies that what Aunt Grace *meant to say* was that she did not know the time the *murders* occurred not that she did not pay attention to what time *Keith was in her house*. *See* Traverse, ECF.28, PAGEID#:10910, n.6. The jury viewed the interview and heard the testimony regarding Keith's supposed alibi given by Aunt Grace; they clearly did not find Aunt Grace credible.

In further support of his shaky alibi, Keith asserts in his traverse that Yolanda Price and Melanie Davison could confirm Keith was at Aunt Grace's house at the time of the murders. *See* Traverse, ECF.28, PAGEID#:10910. However, neither Yolanda nor Melanie testified at trial. Therefore, neither account should be taken as credible evidence of an alibi. Yolanda was not a credible alibi witness because her husband, Roy Price, was also indicted for drug sales conducted with Rudel Chatman also as the confidential informant. *See* State Response to 4th Mtn. New Trial, ROW Apx., ECF.20-25, PAGEID#:7768. As such, the Prices had just as much motive to

---

[9] Keith chastises the Warden for using ellipses in this quote, however, the ellipses replace the work "(inaudible)" taken from the trial transcripts, which is the official transcription of the video clip. *See* Tr.T., ECF.21-1, PAGEID#:10515-516. It is *Keith* that misstates the record by **_adding content_** which based on his supposition and interpretation of the statement given by Aunt Grace to the news reporter, but that the official court reporter did not transcribe. *Compare* Traverse, ECF.28, PAGEID#:10975 *with* Tr.T., ECF.21-1, PAGEID#:10515-516.

see Rudel and his family eliminated.[10] And, since Melanie was arrested after attempting to convey drugs to Keith while he was in jail, it is not unreasonable to conclude that the jury would not find her a credible witness.

Because neither Melanie nor Yolanda testified on Keith's behalf, their support for his alibi is of little value. The jury heard Keith's claim that he was with Aunt Grace at the time of the murders, but obviously did not believe it.

And, as the Warden has extensively explained in the Return of Writ, in this Sur-Reply, and in the chart attached hereto, Keith presented several "alternate suspects" with the most consistent "real killer" being Rodney Melton. For the reasons already explained, the jury and every court that has reviewed this case has determined that those assertions are false.

### III.    Keith's overstates the impact of Yezzo's personnel file and the post-it note reference on the subpoena he issued at the time of trial.

Step two in the §2244(b)(2)(B)(ii) analysis is the evidence the State allegedly improperly withheld in violation of *Brady v. Maryland*. But Keith overstates the impact of the allegedly suppressed evidence contained in Yezzo's personnel file and the post-it note reference on the subpoena he issue at the time of trial.

### A.  Yezzo's personnel file.

Based upon hearsay-within-hearsay statements of co-workers detailing her interpersonal relationship problems, Keith alleges that Yezzo's scientific inculpatory conclusions were suspect. Other than these hearsay statements, Keith points to no findings from the time period around his trial that her work was actually suspect or that disciplinary action was taken based upon her scientific analysis. In fact, no such disciplinary action was taken until 2008 in relation

---

[10] Interestingly, Roy Price was also represented by James Banks, Keith's retained defense counsel on the murder case. *See* Corwin Rpt., p.81, ROW Apx., ECF.20-20, PAGEID#:6285.

28

to Yezzo's analysis of glass and paint—neither of which were in issue in Keith's case. *See* Letter, Pet. Ex.14, ECF.1-14, PAGEID#:140-141. Rather, Yezzo's file was replete with accomplishments and accolades for her scientific work. *See* Yezzo Evals., ROW Apx., ECF.20-27, PAGEID#:8218-261; Letters, ROW Apx., ECF.20-27, PAGEID#:8334-431.

Instead of pointing to any disciplinary action relative to Yezzo's forensic work during the time period of Keith's trial, he offers a new "expert" report, prepared on April 23, 2019, in support of his allegations that Yezzo's personnel file itself calls Yezzo's reliability into question. As the Warden has already expressed, Dr. Sah's report is not properly before this Court, as new arguments cannot be properly raised in a traverse. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("Because [this] argument was first presented in Tyler's traverse rather than in his habeas petition, it was not properly before the district court, and the district court did not err in declining address it."); *see also Nouri v. McQuiggin*, 535 F. App'x 513, 514 (6th Cir. 2013) (district court properly declined to address petitioner's claim because he failed to raise the issue in his habeas petition or seek leave to amend the petition to include the claim) (per curiam); *Marsh v. Bradshaw*, No. 4:14CV2206, 2017 WL 68514, at n.2 (N.D. Ohio Jan. 6, 2017); *Welch v. Lazaroff*, No. 1:14CV2328, 2016 WL 1367894, at *6 (N.D. Ohio Feb. 10, 2016); *Smith v. Bagley*, No. 1:00CV1961, 2014 WL 1340066, at n.15 (N.D. Ohio Apr. 3, 2014); *Jaffal v. Bradshaw*, No. 1:11CV1549, 2013 WL 3337404, at n.8 (N.D. Ohio Jul. 2, 2013); *Palmer v. Bagley*, No. 1:00-cv-882, 2005 WL 3965400, at *8 (S.D. Ohio Dec. 16, 2005) ("A traverse, however, is not the proper vehicle in which to raise new claims or sub-claims in habeas corpus."), *report and recommendation adopted,* 2006 WL 1027733 (S.D. Ohio Apr. 17, 2006).

Even if this report was properly presented, this Court should completely disregard its "findings." Without speaking to a single witness about Yezzo's work, relying only on the

documents Keith provided, Dr. Sah (who is not a forensic expert) incredibly concluded that "that the tire and license plate pattern impression analyses conducted by Michele Yezzo in this case are unvalidated, unreliable, subject to bias and unscientific." Sah Rpt., ECF.28-7, PAGEID#:11120. Dr. Sah also concluded that letters of thanks from prosecutors and law enforcement detailing to Yezzo's supervisors the assistance Yezzo provided were further evidence that she was biased. *See id.* at PAGEID#:11117-119. In particular, Dr. Sah took issue with Yezzo providing prosecutors with assistance in cross-examining defense experts. *Id.* at PAGEID#:11119. Such conclusions illustrate Dr. Sah's lack of understanding of the role of a forensic expert in a criminal case. As Dr. Sah is not a forensic expert, and Dr. Sah rendered an opinion that is itself biased—coupled with the fact that the report is not properly before the Court—this Court must completely disregard Dr. Sah's "conclusions."

### B.  Subpoena with note

Keith continues to allege the State suppressed the subpoena that *he issued* to the police at the time of trial for the telephone and dispatch logs.[11] Pet., ECF.1, PAGEID#:28-30. Again, despite knowing that the police did not provide the telephone and dispatch logs to him in furtherance of his subpoena, Keith *never raised this claim at trial or in any other state court proceedings.* As has been previously explained, Keith's claim therefore is not properly before the Court.

Keith now asserts, with nothing but pure speculation, that had he had the logs which do not have an entry detailing a telephone call by Nurse Foor, that "Keith *could have had Warren's identification suppressed*, due to insufficient indicia of reliability." Traverse, ECF.28, PAGEID#:10983. Keith seems to completely ignore that *Nurse Foor testified about calling the*

---

[11] As Keith has repeatedly done since 2010, he confuses telephone and dispatch logs, referring to them as if the terms are interchangeable.

*police*, trial counsel questioned Nurse Foor about the call to police, and the call is referenced in the police report. *See* Foor Testimony, Tr.T., ECF.21-1, PAGEID#:10473; Beal Rpt., p.6, ROW Apx., ECF.20-20, PAGEID#:6210. Keith gives no explanation for the conflict in his theory that Nurse Foor never called the police with Nurse Foor's testimony that he did call.

Additionally, Keith claims that the suppression of the subpoena with the notation to "ignore for now" prevented him from demonstrating that the police "acted in bad faith" in destroying the call sometime after the time of trial. Traverse, ECF.28, PAGEID#:10983. Again, he makes absolutely no argument that this subpoena somehow shows he is actually innocent of the murders, which is what is required to pass through the gates of §2244(b)(2)(B)(ii).

### C.  Prior allegations

As the Warden has thoroughly explained in the Return of Writ, in this Sur-Reply, and in the chart attached hereto, Keith has lodged multiple *Brady* claims against the State through the years, but none of his allegations have ever gone directly to the issue of his alleged innocence. Rather, the majority of his allegations have been about additional evidence he *could have used to impeach witnesses*. From the notes Warren wrote in the hospital with the name "Kevin" written in a hand other than Warren's (despite Warren indicating in his testimony that *he did not write the name Kevin, that he used sign language* which his father then interpreted) (*see* Tr.T., ECF.21-1, PAGEID#:10056), to the pharmacy board records detailing additional impeachment evidence which he could have attempted to ask Rodney (despite asking Rodney during trial about his involvement in the pharmacy robberies) (*see* Tr.T., ECF.21-1, PAGEID#:10449), to his allegation that Graham lied about finding the shell casing in her yard across the street from where Keith picked up Zina Scott from the GE plant, *none* of Keith's earlier *Brady* claims show he is *actually innocent* of these murders.

31

**IV.  Even with the allegedly improperly suppressed evidence, Keith still cannot show by clear and convincing evidence, in light of the evidence as a whole, that no reasonable juror would have convicted him.**

Step three in the §2244(b)(2)(B)(ii) analysis is the determination whether Keith has proven by clear and convincing evidence, in light of the evidence as a whole, that no reasonable juror would have convicted him. In other words, Keith cannot show by clear and convincing evidence, even with his two newest allegations, that he is *actually innocent* of the murders. *See Calderon v. Thompson*, 523 U.S. at 558 (finding that "a federal court can consider a claim presented in a second or successive application *only if the prisoner shows*, among other things, *that the facts underlying the claim* **establish his innocence by clear and convincing evidence**") (emphasis added).

