**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **KEVIN KEITH,** | Case No. 1:18 CV 634 |
| Petitioner, | Judge Solomon Oliver, Jr. |
| v. | Magistrate Judge James R. Knepp II |
| **WARDEN LYNEAL WAINWRIGHT,** | |
| Respondent. | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Petitioner Kevin Keith ("Petitioner"), a prisoner in state custody, filed a fourth-in-time Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Following the Sixth Circuit's grant of authorization to file a successive habeas petition (Doc. 16), Respondent Warden Lyneal Wainwright ("Respondent") filed an Answer/Return of Writ (Doc. 26) and Petitioner filed a Reply/Traverse (Doc. 28). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Doc. 18). For the reasons discussed below, the undersigned recommends the Petition be DISMISSED.

### FACTUAL BACKGROUND

For the purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, erroneous factual findings by the state court. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state

1

court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. The undersigned thus begins with the Ohio Supreme Court's summary of the facts on direct appeal, and then further elaborates below.

On the evening of February 13, 1994, Marichell Chatman, her seven-year-old daughter, Marchae, and Richard Warren, who had been living with Marichell and Marchae for several weeks, were at Marichell's apartment in the Bucyrus Estates. At the time, Marichell was babysitting her young cousins, Quanita and Quinton Reeves. At approximately 8:45 p.m., Marichell's aunt, Linda Chatman, arrived at the apartment to pick up Quanita and Quinton, Linda's niece and nephew.

A few minutes after Linda arrived, Warren, momentarily diverted from a basketball game he was watching on television, noticed a man standing outside the apartment door. Although the man began to walk away without knocking, Warren opened the door. The man turned and asked for Linda.

While Linda went outside and spoke with the man, Marichell told Warren the man's full name. Although Warren could recall only the first name, Kevin, he later identified appellant as the man at the door. Marichell also mentioned that Kevin had been involved in a big drug bust.

After a short time, Linda and appellant returned to the apartment, where appellant and Warren had a brief conversation. According to Warren, appellant appeared to have his turtleneck shirt pulled up over the bottom part of his face and even drank a glass of water through it.

After drinking the glass of water, appellant pulled a nine-millimeter handgun from a plastic bag he carried and ordered everyone to lie on the floor. Appellant repeatedly scolded Marichell for using his first name when she asked what he was doing and why. Despite Marichell's pleas with appellant on behalf of the children, appellant placed the gun to her head. After ordering Marichell to be quiet, appellant said, "Well, you should have thought about this before your brother started ratting on people." Marichell responded, "Well, my brother didn't rat on anybody and even if he did, we didn't have anything to do with it." Testimony at trial confirmed that Marichell's brother, Rudel Chatman, was a police informant in a drug investigation involving appellant. According to the presentence report, the month prior to the murders, appellant was charged with several counts of aggravated trafficking.

Next, Warren heard a gunshot but was forced to turn away when a bullet struck him in the jaw. Warren heard ten to twelve additional shots, two more striking him in the back. After he heard the apartment door close, Warren ran out of the apartment, across a snow-covered field to Ike's Restaurant, yelling for help. Four or five more shots were fired, one striking him in the buttocks and knocking him down. Warren was able to get up and obtain help from the restaurant.

Another Bucyrus Estates resident, Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's dome light and the light around the license plate did not work. The driver rocked the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.

When medical personnel arrived at the Bucyrus Estates apartment, Linda and Marichell Chatman were dead, having suffered multiple gunshot wounds, including fatal wounds to the neck or head. All three children initially survived the attack. However, Marchae's two gunshot wounds to her back proved fatal. The Reeves children each sustained two bullet wounds and serious injuries.

Approximately eight hours after the shootings, Warren was recovering from surgery at a Columbus hospital. During a postoperative interview with a nurse, Warren wrote "Kevin" on a piece of paper as the name of his assailant. Later that day, Bucyrus Police Captain John Stanley had two telephone conversations with Warren. During the second conversation, Stanley mentioned three or four possible last names for Kevin. At trial, Stanley could only recall that he mentioned the names Kevin Thomas and Kevin Keith. Warren stated that he was seventy-five percent sure the name he heard from Marichell was Kevin Keith. When shown a photo array of six suspects, Warren chose appellant's picture and told police he was ninety-five percent sure that appellant was the murderer.

Investigators recovered a total of twenty-four cartridge casings from the crime scene area, which had all been fired from the same gun. In addition to those, investigators recovered a casing found on the sidewalk across from the entrance to a General Electric plant. On the night of the murders, appellant picked up his girlfriend, Melanie Davison, from work at the entrance to the General Electric plant where the casing was found.

At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number—"043." The indentation from the license plate matched the last three numbers of a 1982 Oldsmobile Omega seized from Melanie Davison shortly after she visited appellant in jail, under the pseudonym of Sherry Brown, a few weeks after the murders.

The Oldsmobile was registered to Alton Davison, Melanie's grandfather, and was also regularly used by Melanie. Davison had put four new tires on the Omega six months prior to the murders. Davison estimated that by February 1994, the new

3

tires had been driven less than 3,000 miles without any problems or need for replacement. Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast did match the tread of the tires purchased by Alton Davison as shown on the tire's sales brochures. Additionally, the tires found on the Oldsmobile Omega had been manufactured in January 1994 and showed a minimal amount of wear.

*State v. Keith*, 79 Ohio St. 3d 514, 514–16 (1997).

Further, the undersigned notes – simply for context – that before determining the instant petition would be permitted to proceed, the Sixth Circuit Court of Appeals presented the following summary of the facts as they relate to the instant petition (quoting, in large part, Judge Clay's dissent from an earlier successive petition denial):

The prosecution's theory of the case was that Keith murdered family members of Rudel Chatman to exact revenge for Chatman's assistance in an investigation that led to a drug trafficking raid and indictments against Keith and members of his family. Two victims survived the shooting.

The prosecution's star witness at trial was Richard Warren, an adult surviving victim, who selected Keith from a photo lineup and reiterated the identification at trial. The prosecution also presented Nancy Smathers, who testified that on the night of the murders, she heard shots, looked outside her window, observed a large stocky man jump into a car, and observed the car crash into a snowbank. In her first two statements to the police Smathers was unable to identify the assailant, but in her third statement, made after seeing Keith on a television news story, she identified the assailant as Keith. There was also eyewitness testimony from Quanita Reeves, a seven-year-old surviving victim, but Reeves told police that she was shot at by her "daddy's friend, Bruce" and excluded the picture of Keith from a photo lineup.

Keith was also connected to the crime by circumstantial physical evidence. Investigators made a cast of a tire tread and a cast of a partial license plate indentation from the snowbank identified by Smathers. The partial license plate number, "043," matched the last three numbers of a car to which Keith was known to have access. The prosecution presented evidence that prior to the shooting, the car's owner had purchased tires that were "similar in tread design" to the tread in the snowbank. Investigators testified that they had collected spent gun casings from the crime scene, and found a matching casing at the entrance to a General Electric plant where Keith picked up his girlfriend from work on the night of the murders. The defense challenged the identification made by Warren, presenting evidence that Warren had been improperly influenced and that the identification was inconsistent with other statements he had made. The defense also presented an alibi for Keith

4

and attempted to cast suspicion on the Melton brothers, who had been arrested in a string of pharmacy burglaries and who had told Rudel Chatman that his family had been shot because of Chatman's snitching. Finally, the defense challenged the testimony of Smathers, arguing that her description of the assailant was consistent with Rodney Melton, and submitting evidence that the license plate "043" matched the first three numbers of a license plate registered to Melton. At the conclusion of the jury trial, Keith was convicted of the murders and sentenced to death.

*In re Keith*, 2018 WL 8807240, at *3 (6th Cir.) (quoting *Keith v. Bobby*, 551 F.3d 555, 560–61

(6th Cir. 2009) (Clay, J., dissenting)).

The Sixth Circuit continued – summarizing evidence Petitioner presented in a prior habeas

petition:

This Court also discussed the new evidence that Keith presented in support of his 2008 habeas petition. This Court explained that "[t]his [*Brady*] evidence falls into two categories: new evidence that supports a contention that Rodney Melton committed the murders, and new evidence that relates to the identification made by eyewitness Richard Warren." *Id.* at 560.

The Court summarized the first type of evidence—i.e. evidence that Rodney Melton, not Keith, committed the murders—as follows:

. . . The new evidence includes: (1) evidence from a file in another investigation in which an informant told police that, two weeks before the shooting, Rodney Melton stated that "he had been paid $15,000 to cripple the man who was responsible for the raids in Crestline, Ohio last week"; (2) evidence that police conducted an interview in which Melton's accomplice in the pharmacy burglary ring told the police that Melton had stated that he would kill anyone who snitched on him and that he was paid to kill Chatman; (3) evidence that two investigators in Keith's case were part of the interview of Melton's accomplice but that Keith was never informed of the interview; and (4) evidence that it was Melton's habit to wear a mask like the one described by witnesses to the shooting.