As both the state and federal courts have repeatedly stated, the evidence against Keith was overwhelming. *See, e.g., Keith*, Opinion & Judgment Entry (Aug. 9, 2010), ROW Apx., ECF.20-24, PAGEID#:7182-196; Keith, 192 Ohio App. 3d 231, 244 (Jan.31, 2011) ("we reiterate this Court's prior finding that, 'a jury of twelve citizens found the evidence presented sufficient to convict Keith, and this verdict has stood the test of time and an exhaustive series of both state and federal appeals.'") (quoting *Keith*, No. 3-08-15, 2008 Ohio App. LEXIS 5176, 2008-Ohio-6187 (Dec. 1, 2008)); *Keith*, No. 3-17-01, 2017 Ohio App. LEXIS 2545, 2017-Ohio-5488, at *27 (Jun. 26, 2017) ("Over the years in his numerous appeals and post-conviction petitions Keith has challenged many aspects of his case and the evidence against him, but one fact remains clear, the evidence against Keith was simply overwhelming.") *Keith v. Mitchell*, 455 F.3d 662, 675 (6th Cir. 2006) ("Finally, we note that this is not 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.' Keith does not claim that he is actually innocent.") (citation omitted); *Keith v. Bobby*, 551 F.3d

32

555, 558 (6th Cir. 2009) ("it is a stretch to say that the fact that another person had a motive and that an eyewitness's original identification may have occurred during a police interview and not independent of it could constitute clear and convincing evidence that no reasonable fact finder could have returned a guilty verdict. … [Keith's new evidence] does not contradict *any* evidence that directly proves guilt.").

And it remains so even in light of Keith's repeated attacks on collateral matters. None of his prior *Brady* claims, nor his newest claims, have gone to the issue of Keith's guilt or innocence. And both of his newest claims allege the material would have been beneficial for impeachment purposes. None of Keith's allegations—new or old—are sufficient to show by clear and convincing evidence that he is *actually and factually innocent* of these murders. *See Calderon v. Thompson*, 523 U.S. at 558; *Case v. Hatch*, 731 F.3d 1015, 1031-32 (10th Cir. 2013); *Caldwell v. Lafler*, No. 4:04-CV-133, 2008 U.S. Dist. LEXIS 25364 at *2 (W.D. Mich. Mar. 31, 2008); *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). At best, Keith's attacks are all against the legal sufficiency of his conviction. While that *might* be enough to obtain relief in a first habeas petition, it is insufficient to obtain relief in a successive petition under §2244(b)(2)(B)(ii).

Moreover, Keith ignores his obligation to show, by clear and convincing evidence, that he is **actually innocent** of these murders. Rather, he merely has attempted to *cast some doubt* on his guilt. As Keith has throughout the years, he attacks collateral matters, and alleges the State withheld evidence he could have used to impeach the witnesses. But, the Sixth Circuit has held that "[e]ven assuming that [petitioner] could not have discovered the proffered evidence sooner, we have held that new impeachment evidence *does not of itself provide proof of actual innocence*." *In re Whittaker*, No. 17-2135, 2018 U.S. App. LEXIS 4804, at *3 (6th Cir. Feb. 26,

33

2018) (citing *In re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001)) (emphasis added); *see also In re Elliot*, No. 17-1496, 2017 U.S. App. LEXIS 22314, at *4 (6th Cir. Nov. 7, 2017) ("Even if we were to accept as true Elliot's allegation that the prosecution did not disclose Hendrix's use as an informant, that fact would only impeach Hendrix and would not establish Elliot's actual innocence. We have held that new impeachment evidence does not provide proof of actual innocence.").

In his latest habeas petition, Keith alleges Yezzo's personnel file would have provided impeachment evidence. Importantly, he does not and cannot allege that the Yezzo's interpersonal problems with her coworkers or the unsupported hearsay-within-hearsay statements that her work was suspect show by clear and convincing evidence that he is *actually innocent* of these murders. Rather, he would have liked to have been able to attempt to impeach her with those records. Nor does he allege that the ignored subpoena for call and dispatch logs show that he is *actually innocent*. Rather, he would have liked to have been able to impeach Nurse Foor who testified he called the police department after Warren gave the name "Kevin." Keith ignores the fact that the subpoena was one *he issued*, so he clearly knew the police had not complied at the time of trial. He also ignores the fact that he extensively cross-examined Nurse Foor about the notes Warren wrote and the phone call Nurse Foor made to the police. *See* Tr.T., ECF.21-1, PAGEID#:10473; *see also* Beal Rpt., p.6, ROW Apx., ECF.20-20, PAGEID#:6210.

Keith's prior *Brady* allegations also did not attack his guilt; rather all of Keith's allegations have been to collateral matters. He has repeatedly mischaracterized the strong evidence against him and alleged everyone that testified against him was lying—from the nurses, to the police, to the witnesses who provided identification testimony and found evidence linking him to the crime. In fact, each and every claim and each of his mischaracterizations of the record

34

that Keith has raised throughout the years has been soundly rejected by every court which has reviewed them. Even the Ohio Parole Board, not bound by legal doctrines, procedural rules barring consideration, or state rules of evidence, did not find *any* of Keith's claims indicative of his innocence. Keith Clemency Report (Aug. 19, 2010), publicly available at https://www.drc.ohio.gov/Portals/0/Clemency/clemency_keithaug2010.pdf?ver=2016-11-04-085148-970 (last accessed March 22, 2019).[12]

And, despite his repeated allegations, not only did the police investigate Rodney Melton as an alternate suspect in the murders, Keith himself extensively presented to the jury his theory that Rodney was the real killer. As already detailed, both in this Sur-reply and the Return of Writ, Keith extensively questioned Rodney about his car, his license plate, his actions on the night of the murders, and his criminal history. Far from preventing him from presenting to the jury his theory that Rodney was the "real killer," the record clearly shows Keith presented the theory and the jury rejected it.

In all, Keith's petition must be denied as being an impermissible successive habeas petition because Keith does not meet his burden under either the diligence prong of §2244(b)(2)(B)(i) or the actual innocence prong of §2244(b)(2)(B)(ii).

---

[12] Keith states that this Court should disregard the findings of the Parole Board because they "generally do[ ] not have the same amount of time to review a case compared to the Governor's office" and they generally "do not have the same amount of time to digest the information and do as thorough of a review given the number of cases that come before the Parole Board.". *See* Traverse, ECF.28, 10988-989. Counsel for Keith (who participated in the clemency hearing) completely ignores the fact that the hearing before the Parole Board was *twelve hours long*, that the Board had the trial transcripts and judicial decisions approximately a month before the hearing (comprising more than 1,200 pages) and also had 855 pages of exhibits in advance of the hearing. The undersigned counsel has participated in approximately 30 clemency hearings, and Keith's, by far, was the most extensive hearing conducted. The Board was fully aware of the contents of the record and Keith's allegations. Keith's suggestion otherwise is completely misplaced and inappropriate.

## V.     Alternate defenses.

In the Return of Writ, the Warden explained that, should this Court determine that Keith's claims pass through the gates of §2244(b), his petition is time-barred which cannot be excused with equitable tolling, Keith's claims are defaulted and/or unexhausted, and his claims completely lack merit. Because the Warden believes the Return of Writ adequately addresses those points, the Warden will not reiterate them here, and incorporates by reference the arguments made in the Return of Writ. *See* Return, ECF.26, PAGEID#:10867-886.

## VI.    Conclusion

Based upon the aforementioned reasons, as well as those stated in the Return of Writ, the Warden respectfully submits that Keith's successive habeas petition must be dismissed under 28 U.S.C.  §2244(b)(4).  Alternatively,  Keith's  claims  violate  the  statute  of  limitations,  are procedurally defaulted, and entirely lack merit.


Respectfully submitted,

**DAVE YOST**
Ohio Attorney General

/s/ *Brenda S. Leikala*

**Brenda S. Leikala (0072635)**
Senior Assistant Attorney General
Criminal Justice Section, Capital Crimes Unit
150 East Gay Street, 16th Floor
Columbus, Ohio 43215-3428
(614) 995-1930; (877) 469-0567 (Facsimile)
Brenda.Leikala@ohioattorneygeneral.gov

**COUNSEL FOR RESPONDENT**

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2019, a copy of the forgoing document was filed electronically.  Notice of this filing has been sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.