. . . Previously-existing evidence that implicates Melton includes:

• evidence that the partial licen[s]e plate number obtained from the snowbank identified by Smathers, "043," also matches the first three numbers of a license plate registered to Melton;

• evidence that Melton owned and drove a yellow Chevy Impala, which matched Smathers' description of a "real light" colored car that was white, cream, or light yellow;

5

> • evidence that defense counsel had been contacted by a relative of Rodney Melton, who told him that Rodney "is in on the killings";
>
> • evidence that Melton appeared at the crime scene, knew the type of bullets involved in the killings, and "made sure to affirmatively tell" the police that his car, which matched the description of the car given by Smathers, was broken down that night; and
>
> • evidence that Quanita Reeves told police that she was shot by her "daddy's friend Bruce."

> Notably, "Bruce" is the name of the brother of Rodney Melton, and the defense argued that seven-year-old Reeves confused the brothers, both of whom were friends with her father, and that Reeves had actually attempted to identify Rodney Melton . . . .

[*Keith*, 551 F.3d] at 561–62 [(Clay, J., dissenting)].

The Court also discussed the new evidence regarding Warren's alleged identification of Keith as the shooter:

> Keith also submits new evidence that, contrary to the testimony of a police captain, the state's primary eyewitness did not identify Keith as the shooter to a nurse.

> An understanding of this evidence requires a bit of context. At Keith's trial, Captain John Stanley testified that a nurse named "Amy Gimmets" called him and stated that Warren, a survivor of the shooting, had gained consciousness after surgery and identified Keith as the shooter. The alleged statement would have taken place before Warren was contacted by police investigators, and undermined allegations by the defense that Warren was improperly influenced. The prosecution did not call the nurse at trial and the defense was unable to locate her.

> Keith now alleges that a report prepared by Captain Stanley states that the nurse who called him regarding Warren's identification of Keith was "Amy Wishman" and not "Amy Gimmets." Based on this new information, defense counsel located the nurse, who provided an affidavit stating that: (1) she was the nurse who treated Warren after his surgery; (2) she does recall calling Captain Stanley after Warren could speak; (3) that she never told the captain that Warren had given her a name for the shooter; and (4) that Warren had never told her the shooter's name.

> This new evidence is significant, most notably because the nurse's alleged statement was strong corroboration for Warren's otherwise questionable

6

identification. At trial, Warren's identification of Keith had been challenged by Warren's previous statements that he did not know who shot him, by his statements that the shooter was wearing a mask, by another eyewitness's exclusion of Keith as the shooter, and by evidence that Warren had been given Keith's name by officers. The defense used this evidence to argue that Warren had been improperly influenced by police officers.

However, the otherwise compelling argument of improper influence was directly undermined by Captain Stanley's testimony that Warren had provided Keith's name to his nurse *before* he had spoken to any law enforcement officials. The nurse's statement, offered through Stanley, bolstered Warren's otherwise questionable identification, and could likely have convinced the jury that the identification was reliable . . . .

*Id.* at 561–63 [Clay, J., dissenting].

*In re Keith*, 2018 WL 8807240, at *3–5.

## PROCEDURAL BACKGROUND

State Court Conviction and Direct Appeal

On February 15, 1994, Petitioner was arrested and subsequently indicted on three counts of aggravated murder and three counts of attempted aggravated murder. *See State v. Keith*, 1996 WL 156710 (Ohio Ct. App.). On May 26, 1994, a jury convicted Petitioner on each count. *Id.* at *3. On June 1, 1994, the trial court accepted the jury's recommendation that Petitioner be sentenced to death on the three counts of aggravated murder. *Id.* In addition, the trial court sentenced Petitioner to consecutive terms of seven to twenty-five years on each of the three counts of attempted aggravated murder. *Id.* On April 5, 1996, the Ohio Third District Court of Appeals affirmed the convictions and sentence. *See id.* On October 1, 1997, the Ohio Supreme Court affirmed the same. *State v. Keith*, 79 Ohio St. 3d 514 (1997).

First Petition for Post-Conviction Relief

In September 1996, while his direct appeal was pending, Petitioner filed a petition for post-conviction relief, asserting ineffective assistance of counsel. On August 19, 1998, the appellate

court overruled Petitioner's assignments of error and affirmed the trial court's determination. *State v. Keith*, 1998 WL 487044 (Ohio Ct. App.).

First Federal Habeas Petition

In September 1999, Petitioner filed his first federal habeas petition. *See Keith v. Mitchell*, No. 99cv657 (N.D. Ohio). On June 14, 2001, the district court denied the petition. *See id.* (Doc. 62). On July 10, 2006, the Sixth Circuit affirmed the district court's denial. *Keith v. Mitchell*, 455 F.3d 662 (6th Cir. 2006). The United States Supreme Court denied a petition for a writ of certiorari. *Keith v. Houk*, 549 U.S. 1308 (2007).

Section Petition for Post-Conviction Relief

In August 2004, Petitioner filed a second petition for post-conviction relief with the trial court. (Doc. 20-8, at 36-47). Therein, he asserted: (1) the prosecution failed to turn over exculpatory evidence including: police reports, an eyewitness statement that Petitioner was too big to be the shooter, handwritten notes of Richard Warren from the hospital, and information that Rudel Chatman was an informant against both Petitioner and Rodney Melton; (2) he had new information indicating two persons were involved in the homicides and that the lead investigator helped Rodney Melton; and (3) cumulative error. *See id.*

On February 13, 2007, the trial court granted the State's motion for summary judgment and dismissed Petitioner's post-conviction petition. (Doc. 20-16, at 302-36). On February 25, 2008, the appellate court affirmed. *State v. Keith*, 176 Ohio App. 3d 260 (2008). On December 2, 2009, the Ohio Supreme Court declined to accept Petitioner's appeal. *State v. Keith*, 123 Ohio St. 3d 1508 (2009).

<u>Application for Reopening</u>

In July 2007, Petitioner filed an application to reopen his direct appeal. (Doc. 20-18, at 112-21). Therein, Petitioner asserted his appellate counsel was ineffective for failing to raise issues of jury tainting, ineffective assistance of trial counsel (for failing to call certain witnesses and failure to voir dire jurors about pretrial publicity), cumulative error, and failure to include jury questionnaires in the appellate record. *See id.* On August 2, 2007, the appellate court denied Petitioner's application. *Id.* at 174-75. On August 7, 2008, the Ohio Supreme Court affirmed. *State v. Keith*, 119 Ohio St. 3d 161 (2008).

<u>First Motion for New Trial</u>

In August 2007, Petitioner filed a motion for leave to file a delayed motion for new trial based on newly discovered evidence (Doc. 20-20, at 36-199), and a motion for new trial (Doc. 20-21, at 1-16). Therein, Petitioner first asserted he had new evidence that Rodney Melton told a confidential informant he was paid to "cripple" the person responsible for the raids in Crestline, Ohio; that person was allegedly Rudel Chatman. (Doc. 20-21, at 7). Second, Petitioner asserted an informant told police it was Rodney Melton's habit to wear a mask to cover his mouth to hide a gap between his front teeth. *Id.* at 8. He asserted this was significant because two surviving victims testified that the shooter wore a mask that covered his mouth. *Id.* Third, Petitioner asserted that Captain John Stanley of the Bucyrus Police Department lied when he stated a Grant Hospital Nurse told him Richard Warren identified a "Kevin" as the shooter. *Id.* at 8-9.

On July 2, 2008, the trial court denied Petitioner's motion. (Ex. 20-22, at 262-73). On December 1, 2008, the appellate court affirmed, *State v. Keith*, 2008 WL 5053538 (Ohio Ct. App.), and on December 2, 2009, the Ohio Supreme Court declined to hear an appeal, *State v. Keith*, 123 Ohio St. 3d 1508 (2009).

<u>Second Federal Habeas Petition</u>

In July 2008, Petitioner filed a second federal habeas corpus petition. *See Keith v. Bobby*, No. 08cv1687 (N.D. Ohio) (Doc. 1). Therein, he asserted newly discovered evidence (the same evidence presented in support of his August 2007 motion for new trial) exculpated him and indicated police officers testified falsely, and that this evidence had been suppressed by the State. *Id.* at 17-27. He also asserted a claim of actual innocence. *Id.* at 28-29. The district court transferred the Petition to the Sixth Circuit Court of Appeals for review pursuant to 28 U.S.C. § 2244(b)(3)(A). *Id.* (Doc. 6). On January 13, 2009, the Sixth Circuit denied Petitioner permission to pursue a successive habeas petition, finding Petitioner's new evidence insufficient to make a *prima facie* showing that no reasonable juror could have found Petitioner guilty. *Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009). Petitioner then filed a motion with the district court to alter or amend its decision, which the district court denied *Keith v. Bobby*, No. 08cv1687 (N.D. Ohio) (Docs. 9, 14). On August 31, 2010, the Sixth Circuit affirmed. *Keith v. Bobby*, 618 F.3d 594 (6th Cir. 2010).