/s/ *Brenda S. Leikala*

**Brenda S. Leikala (0072635)**
Senior Assistant Attorney General

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| Keith's mischaracterization of the evidence | What the evidence actually shows |
|---|---|
| **Smathers' Description of the Car** | **Smathers' description of car** |
| • Smathers described the car as "white, cream, light yellow." ECF 21-1, PageID 10000, 10077. <br><br> • The Omega that the state says Kevin used, however, was green. ECF 21-1, PageID 10138, 10139. <br><br> • Rodney Melton has a "cream to yellow" car that he used in criminal activity. ECF 1-12, PageID 134. <br><br> • Smathers testified that "it was dark inside the car," not that the dome light did not work. ECF 21-1, PageID 10071. <br><br> • Smathers never identified Alton Davison's Omega (State's exhibit 76) as the car she saw <br><br> • Smathers described the car she saw as having 2 doors. ECF 21-1, PageID 10000, 10517. | • Keith's counsel continually tout Smathers' testimony that the car was white, cream, or a light colored car as support that it was not the Omega that Smathers saw, and that the police impounded the Omega despite it not matching Smathers' description. However, Keith's same counsel in 2007 recognized that Smathers told officers immediately following the murders that she had seen a "yellow, green, or blue car." *See* Jun. 27, 2007 Appellant Reply Br., ROW Apx., ECF.20-18, PAGEID#:5703; July 20, 2007 App. to Reopen, ROW Apx., ECF.20-18, PAGEID#:5782; Aug. 1, 2007 Mtn. New Trial, ECF.20-21, PAGEID#:6298. Even Keith, in a *pro se* filing, acknowledged Smathers told the police the car was yellow, green, or blue. *See* Apr. 3, 2012 *Pro se* Mtn. New Trial, ROW Apx., ECF.20-25, PAGEID#:7587. <br><br> • The record clearly shows that the day following the murders Smathers gave a written statement to police describing the events of the night before. *See* Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651. <br><br>    o In that statement, Smathers told police that the car she had seen was a mid-size "*crème color, real light, green, yellow or blue, light color car.*" Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651 (emphasis added); Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6216. <br><br>    o In the written statement, Smathers told officers that "*the dome light was burnt out, when the door was open it wasn't on.*" Smathers Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9652 (emphasis added); Koepke Rpt., p.3, 12, ROW Apx., |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

|  |  |
|---|---|
|  | ECF.20-20, PAGEID#:6207, 6216; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622. *See also* Tr.T., ECF.21-1, PAGEID#:10070-73. |
|  | o  In the written statement, Smathers told officers that the vehicle she saw had no working license plate light. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6206. |
|  | o  In the written statement, Smathers described the car's taillights as "rectangular[,] I think two with a round one in the middle." Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9652; Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6216. |
|  | o  In the written statement, Smathers told officers that the vehicle she saw had a back window which was mostly vertical and not slanted. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Koepke Rpt., p.3, 12 ROW Apx., ECF.20-20, PAGEID#:6207, 6216; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622. |
|  | o  In the written statement, Smathers told officers that the vehicle she saw had a trunk which extended from glass. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651. |
|  | o  Smathers also stated that the driver put his hand on door frame for leverage while he rocked car out of snow. Smathers' Written Stmt., Def.Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651-652; Corwin Rpt., p.72, ROW Apx., ECF.20-20, |

39

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

|  |  |
|---|---|
|  | PAGEID#:6276. |
|  | • Based on Smathers' thorough description of the car she saw, police officers determined that the car they were looking for was most likely a 1980-1982 Oldsmobile Cutlass or Omega. Tr.T., ECF.21-1, PAGEID#:10512; see also Koepke Rpt., p.12, ROW Apx., ECF.20-20, PAGEID#:6216. |
|  | • The fact remains that, other than the number of doors on the vehicle and the fact that it had trim on the sides, the 1982 Omega which police recovered after Melanie Davison brought drugs to Keith in jail fits every major detail given by Smathers.  The Omega is indeed a light colored car—in some of the photographs the car appears either light silver-grey, light greenish-blue, or cream. *See* States Tr.Ex.8, ROW Apx., ECF.20-31, PAGEID#:9460; States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543. It indeed had no working dome or license plate light. States Tr.Exs.74-75, ROW Apx., ECF.20-31, PAGEID#:9538-539; Tr.T., ECF.21-1, PAGEID#:10201-202. It had a mostly-vertical rear window with a trunk that extended from the glass. States Tr.Exs.77-78, ROW Apx., ECF.20-31, PAGEID#: 9541-542. There was a smudge of a hand print on the door frame, exactly where Smathers said Keith grabbed when he was rocking the car out of the snow. States Tr.Exs.72-73, ROW Apx., ECF.20-31, PAGEID#:9536-537; Tr.T., ECF.21-1, PAGEID#:10200-201. And, as will be explained *infra*, the license plate ended in "043" just like the numbers the officers observed in the snow bank.  States Tr.Exs.78-79, ROW Apx., ECF.20-31, PAGEID#:9542-543; Tr.T., ECF.21-1, PAGEID#:10200. |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| [Identification by] Warren | Identification by Warren |
|---|---|
| • Right after the shooting, Warren told four different witnesses, including a police officer, that he did not know who shot him, only that it was a "masked man." ECF 21-1, PageID 9928-31, 9993, 10312, 10315.<br><br>    o Warren was able to answer other questions coherently, like the apartment number where the shooting occurred. ECF 21-1, PageID 10315.<br><br>• Warren also initially told the police that he was only able to identify the shooter by his build and size. ECF 21-1, PageID 10040.<br><br>• Warren could not recall whether the police first mentioned to Warren that the first name of the shooter was Kevin. ECF 21-1, PageID 10060.<br><br>• To prove that Warren was the first person to mention the name Kevin, the state offered the testimony of Nurse John Foor, who testified that Warren wrote down the name "Kevin" on a piece of paper, after which Foor proceeded to call the police. ECF 21-1, PageID 10470-73; *see also* ECF 21-1, PageID 10528-29 (the state saying in closing argument that "John Foor called the Bucyrus Police Department. That is how the name Kevin found its way into this case").<br><br>    o Warren denied that he wrote the name Kevin, as his hands were strapped down. ECF 21-1, PageID 10056. And Warren could not have spoken the name to Nurse Foor because he was not off the ventilator until Foor's shift ended. ECF 20-10, PageID 3594 (Foor worked the 2300-0700 shift, Warren extubated after 1135 on 2-14-94). Indeed, Warren testified that he "tried to do sign language and none of | • Keith asserts that Warren's identification of Keith is faulty because he did not tell the first people he met after being shot multiple times—including in the face and in the rear-end—the name of the shooter. Apparently the fact escapes Keith that immediately after being shot multiple times, Warren was more concerned with not dying than with giving the name of the shooter. Moreover, Keith placed his allegation that Warren's identification of Keith was faulty before the jury, and the jury soundly rejected it.<br><br>• In the ICU after surgery, Warren informed Nurse John Foor that the shooter's first name was "Kevin." Tr.T., ECF.21-1, PAGEID#:10040, 10470; Lt. Beal Rpt., ROW Apx., ECF.20-20, PAGEID#:6210.<br><br>    o Nurse Foor testified that Warren wrote the name on the clipboard, Tr.T., ECF.21-1, PAGEID#:10470, but Warren testified that he used sign language once his father arrived and that someone else wrote the name on the clipboard. Tr.T., ECF.21-1, PAGEID#:10056.<br><br>    o Regardless of *who actually wrote the name on the clipboard*, the evidence unequivocally demonstrates Warren indicated the first name of "Kevin" immediately after surgery. Id. at PAGEID#:10056, 10470; *see also* Handwritten Notes, ROW Apx., ECF.20-8, PAGEID#:2895-898.<br><br>• Several hours later, after being extubated, Warren "immediately began speaking upon the breathing [tube] being removed from his throat." Nurse Amy 2010 Aff't, ROW Apx., ECF.20-25, PAGEID#:7691. Warren told Nurse Amy Whisman ("Nurse Amy") the perpetrator of the crime was "Kevin" but that he did not remember Kevin's last name. *Id.*; Phone call transcript, Def. Tr.Ex.4, ROW Apx., ECF.20-32, PAGEID#:9616; |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

the nurses knew it" but when his "father got there he translated [his] sign language to the nurses [and] then they wrote it down on paper." ECF 21-1, PageID 10056. Nurse Foor's shift had already ended by the time Warren's father arrived at the hospital. See ECF 20-20, PageID 6211; ECF 20-8, PageID 2894; ECF 20-10, PageID 3472 and PageID 3560

o Keith discovered radio dispatch logs, which the state had represented were destroyed, that show no call from Nurse Foor to the Bucyrus Police Department. ECF 1-26, PageID 200-204. Keith also discovered a defense subpoena for those radio dispatch logs that had the words "Ignore For Now" written on top. ECF 1-29, PageID 218.

- Warren initially told the police that he did not remember what the shooter was wearing, but then testified at trial that he was wearing gloves, a coat, and a turtleneck. ECF 21-1, PageID 10053.

- The police provided Warren a photo lineup containing only six pictures, and Keith's pictures was the only one that can be described as depicting a large black man. His photo was darker and framed much closer than all the other photos. ECF 20-32, PageID 9623.

  o Memory experts presented the lineup to over 100 people and asked them to choose the big black guy—over 75% choose Keith's picture. ECF 20-30, PageID 9415.

  o Neither Rodney Melton nor Bruce Melton were included in this lineup, despite the fact that Quanita had already identified the shooter as her daddy's friend Bruce. ECF 21-1, PageID 10428-29

Police Rpt. p.14, ROW Apx., ECF.20-20, PAGEID#:6218; Def. Tr.Ex.13, ROW Apx., ECF.20-32, PAGEID#:9660.

- Captain Stanley spoke to Warren after Nurse Amy called the Police Department to inform them that Warren had given the first name of the shooter. Phone call transcript, Def. Tr.Ex.4, ROW Apx., ECF.20-32, PAGEID#:9616-618; Police Rpt. p.14, 25 ROW Apx., ECF.20-20, PAGEID#:6218, 6229; Def. Tr.Ex.13, ROW Apx., ECF.20-32, PAGEID#:9660.

- Warren told Captain Stanley that, although he did not remember Kevin's last name, he would recognize it if he heard it. *Id.* at PAGEID#:9617.

- Captain Stanley provided Warren four or five different last names; Warren indicated the shooter's last name was "Keith." Tr.T., ECF.21-1, PAGEID#:10350-354; Capt. Stanley Rpt., p.87, ROW Apx., 20-20, PAGEID#:6291.