<u>Second Motion for New Trial</u>

On May 11, 2010, Petitioner filed a second motion for leave to file a delayed motion for new trial (Ex. 20-24, at 1-9) and motion for new trial (Ex. 20-24, at 86-103). Therein, Petitioner cited newly discovered evidence he asserted showed: (1) the police radio dispatch logs establish that Nurse John Foor never called the Bucyrus Police Department; (2) dispatch logs indicated the bullet casing located may have actually been found in a different location. *See id.* He asserted prosecutors withheld this evidence. *Id.*

On August 9, 2010, the trial court denied Petitioner's motions. *Id.* at 156-70. On January 31, 2011, the appellate court affirmed. *State v. Keith*, 192 Ohio App. 3d 231 (2011). On March 21,

2012, the Ohio Supreme Court declined to accept Petitioner's appeal. *State v. Keith*, 131 Ohio St. 3d 1484 (2012).

Clemency Petition

On August 11, 2010, the Ohio Parole Board conducted a hearing, and then recommended the Governor deny Petitioner clemency. *See In re Kevin Keith*, State of Ohio Adult Parole Authority, https://drc.ohio.gov/Portals/0/Clemency/clemency_keithaug2010.pdf?ver=2016-11-04-085148-970. On September 2, 2010, Governor Ted Strickland commuted Petitioner's death sentence to a sentence of life without the possibility of parole. (Doc. 20-4, at 235).

Third Motion for New Trial

On April 3, 2012, Petitioner (acting *pro se*) filed a third motion for leave to file a new trial based on newly discovered evidence. (Doc. 20-25 at 11-19) (motion for leave); (Doc. 20-25, at 72-81) (motion for new trial). Therein, he asserted he had newly discovered evidence from a non-testifying witness demonstrating his statements were misrepresented at trial. *Id.* at 76. On May 24, 2012, the trial court denied Petitioner's motion. *Id.* at 108-12. Petitioner did not appeal.

Fourth Motion for New Trial

On October 12, 2012, Petitioner (acting *pro se*) filed a fourth motion for new trial. *Id.* at 172-75. Therein, Petitioner asserted he had newly discovered evidence that Nurse Amy perjured herself in her prior sworn affidavit. *Id.* at 174. Petitioner – through counsel – voluntarily withdrew this motion on November 1, 2012. *Id.* at 284-86.

Third Federal Habeas Petition

On August 8, 2013, Petitioner filed his third federal habeas petition. *Keith v. LaRose*, No. 13cv1718 (N.D. Ohio) (Doc. 1). Therein, citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), Petitioner argued he was denied the effective assistance

of trial counsel by their failure to: (1) obtain an expert to challenge the State's claim that the imprints left by the getaway car fit a car to which Petitioner had access; (2) use evidence in Richard Warren's medical records to rebut his identification of Petitioner as the shooter; (3) interview and present testimony from alibi witness Yolanda Price; and (4) investigate and present evidence that Rudel Chatman was an informant against Rodney Melton. *See id.* On March 28, 2014, the district court transferred Petitioner's case to the Sixth Circuit for review as a successive petition. *Keith v. LaRose*, 2014 WL1369655 (N.D. Ohio). On December 8, 2014, the Sixth Circuit denied Petitioner's request for an order authorizing his successive habeas petition. *Keith v. LaRose*, No. 14-3290 (Doc. 16-2) (6th Cir. 2014).

Fifth Motion for New Trial

On October 28, 2016, Petitioner filed a fifth motion for leave to file a delayed motion for new trial based on newly discovered evidence. (Doc. 20-26, at 1-14) (motion for leave); (Doc. 20-26, at 15-47) (motion for new trial). Therein, Petitioner cited evidence regarding testifying witness BCI Analyst G. Michele Yezzo's personnel file he asserted was impeaching and the State withheld. *See id.* He further cited an affidavit from Lee Fisher, the Ohio Attorney General during the time when Petitioner was indicted, tried, and convicted, stating that he would not have permitted Yezzo to testify had had he been aware of her job performance issues. *See id.* at 25-26.

On January 13, 2017, the trial court denied Petitioner's motions. (Ex. 20-29, at 280-91). On June 26, 2017, the appellate court affirmed the trial court's denial. *State v. Keith*, 2017 WL 2729625 (Ohio Ct. App). On December 6, 2017, the Ohio Supreme Court declined to hear Petitioner's appeal. *State v. Keith*, 151 Ohio St. 3d 1456 (2017).

**CURRENT FEDERAL HABEAS CORPUS PETITION**

On March 19, 2018, Petitioner filed a habeas Petition with this Court. (Doc. 1). Therein, Petitioner raises two grounds for relief. In his first ground, Petitioner asserts that "[t]he State violated Kevin Keith's rights to due process when it failed to disclose critical impeachment evidence of a key witness." *Id.* at 19. This ground asserts a *Brady* violation based upon the information obtained from Yezzo's personnel file. *Id.* at 19-27. In his second ground for relief, Petitioner asserts "[t]he State violated Kevin Keith's due process rights when the police destroyed evidence and then suppressed documents demonstrating that it acted in bad faith." *Id.* at 28. This claim relates to the police call logs. *See id.*

On June 7, 2018, this Court transferred the case to the Sixth Circuit Court of Appeals to determine authorization to proceed on a successive habeas Petition. (Doc. 15). On October 30, 2018, the Sixth Circuit granted such authorization. *In re Keith*, 2018 WL 8807240 (6th Cir.).

**DISCUSSION**

In the instant Petition, Petitioner contends he has newly discovered evidence that: (1) the government withheld impeachment evidence concerning G. Michele Yezzo, a forensic analyst for the Ohio Bureau of Criminal Investigation ("BCI") whose testimony concerning a license plate impression and tire tracks linked Petitioner to the crime, and (2) the government deliberately ignored a subpoena request for police phone log records prior to his trial and argues that these phone logs would have contradicted the government's theory of the case and undermined the credibility of its star witness. He contends the government's suppression of this exculpatory material violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

§ 2244(b)(2)(B)

As noted above, the Sixth Circuit authorized Petitioner to file a successive habeas petition, finding he made the required *prima facie* showing under 28 U.S.C. § 2244. The relevant portion of that statute requires Petitioner to make a two-part showing to avoid dismissal:

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
> * * *
>
> (B) (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2); *see also* 28 U.S.C. § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.").

### *Diligence – (b)(2)(B)(i)*

The undersigned finds Petitioner has met the first prong of § 2244(b)(2)(B) – the diligence prong – as to the Yezzo personnel file, but not as to the "ignore for now" subpoena. The Sixth Circuit recently described the diligence requirement in § 2244(b)(2)(B)(i) as follows:

> "To show due diligence, [the petitioner] need not have practiced the 'maximum feasible diligence.' " *In re Vinson*, No. 14-2521, 2015 U.S. App. LEXIS 23331, at *6–7 (6th Cir. Sep. 24, 2015) (quoting *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir.2000)). Instead, the petitioner must make "a prima facie showing that he has done as much as could 'reasonably' be expected from someone in his circumstances.' " *Id.* at *7–8 (quoting *DiCenzi*, 452 F.3d at 470).

*In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018). As Respondent points out, another Circuit Court has explained that the diligence requirement is an objective, rather than subjective, standard.

14

*See Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006) ("[T]he plain text of § 2244(b)(2)(B) suggests that due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record.").

The undersigned previously found that the Sixth Circuit looks (at least to some extent) at a petitioner's subjective actions to determine whether the diligence requirement in § 2244(b)(2)(B)(i) is satisfied. *See* Doc. 41, at 13 (Order granting in part and denying in part motion to expand the record)[1]; *In re Wogenstahl*, 902 F.3d at 629 ("That Wogenstahl did not obtain the evidence he now presents until that final request is hardly attributable to a lack of reasonable due diligence on his part. The prosecution has a constitutional obligation under *Brady* to provide material exculpatory and impeachment evidence, *see, e.g.*, *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc), and the defendant is not required to request continuously *Brady* information in order to show due diligence."); *In re Keith*, 2018 WL 8807240, at *6 ("Like the petitioner in *In re Wogenstahl*, Keith has diligently attempted to obtain exculpatory and impeachment evidence before trial and in post-conviction proceedings. And like the petitioner in *In re Wogenstahl*, Keith cannot be faulted for the fact that his previous attempts failed to uncover the *Brady* material that he recently obtained.").