- Captain Corwin took a videotaped statement from Warren at the hospital wherein Warren was shown a photo array. Tr.T., ECF.21-1, PAGEID#:10354; Capt. Corwin Rpt, p.27, ROW. Apx., ECF.20-20, PAGEID#:6231; Def. Tr.Ex.8, ROW Apx., ECF.20-32, PAGEID#:9624-650.

- Warren identified Keith's photo, and indicated he was ninety-five percent sure the person he had just identified was the person that shot him. Tr.T., ECF.21-1, PAGEID#:10050; Capt. Corwin Rpt, p.27, ROW. Apx., ECF.20-20, PAGEID#:6231; Def. Tr.Ex.8, ROW Apx., ECF.20-32, PAGEID#:9646..

- Warren later told officers he was positive Keith was the shooter after seeing him on television and hearing his voice. Capt. Corwin Rpt, p.37, ROW. Apx., ECF.20-20, PAGEID#:6241.

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| ○ Quanita was shown the same lineup and said that "none" of the pictures were of the man that shot them, and that the picture of Kevin was not the man she knew as Bruce. ECF 21-1, PageID 10412-13. Quanita had met Kevin previously, but Warren had not.<br><br>• Warren is Caucasian, and studies have shown that cross-racial identification is particularly suspect. ECF 20-30, PageID 9392, 9412. | • Warren identified Keith in the courtroom as the person who entered the apartment, engaged in small talk, drank two glasses of water, pulled a Tec-9 gun from a trash bag, ordered everyone to the ground, and began shooting. Tr.T., ECF.21-1, PAGEID#:10024. |
| **[Identification by] Smathers**<br><br>• The first two times Smathers talked to the police, she said she could not recognize any "distinct features" of the person. ECF 21-1, PageID 10078-79. When asked whether she would recognize the man if she saw him again, she replied "I don't think so." ECF 21-1, PageID 10085.<br><br>• When she spoke with police for a third time, about a month later and after she had already seen Kevin's face on television, she became 90% sure that Kevin was the person she had seen. ECF 21-1, PageID 10079.<br><br>• Smathers' description of the car she saw does not match the car the state claimed Kevin used (see above).<br><br>• Smathers is caucasion [sic], and studies have shown that cross-racial identification is particularly suspect. ECF 20-30, PageID 9392. | **Identification by Smathers**<br><br>• After hearing several "popping noises," Smathers looked out her door where she saw a "big, stocky" and "powerful" looking man. Tr.T., ECF.21-1, PAGEID#:10070-73; *see also* Smathers Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Police Rpt. p.3, ROW Apx., ECF.20-20, PAGEID#:6207; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622.<br><br>• After seeing Keith's photograph on television and in the newspaper, Smathers was sure he was the same man she saw on the night of the shooting. Tr.T., ECF.21-1, PAGEID#:10073, 10079; Police Rpt. p.72, ROW Apx., ECF.20-20, PAGEID#:6287.<br><br>• Smathers also identified Keith in the courtroom as the man she saw. Tr.T., ECF.21-1, PAGEID#:10073.<br><br>• Keith challenged Smathers' identification of Keith during trial, attempting to convince her that it was Karie Walker she saw rather than Keith. Tr.T., ECF.21-1, PAGEID#:10073. Defense Counsel also brought to the jury's attention that Smathers told officers the first two times she spoke to them that she could not identify the man she saw run to the car which then got stuck in the snow bank. *See* Tr.T., ECF. 21-1, PAGEID#:10077-079. |

43

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | • Smathers unequivocally denied the man she saw was really Karie Walker. *Id.* at PAGEID#:10073, 10081 ("there is a distinct difference between [Keith and Walker].").  |
| | **The physical evidence from the murder scene**<br><br>• Investigators recovered more than twenty bullets and shell casings from the crime scene. Tr.T., ECF.21-1, PAGEID#:10157.<br><br>• Sixteen bullets and casings were located inside the apartment, and six casings were located in the field between the apartment and Ike's. Tr.T., ECF.21-1, PAGEID#:10153, 10155-57, 10189-90; Diagrams, States Tr.Exs.40-41, ROW Apx., ECF.20-31, 9500-504.<br><br>• Analysis of these bullet fragments and casings, as well as the bullets recovered from the victims' bodies, revealed they were fired from the same gun. Tr.T., ECF.21-1, PAGEID#:10254, 10261-262; Lab Rpt., States Tr.Ex.142, ROW Apx., ECF.20-31, PAGEID#:9608-610.<br><br>• In addition to the bullet fragments and casings, officers located other evidence at the apartment—a drinking glass from which Richard and Quanita both stated Keith drank, a green trash bag, and broken glass from the door. Tr.T., ECF.21-1, PAGEID#:10094, 10193, 10241-242; Drinking glass, States Tr.Ex.55, ROW Apx., ECF.20-31, PAGEID#:9519; Lab Rpts., States Tr.Exs.139-140, ROW Apx., ECF.20-31, PAGEID#:9605-606. |
| **Timing does not line up**<br><br>• The bullet casing was found outside the home of Fernelle [sic] Graham, who lived across from the GE plant. Graham testified that it was "a quarter to ten" when she looked out her window and saw someone had thrown trash in front of her house. ECF 21-1, PageID 10117-120 ("on the curb and on my sidewalk and out into | **Timing *does* line up**<br><br>• Keith wants this Court to believe that because Farnella Graham saw trash in her yard before he arrived to pick Zina Scott up from work at the GE plant at 11:00 p.m. that it means the shell casing was already in Graham's yard at 9:45 p.m. However, there is no evidence in the record to support that conclusion. Rather, the evidence which was |