*Yezzo Personnel File*

Respondent contends Petitioner cannot show diligence as to Yezzo's personnel file because his claim that the "file should have been turned over by the prosecution prior to his trial[] necessarily concedes the fact that the file was in existence at the time of trial" and "his ability to

---

1. Cross-objections to this Order permitting limited expansion of the record remain pending. *See* Docs. 42, 44.

get the documents in 2016 shows that obtaining the file was possible." (Doc. 26, at 29). The undersigned disagrees.

The undersigned has no reason to doubt that Respondent is correct on the facts – portions of the personnel file to which Petitioner now points were in existence at the time of trial. But the undersigned disagrees that Petitioner can be faulted for failing to uncover it sooner. Could Petitioner have requested Yezzo's police file at the time of trial? Yes. But, when the prosecution represented to him that it would provide favorable material, and the personnel file was never mentioned or revealed – *see* Doc. 20-1, at 92 (statement in State's Response to Defendant's Motion for Disclosure of Impeaching Information stating: "The prosecution plans to strictly adhere to Crim. R. 16 and to the Code of Professional Responsibility. Defendant's Motions are therefore, unnecessary."); Doc. 20-1, at 103 (trial court judgment entry stating "The State acknowledged a continuing duty to disclose evidence pursuant to Ohio Criminal Rule 16 . . ."); *see also* Doc. 20-8 – 20-16 (Petitioner's Response to Motion for Summary Judgment and Appendix including prosecutor's case file) – a reasonable individual would not have believed it necessary to do so. *See In re Wogenstahl*, 902 F.3d at 629 ("[T]he defendant is not required to request continuously *Brady* information in order to show due diligence."); *Cf. Jefferson v. United States*, 730 F.3d 537, 546 (6th Cir. 2013) ("The prosecution in Jefferson's trial had a constitutional obligation to disclose the full extent of the consideration given to the cooperating witnesses in exchange for their testimony. This obligation existed regardless of whether the defendants in Jefferson's trial asked for the information—which they did, repeatedly. We hold that § 2255(f)(4)'s due-diligence standard did not require Jefferson continuously to seek out evidence that the government had a constitutional duty to disclose (evidence that, despite specific requests by the defense for the information, the government represented did not exist). We reject the district court's determination that because

16

Jefferson suspected undisclosed promises as early as 2000, his failure to seek information from 'the cooperating witnesses themselves or their acquaintances' and his failure to seek sentencing records—which the prosecutor had sealed—rendered his diligence insufficient. We do not fault Jefferson for failing to scavenge for evidence of undisclosed promises when he already repeatedly asked for disclosure and the evidence was unconstitutionally withheld by the government.") (applying similar due diligence standard from 28 U.S.C. § 2255(f)(4)).

Moreover, the undersigned finds specifically that a reasonably diligent individual in Petitioner's circumstances could simply not be expected to anticipate, or even suspect, that a BCI forensic analyst would have such derogatory information in her personnel file and still be permitted to analyze evidence and testify.[2] Nor did Petitioner subjectively have reason to so suspect until his counsel read an article in January 2016 quoting from Yezzo's file. *See* Doc. 29-1, at 12 (Corrected Affidavit of Rachel Troutman).

The cases cited by Respondent to argue to the contrary do not involve evidence allegedly withheld in violation of *Brady. See In re Vinson*, 2017 U.S. App. LEXIS 25141, at *8-9 (6th Cir.) ("Specifically, Vinson argues that Lytle, had she been asked the right questions, would have testified that "'there is only a remote possibility that the Type-O antigens on the [bedsheet] came from the victim, and, therefore, the Type-O antigens almost certainly came from the true perpetrator's semen.' But this factual predicate fails for the same reason. Nothing in Lytle's statements can be considered evidence that could not have been discovered at trial. The technology existed to determine blood type and secretor status. And Lytle's conclusions drawn from those tests were clearly discoverable, as she offered them at trial."); *In re Herrington*, 2017 U.S. App.

---

2. Thus, even under the Fifth Circuit's objective diligence standard, advanced by Respondent (*see Johnson*, 442 F.3d at 908), the undersigned would reach the same conclusion.

LEXIS 20008, at *4 (6th Cir.) ("But the evidence on which Herrington relies—a pre-trial statement provided by Carissa Campbell and trial transcripts—is not new and could have been discovered earlier. . . .The facts underlying Herrington's claims were known to him at the time of trial or could have been discovered at that time through the exercise of due diligence because Akron Police Detective Michael Schaefer testified that he interviewed Campbell. Herrington also admitted that he learned of Campbell's statement no later than 2009—three years before he filed his prior habeas corpus petition."). Thus, the undersigned finds they are not applicable to the facts of this case.

*"Ignore for Now" Subpoena*

Respondent presents a similar argument as to the police call logs and the "ignore for now" subpoena – that they were in existence at the time of trial and that, by virtue of not following up on the lack of response he received, Petitioner was not diligent. On this point, the undersigned agrees.

Although the standard does not require "maximum feasible diligence", the undersigned finds that Petitioner did not do "as much as could 'reasonably' be expected from someone in his circumstances." *In re Vinson*, 2015 U.S. App. LEXIS 23351, at *6-8 (quoting *DiCenzi*, 452 F.3d at 470). Petitioner issued the subpoena during trial on May 12, 1994 to the Bucyrus Police Department, requesting "all records, including radio dispatch logs, of all call-ins from February 12, 1994 to the present time." *See* Doc. 1-29. It is undisputed that Petitioner got no response. However, he has not presented any evidence that he: (1) brought the lack of response to the trial court's attention; (2) questioned any Bucyrus Police Department witness regarding whether they brought such records to trial; or (3) made any attempt to follow up on the lack of response at trial or during his initial appeal. A reasonably diligent individual would have, at a minimum, followed up on the lack of response at the time of trial, or at least sometime earlier than Petitioner here did.

18

Although the "ignore for now" notation on the subpoena is certainly disturbing, it does not change this analysis because Petitioner has not shown that he performed his due diligence. Therefore, the undersigned finds Petitioner's claim regarding the "ignore for now" subpoena fails to satisfy § 2244(b)(2)(B)(i); that is, Petitioner has not shown this evidence "could not have been discovered previously through the exercise of due diligence".

**Actual Innocence – (b)(2)(B)(ii)**

The undersigned thus turns – with the new Yezzo personnel file evidence that satisfies § 2244(b)(2)(B)(i) – to the next step in the analysis. The second prong, in determining whether a successive petition can proceed, § 2244(b)(2)(B)(ii), "has been described as an 'actual innocence' standard." *Davis v. Bradshaw*, 2016 WL 8257676, at *19 (N.D. Ohio) (citing *Caldwell v. Lafler*, 2008 WL 907536, at *4-5 (W.D. Mich), *Lott v. Bagley*, 2007 WL 2891272, at *14 (N.D. Ohio), and *Case v. Hatch*, 731 F.3d 1015, 1031-32 (10th Cir. 2013)), *report and recommendation adopted*, 2017 WL 626138, *aff'd*, 900 F.3d 315 (6th Cir. 2018).[3] As another judge in this district explained:

> Under the more exacting actual innocence standard set forth in § 2244(b)(2)(B)(ii), the Court must "consider the body of evidence presented at trial, 'add back' the evidence kept from the jury as the result of constitutional error, and then determine whether the evidence 'is clear and convincing, in light of the evidence as a whole, that no reasonable factfinder would have found [petitioner] guilty' but for the violation." *Bell v. Tibbals*, 2013 WL 1283861 at *12 (N.D. Ohio March 26, 2013)

---

3. That the Sixth Circuit determined Petitioner made a *prima facie* showing on this threshold requirement is not dispositive. *See In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004) ("'*Prima facie*' in this context means simply sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'") (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)); *In re McDonald*, 514 F.3d 539, 546-47 (6th Cir. 2008) ("[W]e do not need to find that given the alleged constitutional violation no reasonable factfinder would have found [the petitioner] guilty of the underlying offense; instead, we simply must determine whether there are 'sufficient allegations' together with 'some documentation' so as to require a district court to engage in additional analysis in order to ascertain whether but for the constitutional error, no reasonable factfinder would have found McDonald guilty of the underlying offense.") (distinguishing Circuit Court's *prima facie* standard from that required by the district court).

(Gaughan, J.) (citations omitted). As explained by the Tenth Circuit in *Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013), "the analysis proceeds in three steps: (1) we start with the body of evidence produced at trial, (2) add 'evidence allegedly kept from the jury due to an alleged [constitutional] violation,' *Sawyer* [*v. Whitley*], 505 U.S. at 349, 112 S.Ct. 2514, and (3) determine whether it is 'clear and convincing,' 'in light of the evidence as a whole,' that 'no reasonable factfinder would have' convicted." *Case*, 731 F.3d at 1033.