44

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| the street"). According to Graham's testimony, the bullet was found in that trash. ECF 21-1, PageID 10124.<br><br>• Zina Scott testified that Keith picked her up at the GE plant at 11 p.m. ECF 21-1, PageID 10098. This means the trash and bullet were supposedly on Graham's sidewalk an hour and fifteen minutes before Keith was even in the area.<br><br>• The Warden's counsel now claims that the bullet was not tied to the trash, but the same counsel at Kevin's clemency proceedings argued that the bullet and trash were connected—counsel offered a statement by a McDonalds employee that she had seen a man matching Kevin's description in the drive-thru, and that a McDonalds bag and wrappers were found at Graham's home. State's Clemency Br. at 14. | before the jury was that Graham found the bullet casing the morning *after* the murders, and consequently, *after* Keith picked up Zina, not before. Tr.T., ECF.21-1, PAGEID#:10116-117.<br><br>• Graham testified that, at approximately 9:45 p.m. on February 13, 1994, she noticed trash on the sidewalk in front of her home which was directly in front of the driveway to the General Electric plant. Tr.T., ECF.21-1, PAGEID#:10116-118, 10123-124.<br><br>   ○ Graham did not say she saw the *shell casing* the night of the murders. Rather, she *saw the trash* the night of the murders and found the casing the next morning.<br><br>   ○ There was no testimony offered that Graham saw the shell casing in her yard at the same time she saw the trash.<br><br>• Graham picked up the trash from her sidewalk when she awoke the next morning. Tr.T., ECF.21-1, PAGEID#:10117. When she picked up the fast food trash, she located the spent shell casing. *Id.* at PAGEID#:10117-118, 10123-124.<br><br>• Not knowing the significance of the shell casing, Graham threw it and the trash into her kitchen garbage can. Tr.T., ECF.21-1, PAGEID#:10118, 10125-127.<br><br>• Graham's daughter, having heard about the shootings which had occurred the night before, called the police to respond to her mother's home to retrieve the shell casing. Tr.T., ECF.21-1, PAGEID#:10118-119.<br><br>• Officer John Seif testified that he met with Graham and retrieved the spent shell casing from her trash can. Tr.T., ECF.21-1, PAGEID#:10128-129; Seif Rpt., ROW Apx., ECF.20-27, PAGEID#:8146.; Police Rpt. p.29, ROW Apx., ECF.20-20, PAGEID#:6233.<br><br>• Scientific analysis of the shell casing |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | Graham located on her walkway revealed it matched the casings located at the crime scene. Tr.T., ECF.21-1, PAGEID#:10254, 10261-262; Lab Rpt., States Tr.Ex.142, ROW Apx., ECF.20-31, PAGEID#:9608-610. |
| **Call logs say McDonald's**<br><br>• Police dispatch call logs—the same ones showing no call from Nurse Foor—show that the bullet casing may have actually been found at a McDonald's over a mile away, not at Graham's home in front of the GE plant. ECF 1-26, PageID 202. | *Dispatch logs*<br><br>• The police *dispatch logs* (which are different than call logs) do have a notation that "woman found casing; thinks she may have picked it up in McDonald's area." Log, ROW Apx., ECF.20-24, PAGEID#:7109.<br><br>• Keith would have this Court believe a one-line notation by a police dispatcher over the testimony by the witness that found the evidence and the officer that recovered the evidence.<br><br>• Keith fails to disclose to the Court that the testimony was that Graham did not make that call; rather it was Graham's *daughter* that made the call to police. Tr.T., ECF.21-1, PAGEID#:10118-119. The fact that someone other than Graham called the police coupled with the fact that a dispatcher was probably typing the log as they were dispatching an officer to respond is likely the explanation for the confusion.<br><br>• Both Graham and the responding officer testified as to where the recovered casing was found. Tr.T., ECF.21-1, PAGEID#:10116-130. |
| **Demetrius Reeves**<br><br>• The father of the surviving children, Demetrius Reeves, also worked at the GE plant at the time. ECF 21-1, PageID 10400.<br><br>• Demetrius Reeves was friends with the Meltons, having went to school with them, and also assisted them in the Pharmacy Burglary Ring as a driver. ECF 21-1, PageID 10365, 10396-97.; ECF 20- | **\*\* Demetrius and Joyce Reeves**<br><br>• Demetrius Reeves: the statement that Demetrius threatened to kill his wife and children (and the citation Keith includes as reference) **is not to testimony, but rather to the *opening statement* of Defense Counsel James Banks.** Opening Stmt., Tr.T., ECF.21-1, PAGEID#:10300. In fact, when Attorney Banks asked Demetrius about that alleged matter on direct |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| 20, PageID 6158.<br><br>• Demetrius Reeves threatened to kill his wife and his children because his wife was living with a white man, and he asked friends for money to get out of town because he killed his wife and kids. ECF 21-1, PageID 10300. Joyce Reeves, Demetrius' wife, testified that there was a large black man following her in a light colored car after the murder which caused her to fear for her safety. ECF 21-1, PageID 10440. | examination Demetrius *denied* he ever threatened to kill his wife and children and *denied* he requested money to flee town because he had murdered his wife and children. *See* Demetrius Testimony, Tr.T., ECF.21-1, PAGEID#:10398.<br><br>• Joyce Reeves: **the statement about Joyce Reeves *testifying* she was afraid for her safety because she was being followed is patently false.** Joyce never was asked, nor did she offer any such testimony. *See* Joyce Testimony, Tr.T., ECF.21-1, PAGEID#:10284-287. In fact, Defense Counsel did not ask Joyce *any* questions at all. *See id.* Rather, the page citation Keith gives, and the only testimony regarding any allegation that Joyce was fearful for her safety, came from Captain Corwin testifying about hearsay statements he received. *See* Corwin Testimony, Tr.T., ECF.21-1, PAGEID#:10440. |
| **Rodney Melton** | **Rodney Melton** |
| • Rodney Melton appeared at the crime scene after the police arrived and revealed knowledge of the bullets. Melton knew the specific type of bullet involved (9mm) and told the police that if the shooter used that type of bullet, he must have come in from Detroit. ECF 21-1, PageID 10363-64. | • Keith has presented Rodney Melton as the "alternate suspect" since his trial. *See, e.g., State v. Keith*, 2017 Ohio App. LEXIS 2545, at *23-27, n.9 ("Both at his trial and following his convictions Keith has strongly pursued the defense that another man committed the killings, specifically Rodney Melton. *That theory was presented at trial*, along with multiple other individuals the defense contended were the potential killers. Rodney Melton, along with the others, actually testified for the jury to see and hear and the jury rejected the defense's theories."<br><br>• Rodney was called to testify by Keith twice. Tr.T., ECF.21-1, PAGEID#:10364-374; PAGEID#:10448-456.<br><br>• Rodney testified he went to the scene after hearing that there was a shooting at Marichell's apartment. Tr.T., ECF.21-1, PAGEID#:10367.<br><br>• Rodney also testified that it was a possibility |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | that he was Marichell's father. Tr.T., ECF.21-1, PAGEID#:10374. |
| **Snow Bank – License Plate** | **Snow Bank – License Plate** |
| • Rodney Melton's license plate also contains "043" and the color of his vehicle, unlike Kevin, actually matches the description of the vehicle. ECF 21-1, PageID 10367, 10371.<br><br>• The Warden in her brief states that Agent Barnes "testified that, on the night of the murders, he saw the imprint of the numbers 'zero, 4, 3' in the snow.'" ECF 26, PageID 10853. But that is not so. At trial, Barnes was shown a picture of the impression and asked what the picture "depicted," and Barnes described the picture as "showing" those three numbers. ECF 21-1, PageID 10165.<br><br>• The Warden also cites the cast and the photographs submitted as trial exhibits, but those, if anything, undercut her claim that these numbers'—let alone the numbers' positioning on the plate—were "visible to the naked eye." See PageID #: 9452-53, 9464-66.<br><br>• The other evidence the Warden cites (ECF 26, PageID 10853) was not submitted at trial, and therefore did not play into the weight the jury would have accorded Yezzo's testimony (see below). ECF 20-31, PageID 9450-51. | • Rodney Melton's light crème colored 1979 Impala was inoperable the night of the murders and it does not match Smathers' descriptions. Tr.T., ECF.21-1, PAGEID#:10372; Corwin Rpt. p.30, 47, ROW Apx., ECF.20-20, PAGEID#:6234, 6251.<br><br>• Keith misleads the Court in repeatedly saying "Rodney Melton's plate *also contains* "043." Rather, the testimony clearly shows that it was Rodney's *former and expired* plate that contained the numbers "043" in the beginning of the plate. Rodney's *former* 043 license plate was "an older plate, expired for some period of time, and the letters and numbers were oppositely displayed as to what they are here." Tr.T., ECF.21-1, PAGEID#:10484. ("The difference being the 043 on this plate [State's Exhibit 78] is on the right side and Rodney Melton's older registration, the 043 would be on the left or come first as you are reading left to right."). Rodney's valid plate was "JKZ218." Pharm. Rpt., ROW Apx., ECF.20-20, PAGEID#:6149.<br><br>• The day after the murders, Smathers described in her written statement that she witnessed the getaway vehicle slide into a snow bank underneath a street light while attempting to speed away. Smathers' Written Stmt., Def. Tr.Ex.9, ROW Apx., ECF.20-32, PAGEID#:9651; Police Rpt. p.3, ROW Apx., ECF.20-20, PAGEID#:6207; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622.<br><br>• At the scene, BCI Special Agent David Barnes observed with the naked eye the impression in the snow bank left by the vehicle's front bumper and license plate, as |

48

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

|  | well as tire tracks leading to the snow bank. Tr.T., ECF.21-1, PAGEID#:10164-165; *see also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883 "043" ("South of the office, on the south side of this drive, was a snow bank approximately two feet high. The impact of a motor vehicle was evidence in this snow bank, as an area of snow was apparently pushed back by a bumper, above a tire track."). |
|---|---|
|  | • Agent Barnes testified that he "[w]ent to see what kind of physical evidence could be recorded or collected there. And there appeared to be two different types. One was a tire track and immediately in front of that, an indentation in the snow which appeared to be made by the front bumper or a bumper of a motor vehicle, and also impacted in farther was an indentation vertically in the snow bank were apparently three numbers, that because of their size, I felt most probably came from the license plate." Tr.T., ECF.21-1, PAGEID#:10164-165. Agent Barnes *then* described the photograph showing the indentation he observed in the snowbank "showing the three numbers: zero, 4, 3." *Id.* at PAGEID#:10165. |
|  | • The record belies Keith's assertion that Agent Barnes did not see the imprint of the numbers "zero, 4, 3" in the snow. Tr.T., ECF.21-1, PAGEID#:10165; *see also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883 ("Coexisting in the impression made by the bumper were three reversed numerals, consistent in size with those on a license plate. These numerals seemed to be 043."). Police Rpt. p.23, 24, ROW Apx., ECF.20-20, PAGEID#:6227, 6228. |
|  | • After seeing the numbers in the snow, Agent Barnes took measurements, photographs, and made plaster casts of the tire tread, license plate, and bumper impressions. *Id.* at PAGEID#:10166-168; *see also* plaster casts, |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#:9452-53; Photographs, States Tr.Exs.11-16, ROW Apx., ECF.20-31, PAGEID#:9463-68; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883. |
| | • The plaster casts and the photographic evidence submitted at trial, rather than "undercut[ting the Warden's] claim that these numbers'—let alone the numbers' positioning on the plate—were 'visible to the naked eye'" show that the jury had the ability to see what the officers saw. The fact that the plaster casts did not photograph well for the purposes of the habeas record does not mean the numbers are not clearly visible to someone actually looking at the fragile casts. Keith's implication otherwise is disingenuous. |
| | • Moreover, while the police reports of other officers were not submitted to the jury and "did not play into the weight the jury would have accorded Yezzo's testimony," the reports show that officers were able to determine without the assistance of Yezzo or any other expert that they were looking for a vehicle with "0,4,3" in the license plate and that they were able to determine from visual inspection of the snow bank that the numbers came at the end of the plate rather than in the beginning of the plate. *See* Koepke Rpt. pg.3, Def. Tr.Ex.6, ROW Apx., ECF.20-20, PAGEID#:6207; ECF.20-32, PAGEID#:9622 (which *was* submitted to the jury) ("There was 1 tire track imprint, scrapes of front underside, and poss[ible] partial front plate impression."); Harden Rpt., Def. Ex.10, ROW Apx., ECF.20-32, PAGEID#:9653 (which *was* submitted to the jury) ("Examination of the snow bank revealed a partial license plate of _ _ _ 043 in the snow."); Beal Rpt. pg.6, ROW Apx., ECF.20-20, PAGEID#:6210 ("I assisted in making a plaster cast of the tire print and a partial license plate print from the snow. The |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | number appeared to be _ _ _046, 048, or 043."). |
| **Snow Bank – Tire tread** | **Snow Bank – Tire tread** |
| • Keith is unable to discern what the Warden means when she says that the tire tread at the scene "[a]ppeared similar to tires on car from visual observation." ECF 26, PageID 10891.<br><br>• To the contrary, the state's own theory is that "the tread designs on the tires on the Oldsmobile were not consistent with the tread from the photographs or the plaster cast." ECF 26, PageID 10858.<br><br>• To the extent the Warden means that the tire tracks appeared consistent with the brochure used by Yezzo, nowhere does the Warden show where that was put in front of the jury other than through Yezzo's testimony. ECF 20-1, PageID 572, 581-83. | • At the snow bank where Smathers observed Keith get his vehicle stuck, officers located a partial tire imprint, as well as a partial license plate imprint; Koepke Rpt. p.3, Def. Tr.Ex.6, ROW Apx., ECF.20-20, PAGEID#:6207; Def. Tr.Ex.6, ROW Apx., ECF.20-32, PAGEID#:9622.<br><br>• Keith asserts there was no evidence put in front of the jury—other than through Yezzo's testimony—that the tire tread found at the scene, photographed, and a plaster cast made, was consistent with the tire brochure. Keith apparently dismisses the notion that the jury could compare the photographs, the plaster cast, and the brochure themselves, as the items were placed into evidence by individuals other than Yezzo. *See* Tr.T., ECF.21-1, PAGEID#:10165-67 (Barnes identifying the plaster casts he created, and photographs he took); Tr.T., ECF.21-1, PAGEID#:10135  (Alton Davison identifying the documentation from Firestone when he purchased the tires for his car in August 1993). This is inconsistent with Keith's later implication that Yezzo gave testimony which was no more meaningful than that of a lay witness. *See* Traverse, ECF.28, PAGEID#:11005 (citing Bodziak Rpt., ROW Apx., ECF.20-26, PAGEID#:7895) ("Bodziak explained that 'the forensic use of the word similar has no further meaning than it would for a layman in that it can only attest to a visual likeness of sorts.'"). |
| | **Vehicle Located** |
| | • When Officer Cochran checked the sweat pants, she became suspicious and contacted another deputy for assistance. Melanie Davison arrested for bringing drugs to Keith in jail in light colored '82 Omega. Tr.T., |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | ECF.21-1, PAGEID#:10108-109; *see also* Report, ROW Apx., ECF.20-11, PAGEID#:3890-897. Cochran Rpt., ROW; Apx., ECF.20-11, PAGEID#:3897; Police Rpt. p.58, ROW Apx., ECF.20-20, PAGEID#:6262. |
| | • Deputy Scott Robertson testified that after his conversation with Officer Cochran, he contacted the Crestline Police Department to have them be on the lookout for Davison. Tr.T., ECF.21-1, PAGEID#:10111; Police Rpt. p.58, ROW Apx., ECF.20-20, PAGEID#:6262. |
| | • Crestline Officer Edward Wilhite testified that he located and stopped Davison's vehicle. *Id.* at PAGEID#:10113-114. |
| | • Upon stopping her vehicle, Patrolman Wilhite noticed the last three numbers on the license plate matched the license plate numbers that the Bucyrus Police Department wanted in connection with the shootings. *Id.* at PAGEID#:10114; *see also* Robertson Rpt., ROW Apx., ECF.20-11, PAGEID#:3890. |
| | • The car, a light-colored 1982 Oldsmobile Omega, with a license plate of MVR043, was subsequently impounded. Tr.T., ECF.21-1, PAGEID#:10115; *see also* Robertson Rpt., ROW Apx., ECF.20-11, PAGEID#:3890; Photos of Omega, States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543; ; Police Rpt. p.59, ROW Apx., ECF.20-20, PAGEID#:6263. |
| **Vehicle Owned by Alton Davison** | **1982 Oldsmobile Omega owned by Alton Davison** |
| • The vehicle owned by Alton Davison does not match the description given by Nancy Smathers, who said the car she had seen was a "white, cream, light yellow" two-door car. The '82 Omega was a green four-door car. ECF 21-1, PageID 10077, 10138-39, 10219. | • The 1982 Oldsmobile Omega was a light green or bluish/silver color. Photos of Omega, States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543. |
| • Rodney Melton's license plate also | • As described by Smathers, the vehicle had a nearly straight rear window, a trunk which extended from the rear glass, and rectangular |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