In sum, the Court's task is "to look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the constitutional violations] and then make a probabilistic determination about what reasonable, properly instructed jurors would do." *Bell*, 2013 WL 1283861 at *12 (citing *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006)). "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

*Davis*, 2016 WL 8257676, at *20. *Davis* explained this is a "more exacting" actual innocence standard than that required to overcome procedural default which requires a petitioner show "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)); *see also Case*, 731 F.3d at 1037 (observing that "[t]he *Schlup* standard appears to be more forgiving than subparagraph [§ 2244(b)(2)](B)(ii), since it allows a broader range of evidence to be evaluated by the court—old and new; admissible and inadmissible"); *Freeman v. Warren*, 2019 WL 507089, at *5-6 (E.D. Mich.).

Given this framework, the undersigned will summarize the trial evidence, detail the "newly discovered evidence" that satisfies § 2244(b)(2)(B)(i) as set forth above, and then analyze the likely impact this new evidence would have on reasonable jurors in light of the evidence presented at trial.

20

*Evidence Presented at Trial*

<u>Warren's Testimony</u>

Surviving victim Richard Warren testified at trial. *See* Tr. 333-78[4]. As the state court summarized, Warren testified that Marichell told him the shooter's full name before the shooting, though he could later only recall the first name – Kevin – initially. *Keith*, 79 Ohio St. 3d at 515. He later communicated this name to a nurse. *Id.* at 516; *see also* Tr. 351-52, 368, 377 (testimony that he communicated the name Kevin to medical personnel). In an interview with Bucyrus Police Captain John Stanley, after being provided several possible last names, Petitioner stated he was seventy-five percent sure that Marichell had said "Kevin Keith" and when shown a photo array, Warren identified Petitioner and told police he was ninety-five percent sure Petitioner was the shooter. *Id.*

Petitioner challenged this identification on cross-examination and through other witnesses. As Petitioner then pointed out, and now points out, Warren told four different witnesses after the shooting that he did not know who shot him; he described the shooter as a "masked man". *See* Tr. 242-43, 305, 620, 623. Warren further testified the shooter's mouth and nose were covered (Tr. 348, 372) and he initially told police he thought he would only be able to identify the shooter by build and size because he was unsure he would recognize his face (Tr. 352, 364-65).

Petitioner's counsel also cross-examined Warren on his selection of Petitioner from the photo lineup and his level of certainty in making the selection (Tr. 357-64). On cross-examination, Petitioner's counsel also pushed Warren on whether he gave the name Kevin to police first, or whether the police mentioned it first. (Tr. 371-72).[5]

---

4. The trial transcript in this case is located at Docket 21-1.
5. Q:   Now, when you talked to the officer on the telephone prior to your recorded interview, did they gave you the name Kevin or did you give them the name Kevin, excuse me?

Nurse John Foor testified as a rebuttal witness for the State at trial. (Tr. 776-83). He testified he treated Warren the morning after the shooting when he came out of surgery. (Tr. 776-77). He testified Warren was on a ventilator and unable to speak, so he tried to communicate by sign language. (Tr. 778). Foor testified he got a clipboard and piece of paper and Warren wrote "Kevin" as the name of the shooter. *Id.* Foor testified this was around 5:00 a.m. after Warren came out of surgery. *Id.* Foor stated he called and communicated this information to the Bucyrus Police Department. (Tr. 781). Petitioner's counsel challenged Foor – asking him "what would you say if I told you he said he never wrote anything down?", to which Foor responded, "Well, he did write something down." (Tr. 779). [6]

---

A:     I gave them the name Kevin.
Q:     Have you seen a copy of the transcript?
A:     No, sir, I haven't.
Q:     I am handing you what has been marked as Defendant's Exhibit Number 4, would you take a minute and review that please. You have had an opportunity to review that?
A:     Yes.
Q:     Could you show me - - Does it look like or appear to be the telephone conversation that you had?
A:     I don't actually recall the conversation in detail.
Q:     So you don't recall whether you mentioned the name Kevin to them or they mentioned it to you; do you?
A:     No, sir, I do not.
Q:     Now - -
A:     Not on the phone. If I said that in a phone conversation, I don't remember.

(Tr. 371-72).

6. In addressing Petitioner's second state-court petition for post-conviction relief (based, in part, on handwritten notes from the hospital), the Ohio Third District Court of Appeals explained:

> Keith's fourth exhibit consists of six pages of handwritten notes allegedly written by Warren while he was in the hospital. Keith asserts that the pages demonstrate that Warren did not write the name "Kevin" because it is not in his handwriting. The trial court found that this evidence was not probative, because Warren recovered from his injuries and testified at trial that he communicated the name "Kevin" to his father via hand signals and his father wrote the name down.

<u>Smathers' Testimony</u>

Nancy Smathers also testified at trial. (Tr. 379-402). The Ohio Supreme Court summarized her testimony:

> Nancy Smathers, heard several popping noises at approximately 9:00 p.m. As she looked out her front door, Smathers saw a large, stocky black man run to the parking lot and get into a light-colored, medium-sized car. As the car sped away, it slid on the icy driveway and into a snowbank. When the driver got out of the car, Smathers noticed that the car's dome light and the light around the license plate did not work. The driver rocked the car back and forth for nearly five minutes before he was able to free the car from the snowbank. Several weeks later, Smathers informed Bucyrus Police Captain Michael Corwin that, after seeing appellant on television, she was ninety percent sure appellant was the man she had seen that night.

*Keith*, 79 Ohio St. 3d at 515; *see also* Tr. 381-402. Smathers also testified she observed that "most back lights slope[] down", but "[t]his one went down at a straight cut like that. (Indicating)." (Tr. 384). She further testified that when the car got stuck in the snow, the person she saw rocking the stuck car had a hand on "whatever it is that connects the roof of the car to the base of the car where the door shuts, that metal part right there." (Tr. 383). On cross-examination, Petitioner's counsel cross-examined Smathers regarding her earlier statement to police:

Q:     Okay. And do you remember telling what color the car was?

A:     It was a light colored car, cream colored- -

---

Additionally, Warren testified at trial that Keith was the perpetrator.

*State v. Keith*, 176 Ohio App. 3d at 271–72. The appellate court held that "the trial court's grant of summary judgment to the state was not an abuse of discretion." *Id.* at 272. Petitioner argues this analysis (and the trial testimony) does not comport with hospital records, which, he asserts, indicate Warren's father was not present during Nurse Foor's shift. *See* Doc. 28, at 75-76. Regardless, however, Warren still testified at trial that he heard Marichell say the name "Kevin" immediately before the shooting multiple times (Tr. 338, 342, 349), and that he communicated it to medical personnel at the hospital (Tr. 351-52, 368, 377). Further, Warren identified Keith at trial. (Tr. 336). This evidence – including some of Petitioner's challenges to the identification (discussed above) – was presented at trial. *See* Tr. 333-78. Moreover, the instant question before the Court's current task is to "consider the body of evidence presented at trial", *Bell*, 2013 WL 1283861, at *12, not Petitioner's later attempts to undermine that evidence.

Q:      Did you tell him light yellow or light blue?

A:      It was a light cream color but I couldn't, you know, with the lights and stuff,
see the exact color. I know it was a white, cream, light yellow."

(Tr. 388-89). Trial counsel also brought out on cross-examination that Smathers previously told

the police that she could not identify the man she saw, and only finally identified him after seeing

Petitioner on television. (Tr. 389-98). In cross-examining Smathers, Petitioner's trial counsel

introduced Smathers' prior written statement to police. *See* Doc. 20-32, at 36-37 (Def. Trial Ex.

9). Therein, Smathers stated that the car was a two-door "creme color, real light green, yellow, or

blue, light color car." *Id.* at 36; *see also* Tr. 844 (defense counsel's closing argument emphasizing

that Smathers was unsure of the car color because she stated it was "cream colored" "[b]ut you

read her statement she made that night. Well, it was light colored, maybe green."). She also stated:

"Most back windows slope. This one was cut straight down, then the trunk came out."; "the dome

light was burnt out, when the door was open it wasn't on."; and the taillights "were rectangular, I

think two with a round one in the middle." (Doc. 20-32, at 36). Captain Roger Blankenship of the

Bucyrus Police Department testified that he obtained a printout from Highway Patrol for vehicles

with the numbers "043" in the license plate for Crawford and Richland County. (Tr. 817-18).

Taking this list and Smathers' description, police went through the list and "started checking cars,

also observing traffic trying to find a similar looking car according to the witness' description."