contains "043" and the color of his vehicle, unlike Kevin, actually matches the description of the vehicle. ECF 21-1, PageID 10367, 10371.

- Yezzo's testimony regarding the placement of the numbers on the license plate is unreliable for the reasons explained below.

tail lights with an emblem between the rectangles. Photos of Omega, States Tr.Exs.77-78, ROW Apx., ECF.20-31, PAGEID#:9541-542; Corwin Rpt. p.60, ROW Apx., ECF.20-20, PAGEID#:6264.

- Officers discovered the license plate light did not function, nor did the dome light when the driver's door was opened, just as Smathers reported. Tr.T., EFC.21-1, PAGEID#:10201-202; Photos of Omega, States Tr.Exs.74-75, ROW Apx., ECF.20-31, PAGEID#:9538-539; *see also* Corwin Rpt., p.60, ROW Apx., ECF.20-20, PAGEID#:6264; Harden Rpt., Def. Tr.Ex.10, ECF.20-32, PAGEID#:9658.

- Officers also located a hand print (without sufficient ridge detail for a comparison) on the driver's side door frame near the front windshield—precisely where Smathers indicated Keith grabbed the frame to rock the car out of the snow. Tr.T., EFC.21-1, PAGEID#:10200-201; Photos of Omega, States Tr.Exs.72-73, ROW Apx., ECF.20-31, PAGEID#:9536-537; *see also* Corwin Rpt., p.60, ROW Apx., ECF.20-20, PAGEID#:6264; Harden Rpt., Def. Tr.Ex.10, ECF.20-32, PAGEID#:9658.

- The fact remains that, other than the number of doors on the vehicle and the fact that it had trim on the sides, the 1982 Omega which police recovered after Melanie Davison brought drugs to Keith in jail fits every major detail given by Smathers. The Omega is indeed a light colored car—in some of the photographs the car appears either light silver-grey, light greenish-blue, or cream. *See* States Tr.Ex.8, ROW Apx., ECF.20-31, PAGEID#:9460; States Tr.Exs.72-79, ROW Apx., ECF.20-31, PAGEID#:9536-543. It indeed had no working dome or license plate light. States Tr.Exs.74-75, ROW Apx., ECF.20-31, PAGEID#:9538-539; Tr.T., ECF.21-1, PAGEID#:10201-202. It had a mostly-

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | vertical rear window with a trunk that extended from the glass. States Tr.Exs.77-78, ROW Apx., ECF.20-31, PAGEID#: 9541-542. There was a smudge of a hand print on the door frame, exactly where Smathers said Keith grabbed when he was rocking the car out of the snow. States Tr.Exs.72-73, ROW Apx., ECF.20-31, PAGEID#:9536-537; Tr.T., ECF.21-1, PAGEID#:10200-201. And, as will be explained *infra*, the license plate ended in "043" just like the numbers the officers observed in the snow bank. States Tr.Exs.78-79, ROW Apx., ECF.20-31, PAGEID#:9542-543; Tr.T., ECF.21-1, PAGEID#:10200. |
| | • Rodney Melton's light crème colored 1979 Impala was inoperable the night of the murders and it does not match Smathers' descriptions. Tr.T., ECF.21-1, PAGEID#:10372; Corwin Rpt. p.30, 47, ROW Apx., ECF.20-20, PAGEID#:6234, 6251. |
| | • Keith misleads the Court in repeatedly saying "Rodney Melton's plate *also contains* "043."" Rather, the testimony clearly shows that it was Rodney's *former and expired* plate that contained the numbers "043" in the beginning of the plate. Rodney's *former* 043 license plate was "an older plate, expired for some period of time, and the letters and numbers were oppositely displayed as to what they are here." Tr.T., ECF.21-1, PAGEID#:10484. ("The difference being the 043 on this plate [State's Exhibit 78] is on the right side and Rodney Melton's older registration, the 043 would be on the left or come first as you are reading left to right."). Rodney's valid plate was "JKZ218." Pharm. Rpt., ROW Apx., ECF.20-20, PAGEID#:6149. |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| Plate: | Plate: |
|---|---|
| <ul><li>Rodney Melton's license plate also contains "043" and the color of his vehicle, unlike Kevin, actually matches the description of the vehicle. ECF 21-1, PageID 10367, 10371.</li><li>Report by William J. Bodziak (expert in forensics) challenges Yezzo's process and conclusions.<ul><li>Bodziak concludes that there was no evidence of any numeral "3." ECF 20-26, PageID 7893.</li><li>Bodziak also concludes that there was no way of knowing where the "4" and the "0" appeared on the license plate because no reference areas appear on the photographs, which were the only things Yezzo examined. ECF 20-26, PageID 7893.</li><li>Bodziak also concludes that the bumper impressions in the snow bank were not consistent with the profile of the front of the Omega. ECF 20-26, PageID 7891.</li></ul></li></ul> | <ul><li>Rodney Melton's light crème colored 1979 Impala was inoperable the night of the murders and it does not match Smathers' descriptions. Tr.T., ECF.21-1, PAGEID#:10372; Corwin Rpt. p.30, 47, ROW Apx., ECF.20-20, PAGEID#:6234, 6251.</li><li>Keith misleads the Court in repeatedly saying "Rodney Melton's plate *also contains "043."* Rather, the testimony clearly shows that it was Rodney's *former and expired* plate that contained the numbers "043" in the beginning of the plate. Rodney's *former* 043 license plate was "an older plate, expired for some period of time, and the letters and numbers were oppositely displayed as to what they are here." Tr.T., ECF.21-1, PAGEID#:10484. ("The difference being the 043 on this plate [State's Exhibit 78] is on the right side and Rodney Melton's older registration, the 043 would be on the left or come first as you are reading left to right."). Rodney's valid plate was "JKZ218." Pharm. Rpt., ROW Apx., ECF.20-20, PAGEID#:6149.</li><li>Upon obtaining the 1982 Oldsmobile Omega when Ms. Davison was arrested, officers observed that the placement of the license plate, the numbers, and bumper appeared to match the impressions left in the snow. *See, e.g.,* Tr.T., ECF.21-1, PAGEID#:10199-200; States Tr.Exs. 8, 11-14, 79, PAGEID#:9460, 9463-466, 9543; *see also* Corwin Rpt, ROW Apx., ECF.20-21, PAGEID#:6434, 6435-436 (describing Agent Harden comparing the measurements taken from the snow bank to the vehicle). The measurements taken at the scene also appeared to match, but the car was sent for analysis to confirm the officers' observations. *Id.*</li><li>Yezzo testified that she analyzed the photographs of the snow bank, the plaster casts, and the vehicle to determine the</li></ul> |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| | license plate and bumper on the Omega were similarly placed on the vehicle as on the vehicle which made the impression in the snow bank. Yezzo Depo., ROW Apx., 20-1, PAGEID#:559-89; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9449-451. |
| | • In contrast, Bodziak did not review the plaster casts, the measurements, or the vehicle. Bodziak Rpt., ROW Apx., ECF.20-26, PAGEID#:7890. Rather, he reviewed the testimony, photographs, and the Firestone documents. *Id.* Curiously, Bodziak was able to conclude the plate was *not* consistent with the snow bank without ever looking at the actual car and measurements from the scene (as Yezzo had) and without reviewing the plaster cast (which Yezzo had). Without the benefit of the cast, and evidently without looking at the photographs in which the bumper impression is clearly visible, Bodziak concludes there was no way to determine the placement on the plate of the "0" and the "4" (he claims there is no evidence of a "3"). *Id* at PAGEID#:7893. See State's Exhibits 11-14, ROW Apx., ECF.20-31, PAGEID#:9463-466. *See also* photographs with notations which the Warden has prepared to assist this Court (which were *not* presented to the jury but which the Warden believes may be beneficial for the Court's review) attached to this sur-reply. |
| **Tires:** | **Tires:** |
| • Yezzo never actually examined the tires, she rendered her conclusions based off a brochure. ECF 20-1, PageID 580 and ECF 20-31, PageID 9450. | • It is undisputed that the tires on the Omega were not the same as those the owner had purchased six months before the murders. |
| • Yezzo rendered her conclusions after receiving input from Bucyrus Police Captain Michael Corwin. ECF 1-23, PageID 181-86 and ECF 20-1, PageID 572, 581-83. | • Keith now admits the tires *were* changed without the knowledge of the vehicle's owner, Alton Davison. Yet he now claims it was Alton's granddaughter, Melanie (the same person who was arrested after bringing drugs to Keith in the county jail) |
|     o Captain Corwin faxed Yezzo a |     o Melanie's statement does not help Keith |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