*Id.* at 818. "And by running the registration, getting the ownership and year and make a model of

the vehicle, [the police] determined that the car [they] were looking for was an '80 to '82

Oldsmobile Cutlass or Omega." *Id.*

The Getaway Car (license plate and tire tracks)

The State presented evidence at trial in addition to Smathers' testimony regarding the getaway car. Again, the Ohio Supreme Court summarized this evidence on direct appeal:

> At the snowbank where Smathers witnessed the getaway car slide, investigators made a cast of the tire tread and of the indentation in the snowbank made by the car's front license plate number—"043." The indentation from the license plate matched the last three numbers of a 1982 Oldsmobile Omega seized from Melanie Davison shortly after she visited appellant in jail, under the pseudonym of Sherry Brown, a few weeks after the murders.
>
> The Oldsmobile was registered to Alton Davison, Melanie's grandfather, and was also regularly used by Melanie. Davison had put four new tires on the Omega six months prior to the murders. Davison estimated that by February 1994, the new tires had been driven less than 3,000 miles without any problems or need for replacement. Although the cast taken of the tire tread at the crime scene did not match tires found on the Oldsmobile Omega one month later, the cast did match the tread of the tires purchased by Alton Davison as shown on the tire's sales brochures. Additionally, the tires found on the Oldsmobile Omega had been manufactured in January 1994 and showed a minimal amount of wear.

*State v. Keith*, 79 Ohio St. 3d at 516.

In addressing Petitioner's first motion for new trial, the state appellate court rejected Petitioner's attempt to challenge the testimony presented at trial regarding the color of the car. *See Keith*, 2008 WL 5053538, at *5 ("Keith identified four allegedly new pieces of evidence . . . [including] "eyewitness Nancy Smathers' testimony indicates that the getaway car was 'white, cream, light yellow' in color, which matches Melton's car, not the vehicle Keith allegedly drove[.]"). The court explained that this claim could have been brought on direct appeal and thus was barred by *res judicata*, but also noted: "Melton testified at trial that he owned a 'light tannish, cream' 1979 Chevy Impala; and therefore, this evidence was before the jury and was not new evidence as Keith alleges." *Id.* Evidence regarding Melton's car and how it matched (at least to some degree) Smathers' description, was thus in front of the jury at the time of trial.

BCI Special Agent David Barnes testified that he was at the scene and observed a tire track mark in the snow as well as what he presumed to be a license plate impression. (Tr. 474-75). He identified photos he took showing the indentation in the snowbank, as well as an indentation "showing the three numbers: zero, 4, 3." (Tr. 475). He further testified that he took measurements regarding "the relationship between the tire tracks and the license plate, as far as, number one, the distance between the front of the tire track and the license plate impression . . . . [and] the . . . measurement . . . from the outside of the tire track to the outside of the license plate." (Tr. 476). Senior Special Agent Larry Hardin with BCI testified to photos showing smudges from hands and fingers on the Omega's frame between the windshield and the driver's side door. (Tr. 510-11); *see also* Doc. 20-31, at 91-92 (State's Trial Exhibits 72 and 73 – photographs).

As is most relevant here, BCI forensic analyst G. Michelle Yezzo also testified at trial on behalf of the State. In affirming the trial court's denial of Petitioner's motion for leave to file a fifth motion for new trial, the state appellate court summarized her testimony:

> {¶ 11} By way of context regarding Yezzo's testimony during Keith's trial specifically, Yezzo testified via a trial deposition that was read into the record. Yezzo's testimony indicated that she had been at BCI for over 17 years, that she had testified over 200 times in 49 counties in Ohio and that she had been qualified as an expert in prior cases. Specifically regarding this case, Yezzo testified that she was able to identify the numbers "043" in the region of the purported license plate area from impressions the license plate left in the snowbank when the vehicle was stuck, and that the numbers from the plate were in an area similarly placed to what they would be on the vehicle linked to Keith. Yezzo also testified that the tire tracks left at the scene were similar in tread pattern to the pattern in a tire brochure that had been submitted to her. Other witnesses were used to establish that the tires had been recently changed on the vehicle linked to Keith.

*State v. Keith*, 2017 WL 2729625, at *5; *see also* Doc. 20-1, at 189-219 (Yezzo deposition).

<u>The Bullet Casing</u>

The Ohio Supreme Court summarized the evidence presented regarding the bullet casing:

26

Investigators recovered a total of twenty-four cartridge casings from the crime scene area, which had all been fired from the same gun. In addition to those, investigators recovered a casing found on the sidewalk across from the entrance to a General Electric plant. On the night of the murders, appellant picked up his girlfriend, Melanie Davison, from work at the entrance to the General Electric plant where the casing was found.

*State v. Keith*, 79 Ohio St. 3d at 516. Petitioner attacked this evidence in his second motion for a new trial. *See* Ex. 20-24, at 1-9 (motion for leave); Ex. 20-24, at 86-103 (motion for new trial). Therein, he asserted that later-discovered police radio logs indicated the bullet casing was found elsewhere. *See id.* The state appellate court summarized this evidence and the trial court's findings:

Further, the trial court stated that 25 bullet casings were recovered; that experts testified that all 25 bullet casings were fired from the same weapon; that all of the bullet casings were recovered at or near the location of the shootings, except for one; that the one remaining bullet casing was discovered near the entrance to the General Electric plant in Bucyrus; that the Bucyrus Police Department radio log included an entry reading "1221 S. Walnut. Woman found casing. Thinks she may have picked it up in the McDonald's area"; that, at trial, Officer John Seif testified that Farnella Graham told him, face to face, that she recovered the casing "on the sidewalk that morning"; that, at trial, Farnella Graham testified that she found the casing on the sidewalk in front of her house the morning of February 14 while cleaning fast-food litter from her front walk, that she lived across the street from the General Electric plant, and that her daughter had called the police about the casing; that the bullet was linked to Keith because he had picked up his girlfriend at the General Electric plant on the evening of February 13; and that the discrepancy in the log concerning the location of the casing was likely explained by Farnella Graham's testimony at trial that she initially assumed that the fast-food litter she found by the casing was from McDonald's, but then noticed it was from Wendy's.

*State v. Keith*, 192 Ohio App. 3d at 239. The appellate court then found no error in the trial court's determination:

We further find the offered evidence concerning the radio log entry about the bullet casing to be immaterial. Keith argued that testimony the state presented at trial indicated that a bullet casing was discovered right across the street from the General Electric plant but that the newly discovered radio logs contained an entry indicating that the caller indicated that the casing was discovered "in the McDonald's area," which was over one mile away from the General Electric plant. However, Keith's argument again ignores the testimony that was heard at trial on the matter. At trial, Officer John Seif testified that Farnella Graham told him, face to face, that she recovered the casing "on the sidewalk that morning," and that, at trial, Farnella

27

> Graham testified that she found the bullet casing on the sidewalk in front of her house while cleaning fast-food litter from her front walk; that she lived across the street from the General Electric plant; and that her daughter had called the police about the bullet casing. We agree with the trial court that the discrepancy in the log concerning the location of the bullet casing was likely explained by Graham's testimony at trial that she initially assumed that the fast-food litter she found by the bullet casing was from McDonald's, but then noticed that it was from Wendy's, and that not she but her daughter called the police. In light of the clear testimony heard at trial, as well as the obvious explanation for the discrepancy in the radio log entry, we do not find that this evidence is even remotely sufficient to undermine confidence in the outcome of the trial.

*Id.* at 244–45.

In his Reply, Petitioner points out that Ms. Graham testified that she saw trash on her curb at 9:45 p.m. the night of the shooting and the next morning, she found the bullet casing in that trash. (Doc. 28, at 22) (citing Tr. 427-30). Petitioner picked Ms. Scott up from the GE plant at 11:00 p.m. (Tr. 410). Petitioner thus contends "the trash and bullet casing were supposedly on Ms. Graham's sidewalk an hour and fifteen minutes before Keith was in the area." (Doc. 28, at 22). But Ms. Graham did not say she saw the bullet casing *itself* at 9:45 p.m. that night. Rather, she said she saw the *trash*. Again, the question before the Court is to "consider the body of evidence presented at trial", *Bell*, 2013 WL 1283861, at *12. Petitioner's argument does not change the bullet casing evidence presented at trial.

<u>Keith's Indictment on the Drug Raid</u>

The State contended Petitioner's motive for the shooting was retaliation for the victims' family member – Rudel Chatman – serving as a police informant in a case that resulted in an indictment against Petitioner (and others). The Ohio Supreme Court described the testimony presented at trial:

> After ordering Marichell to be quiet, appellant said, "Well, you should have thought about this before your brother started ratting on people." Marichell responded, "Well, my brother didn't rat on anybody and even if he did, we didn't have anything to do with it." Testimony at trial confirmed that Marichell's brother, Rudel

> Chatman, was a police informant in a drug investigation involving appellant. According to the presentence report, the month prior to the murders, appellant was charged with several counts of aggravated trafficking.