receipt for the type of tires purchased by Alton Davison (the owner of the Omega) the previous year and put on his car, and he also sent her a brochure picture of the tires. ECF 1-23, PageID 181-86 and ECF 20-26, PageID 7924-26.

- o Corwin specifically pointed out to Yezzo which tire picture in the brochure was the tire previously put on the car. Corwin wrote a note to Yezzo that he "hope[d] this will do the trick for us." ECF 1-23, PageID 186. Five days later, Yezzo rendered her conclusion—based upon the brochure pictures of tires—that the tires formerly on Davison's car were similar in tread design to the tire tracks at the scene. ECF 20-1, PageID 572, 581.

- As for the evidence that the tires were changed on the Omega, Melanie Davison (the granddaughter of the car owner) provided a sworn statement that she changed the tires because they were slashed. If Melanie had gone through the trouble of changing the tires to avoid the tire evidence, she surely would have also gotten rid of the license plate, since it was widely publicized that the car had left a license plate impression at the scene Ex.9

at all, a fact that most certainly Keith's counsel recognized at some point since Keith failed to raise this argument anytime in state or federal court since he first obtained the statement in September 2010.

- o Keith's timing that does not line up. In Melanie's "sworn statement" regarding changing the tires, she indicated that she changed the tires in *January*, but the murders occurred on *February 13*. *See* Davison 2010 Stmt, ECF.28-9, PAGEID#:11149.

- o The obvious question is, **if Melanie changed the tires in _January_ and the murders occurred in _February_, would not the tires that were on the car when Melanie was arrested in _March_ be the same tires that left the tire tracks at the scene in _February_?**

  - ▪ A simple comparison of the photographs of the tires on the vehicle with the photographs of the tire tracks at the scene show even a non-tire-expert that the treads are markedly different. Compare Photo of Tire, States Tr.Ex.10, ROW Apx., ECF.20-31, PAGEID#:9462 with Photos of Tire Track, States Tr.Exs.15-16, ROW Apx.20-31, PAGEID#:9467-468.

- Keith asserts Yezzo never examined the tires, but that is false, in part. Yezzo *did* examine the tires that were on the vehicle at the time the car was impounded. Yezzo Depo, ROW Apx. 20-1, PAGEID#:559-589. Of course she could not examine the tires that were on the vehicle at the time of the murders because the tires had been changed between the murders and the time of impound.

- Bodziak also did not examine an actual tire. Rather, he reviewed the testimony,

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

|  | photographs, and the Firestone documents. Bodziak Rpt., ROW Apx., ECF.20-26, PAGEID#:7890. He did not review the plaster cast. ." Bodziak Rpt., ROW Apx., ECF.20-26, PAGEID#:7894.Yet even he stated "The photograph revealed similar design features to the Firestone Triumph 2000 tire." *Id.* |
|---|---|
|  | • Alton, the owner of the Omega, testified he purchased the car in June 1993, and in August 1993 he purchased four new tires for the vehicle from Firestone in Mansfield, Ohio. Tr.T., ECF.21-1, PAGEID#:10134-135; Receipt, States Tr.Ex.19; ROW Apx., ECF.20-31, PAGEID#:9471; Firestone Docs, States Tr.Ex.7; ROW Apx., ECF.20-31, PAGEID#:9456-459. |
|  | • Alton estimated the tires had 3000 miles of usage between August 1993 and February 1994. Tr.T., ECF.21-1, PAGEID#:10136. He further testified he had no reason to replace the tires in that time period, nor did he authorize anyone to change the tires. *Id.* |
|  | • When Yezzo analyzed the vehicle, she determined the tires Alton had purchased in August were no longer on the vehicle. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571-72, 574; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Photos, States Tr.Exs.9-10, 15-16, ROW Apx., ECF.20-31, PAGEID#:9461-462, 9467-468. |
|  | • The tires found on the Omega at the time it was impounded were not even manufactured until the third week of January 1994, making it impossible these were the tires Alton had purchased in August of 1993. Yezzo Depo., ROW Apx., 20-1, PAGEID#:574, 579-80; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451. |
|  | • Yezzo indicated that the tires did not appear to be professionally balanced, and therefore, may not have been placed by a dealer. Yezzo Depo., ROW Apx., 20-1, PAGEID#:587-88. |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

|  |  |
|---|---|
|  | • The tread designs on the tires on the Oldsmobile were not consistent with the tread from the photographs or the plaster cast. Yezzo Depo., ROW Apx., 20-1, PAGEID#:571-72, 574; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Photos, States Tr.Exs.9-10, 15-16, ROW Apx., ECF.20-31, PAGEID#:9461-462, 9467-468. |
|  | • The tread design *was* consistent with the tires Alton had purchased and placed on the vehicle in August. Yezzo Depo., ROW Apx., 20-1, PAGEID#:572; Yezzo Rpt., States Tr.Ex.1, ROW Apx., PAGEID#:9451; Tire documents, States Tr.Exs.7, 17-19, ROW Apx., ECF.20-31, PAGEID#:9456-459; 9469-471; Photos, States Tr.Exs.9-10, ROW Apx., ECF.20-31, PAGEID#:9461-462. |
|  | • The jury had the photographs of the tire tracks in the snow, the plaster cast, and the tire documentation to review in order to make their own comparisons. Plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#: 9452-453; Photos, States Tr.Exs.9-16, ROW Apx., ECF.20-31, PAGEID#:9461-468. |
| **Kevin Keith's motive** | **Keith's Motive** |
| • As a result of the drug raid, Keith was charged with selling what equaled to less than 3 grams of crack cocaine. The sentencing outcome of the others charged demonstrates that the harshest punishment he likely would have received would have been two years in prison. Ex. 1 | • Keith's victims were related to Rudel Chatman, the confidential informant that was involved in Keith's drug case and for which he was out on bond at the time of the aggravated murders. |
| • The only evidence of "Kevin" telling the victims that Rudel should not have snitched is Warren's testimony that the shooter made this statement before pulling the trigger, and his later identification of Kevin as the shooter, which, for the reasons explained above and in the brief, would carry little weight given the newly discovered evidence in | • Keith told the victims before shooting that her brother should not have been ratting on people. Corwin Rpt. p.27 ROW Apx., ECF.20-20, PAGEID#:6402; Warren Telephone Stmt., Def. Tr.Ex.4, ECF.20-32, PAGEID#:9617; Tr.T., ECF.21-1, PAGEID#:10031. |
|  | • Keith asserts that he did not have a motive to harm Rudel or his family because he likely would have only had a short prison term. |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| this case. | This assertion makes little sense. First, Keith would not have known what his sentence would be for the case for which he was out on bond at the time he committed the murders. Keith likely believed he could avoid any prison time at all if he could eliminate the confidential informant, or scare him into silence.<br><br>• The police reports belie Keith's implication that he did not have a motive to harm Rudel or his family. Rather, the reports detail that Keith and/or members of his family threatened Rudel following his drug indictment. *See, e.g.,* Police Rpt., p.29, ROW Apx., ECF 20-20, PAGEID#:6233; Corwin Rpt., p.42, 44, 64, ROW Apx., ECF 20-20, PAGEID#:6246, 6248, 6268. |
| **Rodney Melton's motive**<br><br>• Rodney Melton had a far stronger motive to kill Rudel Chatman. Not only that, he professed an actual plan to do so.<br><br>• Rudel Chatman was also an informant in relation to the Meltons, and the Meltons knew this before the murders. ECF 20-26, PageID 7998, 7999, 8015, 8036-37.<br><br>• In the weeks preceding the murders, Rodney Melton expressed to multiple people that anyone who snitched on him would be killed. Rodney had told Yolanda Price before the murders that "if Rudel ever snitched on me, I'd kill him." ECF 1-3, PageID 43.<br><br>• Rodney had also told a confidential police informant that "he had been paid $15,000 to cripple 'the man' who was responsible for the raids in Crestline, Ohio last week." ECF 20-20, PageID 6149. Rudel Chatman was the man responsible for the Crestline drug raids on January 21, 1994. ECF 21-1, PageID 10279-81, 10524.<br><br>• After the murders, Rodney went to the hospital and told a member of the victims' | **Rodney Melton's motive**<br><br>• Keith claims Rodney had motive to kill Rudel Chatman, but Keith fails to take into account that Rodney was most possibly related to the Rudel's family. Rodney testified that it was a possibility that he was Marichell's father. Tr.T., ECF.21-1, PAGEID#:10374.<br><br>• As explained above, the police reports belie Keith's implication that he did not have a motive to harm Rudel or his family. Rather, the reports detail that Keith and/or members of his family threatened Rudel following his drug indictment. *See, e.g.,* Police Rpt., p.29, ROW Apx., ECF 20-20, PAGEID#:6233; Corwin Rpt., p.42, 44, 64, ROW Apx., ECF 20-20, PAGEID#:6246, 6248, 6268.<br><br>• Just like with the Yezzo personnel file, Keith takes hearsay-within-hearsay statements as fact that Rodney made threats against Rudel.<br><br>• Keith also fails to recognize that he presented the theory that Rodney was the "real killer" to the jury, that he called Rodney to testify twice, that he asked about the pharmacy robberies, and that he asked about Rodney's Impala and license plates. |