*State v. Keith*, 79 Ohio St. 3d at 515; *see also In re Keith*, 2018 WL 8807240, at *3 ("The prosecution's theory of the case was that Keith murdered family members of Rudel Chatman to exact revenge for Chatman's assistance in an investigation that led to a drug trafficking raid and indictments against Keith and members of his family.") (quoting *Keith v. Bobby*, 551 F.3d at 560-61 (Clay, J., dissenting)).

Defense Case

In addition to challenging the State's evidence as described above, Petitioner presented an alibi defense at trial. He presented testimony from Judith Rogers, a neighbor of his girlfriend Melanie Davison who noticed Petitioner and Davison leaving Davison's apartment in Mansfield around 8:45 p.m. the night of the shooting (in a blue car); she testified she was certain of the time based on the television program she was watching. (Tr. 691-93). Petitioner's aunt, Grace Keith, testified that Petitioner was at her house in Crestline at 9:00 p.m. that evening. (Tr. 685).

Petitioner further attempted to point to Rodney Melton as an alternate suspect. *See, e.g.*, *State v. Keith*, 2017 WL 2729625, at *10 n.9 ("Both at his trial and following his convictions Keith has strongly pursued the defense that another man committed the killings, specifically Rodney Melton. That theory was presented at trial, along with multiple other individuals the defense contended were the potential killers. Rodney Melton, along with the others, actually testified for the jury to see and hear and the jury rejected the defense's theories."). Melton testified at trial. (Tr. 672-82, 756-64). He testified he was at home the night of the murder (Tr. 673), and went to the scene after someone woke him up (Tr. 674). He further testified he owned a "[l]ight tannish, cream" 1979 Chevy Impala with the license plate LKS218 that was inoperable the night of the

shooting, and previously owned a different car with license plate LAJ043 or 043LAJ. (Tr. 675, 679-80). Melton also testified that he told an officer at the scene about his Impala and that it was not working. (Tr. 677, 758). Melton further admitted to warning Rudel Chatman to watch his back prior to the shooting. (Tr. 763).

Several officers also testified about Melton's car and license plate. *See* Tr. 792-93 (Lieutenant Dayne's testimony that he investigated prior registrations and found Melton had an "older plate, expired for some period of time, and the letters and numbers were oppositely displayed as to what they are here" with "043" in it); Tr. 822 (Officer Blankenship's testimony that the license plate 043LAJ was registered to Rodney Melton). At the time officers investigated Melton's car, Lt. Dayne observed there was no front license plate on the car and the mounting for such a plate was in the center of the front of the car. (Tr. 791).

An interview with surviving child victim Quanita Reeves was played at trial. (Tr. 712-22). She identified the shooter as "daddy's friend, Bruce" and excluded a photo of Petitioner from a photo lineup. *See id.* Petitioner's counsel argued in closing at trial that Reeves confused Rodney Melton with his brother, Bruce Melton. *See* Tr. 846-47.

> *New Evidence: Yezzo's Personnel File*

The undersigned next turns to the new evidence. *See Bell*, 2013 WL 1283861 at *12 (court's second step is to "'add back' the evidence kept from the jury as the result of constitutional error") (citations omitted). The Sixth Circuit accurately summarized the negative information contained in Yezzo's personnel file that pre-dated Petitioner's trial as follows:

> Keith has presented several internal BCI memoranda from 1989 to 1994 that reveal significant concerns about Yezzo's mental state and professional integrity. For instance, a May 1989 report from BCI's assistant superintendent states that "the consensus opinion" is that Yezzo "suffers a severe mental imbalance and needs immediate assistance." (R. 1-16 at PageID #144.) The assistant superintendent also reported that Yezzo's "perceived problem affects her overall performance. Her

30

findings and conclusions regarding evidence may be suspect. She will stretch the truth to satisfy a department." (*Id.* at PageID #145.) A report on September 1989 states that Yezzo threw a book at a co-worker and told her co-worker she was going to "deck her." (R. 1-20 at PageID #170.) Moreover, in August 1993, Yezzo was placed on administrative leave for "threatening co-workers and failure of good behavior" after Yezzo experienced several fits of rage and threatened to kill co-workers. (R. 1-17 at PageID #148.) Notes taken during the investigation into Yezzo's conduct in August 1993 report that Yezzo had a "reputation of giving dept. answer [it] wants if [it] stroke[s] her." (R. 1-18 at PageID #161.) The same notes indicate that an analyst assigned to one of Yezzo's cases would have reached a different result than Yezzo had reached on a footprint and blood analysis. (*Id.*) Yezzo also had a documented history of racist outbursts: she made a comment about a "ni**er in a woodpile" and once referred to a co-worker as a "ni**r bitch." (*See* R. 1-20 at PageID #173.) In fact, Yezzo was *still under investigation* when she testified against Keith. (*See* R. 1-21 at PageID #177.)

*In re Keith*, 2018 WL 8807240, at *5 (alterations and emphasis in original); *see also* Docs. 1-14 to 1-21. As Respondent points out, the file also contained numerous positive evaluations (*see generally* Doc. 20-27, at 149-92), and letters of thanks (for testimony, and for presentations) from, e.g., police departments, prosecutors' offices, the Ohio Attorney General, and schools (*see* Doc. 20-27, at 266-362).

### *Impact on Jurors*

The Court's next task is to "determine whether it is 'clear and convincing,' 'in light of the evidence as a whole,' that 'no reasonable factfinder would have' convicted." *Case*, 731 F.3d at 1033 (quoting 28 U.S.C. § 2244(b)(2)(B)(ii)). For the reasons discussed below, the undersigned recommends the Court find Petitioner's evidence does not satisfy this demanding standard and dismiss the Petition.

The Sixth Circuit previously summarized the "core" of the State's case:

The core of the case, as recounted by this court, against Keith included:

• Eyewitness testimony of the survivor Warren identifying Keith;

31

> • A partial imprint of the license plate made from the snowbank where the getaway car crashed matched the license plate of a car he was known to have access to;
>
> • Eyewitness identification of him as the man driving the getaway car when it crashed;
>
> • A spent bullet cartridge casing matching the ones recovered from the scene of the murders was found where Keith later picked up his girlfriend; and
>
> • Testimony that Keith had been indicted as a result of the drug raid precipitated by the victims' relative.

*Keith v. Bobby*, 551 F.3d at 558 (citing *Keith v. Mitchell*, 455 F.3d at 666-68). In its determination that Petitioner made a *prima facie* showing that he could satisfy § 2244(B)(2)(b)(ii) as to the Yezzo personnel file, the Sixth Circuit explained:

> Keith alleges that the government violated his due process rights by suppressing *Brady* material. "Three factors must be satisfied to establish a *Brady* violation: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *In re Wogenstahl*, 902 F.3d at 629 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Keith has satisfied each of these three elements.
>
> The new evidence is impeaching. The evidence concerning Yezzo's psychological instability, professional integrity, and racial bias reduces the credibility of her testimony. The impeachment value of this evidence cannot be understated, particularly given that Yezzo's forensic analysis of the license plate was one of the "core" elements of the government's case against Keith. *Keith*, 551 F.3d at 558. * * *
>
> The state suppressed the evidence. The state did not disclose the evidence in Yezzo's personnel file at the time of trial. In fact, Keith did not receive this evidence until he successfully requested it in 2016. * * *
>
> Finally, viewing his current claims "in light of the evidence as a whole," 28 U.S.C. § 2244(b)(2)(B)(ii), Keith has made a *prima facie* showing that no reasonable fact finder would have found him guilty. *See In re Wogenstahl*, 902 F.3d at 629. That is to say, Keith's *Brady* claims " 'warrant a fuller exploration in the district court.' " *Id.* (quoting *In re Lott*, 366 F.3d at 433).

*In re Keith*, 2018 WL 8807240, at *7. Upon that "fuller exploration", the undersigned finds the impeachment evidence presented by Yezzo's personnel file does not prove clearly and convincingly that a reasonable jury would have been swayed to acquit Petitioner.