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

| | |
|---|---|
| family, Tom Chatman, that the shooting happened because Rudel Chatman had been "setting people up." ECF 21-1, PageID 10443. | However, the jury evidently did not find any reasonable doubt about Keith's guilt despite his assertions that Rodney had the greater motive, had a car and old plate that might have been an option as the getaway vehicle, or that Rodney's presence at the scene. |
| | • Nothing Keith has asserted about Rodney's motives or Rodney being the "real killer" since the time of trial is any different than what he presented to the jury in the first place. |
| **Yezzo:** | **Yezzo** |
| • Yezzo was permitted to testify via deposition because she was a "material" witness. (Ohio Crim. R. 15(A)). | • Testimony provided by deposition read into the record due to her unavailability for trial because she was out of state at a conference. Tr.T., ECF.21-1, PAGEID#:10277. |
| • Yezzo is an unreliable witness. The consensus among her colleagues was that "[h]er findings and conclusions regarding evidence may be suspect. [And s]he will stretch the truth to satisfy a department." This was in a memorandum from 1989, before Kevin's trial. ECF 1-13, PageID 138. | • There was never a motion requesting the deposition or an entry placed in the record ordering the deposition, therefore, Keith's trial counsel apparently consented to the taking of the testimony by deposition. |
| • In the notes detailing the investigation of Yezzo for "threatening co-workers and failure of good behavior," ECF 20-26, PageID 7910, it was noted that Yezzo had a "reputation of giving dept. answer wants if stroke her." ECF 20-26, PageID 7496-98, 7510. In the same notes, it was recorded that the analysts reworking Yezzo's cases questioned Yezzo's conclusions on a blood analysis and a partial footprint analysis. This documentation, again, is dated before Kevin's trial. ECF 12, PageID 161. | • While the prosecutor laid the foundation to have Yezzo qualified as an expert, when the deposition was read into the record, the prosecutor never moved to have her admitted as an expert. *See* Tr.T., ECF.21-1, PAGEID#:10277. |
| | • Keith takes the contradictory stance that Yezzo's testimony regarding the tire tread and license plate must be rejected because of the hearsay-within-hearsay contents of her personnel file, but Keith uses as support for his alleged innocence her lack of finding any fibers, fingerprints, or shoe prints which could be connected to Keith. *See, e.g,* Traverse, ECF.28, PAGEID#:10998. Keith wants it both ways—to discredit Yezzo's *inculpatory* findings, but embrace her *exculpatory* findings. |
| • A reprimand in Yezzo's personal file revealed that Yezzo's "interpretational and observational errors" were "failures that could lead to a substantial miscarriage of justice." ECF 20-26, PageID 7905. | ○ Keith fails to recognize that excluding Yezzo's inculpatory testimony also excludes her exculpatory findings. |

61

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

- Yezzo was biased. Not only was Yezzo both verbally and physically abusive to her coworkers, Yezzo's documented use of racial slurs ("nigger bitch," "nigger in a woodpile") when addressing an African-American co-worker in a professional environment is strong evidence of her bias. ECF 20-26, PageID 7914-15, 7917, 7919.

- Lee Fisher—the Ohio Attorney General at the time of Kevin's trial—would not have "permitted Ms. Yezzo to provide testimony against Kevin Keith" had he been aware of the information about her that was in her personnel file. ECF 20-26, Page ID 7889. He expressed his belief that "Yezzo's opinions were very likely wrong and that the prejudice in [Keith's] case is very significant." ECF 20-26, PageID 7889. Mr. Fisher was "deeply concerned that Ms. Yezzo's conclusions and testimony led to a miscarriage of justice in Mr. Keith's case." ECF 20-26, PageID 7889.

**Not Duplicative:**

- A forensic expert's testimony that purportedly scientific techniques proved the numbers—and the spacing of those numbers—in a license plate imprint is not duplicative of a lay officer's testimony that a picture shows those numbers (see above). It goes without saying that expert testimony holds particular sway over juries, which no doubt is why the state offered and relied on Yezzo's testimony at trial.

- Keith's allegation that Yezzo would "stretch the truth to satisfy a department" *see* Traverse, ECF.28, PAGEID#:10923, makes no logical sense in light of the fact that she found *no* fibers, fingerprints, or shoe prints which matched Keith. Yezzo Depo, ROW Apx., ECF.20-1, PAGEID#:574, 577, 584. If Yezzo truly would give departments the evidence that they wanted, why then did she find the lack of inculpatory evidence which would *directly* link to Keith and only found *circumstantial* evidence linking Keith to the crime by way of his girlfriend's car?

- The information contained in Yezzo's personnel file is hearsay-within-hearsay statements by her coworkers, and detail interpersonal issues she had with her coworkers. Other than these hearsay statements, Keith points to no findings from the time period around his trial that her work was actually suspect or that disciplinary action was taken based upon her scientific analysis. In fact, no such disciplinary action was taken until 2008 in relation to Yezzo's analysis of glass and paint—neither of which were in issue in Keith's case. *See* Letter, Pet. Ex.14, ECF.1-14, PAGEID#:140-141. Rather, Yezzo's file was replete with accomplishments and accolades for her scientific work. *See* Yezzo Evals., ROW Apx., ECF.20-27, PAGEID#:8218-261; Letters, ROW Apx., ECF.20-27, PAGEID#:8334-431.

- Keith cannot escape the fact that, while Yezzo testified regarding the impressions in the snow, so did the officers. *See, e.g.,* Tr.T., ECF.21-1, PAGEID#:10164-165.

  o Agent Barnes testified that, on the night of the murders, he saw the imprint of the numbers "zero, 4, 3" in the snow. *Id.* at PAGEID#:10165; *see also* Barnes Rpt., ROW Apx.20-11, PAGEID#:3883 ("Coexisting in the impression made by the bumper were three reversed

**Keith's Mischaracterizations of the Evidence and What the Evidence Actually Shows**

<table>
<tr>
<td></td>
<td>numerals, consistent in size with those on a license plate. These numerals seemed to be 043.").

<ul><li>o Agent Barnes explained to the jury how he took measurements, photographs, and made plaster casts of the tire, license plate, and bumper impressions. *Id.* at PAGEID#:10166-168; *see also* plaster casts, States Tr.Exs.3-4, ROW Apx., ECF.20-31, PAGEID#:9452-53; Photographs, States Tr.Exs.11-16, ROW Apx., ECF.20-31, PAGEID#:9463-68; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883.</li></ul>

<ul><li>While Yezzo testified about the tire tread at the scene appearing similar to the tire brochure, Keith fails to acknowledge that the tire brochure, the plaster cast, and the photographs were all placed before the jury through other witnesses—namely Alton Davison (the brochure), Tr.T., ECF.21-1, PAGEID#:10135; States Tr.Ex. 7, ROW Apx., ECF.20-31, PAGEID#:9456-459, and Agent Barnes (the photographs and the plaster cast). Tr.T., ECF.21-1, PAGEID#:10164-168; *see also* plaster cast, States Tr.Ex. 4, ROW Apx., ECF.20-31, PAGEID#:9453; Photographs, States Tr.Exs.15-16, ROW Apx., ECF.20-31, PAGEID#:9467-468; Barnes Rpt., ROW Apx., ECF.20-11, PAGEID#:3883.</li></ul>

<ul><li>o The jury, therefore, had the necessary evidence in the jury room for them to make a comparison themselves, which is what we expect juries to do—to review the evidence they receive in the courtroom and to independently weigh and evaluate that evidence.</li></ul></td>
</tr>
</table>