Initially, as the State court explained, Yezzo's testimony was less significant than Petitioner asserts:

> {¶ 11} By way of context regarding Yezzo's testimony during Keith's trial specifically, Yezzo testified via a trial deposition that was read into the record. Yezzo's testimony indicated that she had been at BCI for over 17 years, that she had testified over 200 times in 49 counties in Ohio and that she had been qualified as an expert in prior cases. Specifically regarding this case, Yezzo testified that she was able to identify the numbers "043" in the region of the purported license plate area from impressions the license plate left in the snowbank when the vehicle was stuck, and that the numbers from the plate were in an area similarly placed to what they would be on the vehicle linked to Keith. Yezzo also testified that the tire tracks left at the scene were similar in tread pattern to the pattern in a tire brochure that had been submitted to her. Other witnesses were used to establish that the tires had been recently changed on the vehicle linked to Keith.
>
> {¶ 12} However, it is also important to note that on cross-examination Yezzo indicated that she could not state with certainty that the license plate from the vehicle linked to Keith was the one that made the impression in the snow. In fact, Yezzo acknowledged that defense counsel had a list of numerous vehicles containing the sequential digits "043" from Richland and Crawford Counties alone. This supported the theory put forth by Keith's trial counsel to the jury that there were several other potential suspects, including Bruce Melton and Rodney Melton who had access to a car that had the sequential digits "043" in it.
>
> {¶ 13} Yezzo also testified on cross-examination that she analyzed sweepings taken from the vehicle linked to Keith, and found no fibers inside connecting it to the murders. As to the tire tread similarities, Yezzo testified that she could only state that the tread pattern from the impression left in the snow was "similar" to those provided to her in a brochure because she only had a partial tread design from the print. (Yezzo Depo. Tr. at 23). Finally, defense counsel was able to get Yezzo to acknowledge that Keith's footwear, which had been obtained when Keith was later arrested, did *not* match the prints left at the scene.

*State v. Keith*, 2017 WL 2729625, at *5 (footnote omitted). And, although the state court ultimately found Petitioner had not shown he was unavoidably prevented from discovering the personnel file sooner, it further explained that it could not find prejudice:

33

{¶ 38} In our own review of the matter, even if we assumed, without finding, that the State inadvertently suppressed Yezzo's personnel file, and even if we assumed that Yezzo's personnel file contained evidence favorable to Keith, we absolutely could not find in the circumstances of this case that prejudice resulted here. Keith may claim that Yezzo was a critical witness tying him to the crime, but Yezzo provided testimony regarding a license plate number that was elicited elsewhere such as through the testimony of Patrolman Edward Wilhite of the Crestline Police Department and David Barnes of BCI, and she provided limited probative testimony regarding the tires at the scene. (Tr. At 424, 478–79). In fact, Yezzo actually provided one key piece of evidence *for the defense*, being that the footprints taken from the scene did not match later-acquired footwear from Keith.

*Id.* at *10. The state court explained that "the primary testimony linking Keith to the crime was from Warren and Smathers" and "Smathers' testimony alone links Keith to the car, even if Yezzo had never testified at all in this case." *Id.* This was so, because "Smathers also testified that the dome light did not work on the car Keith was driving, and that the license plate light did not work. When the car Keith was using was seized, both of those things were found to be true, corroborating her story, and also adding credibility to Smathers' eyewitness identification." *Id.* The undersigned further notes that the photographs of what appear to be handprints on the car where Smathers' described the person she witnessed holding the car lend further credibility to her identification. *See* Doc. 20-31, at 91-92 (State's Trial Exhibits 72 and 73); (Tr. 510-11). The undersigned thus agrees with the state court's analysis of the importance of the Yezzo testimony – it was not the so-called "smoking gun" in this case, but one additional piece of evidence.

Moreover, a reasonable factfinder, even presented with this impeachment evidence, would not necessarily have completely disregarded Yezzo's testimony. This is thus, not "clear and convincing" evidence of innocence. *Cf. McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013) ("The voluminous evidence of Detective Guevara's misfeasance in other cases similarly fails to establish that McDowell was actually innocent. Even if we believed all of the allegations, they remain collateral to McDowell's case. While they may be able to establish that Detective Guevara

34

intentionally induced erroneous identifications in other cases, they cannot definitively prove he did so in McDowell's case. Rather than establishing McDowell's innocence, they tend to impeach Guevara's credibility. And latter-day impeachment evidence 'seldom, if ever, make[s] a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account . . . .'") (quoting *Sawyer v. Whitley*, 505 U.S. 333, 334 (1992)); *Munchinski v. Wilson*, 694 F.3d 308, 335 (3d Cir. 2012) (explaining that "mere impeachment evidence is generally not sufficient to show actual innocence by clear and convincing evidence", but such impeachment evidence could show innocence when it "clearly and convincingly shows that the murders could not have happened as the Commonwealth proposed at trial."). The Sixth Circuit has also repeatedly stated that impeachment evidence alone can rarely demonstrate actual innocence. *See In re Whittaker*, 2018 U.S. App. LEXIS 4804, at *3 (6th Cir.) ("Even assuming that he could not have discovered the proffered evidence sooner, we have held that new impeachment evidence does not of itself provide proof of actual innocence.") (citing *In re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001)); *In re Elliott*, 2017 U.S. App. LEXIS 22314, at *4 (6th Cir.) ("Even if we were to accept as true Elliot's allegation that the prosecution did not disclose Hendrix's use as an informant, that fact would only impeach Hendrix and would not establish Elliot's actual innocence. We have held that new impeachment evidence does not provide proof of actual innocence.") (citing *In re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001)).

Further, a reasonable factfinder presented with this evidence could have fully discounted Yezzo's testimony, and still have found Petitioner guilty. As the state appellate court recognized, Smathers' testimony (and statement) about the dome light and license plate light (in addition to her identification of Petitioner), linked Petitioner to the car observed at the scene, even without Yezzo's testimony. *See State v. Keith*, 2017 WL 2729625, at *10. Additionally, the jury had before

35

it the photographs taken at the scene of the license plate impression and tire tracks, as well as the plaster casts. *See* Doc. 20-31, at 7-8, 18-23 (State Trial Ex. 3-4, 11-15). It also had photographs of the Omega to compare to Smathers' testimony, *see* Doc. 20-31, at 15, 91-98 (State Trial Exs. 8, 72-79), and Alton Davison's testimony that he purchased new tires for his car in August 1993 and had not changed those tires, *see* Tr. 444-47, along with the brochure of the tires he purchased (Doc. 20-31, at 11-14, 24-26 (State Trial Exs. 7, 17-19)).

The evidence presented regarding Yezzo's personnel file certainly weakens some of the "core" of the State's case, and use of that information on cross-examination to impeach Yezzo might have caused a reasonable jury to discount her testimony to a degree. The weakening of her testimony correspondingly strengthens, to some degree, Petitioner's defense. However, this impeachment evidence simply does not rise to the level of "clear and convincing evidence that . . . no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Much of the "core" of the Government's case is unimpeached by any evidence relative to Yezzo, such as: Warren's testimony, Smathers' testimony, the found bullet casing, the non-Yezzo evidence related to the car, and the indictment on the drug raid as motive.

Petitioner passionately argues the limitations of each individual piece of evidence in his case. But it is not this Court's role evaluate what it would do independently if presented with such evidence as an initial trier of fact. *See Bell*, 2013 WL 1283861, at *12 ("The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."). Rather, the Court is to "to look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the constitutional violation] and then make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Indeed, many of the limitations in

the State's evidence presented that Petitioner now argues were presented to the jury at trial as set forth above. The undersigned finds that reasonable, properly instructed jurors who heard the evidence presented at trial, and the newly discovered impeachment evidence from Yezzo's personnel file, would still have convicted Petitioner.[7]

Because Petitioner cannot satisfy § 2244(b)(2)(B)(ii), he cannot pass through the successive petition gateway to obtain consideration of his underlying *Brady* claims. As such, the undersigned recommends the Petition be DISMISSED. *See* 28 U.S.C. § 2244(b)(2) (a claim that does not satisfy subsections (B)(i) and (ii) "shall be dismissed."); 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.").

Evidentiary Hearing

Petitioner, citing *Clark v. Warden*, 934 F.3d 483 (6th Cir. 2019), contends that an evidentiary hearing is required. (Doc. 38).[8] *Clark*, however, presented different circumstances than those present in the instant case. In *Clark*, Petitioner filed a successive habeas petition based on allegedly suppressed eyewitness testimony. 934 F.3d at 489. The Sixth Circuit held the district court erred in *granting* the habeas petition based on a *Brady* violation without first holding a hearing regarding the credibility of the new evidence. *Id.* at 494 ("Clark's case does not present

---

7. Before full review of the Petition, the undersigned issued an Order permitting expansion of the record to admit the report of Dr. Sunita Sah, who offered an opinion regarding the impact of the information in Yezzo's personnel file on the quality of Yezzo's work. (Doc. 41, at 15). On full review of the Petition, for the reasons set forth above, the undersigned finds the report does not speak to the question at issue, and assigns it no weight in the analysis.

8. The undersigned previously denied Petitioner's request for a hearing without prejudice. *See* Doc. 41, at 16-17.

the sort of unusual circumstances—such as a deceased affiant or a defect obvious from the record—that justified granting relief without a hearing in other cases.").

There are no such credibility issues presented in the instant case. And, as set forth above, even taking the allegedly suppressed evidence at full face value, Petitioner cannot satisfy the required successive petition "actual innocence" standard to obtain review of his successive petition. As such, Petitioner's request for an evidentiary hearing is DENIED.

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the Court recommends the Petition be DISMISSED.

s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).